# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

G&G, LLC,                    )
                             )
          Plaintiff,         )    Case No. 07-440  (SLR)
                             )
     -v-                     )
                             )
James L. Hyde, et al.,       )
                             )
          Defendants.        )

## OPENING BRIEF IN SUPPORT OF MOTION OF DEFENDANTS WALNUT INVESTMENT PARTNERS, LP, WALNUT PRIVATE EQUITY FUND, LP, THE WALNUT GROUP, BRAND EQUITY VENTURES II, LP, MILLEVERE HOLDINGS LIMITED, DAVID YARNELL, JAMES GOULD, SIMON WRIGHT, AND WALT SPOKOWSKI TO DISMISS OR STAY THIS PROCEEDING PURSUANT TO THE "FIRST TO FILE" DOCTRINE

Michael A. Weidinger (No. 3330)
Joseph S. Naylor (No. 3886)
MORRIS, JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Tel: (302) 888-6800
Fax: (302) 571-1750
mweidinger@morrisjames.com
jnaylor@morrisjames.com
Fax: (302) 571-1750
mweidinger@morrisjames.com
jnaylor@morrisjames.com

*Of Counsel*
Michael L. Scheier
Joseph L. Bruemmer
KEATING MUETHING & KLEKAMP PLL
One East Fourth St.
Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 579-6952
Fax: (513) 579-6457
mscheier@kmklaw.com
jbruemmer@kmklaw.com

*Attorneys for Defendants, Brand Equity Ventures II, LP, Walnut Investment Partners, LP Walnut Private Equity Fund, LP, The Walnut Group, Millevere Holdings Limited, David Yarnell, James Gould, Simon Wright & Walt Spokowski*

## TABLE OF CONTENTS

**NATURE AND STAGE OF PROCEEDINGS**....................................................................1

**SUMMARY OF ARGUMENT**..........................................................................................2

**STATEMENT OF FACTS**................................................................................................3

**ARGUMENT**....................................................................................................................7

    A.    The Court Should Grant the Moving Defendants' Motion
           Based on the "First-to-File" Rule .......................................................................7

    B.    Alternatively, the Court Should Stay This Suit Pending
           The Outcome of the Ohio Action...................................................................13

**CONCLUSION** .................................................................................................................17

# TABLE OF AUTHORITIES

## Cases

*Adams v. Jacobs,*
  950 F.2d 89 (2d Cir. 1991)..................................................................................... 10

*Alibaba.com v. Litecubes, Inc.,*
  No. C 03-5574, 2004 U.S. Dist. LEXIS 3492, (N.D. Cal. Mar. 8, 2004)............................. 13, 14

*Bristol Farmers Market and Auction Co. v. Arlen Realty Development Corp.,*
  589 F.2d 1214 (3rd Cir. 1978) ................................................................................. 11

*Crosley Corp. v. Hazeltine Corp.,*
  122 F.2d 925 (3d Cir. 1941)...................................................................................... 7

*EBW, Inc. v. Environ Prods., Inc.,*
  No. 1:96-cv-144 U.S. Dist. LEXIS 11922 (W.D. Mich. July 8, 1996).................................... 8, 9

*Gilbane Bldg. Co. v. Nemours Foundation,*
  606 F. Supp. 995 (D. Del. 1985)............................................................................... 12

*Gries v. Std. Ready Mix Concrete, L.L.C.,*
  No. C07-4013, 2007 U.S. Dist. LEXIS 48656 (N.D. Iowa July 3, 2007) .................................. 8

*Maverick Tube, LP v. Westchester Surplus Lines Ins. Co.,*
  No. 4:07 CV 298 U.S. Dist. LEXIS 66537 (E.D. Mo. August 6, 2007)..................................... 8

*McCain v. Rahal Letterman Racing, LLC,*
  No. 07 Civ. 5729 U.S. Dist. LEXIS 63091 (S.D.N.Y. Aug. 24, 2007) ...................................... 8

*Metallgesellschaft AG v. Foster Wheeler Energy Corp.,*
  143 F.R.D. 553 (D. Del. 1992) ................................................................................. 12

*Pegasus Dev. Corp. v. DirectTV, Inc.,*
  2003 U.S. Dist. LEXIS 8052 (D. Del. May 14, 2003)........................................................ 14

*Plating Resources, Inc. v. UTI Corporation,*
  47 F. Supp. 2d 899 (N.D. Ohio 1999).......................................................................... 8

*RJF Holdings III, Inc. v. Refractec, Inc.,*
  No. 03-1600, 2003 U.S. Dist. LEXIS 22144 (E.D. Pa. 2003) ............................................... 14

*SAS Inst., v. PracticingSmarter, Inc.,*
  353 F. Supp. 2d 614 (M.D.N.C. 2005.......................................................................... 11

*Sega of America, Inc. v. Signal Apparel Company*,
   1997 WL 414196 (N.D. Ca. July 14, 1997)................................................................. 11

*Southern Constr. Co. v. Pickard*,
   371 U.S. 57 (1962)...................................................................................................... 11

*Time Warner Cable, Inc. v. GPNE Corp.*,
   2007 U.S. Dist. LEXIS 52655 (D. Del. July 20, 2007) .................................... 1, 7, 9, 16

*Walnut Investment Partners, L.P. et al. v. G&G, LLC et al.*,
   Case No. 1:07-cv-380 (S.D. Ohio).............................................................................. 3

*Wolf Designs, Inc., v. McEvoy LTD., Inc.*,
   341 F. Supp. 2d 639 (N.D. Tex. 2004) ......................................................... 13, 14, 15

*Xerox Corp. v. SCM Corp.*,
   576 F.2d 1057 (3d Cir. 1978)...................................................................................... 12

*Zide Sport Shop of Ohio, Inc. v. Ed Tobergate Assocs.*,
   16 Fed. Appx. 433 (6th Cir. 2001)............................................................................... 7

## Statutes and Other Authorities

Fed. R. Civ. P. 13(a) .................................................................................................... 11
Fed. R. Civ. P. 13-14; *supra* Part II.A.3 ...................................................................... 15
28 U.S.C. § 1404(a) ...................................................................................................... 15
WRIGHT, MILLER, & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1410 (1990) ....... 12
WRIGHT, MILLER, & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1418 (1990) ....... 11

## NATURE AND STAGE OF PROCEEDINGS

On July 13, 2007, Plaintiff G&G, LLC filed their Complaint in this action. On August 30, 2007, Plaintiff filed their Amended Complaint.

Defendants Walnut Investment Partners, LP ("WIP"), Walnut Private Equity Fund, LP ("WPEF"), The Walnut Group, Brand Equity Ventures II, LP ("BEV"), Millevere Holdings Limited ("Millevere") (WIP, WPEF, The Walnut Group, BEV, and Millevere are collectively referred to as the "Investor Defendants"), David Yarnell, James Gould, Simon Wright, and Walt Spokowski (Yarnell, Gould, Wright, and Spokowski are collectively referred to as the "Director/Officer Defendants") submit this Memorandum in Support of their separately filed Motion to Dismiss or Stay this case pursuant to the "first-to-file" doctrine recognized by the Third Circuit, and most recently applied in this judicial district in *Time Warner Cable, Inc. v. GPNE Corp.*, 2007 U.S. Dist. LEXIS 52655, at *9 (D. Del. July 20, 2007).[1]

Throughout this Memorandum, we will collectively refer to the Investor Defendants and the Director/Officer Defendants as the Moving Defendants.

---

[1] The Director/Officer Defendants and Millevere have also filed a separate motion to dismiss G&G's Amended Complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). *See* Motion of Defendants David Yarnell, James Gould, Simon Wright, Walt Spokowski, and Millevere Holdings Limited to Dismiss Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(2) (filed September 21, 2007). If the Court were to grant that motion, those parties would no longer be relevant to the Court's analysis of the arguments raised in this Motion and memorandum.

## SUMMARY OF ARGUMENT

The Court should grant the moving Defendants' motion based on the first-to-file rule because the Delaware and Ohio Actions share the same set of operative facts, and the Delaware action was filed nearly two months after WIP, WPEF, and BEV filed the Ohio Action. For example, in the Ohio Action, WIP, WPEF, and BEV allege that G&G and Mr. Gourley fraudulently induced them to make the March 3, 2005 Investment and the September 2005 Loan. In the instant action, G&G alleges that the March 3, 2005 Investment and the September 2005 Loan were part of the Moving Defendants' alleged scheme to defraud G&G. Moreover, G&G's claims against WIP, WPEF, and BEV are compulsory counterclaims that G&G should be asserted in the Ohio Action.

As an alternative to dismissing this litigation, the Court may stay the proceedings pending resolution of the Ohio Action. When related cases are pending in two federal courts, a court has the power to stay the proceedings before it in deference to the related action. Here, a stay is appropriate because it would not unduly prejudice or present a clear tactical disadvantage to the non-moving party, it will simplify the issues and proceedings, and the litigation is still at its earliest stage.

## STATEMENT OF FACTS

### This Case and the Ohio Action Arise From the Same Set of Facts.

On May 15, 2007, a number of the Defendants in this case filed a lawsuit against the

Plaintiff in this case, G&G, and its principal Trent Gourley, in the United States District Court

for the Southern District of Ohio. That case is styled *Walnut Investment Partners, L.P. et al. v.*

*G&G, LLC et al.*, Case No. 1:07-cv-380 (S.D. Ohio) (Weber, J.) ("Ohio Action"). This case and

the Ohio Action arise out of the same sets of facts, transactions and circumstances involving the

same individuals and entities. Those facts follow.

In February 2005, a Utah corporation known as The LoveSac Corporation ("LoveSac

Utah") merged with a Delaware corporation called The LoveSac Corporation ("LoveSac

Delaware"). (D.I. 19, G&G Amended Complaint, ¶50). The surviving entity from that merger

(the "Merger") was LoveSac Delaware. (*Id.*)

Since 2003, long before the Merger, G&G was a lender to LoveSac Utah. (Ohio

Amended Complaint, ¶ 12).[2] On October 30, 2003, G&G extended a $2.8 million revolving line

of credit ("Line of Credit") to LoveSac Utah, which was secured by a Revolving Credit Line

Deed of Trust Note ("Note") and a first priority security interest in various real and personal

property, including LoveSac Utah's inventory. (D.I. 19, G&G Amended Complaint, ¶¶ 29-31).

In addition, G&G received a secured personal guaranty of a number of individuals associated

with LoveSac Utah. (*Id.*, ¶ 32) Those guaranties were secured by pledges of the guarantors'

stock shares in LoveSac Utah. (*Id.*, ¶¶ 33-34) After various extensions, the Line of Credit was

set to expire on November 1, 2005. (Ohio Amended Complaint, ¶ 13).

In or about November 2004, the Investor Defendants, who are venture capital firms

---

[2] The First Amended Complaint in the Ohio Action will be referred to in this memorandum as the "Ohio Amended Complaint." A true and accurate copy of the Ohio Amended Complaint is attached as Exhibit 1 to the Affidavit of Michael L. Scheier, Esq., which is attached hereto as Exhibit A.

offering non-traditional debt and equity financing to companies, were considering an investment in LoveSac's business. (*Id.*, ¶ 11). As a condition for making this investment, the Investor Defendants required that the entity in which they might invest be a Delaware corporation. LoveSac Utah agreed with this condition, and LoveSac Delaware was incorporated in December 2004. LoveSac Utah merged with LoveSac Delaware in February 2005. (D.I. 19, G&G Amended Complaint, ¶ 50). As noted above, the entity surviving the Merger was LoveSac, Delaware. The Investor Defendants ultimately invested in LoveSac Delaware.

Prior to agreeing to the investment, the Investor Defendants conducted a due diligence investigation of LoveSac's business through which they discovered LoveSac Utah's line of credit with G&G. (Ohio Amended Complaint, ¶ 12). The Line of Credit provided LoveSac Utah with a source of funds, and the Investor Defendants believed that LoveSac Utah would need to keep the full amount of the Line of Credit in place even after a potential investment from the Investor Defendants to ensure that the new Delaware entity would have a sufficient amount of money to operate its business. (*Id.*, ¶ 14).

Consequently, on February 28, 2005, the Investor Defendants' representative, John Bernloehr, telephoned G&G's principal, Trent Gourley, to discuss the Investor Defendants' potential investment in LoveSac and to request that G&G keep the Line of Credit in place after its November 1, 2005 maturity date. (*Id.*, ¶ 15). Mr. Gourley agreed that G&G would extend the Line of Credit indefinitely on the same terms as long as LoveSac stayed current on its interest payments under the Note. (*Id.*, ¶ 16). Although Mr. Bernloehr requested that Mr. Gourley execute a written amendment to the Note memorializing this agreement ("February 2005 Oral Agreement"), Mr. Gourley declined and represented that G&G would abide by the oral agreement. (*Id.*).

In direct reliance on G&G's and Mr. Gourley's representations and the February 2005 Oral Agreement, the Investor Defendants invested $10.5 million in LoveSac Delaware after the Merger on March 3, 2005 ("March 3, 2005 Investment"). (*Id.*, ¶ 17). The Investor Defendants again relied on G&G's representations and the February 2005 Oral Agreement in September 2005, when they loaned an additional $3 million to LoveSac ("September 2005 Loan"). (*Id.*, ¶ 18).

In October 2005, with little more than a month left before the Note came due, G&G contacted LoveSac to see if it was still interested in extending the Line of Credit past the November 1, 2005 maturity date. (*Id.*, ¶ 21). LoveSac responded that it was so interested. (*Id.*). G&G's attorney then sent LoveSac a letter outlining the terms of the proposed extension. (*Id.*, ¶ 22). The terms contained in this letter differed materially from the terms of the February 2005 Oral Agreement, in that G&G offered to extend the Line of Credit only if it was reduced from $2.8 million to $1.5 million. (*Id.*, ¶ 23). The Investor Defendants, through Mr. Bernloehr, and LoveSac repeatedly pressed G&G over the following weeks to abide by the terms of the February 2005 Oral Agreement, but to no avail. (*Id.*, ¶¶ 24-27). G&G refused to honor that agreement, and LoveSac had no time to locate another lender. LoveSac was therefore forced to accept an extension of the Line of Credit only in the amount of $1.5 million, and only until May 1, 2006, rather than indefinitely, as G&G had originally promised. (*Id.*, ¶ 24-28).

It was about this time that G&G was notified that its borrower, LoveSac Utah, merged into LoveSac Delaware. (D.I. 19, G&G Amended Complaint, ¶ 78 (explaining that G&G received a Corporate Resolution in connection with the loan amendment identifying LoveSac as a Delaware corporation). G&G, however, failed to protect its security interests by filing financing statements with the relevant authorities in Delaware.

The reduction in the amount and duration of the Line of Credit were devastating and precipitated LoveSac Delaware's decline into bankruptcy, which caused the Investor Defendants to lose their investment in and loan to LoveSac Delaware. (Ohio Amended Complaint, ¶ 29). Also, because G&G failed to file financing statements in Delaware, its security interest in certain assets was not perfected, and G&G was treated as an unsecured creditor in the LoveSac Delaware bankruptcy. (D.I. 19, G&G Amended Complaint, ¶ 84).

These facts form the basis of the Ohio Action and this action. In the Ohio Action, three of the Investor Defendants – WIP, WPEF, and BEV – allege that G&G and Mr. Gourley fraudulently induced WIP, WPEF, and BEV to invest in LoveSac on March 3, 2005 and to loan money to LoveSac Delaware in September 2005 by misrepresenting that they would extend the Line of Credit on the same terms. (Ohio Amended Complaint, ¶¶ 30-41). WIP, WPEF, and BEV further alleged that G&G and Mr. Gourley breached the February 2005 Oral Agreement. (*Id.*, ¶¶ 42-46).[3]

On July 13, 2007, nearly two months after WIP, WPEF, and BEV filed the Ohio Action, G&G filed this lawsuit, alleging a variety of claims for fraud, conspiracy, and negligence against the Moving Defendants. (D.I. 1, G&G Complaint).[4] Those claims arise from the same series of events, transactions and circumstances as the Ohio Action, with the alleged participation of the same individuals and entities.[5]

---

[3] The complaint in the Ohio Action was amended on August 3, 2007. Those amendments are not relevant to the issues addressed in this Motion.

[4] The Ohio Action was filed on May 15, 2007, as evidenced by the original Complaint in that action. A true and accurate copy of the original Complaint in the Ohio Action is attached as Exhibit 2 to the Affidavit of Michael L. Scheier, Esq., which is attached as Exhibit A.

[5] G&G also asserts a variety of claims against Wilson, Sonsini, Goodrich, & Rosati, PC ("Wilson Sonsini") and Lily C. Wong Langen, the attorneys who represented LoveSac Utah in connection with the March 3, 2005 Investment and the Merger, which essentially allege that those individuals were negligent in failing to inform G&G of the Merger and related events and in misrepresenting that LoveSac Utah was a going concern after the Merger.

## ARGUMENT

### A.    The Court Should Grant the Moving Defendants' Motion Based on the "First-to-File" Rule.

#### 1.    The First-to-File Rule Applies.

For over 60 years, the United States Court of Appeals for the Third Circuit has recognized the "first-to-file" rule. *See Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3d Cir. 1941). The court declared that "in all cases of federal concurrent jurisdiction, the court which first has possession of the subject must decide it." *Id.* (*quoting Smith v. McIver*, 22 U.S. (9 Wheat.) 532 (1824)).

The Sixth Circuit also embraces the first-to-file rule. That court has stated that "when actions involving nearly the identical parties and issues are filed in two different courts, the court in which the first law suit was filed should generally proceed to judgment." *Zide Sport Shop of Ohio, Inc. v. Ed Tobergate Assocs.*, 16 Fed. Appx. 433, 437 (6th Cir. 2001).

The District of Delaware has recently stated that "the first-to-file rule gives courts the power to dismiss subsequent claims involving the same parties and same issues already before another court. [It] reduces the possibility of dispositive differences between the jurisdictions and ensures that litigants receive a single determination of their controversy, rather than multiple decisions which may conflict and require separate appeals. Additionally, the rule 'helps to avoid the waste involved in duplicative suits, and the delay in providing prompt administrative justice.' While the decision is left to the court's discretion, the first-to-file rule 'has served to counsel trial judges to exercise their discretion by enjoining the subsequent prosecution of 'similar cases... in different federal district courts.'" *Time Warner Cable, Inc. v. GPNE Corp.*, Case No. 07-67-MPT, 2007 U.S. Dist. LEXIS 52655, at *9 (D. Del. July 20, 2007) (internal citations omitted).

---

(*Id.*, ¶¶ 106-121, 138-198). We suggest that the claims against Wilson Sonsini be severed and should remain in this Court.

Thus, the first-to-file rule encourages sound judicial administration and promotes comity among federal courts of equal rank.

> 2.    The First-to-File Rule Does Not Require Identical Parties to Both Actions—Just the Same Set of Facts.

Although the Ohio Action does not include the former directors and officers of LoveSac Delaware, the first-to-file rule is applicable because it does not require that both actions involve identical parties. *EBW, Inc. v. Environ Prods., Inc.*, No. 1:96-cv-144, 1996 U.S. Dist. LEXIS 11922, at \*9 (W.D. Mich. July 8, 1996) ("[A] precise identify of parties is simply not required."). Put differently, the first-to-file rule is properly invoked when two suits involve "substantially the same parties." *Plating Resources, Inc. v. UTI Corporation*, 47 F. Supp. 2d 899, 903 (N.D. Ohio 1999) (*citing Barber-Greene Co. v. Blaw Knox Co.*, 239 F.2d 774, 778 (6th Cir. 1957)); *see also McCain v. Rahal Letterman Racing, LLC*, No. 07 Civ. 5729, 2007 U.S. Dist. LEXIS 63091, at \*7 (S.D.N.Y. Aug. 24, 2007) (stating that for the first-filed rule to be invoked, there must be "actions involving substantially or effectively the same parties and issues"); *Maverick Tube, LP v. Westchester Surplus Lines Ins. Co.*, No. 4:07 CV 298, 2007 U.S. Dist. LEXIS 66537, at \*4-5 (E.D. Mo. August 6, 2007) (stating that for the first-filed rule to apply, the cases need "substantially the same parties litigat[ing] substantially the same issues in different forums" (citing *Scottsdale Ins. Co. v. Detco Indus., Inc.*, 426 F.3d 994, 997 (8th Cir. 2005))); *Gries v. Std. Ready Mix Concrete, L.L.C.*, No. C07-4013, 2007 U.S. Dist. LEXIS 48656, at \*9 (N.D. Iowa July 3, 2007) (stating, while analyzing the first-to-file rule, that suits need to be parallel, and that suits are considered parallel "if substantially the same parties litigate substantially the same issues in different forums" (*citing Dittmer v. County of Suffolk*, 146 F.3d 113, 118 (2d Cir. 1998))).

As this Court recently explained, the significant inquiry when applying the first-to-file rule is the subject matter of the proceedings, not the identity of the parties. *Time Warner Cable, Inc.*, 2007 U.S. Dist. LEXIS 52655, at *10-11 (*citing APV N. AM., Inc., v. Sig Simonazzi N. Am., Inc.*, 295 F.Supp.2d 393, 396 (D. Del. 2002)). The rule simply requires that the two actions be based upon the "same set of facts." *EBW*, 1996 U.S. Dist. LEXIS 11922, at *9; *see also Time Warner Cable, Inc.*, 2007 U.S. Dist. LEXIS 52655, at *10-11.

This Court's recent holding in *Time Warner Cable* is instructive. In that case, GPNE filed a patent infringement case in the Eastern District of Texas against Time Warner, Inc., Comcast Cable Communications LLC, and Charter Communications, Inc. *Time Warner Cable*, 2007 U.S. Dist. LEXIS 52655, at *1. The Texas litigation did not originally include Time Warner Cable, Inc. as a defendant. *Id.* at *2. Two days later, Time Warner Cable, Inc. filed suit in the District of Delaware, asking the court for a declaratory judgment of non-infringement and invalidity of the patent in dispute. *Id.* Three weeks after that, GPNE amended its complaint to add Time Warner Cable, Inc. as a defendant. *Id.* GPNE then moved in the District of Delaware for a dismissal, stay, or a transfer of the matter to Texas in the interests of justice and judicial economy. *Id.*

GPNE argued that the Delaware action should be dismissed because the Texas court was the first court to obtain possession of the subject of the dispute (the validity or invalidity of the patent in question). *Id.* at *4. Time Warner Cable, Inc. also relied on the first-to-file rule, but claimed it mandated dismissal of the Texas action, because Delaware allegedly "prevents duplicative litigation only where the *same* issues arise between the *same* parties." *Id.* at *5 (emphasis in original). The Court flatly rejected Time Warner Cable, Inc.'s argument and ruled in favor of GPNE. *Id.* at *8, *10-13. In doing so, the Court explained that Time Warner Cable's

argument was inconsistent with both Third Circuit and District of Delaware law, which require only that two cases involve the same set of facts, not identical parties, for the first-to-file rule to apply. *Id.* at \*10-13. Accordingly, the Court dismissed the Delaware action.

In light of this decision, there can be no doubt that this case should be dismissed, as it and the Ohio Action share the same set of underlying facts. In the Ohio Action, WIP, WPEF, and BEV allege that G&G and Mr. Gourley fraudulently induced them to make the March 3, 2005 Investment and the September 2005 Loan. (*See generally* Ohio Amended Complaint). In the instant action, G&G alleges that the March 3, 2005 Investment and the September 2005 Loan were part of the Moving Defendants' alleged scheme to defraud G&G. (*See generally* D.I. 19, G&G Amended Complaint). The closely interrelated nature of these allegations and the facts upon which they are based is apparent. The Delaware suit should, therefore, be dismissed in favor of the previously filed Ohio Action.

> 3. G&G Must Bring Its Compulsory Counterclaims and Could Bring Third-Party Claims in Ohio.

Additionally, in light of WIP's, WPEF's, and BEV's first-filed complaint in Ohio, G&G must bring its compulsory counterclaims in that forum, and not institute a new action in another venue.

A federal court should not hear a claim that is a compulsory counterclaim in an earlier filed federal action. *Adams v. Jacobs*, 950 F.2d 89, 92 (2d Cir. 1991). When a federal court action involves a claim that should be a compulsory counterclaim in another pending federal action, the court should either dismiss or stay the second-filed action. *Id.* at 92, 94 (holding that where guarantees and a merger agreement that were the subject of two lawsuits in different federal jurisdictions arose out of the "same transaction or occurrence," the claims asserted in the second-filed suit were compulsory counterclaims that should have been brought in the first-filed

action, and remanding so that district court presiding over the second-filed suit could dismiss); *SAS Inst., v. PracticingSmarter, Inc.*, 353 F. Supp. 2d 614, 619 (M.D.N.C. 2005) (holding that claims in second-filed action were compulsory counterclaims to the first-filed action because the claims arose out of the same "transaction or occurrence," and granting the motion to dismiss). As a leading treatise notes, "[O]nce a court becomes aware that an action on its docket involves a claim that should be a compulsory counterclaim in another pending federal suit, it will stay its own proceedings or will dismiss the claim with leave to plead it in the prior action." WRIGHT, MILLER, & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1418 (1990). The rationale underlying this rule is that it is not for the second court, or the defendant in the first action, to determine the choice of forum. See *Sega of America, Inc. v. Signal Apparel Company*, 1997 WL 414196, at *1 (N.D. Ca. July 14, 1997). The claims asserted by G&G in this action against the Ohio plaintiffs are disguised compulsory counterclaims, and the Court need look no further than Federal Rule 13 for guidance.

Federal Rule of Civil Procedure 13(a) states:

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Fed. R. Civ. P. 13(a).[6] The Third Circuit has endorsed a liberal interpretation of the "transaction or occurrence" standard in Rule 13(a); the key question is whether the counterclaim bears a logical relationship to an opposing party's claim. *Xerox Corp. v. SCM Corp.*, 576 F.2d 1057,

---

[6] Rule 13(a) was designed to prevent multiplicity of lawsuits and to resolve in one action all disputes arising from a single transaction. *Southern Constr. Co. v. Pickard*, 371 U.S. 57, 60 (1962). "The Rule was particularly directed against one who failed to assert a counterclaim in one action and then instituted a second action in which that counterclaim became the basis of the complaint." *Id.*; see also, *Bristol Farmers Market and Auction Co. v. Arlen Realty Development Corp.*, 589 F.2d 1214, 1220 (3rd Cir. 1978) (compulsory counterclaim which is not raised in first action is barred in subsequent litigation). The filing of a second action in these circumstances directly contravenes the purpose of Rule 13(a). *Adam*, 950 F.2d at 93.

1059 (3d Cir. 1978). In assessing whether a "logical relationship" exists between a counterclaim and an opposing party's claim, the court must answer three questions: (1) are the legal and factual issues raised largely the same; (2) would *res judicata* bar a subsequent suit on defendant's claims absent the compulsory counterclaim rule; and (3) will substantially the same evidence support or refute plaintiff's claim and defendant's counterclaims. *Metallgesellschaft AG v. Foster Wheeler Energy Corp.*, 143 F.R.D. 553, 558 (D. Del. 1992). "When the same conduct serves as the basis for both the claims and counterclaims, the logical relationship standard also has been satisfied." WRIGHT, MILLER, & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1410 at 68 (1990); *see also Gilbane Bldg. Co. v. Nemours Foundation*, 606 F. Supp. 995, 997 (D. Del. 1985) (applying the "logical relationship" standard to conclude that defendant's claim arising from the same contract upon which the plaintiff had sued was a compulsory counterclaim).

In this case, the claims asserted by G&G in the Delaware litigation are "logically related" to WIP's, WPEF's, and BEV's claims in the Ohio litigation. First, the claims in both actions focus on a single series of factual events – namely, G&G's loan to LoveSac Utah and the associated security interests, G&G's perfection of those security interests in Utah, the Merger, notice to G&G of the Merger, G&G's failure to perfect certain of its security interests in Delaware after the Merger, and Wilson Sonsini's notice to G&G of the Merger, the March 3, 2005 Investment, the September 2005 Loan, and the circumstances and occurrences surrounding those transactions.

Second, the evidence and discovery in both the Ohio Action and this case will be identical, and most of the Defendants in this case will be witnesses in the Ohio Action. By way of example, the parties to both actions will need to take document and deposition discovery of

the Director/Officer Defendants, individual representatives of the Investor Defendants, Mr. Gourley, a representative of G&G, Ms. Langen, and other attorneys at Wilson Sonsini.

Based on the foregoing, G&G's claims against WIP, WPEF, and BEV are compulsory counterclaims that G&G should have asserted in the Ohio Action. Accordingly, this case should be dismissed without prejudice in favor of the Ohio Action.[7]

### B.   Alternatively, the Court Should Stay This Suit Pending the Outcome of the Ohio Action.

As an alternative to dismissing this litigation, the Court may stay the proceedings pending resolution of the Ohio Action.

A court has the "inherent power to conserve judicial resources by controlling its own docket." *Zoetics*, 2006 U.S. Dist. LEXIS 46910, at *3 (*quoting Cost Bros., Inc. v. Travelers Indem. Co.*, 760 F.2d 58, 60 (3d Cir. 1985)). Specifically, when related cases are pending in two federal courts, a court has the power to stay the proceedings before it in deference to the related action. *Wolf Designs, Inc., v. McEvoy LTD., Inc.*, 341 F. Supp. 2d 639, 642 (N.D. Tex. 2004); *Alibaba.com v. Litecubes, Inc.*, No. C 03-5574, 2004 U.S. Dist. LEXIS 3492, at *4 (N.D. Cal. Mar. 8, 2004) ("[D]istrict courts have long retained substantial discretion to stay civil actions where 'it is efficient for [the court's] docket and [where it is] the fairest course...pending resolution of independent proceedings which bear upon the case.'" (*quoting Yong v. I.N.S.*, 208 F.3d 1116 (9th Cir. 2000)) (alterations and omission in original)). As the *Wolf Designs* court observed:

> The federal courts have long recognized that the principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs. "As between federal district courts, ... the general principle is to avoid the duplicative litigation." The

---

[7] In addition to the compulsory counterclaims that G&G should have asserted in the first-filed Ohio litigation, G&G should have filed third-party claims against the other defendants in the Ohio Action. Accordingly, G&G can litigate all of its claims and defenses in Ohio.

> concern manifestly is to avoid waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result. To avoid these ills, a district court may [stay] an action where the issues presented can be resolved in an earlier filed action pending in another district court.

*Wolf Designs*, 341 F. Supp. 2d at 643 (*quoting West Gulf Maritime Association v. IL Deep Sea Local 24*, 751 F.2d 721, 728-729 (5th Cir. 1985)).

In ruling on a motion to stay, courts are guided by a variety of factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Pegasus Dev. Corp. v. DirectTV, Inc.*, 2003 U.S. Dist. LEXIS 8052, at *3-4 (D. Del. May 14, 2003) (*quoting Xerox Corp. v. 3Comm Corp.*, 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999)). In addition, where two similar actions have been filed in different federal courts, courts look to the "'first-to-file' rule to determine is a stay of the latter-filed action is appropriate." *Alibaba.com*, 2004 U.S. Dist. LEXIS 3492, at *5; *see also RJF Holdings III, Inc. v. Refractec, Inc.*, No. 03-1600, 2003 U.S. Dist. LEXIS 22144 (E.D. Pa. 2003) (court granting motion to stay of second-filed action so that first-filed action in California may proceed). In this context, the first-to-file rule counsels that stays are typically appropriate where (1) the action to be stayed was filed after the filing of the related action and (2) the two actions involving significantly similar parties and issues. *Alibaba.com*, 2004 U.S. Dist. LEXIS 3492, at *5. These considerations all weigh in favor of the first-filing parties, WIP, WPEF, and BEV.

First, G&G cannot claim that they would be prejudiced or tactically disadvantaged if a stay is entered here, because G&G will have the opportunity to litigate its claims in the earlier-filed Ohio Action. It can, and indeed must, assert whatever claims it has against WIP, WPEF, and BEV as compulsory counterclaims in that proceeding, and can assert its claims against the

remainder of the Moving Defendants through a third-party complaint. *See* Fed. R. Civ. P. 13-14; *supra* Part II.A.3. G&G also cannot claim prejudice because there has been hardly any progress in this case. Answers have not been filed, initial disclosures have not been served, and no discovery has been taken. Scheier Aff, ¶ 2; *see generally* D.I. The only papers that have been filed in this suit, apart from the Complaint and Amended Complaint, are the Moving Defendants' motions to dismiss. *See generally* D.I. Given the nascent stage of this litigation, G&G would not suffer any adverse consequences if it were stayed.

Second, it is facially apparent that a stay in this action would simplify the issues and proceedings. If the Court were to suspend this action, there would be only one lawsuit moving forward, and it would be in the court that took original jurisdiction over the common subject of the parties' dispute. The complexities and burdens that would ensue from proceeding with two actions simultaneously would be eliminated. For example, common witnesses would not be subjected to multiple depositions, duplicative document discovery would be curtailed, the ever-present risk of inconsistent decisions in the two actions would cease to exist, and the parties would only have to proceed with one trial instead of two.

Third, as discussed above, this suit has not proceeded past the motion-to-dismiss stage. No discovery has been exchanged and no trial date has been set. Scheier Aff., ¶ 2; *see generally* D.I. A stay, therefore, would neither impede judicial efficiency nor waste the Court's resources.

Finally, as discussed above, the Ohio Action was filed almost two months before this action, and involves substantially the same facts. *See supra* Part I. Concerns of comity, as embodied in the first-to-file rule, therefore strongly suggest that the present action should be stayed.[8] *Wolf Designs*, 341 F. Supp. 2d at 643 (noting that first-to-file rule promotes comity by

---

[8] A third option available to the Court would be to transfer the instant action to the Southern District of Ohio pursuant to 28 U.S.C. § 1404(a) so that it and the Ohio Action could be heard by the same court.

allowing district court to stay action in favor of earlier-filed federal action); *Time Warner Cable*, 2007 U.S. Dist. LEXIS 52655, at *9 ("[T]he first-to-file rule 'has served to counsel trial judges to exercise their discretion by enjoining the subsequent prosecution of similar cases in...different federal district courts.'" (quoting *E.E.O.C. v. Univ. of Penn.*, 850 F.2d 969, 971 (3d Cir. 1988)) (omission in original)).

## CONCLUSION.

For the foregoing reasons, the Court should grant the Motion to Dismiss or Stay this litigation in favor of the first-filed action in Ohio.

September 21, 2007

Michael A. Weidinger (No. 3330)
Joseph S. Naylor (No. 3886)
MORRIS, JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Tel: (302) 888-6800
Fax: (302) 571-1750
mweidinger@morrisjames.com
jnaylor@morrisjames.com
Fax: (302) 571-1750
mweidinger@morrisjames.com
jnaylor@morrisjames.com

-and-

Michael L. Scheier (0055512)
Joseph L. Bruemmer (0079120)
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 579-6952
Fax: (513) 579-6457
mscheier@kmklaw.com
*Attorney for Defendants,*
*Brand Equity Ventures II, LP, Walnut*
*Investment Partners, LP, Walnut Private*
*Equity Fund, LP, The Walnut Group, Millevere*
*Holdings Limited, David Yarnell, James*
*Gould, Simon Wright, & Walt Spokowski*

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

G&G, LLC,                                    )    Case No. 07-440
                                             )
                    Plaintiff,               )    (Judge Sue L. Robinson)
                                             )
       -v-                                   )
                                             )
James L. Hyde, et al.,                       )
                                             )
                    Defendants.              )

## AFFIDAVIT OF MICHAEL L. SCHEIER

I, Michael L. Scheier, affirm and state as follows:

1.      I am an attorney with the law firm of Keating Muething & Klekamp PLL. I am a member of the Bar in the State of Ohio. I have been admitted *pro hac vice* in this Court to represent defendants Walnut Investment Partners, L.P., Walnut Private Equity Fund, L.P., The Walnut Group, Brand Equity Ventures II, L.P., Millevere Holdings Limited, David Yarnell, James Gould, Simon Wright, and Walt Spokowski in the above-captioned action. I make this declaration based on my personal knowledge.

2.      Discovery has not yet begun between my clients and plaintiff G&G, L.L.C. in the above-captioned action, nor has the period to exchange initial disclosures under Federal Rule of Civil Procedure 26(a) been triggered.

3.      I am an attorney for the plaintiffs, Walnut Investment Partners, L.P., Walnut Private Equity Fund, L.P., and Brand Equity Ventures II, L.P., in a case styled, *Walnut Investment Partners, L.P., et al. v. G&G L.L.C. et al.*, filed in the United States District Court, Southern District of Ohio, Western Division, under Case No. 1:07-cv-380.

4.      Attached as Exhibit 1 is a true and correct copy of the Complaint filed May 15, 2007, in the case styled *Walnut Investment Partners, L.P., et al. v. G&G L.L.C. et al.*

5.    Attached as Exhibit 2 is a true and correct copy of the Amended Complaint filed

August 3, 2007, in the case styled *Walnut Investment Partners, L.P., et al. v. G&G L.L.C. et al.*


FURTHER AFFIANT SAYETH NAUGHT

_____
Michael L. Scheier


STATE OF *Ohio*        :
                       : ss
COUNTY OF *Hamilton*   :

Sworn to before me and subscribed in my presence this 21st day   of   September,

2007 by Michael L. Scheier.

_____
Notary Public


**MARGARET VOLLMAN**
Notary Public, State of Ohio
My Commission Expires June 28, 2009

**1**

Michael L. Scheier (0055512)
Robert G. Sanker (0039040)
Joseph L. Bruemmer (0079120)
Attorneys For Plaintiffs,
Walnut Investment Partners, L.P., Walnut Private
Equity Fund, L.P., and Brand Equity Ventures II, L.P.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION
## AT CINCINNATI

| | |
|---|---|
| Walnut Investment Partners, L.P.<br>312 Walnut Street, Suite 1151<br>Cincinnati, OH 45202; | )  Case No. 1:07-cv-380<br>)<br>)  (Judge Weber) |
| - and - | ) |
| Walnut Private Equity Fund, L.P.<br>312 Walnut Street, Suite 1151<br>Cincinnati, OH 45202; | )  **FIRST AMENDED COMPLAINT FOR**<br>)  **MONEY DAMAGES WITH DEMAND**<br>)  **FOR JURY TRIAL** |
| - and - | ) |
| Brand Equity Ventures II, L.P.<br>One Stamford Plaza<br>263 Tresser Blvd., 16th Floor<br>Stamford, CT 06901 | )<br>)<br>) |
| Plaintiffs, | ) |
| -v- | ) |
| G&G, L.L.C.<br>8756 Lewinsville Rd.<br>McLean, VA 22102 | )<br>)<br>) |
| **Serve Statutory Agent**<br>Chris Beatley<br>221 S. Fayette Street<br>Alexandria, VA 22313 | )<br>)<br>) |
| - and - | ) |
| Trent Gourley<br>8756 Lewinsville Rd.<br>McLean, VA 22102 | )<br>)<br>) |
| Defendants. | ) |

Now come plaintiffs Walnut Investment Partners, L.P. ("WIP"), Walnut Private Equity Fund, L.P. ("WPEF"), and Brand Equity Ventures II, L.P. ("BEV") (WIP, WPEF, and BEV collectively "Investors"), and for their first amended complaint against defendants G&G, L.L.C. ("G&G") and Trent Gourley ("Mr. Gourley") (G&G and Mr. Gourley are sometimes collectively referred to as "Defendants") state as follows:

### NATURE OF THE ACTION

1.    This is an action to recover money damages sustained by the Investors as a result of the Defendants' fraudulent misrepresentations and breach of a binding oral contract with the Investors. Defendants made these misrepresentations to, and entered into this contract with, individuals in Ohio. As a direct and proximate result of Defendants' misconduct, the Investors have been damaged in an amount in excess of $9,000,000.00, to be proven at trial.

### JURISDICTION AND VENUE

2.    Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332(a)(1) because this action is between citizens of different states and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00).

3.    This Court has personal jurisdiction over G&G because G&G has transacted business in this state, has an interest in real property in this state, and has committed torts that it foresaw or reasonably should have foreseen would cause injury to persons in this state.

4.    This Court has personal jurisdiction over Mr. Gourley because Mr. Gourley has transacted business in this state on behalf of G&G and has committed torts that he foresaw or reasonably should have foreseen would cause injury to persons in this state.

5.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district, because

Defendants are subject to personal jurisdiction in this district, and because the Investors suffered injury in this district.

## PARTIES

6.      WIP is a Delaware limited partnership with its principal place of business at 312 Walnut Street, Suite 1151, Cincinnati, Ohio 45202.

7.      WPEF is a Delaware limited partnership with its principal place of business at 312 Walnut Street, Suite 1151, Cincinnati, Ohio 45202.

8.      BEV is a Connecticut limited partnership with its principal place of business at One Stamford Plaza, 263 Tresser Boulevard, 16th Floor, Stamford, Connecticut 06901.

9.      G&G is a Virginia limited liability company with its principal place of business at 8756 Lewinsville Road, McLean, Virginia 22102.

10.      Mr. Gourley is an individual who resides at 8756 Lewinsville Road, McLean, Virginia 22102.  Upon information and belief, Mr. Gourley is a principal of G&G.

## FACTUAL ALLEGATIONS

### Defendants Fraudulently Induce the Investors to Invest in Defendants' Borrower, The LoveSac Corporation, and G&G Breaches the February 2005 Agreement with the Investors

11.      The Investors are all firms in the business of offering non-traditional debt and equity financing to businesses.  In or about November 2004, the Investors learned that The LoveSac Corporation, a Utah corporation ("LoveSac"), was looking for investment partners to help it grow its business.  The Investors and LoveSac entered into discussions about the possibility of investing in LoveSac, and the Investors began a due diligence investigation of the company.

12.    During the course of this investigation, LoveSac informed the Investors that it had access to a $ 2,800,000.00 revolving line of credit with G&G ("Line of Credit"). The terms of the Line of Credit were memorialized in a Revolving Credit Line Deed of Trust Note ("Note"), executed by and between LoveSac and G&G, among others, in October 2003.

13.    Under the terms of the Note, LoveSac was to pay off the G&G Line of Credit in full by November 1, 2004. Subsequently, G&G extended the maturity date on the Line of Credit to November 1, 2005.

14.    The Line of Credit provided LoveSac with a source of funds. It allowed LoveSac to meet variable and seasonal expenses, such as the costs associated with increasing its inventory for the holiday sales season. The Investors believed that LoveSac would need to keep the full amount of the Line of Credit in place to ensure that LoveSac would have access to a sufficient amount of funds to operate its business.

15.    Accordingly, on or about February 28, 2005, while the Investors were still investigating the possibility of investing in LoveSac, John Bernloehr, on behalf of the Investors, telephoned Mr. Gourley at G&G to discuss the Investors' potential investment and the possibility of maintaining the Line of Credit. Mr. Bernloehr informed Mr. Gourley that the Investors and others were considering investing approximately $10,500,000.00 in LoveSac, but believed that LoveSac would still need to keep the Line of Credit in place to finance its operations.

16.    Mr. Gourley represented to Mr. Bernloehr that G&G would extend the Line of Credit indefinitely as long as LoveSac stayed current on its interest payments under the Note. Mr. Bernloehr requested that G&G execute a written amendment to the Note memorializing this agreement ("February 2005 Oral Agreement"), but Mr. Gourley declined, stating that he did not want the trouble and expense that the amendment process would entail, and represented that

-4-

G&G would extend the maturity date of the Note again when it came due on November 1, 2005 on the same terms.

17.    In reliance upon G&G's express representations, the Investors invested $7,000,000.00 of the total $10,500,000.00 invested in LoveSac on March 3, 2005. But for G&G's representations, the Investors would not have made this investment.

18.    In September 2005, after the Investors had invested in LoveSac, the Line of Credit was fully drawn, and LoveSac still required additional funds. LoveSac approached the Investors for a loan. Again relying on the February 2005 Oral Agreement, which was still in place at the time, the Investors loaned $ 2,000,000.00 of a total $3,000,000.00 loan to LoveSac in early October 2005. But for the February 2005 Oral Agreement, the Investors would not have made this loan.

19.    G&G and Mr. Gourley never intended to honor the February 2005 Oral Agreement.

20.    When Mr. Bernloehr contacted Mr. Gourley in February 2005, Mr. Gourley willfully misrepresented that G&G would extend the Line of Credit in order to induce the Investors to invest in LoveSac. In point of fact, G&G intended to cancel or reduce the Line of Credit on November 1, 2005, once LoveSac had obtained the Investors' funds.

21.    At all times between the date of the February 2005 Oral Agreement and November 1, 2005, LoveSac remained current on its interest payments under the Note. In early October 2005, approximately one month before the Note came due, G&G contacted LoveSac to inquire whether it would be interested in extending the Line of Credit past the amended November 1, 2005 maturity date. LoveSac responded that, consistent with the February 2005 Oral Agreement, it would indeed prefer to extend the Line of Credit once again.

22.    On October 5, 2005, Demetris Voudouris, counsel for G&G, sent a letter to Shawn Nelson, LoveSac's chief executive officer, ("October 5, 2005 Letter") setting forth the terms of the proposed extension.

23.    The terms contained in the October 5, 2005 Letter differed materially from Mr. Gourley's representations in February 2005. At that time, Mr. Gourley stated that G&G would extend the Line of Credit on the same terms as in the Note provided that LoveSac remained current on its interest payments. In the October 5, 2005 Letter, however, G&G offered to extend the Line of Credit only if the current balance was reduced from $2,800,000.00 to $1,500,000.00. This proposed $1,300,000.00 reduction was a material limitation on the amount of funds available to LoveSac, and would have handicapped LoveSac's ability to grow and operate its business.

24.    Believing that there had been a misunderstanding, Mr. Bernloehr and Doyle Judd, LoveSac's chief financial officer, called Jennifer Conein, a portfolio manager at G&G, on October 6, 2005 to explain that Mr. Bernloehr and Mr. Gourley had already reached an oral agreement in February 2005 about extending the Line of Credit and about the terms on which that extension would be offered.

25.    On October 7, 2005, Ms. Conein sent an email to Mr. Judd informing him that G&G would not extend the Line of Credit except on the terms set forth in the October 5, 2005 Letter.

26.    Over the following weeks, the Investors attempted to negotiate with G&G and urged it to honor the February 2005 Oral Agreement, but to no avail. On November 3, 2005, Mr. Voudouris sent an email on behalf of G&G refusing to continue the Line of Credit at the full $2,800,000.00 limit, as G&G had previously represented it would do, and declaring that the Line

of Credit would only be offered in the amount of $1,500,000.00. In addition, Mr. Voudouris stated that the Line of Credit would only be extended until May 1, 2006.

27.    In a November 4, 2005 email, LoveSac made a final attempt to negotiate the terms of an extension consistent with the February 2005 Oral Agreement. G&G summarily rejected this effort, and threatened immediate enforcement of the Note.

28.    LoveSac had no choice but to accept G&G's terms. LoveSac could not operate without the Line of Credit. And, because the first indication that G&G would not abide by the February 2005 Oral Agreement came only in early October 2005, less than a month before the Note came due, LoveSac had no time to pursue alternative financing from other lenders. Consequently, on or about November 15, 2005, LoveSac and G&G, among others, executed the First Omnibus Amendment to Loan Documents ("Loan Amendment"), reducing the Line of Credit over time to $1,500,000.00 and setting the maturity date for the Note as May 1, 2006.

29.    Due to the reduction in the Line of Credit, LoveSac became unable to meet its financial commitments, and, in January 2006, filed for bankruptcy protection. As a result of G&G's and Mr. Gourley's misrepresentation, the Investors lost the $9,000,000.00 they invested in and loaned to LoveSac.

## COUNT ONE – FRAUDULENT INDUCEMENT
### (Defendants)

30.    The Investors incorporate by reference paragraphs 1 through 29 of this Complaint as if fully set forth herein.

31.    In February 2005, Defendants intentionally misrepresented to the Investors that G&G would extend the Line of Credit on the same terms contained in the Note.

32.    Defendants knew this representation was false when made.

- 7 -

33.    Defendants made this misrepresentation to induce the Investors to invest in and lend money to LoveSac, and intended the Investors to rely upon it.

34.    The Investors reasonably and justifiably relied upon Defendants' intentional misrepresentation, and, but for that misrepresentation, would not have invested in or loaned money to LoveSac.

35.    As a direct and proximate result of Defendants' misrepresentation, the Investors have been unable to recover any of the amounts they invested in and loaned to LoveSac, and have sustained damages in the amount of $9,000,000.00, to be proven at trial.

### COUNT TWO – NEGLIGENT MISREPRESENTATION
### (Defendants)

36.    The Investors incorporate by reference the allegations contained in paragraphs 1 through 35 of this Complaint as if fully set forth herein.

37.    In the course of their business, Defendants negligently misrepresented to the Investors in February 2005 that G&G would extend the Line of Credit on the same terms contained in the Note to guide the Investors in their decisions to invest money in and loan money to LoveSac.

38.    Defendants failed to exercise reasonable care or competence in communicating this information to the Investors.

39.    At the time Defendants made this misrepresentation, they had no intention of extending the Line of Credit, and the representation was false when made.

40.    The Investors reasonably and justifiably relied upon Defendants' negligent misrepresentation when investing in and loaning money to LoveSac, and, but for that misrepresentation, would not have invested in or loaned money to LoveSac.

41.    As a direct and proximate result of Defendants' misrepresentation, the Investors have been unable to recover any of the amounts they invested in and loaned to LoveSac, and have sustained damages in the amount of $9,000,000.00, to be proven at trial.

**COUNT THREE – BREACH OF CONTRACT**
**(G&G)**

42.    The Investors incorporate by reference the allegations contained in paragraphs 1 through 41 of this Complaint as if fully set forth herein.

43.    The February 2005 Oral Agreement was a valid and binding contract between the Investors and G&G.

44.    The Investors performed under the February 2005 Oral Agreement by investing $ 7,000,000 in LoveSac on March 3, 2005.

45.    G&G breached the February 2005 Oral Agreement by failing to extend the Note and by reducing the limit on the Line of Credit from $2,800,000.00 to $1,500,000.00.

46.    As a direct and proximate result of G&G's breach, the Investors have been unable to recover any of the amount they invested in and loaned to LoveSac, and have been damaged in the amount of $7,000,000.00, to be proven at trial.

**COUNT FOUR – PROMISSORY ESTOPPEL**
**(G&G)**

47.    The Investors incorporate by reference the allegations contained in paragraphs 1 through 46 of this Complaint as if fully set forth herein.

48.    In February 2005, G&G promised the Investors that G&G would extend the Line of Credit on the same terms contained in the Note.

49.    G&G made this promise to induce the Investors to invest $7,000,000.00 on March 3, 2005, and, therefore, foresaw that the Investors would rely on the promise.

50.     The Investors relied on this promise in investing $7,000,000.00 in LoveSac on March 3, 2005, and, but for this promise, would not have invested money in or loaned money to LoveSac.

51.     The Investors have been unable to recover any of the amounts they invested in and loaned to LoveSac.

52.     As a direct and proximate result of their reliance on G&G's promise, the Investors have been damaged in the amount of $7,000,000.00, to be proven at trial.

**COUNT FIVE – PUNITIVE DAMAGES**
**(Defendants)**

53.     The Investors incorporate by reference the allegations contained in paragraphs 1 through 52 of this Complaint as if fully set forth herein.

54.     In making the aforementioned misrepresentations, Defendants acted in a willful, wanton, and reckless manner and in callous disregard of the Investors' rights. Their misconduct rises to such a high level of moral culpability as to justify the imposition of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, the Investors pray that this Court enter judgment as follows:

A.      Under Counts One and Two, compensatory damages in the amount of $9,000,000.00 in favor of the Investors, and against Defendants, in an amount to be proven at trial;

B.      Under Counts Three and Four, compensatory damages in the amount of $7,000,000.00 in favor of the Investors, and against Defendants, in an amount to be proven at trial;

C.      Based upon Count Five, an Order awarding punitive damages in favor of the Investors, and against Defendants, including their attorneys fees and costs incurred in prosecuting this action;

D.      Under all Counts, an Order awarding pre-judgment and post-judgment interest in favor of the Investors, and against Defendants;

E.      An Order granting such other relief as this Court deems just and proper.

Respectfully submitted,

/s/ Michael L. Scheier
Michael L. Scheier (0055512)
Robert G. Sanker (0039040)
Joseph L. Bruemmer (0079120)
One East Fourth St.
Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 579-6952
Fax: (513) 579-6457
mscheier@kmklaw.com
rsanker@kmklaw.com
jbruemmer@kmklaw.com
Attorney for Plaintiffs,
Walnut Investment Partners, L.P., Walnut Private Equity Fund, L.P., and Brand Equity Ventures II, L.P.

OF COUNSEL:
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street
Suite 1400
Cincinnati, Ohio 45202
(513) 579-6400

### JURY DEMAND

The Investors demand a jury trial on all issues so triable.

/s/ Michael L. Scheier
Michael L. Scheier (0055512)

2138295.1

**2**



07 MAY 15 PM 12: 34

Michael L. Scheier (0055512)
Robert G. Sanker (0039040)
Joseph L. Bruemmer (0079120)
Attorneys For Plaintiffs,
Walnut Investment Partners, L.P., Walnut Private
Equity Fund, L.P., and Brand Equity Ventures II, L.P.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION
## AT CINCINNATI

| | |
|---|---|
| Walnut Investment Partners, L.P.<br>312 Walnut Street, Suite 1151<br>Cincinnati, OH 45202;<br><br>- and -<br><br>Walnut Private Equity Fund, L.P.<br>312 Walnut Street, Suite 1151<br>Cincinnati, OH 45202;<br><br>- and -<br><br>Brand Equity Ventures II, L.P.<br>One Stamford Plaza<br>263 Tresser Blvd., 16th Floor<br>Stamford, CT 06901<br><br>              Plaintiffs,<br><br>    -v-<br><br>Gourley & Gourley, L.L.C.<br>8756 Lewinsville Rd.<br>McLean, VA 22102<br><br>**Serve Statutory Agent**<br>Chris Beatley<br>221 S. Fayette Street<br>Alexandria, VA 23314<br><br>- and -<br><br>Trent Gourley<br>8756 Lewinsville Rd.<br>McLean, VA 22102<br>            Defendants. | Case No. **1107 CV 380**<br><br>(Judge **J. DLOTT**    )<br><br><br>**COMPLAINT FOR MONEY DAMAGES**<br>**WITH DEMAND FOR JURY TRIAL** |

Now come plaintiffs Walnut Investment Partners, L.P. ("WIP"), Walnut Private Equity Fund, L.P. ("WPEF"), and Brand Equity Ventures II, L.P. ("BEV") (WIP, WPEF, and BEV collectively "Investors"), and for their complaint against defendants Gourley & Gourley, L.L.C. ("G&G") and Trent Gourley ("Mr. Gourley") (G&G and Mr. Gourley are sometimes collectively referred to as "Defendants") state as follows:

## NATURE OF THE ACTION

1.     This is an action to recover money damages sustained by the Investors as a result of the Defendants' fraudulent misrepresentations and breach of a binding oral contract with the Investors. Defendants made these misrepresentations to, and entered into this contract with, individuals in Ohio. As a direct and proximate result of Defendants' misconduct, the Investors have been damaged in an amount in excess of $9,000,000.00, to be proven at trial.

## JURISDICTION AND VENUE

2.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332(a)(1) because this action is between citizens of different states and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00).

3.     This Court has personal jurisdiction over G&G because G&G has transacted business in this state, has an interest in real property in this state, and has committed torts that it foresaw or reasonably should have foreseen would cause injury to persons in this state.

4.     This Court has personal jurisdiction over Mr. Gourley because Mr. Gourley has transacted business in this state on behalf of G&G and has committed torts that he foresaw or reasonably should have foreseen would cause injury to persons in this state.

5.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district, because G&G is

subject to personal jurisdiction in this district, and because the Investors suffered injury in this district.

## PARTIES

6.     WIP is a Delaware limited partnership with its principal place of business at 312 Walnut Street, Suite 1151, Cincinnati, Ohio 45202.

7.     WPEF is a Delaware limited partnership with its principal place of business at 312 Walnut Street, Suite 1151, Cincinnati, Ohio 45202.

8.     BEV is a Connecticut limited partnership with its principal place of business at One Stamford Plaza, 263 Tresser Boulevard, 16th Floor, Stamford, Connecticut 06901.

9.     G&G is a Virginia limited liability company with its principal place of business at 8756 Lewinsville Road, McLean, Virginia 22102.

10.     Mr. Gourley is an individual who resides at 8756 Lewinsville Road, McLean, Virginia 22102.

## FACTUAL ALLEGATIONS

### Defendants Fraudulently Induce the Investors to Invest in Defendants' Borrower, The LoveSac Corporation, and G&G Breaches the February 2005 Agreement with the Investors

11.     The Investors are all firms in the business of offering non-traditional debt and equity financing to businesses. In or about November 2004, the Investors learned that The LoveSac Corporation, a Utah corporation ("LoveSac"), was looking for investment partners to help it grow its business. The Investors and LoveSac entered into discussions about the possibility of investing in LoveSac, and the Investors began a due diligence investigation of the company.

-3-

12.    During the course of this investigation, LoveSac informed the Investors that it had access to a $ 2,800,000.00 revolving line of credit with G&G ("Line of Credit"). The terms of the Line of Credit were memorialized in a Revolving Credit Line Deed of Trust Note ("Note"), executed by and between LoveSac and G&G, among others, in October 2003.

13.    Under the terms of the Note, LoveSac was to pay off the G&G Line of Credit in full by November 1, 2004. Subsequently, G&G extended the maturity date on the Line of Credit to November 1, 2005.

14.    The Line of Credit provided LoveSac with a source of funds. It allowed LoveSac to meet variable and seasonal expenses, such as the costs associated with increasing its inventory for the holiday sales season. The Investors believed that LoveSac would need to keep the full amount of the Line of Credit in place to ensure that LoveSac would have access to a sufficient amount of funds to operate its business.

15.    Accordingly, on or about February 28, 2005, while the Investors were still investigating the possibility of investing in LoveSac, John Bernloehr, on behalf of the Investors, telephoned Mr. Gourley at G&G to discuss the Investors' potential investment and the possibility of maintaining the Line of Credit. Mr. Bernloehr informed Mr. Gourley that the Investors and others were considering investing approximately $10,500,000.00 in LoveSac, but believed that LoveSac would still need to keep the Line of Credit in place to finance its operations.

16.    Mr. Gourley represented to Mr. Bernloehr that G&G would extend the Line of Credit indefinitely as long as LoveSac stayed current on its interest payments under the Note. Mr. Bernloehr requested that G&G execute a written amendment to the Note memorializing this agreement ("February 2005 Oral Agreement"), but Mr. Gourley declined, stating that he did not want the trouble and expense that the amendment process would entail, and represented that

- 4 -

G&G would extend the maturity date of the Note again when it came due on November 1, 2005 on the same terms.

17.     In reliance upon G&G's express representations, the Investors invested $7,000,000.00 of the total $10,500,000.00 invested in LoveSac on March 3, 2005. But for G&G's representations, the Investors would not have made this investment.

18.     In September 2005, after the Investors had invested in LoveSac, the Line of Credit was fully drawn, and LoveSac still required additional funds. LoveSac approached the Investors for a loan. Again relying on the February 2005 Oral Agreement, which was still in place at the time, the Investors loaned $ 2,000,000.00 of a total $3,000,000.00 loan to LoveSac in early October 2005. But for the February 2005 Oral Agreement, the Investors would not have made this loan.

19.     G&G and Mr. Gourley never intended to honor the February 2005 Oral Agreement.

20.     When Mr. Bernloehr contacted Mr. Gourley in February 2005, Mr. Gourley willfully misrepresented that G&G would extend the Line of Credit in order to induce the Investors to invest in LoveSac. In point of fact, G&G intended to cancel or reduce the Line of Credit on November 1, 2005, once LoveSac had obtained the Investors' funds.

21.     At all times between the date of the February 2005 Oral Agreement and November 1, 2005, LoveSac remained current on its interest payments under the Note. In early October 2005, approximately one month before the Note came due, G&G contacted LoveSac to inquire whether it would be interested in extending the Line of Credit past the amended November 1, 2005 maturity date. LoveSac responded that, consistent with the February 2005 Oral Agreement, it would indeed prefer to extend the Line of Credit once again.

22.     On October 5, 2005, Demetris Voudouris, counsel for G&G, sent a letter to Shawn Nelson, LoveSac's chief executive officer, ("October 5, 2005 Letter") setting forth the terms of the proposed extension.

23.     The terms contained in the October 5, 2005 Letter differed materially from Mr. Gourley's representations in February 2005. At that time, Mr. Gourley stated that G&G would extend the Line of Credit on the same terms as in the Note provided that LoveSac remained current on its interest payments. In the October 5, 2005 Letter, however, G&G offered to extend the Line of Credit only if the current balance was reduced from $2,800,000.00 to $1,500,000.00. This proposed $1,300,000.00 reduction was a material limitation on the amount of funds available to LoveSac, and would have handicapped LoveSac's ability to grow and operate its business.

24.     Believing that there had been a misunderstanding, Mr. Bernloehr and Doyle Judd, LoveSac's chief financial officer, called Jennifer Conein, a portfolio manager at G&G, on October 6, 2005 to explain that Mr. Bernloehr and Mr. Gourley had already reached an oral agreement in February 2005 about extending the Line of Credit and about the terms on which that extension would be offered.

25.     On October 7, 2005, Ms. Conein sent an email to Mr. Judd informing him that G&G would not extend the Line of Credit except on the terms set forth in the October 5, 2005 Letter.

26.     Over the following weeks, the Investors attempted to negotiate with G&G and urged it to honor the February 2005 Oral Agreement, but to no avail. On November 3, 2005, Mr. Voudouris sent an email on behalf of G&G refusing to continue the Line of Credit at the full $2,800,000.00 limit, as G&G had previously represented it would do, and declaring that the Line

of Credit would only be offered in the amount of $1,500,000.00. In addition, Mr. Voudouris stated that the Line of Credit would only be extended until May 1, 2006.

27.    In a November 4, 2005 email, LoveSac made a final attempt to negotiate the terms of an extension consistent with the February 2005 Oral Agreement. G&G summarily rejected this effort, and threatened immediate enforcement of the Note.

28.    LoveSac had no choice but to accept G&G's terms. LoveSac could not operate without the Line of Credit. And, because the first indication that G&G would not abide by the February 2005 Oral Agreement came only in early October 2005, less than a month before the Note came due, LoveSac had no time to pursue alternative financing from other lenders. Consequently, on or about November 15, 2005, LoveSac and G&G, among others, executed the First Omnibus Amendment to Loan Documents ("Loan Amendment"), reducing the Line of Credit over time to $1,500,000.00 and setting the maturity date for the Note as May 1, 2006.

29.    Due to the reduction in the Line of Credit, LoveSac became unable to meet its financial commitments, and, in January 2006, filed for bankruptcy protection. As a result of G&G's and Mr. Gourley's misrepresentation, the Investors lost the $9,000,000.00 million they invested in and loaned to LoveSac.

## COUNT ONE – FRAUDULENT INDUCEMENT
### (Defendants)

30.    The Investors incorporate by reference paragraphs 1 through 29 of this Complaint as if fully set forth herein.

31.    In February 2005, Defendants intentionally misrepresented to the Investors that G&G would extend the Line of Credit on the same terms contained in the Note.

32.    Defendants knew this representation was false when made.

- 7 -

33.    Defendants made this misrepresentation to induce the Investors to invest in and lend money to LoveSac, and intended the Investors to rely upon it.

34.    The Investors reasonably and justifiably relied upon Defendants' intentional misrepresentation, and, but for that misrepresentation, would not have invested in or loaned money to LoveSac.

35.    As a direct and proximate result of Defendants' misrepresentation, the Investors have been unable to recover any of the amounts they invested in and loaned to LoveSac, and have sustained damages in the amount of $9,000,000.00, to be proven at trial.

## COUNT TWO – NEGLIGENT MISREPRESENTATION
### (Defendants)

36.    The Investors incorporate by reference the allegations contained in paragraphs 1 through 35 of this Complaint as if fully set forth herein.

37.    In the course of their business, Defendants negligently misrepresented to the Investors in February 2005 that G&G would extend the Line of Credit on the same terms contained in the Note to guide the Investors in their decisions to invest money in and loan money to LoveSac.

38.    Defendants failed to exercise reasonable care or competence in communicating this information to the Investors.

39.    At the time Defendants made this misrepresentation, they had no intention of extending the Line of Credit, and the representation was false when made.

40.    The Investors reasonably and justifiably relied upon Defendants' negligent misrepresentation when investing in and loaning money to LoveSac, and, but for that misrepresentation, would not have invested in or loaned money to LoveSac.

- 8 -

41.    As a direct and proximate result of Defendants' misrepresentation, the Investors have been unable to recover any of the amounts they invested in and loaned to LoveSac, and have sustained damages in the amount of $9,000,000.00, to be proven at trial.

**COUNT THREE – BREACH OF CONTRACT**
**(G&G)**

42.    The Investors incorporate by reference the allegations contained in paragraphs 1 through 41 of this Complaint as if fully set forth herein.

43.    The February 2005 Oral Agreement was a valid and binding contract between the Investors and G&G.

44.    The Investors performed under the February 2005 Oral Agreement by investing $ 7,000,000 in LoveSac on March 3, 2005.

45.    G&G breached the February 2005 Oral Agreement by failing to extend the Note and by reducing the limit on the Line of Credit from $2,800,000.00 to $1,500,000.00.

46.    As a direct and proximate result of G&G's breach, the Investors have been unable to recover any of the amount they invested in and loaned to LoveSac, and have been damaged in the amount of $7,000,000.00, to be proven at trial.

**COUNT FOUR – PROMISSORY ESTOPPEL**
**(G&G)**

47.    The Investors incorporate by reference the allegations contained in paragraphs 1 through 46 of this Complaint as if fully set forth herein.

48.    In February 2005, G&G promised the Investors that G&G would extend the Line of Credit on the same terms contained in the Note.

49.    G&G made this promise to induce the Investors to invest $7,000,000.00 on March 3, 2005, and, therefore, foresaw that the Investors would rely on the promise.

50. The Investors relied on this promise in investing $7,000,000.00 in LoveSac on March 3, 2005, and, but for this promise, would not have invested money in or loaned money to LoveSac.

51. The Investors have been unable to recover any of the amounts they invested in and loaned to LoveSac.

52. As a direct and proximate result of their reliance on G&G's promise, the Investors have been damaged in the amount of $7,000,000.00, to be proven at trial.

## COUNT FIVE – PUNITIVE DAMAGES
### (Defendants)

53. The Investors incorporate by reference the allegations contained in paragraphs 1 through 52 of this Complaint as if fully set forth herein.

54. In making the aforementioned misrepresentations, Defendants acted in a willful, wanton, and reckless manner and in callous disregard of the Investors' rights. Their misconduct rises to such a high level of moral culpability as to justify the imposition of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, the Investors pray that this Court enter judgment as follows:

A. Under Counts One and Two, compensatory damages in the amount of $9,000,000.00 in favor of the Investors, and against Defendants, in an amount to be proven at trial;

B. Under Counts Three and Four, compensatory damages in the amount of $7,000,000.00 in favor of the Investors, and against Defendants, in an amount to be proven at trial;

C.    Based upon Count Five, an Order awarding punitive damages in favor of the Investors, and against Defendants, including their attorneys fees and costs incurred in prosecuting this action;

D.    Under all Counts, an Order awarding pre-judgment and post-judgment interest in favor of the Investors, and against Defendants;

E.    An Order granting such other relief as this Court deems just and proper.

Respectfully submitted,

Michael L. Scheier (0055512)
Robert G. Sanker (0039040)
Joseph L. Bruemmer (0079120)
One East Fourth St.
Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 579-6952
Fax: (513) 579-6457
mscheier@kmklaw.com
rsanker@kmklaw.com
jbruemmer@kmklaw.com
Attorney for Plaintiffs,
Walnut Investment Partners, L.P., Walnut Private Equity Fund, L.P., and Brand Equity Ventures II, L.P.

OF COUNSEL:
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street
Suite 1400
Cincinnati, Ohio 45202
(513) 579-6400

**JURY DEMAND**

The Investors demand a jury trial on all issues so triable.

Michael L. Scheier (0055512)

2000713.7

- 11 -