**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| G&G, LLC | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. 07-440 (SLR) |
| | : | |
| v. | : | |
| | : | |
| JAMES HYDE, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

# APPENDIX

### TO THE

### ANSWERING BRIEF OF PLAINTIFF G&G, LLC
### IN OPPOSITION TO MOTION OF DEFENDANTS DAVID YARNELL,
### JAMES GOULD, SIMON WRIGHT, WALT SPOKOWSKI, AND MILLEVERE
### HOLDINGS LIMITED TO DISMISS AMENDED COMPLAINT
### PURSUANT TO FED. R. CIV. P. 12(B)(2)

ZUCKERMAN SPAEDER LLP
Thomas G. Macauley (ID No. 3411)
Virginia Whitehill Guldi (ID No. 2792)
919 Market Street, Suite 990
P.O. Box 1028
Wilmington, DE 19899
(302) 427-0400

STINSON MORRISON HECKER LLP
Marc E. Albert
Janet M. Nesse
Lawrence P. Block
Katherine M. Sutcliffe Becker
1150 18th Street NW, Suite 800
Washington, DC 20036-3816
(202) 785-9100

*Attorneys for G&G, LLC*

## TABLE OF CONTENTS

Exhibit A:     Agreement and Plan of Merger…………………………………00001-00007

Exhibit B:     Series A Preferred Stock Purchase Agreement………………00008-00039
               Right of First Refusal and Co-Sale Agreement………………00040-00050
               Voting Agreement……………………………………………00051-00062
               Investors' Rights Agreement…………………………………00063-00087

Exhibit C:     E-mails, October 20, 2005……………………………………00088-00089

Exhibit D:     Letter to LoveSac Stockholders, December 7, 2005……………00090-00096

Exhibit E:     Motion of Debtors for an Order Authorizing
               Post-Petition Financing………………………………………00097-00109

Exhibit F:     Significant Differences Between the Corporation Laws
               of Utah and Delaware…………………………………………00110-00117

Exhibit G:     Indemnification Agreement……………………………………00118-00130

No Exhibit H

Exhibit I:     Joint Plan of Liquidation…………………………………......00132-00133

Exhibit J:     E-mails, October 24, 2005……………………………………..00134-00135

Exhibit A

# AGREEMENT AND PLAN OF MERGER OF
## THE LOVESAC CORPORATION, A DELAWARE CORPORATION, AND
## THE LOVESAC CORPORATION, A UTAH CORPORATION

*THIS AGREEMENT AND PLAN OF MERGER*, dated as of February 25, 2005, (the "*Agreement*") is made by and between The LoveSac Corporation, a Delaware corporation ("*LoveSac DE*") and The LoveSac Corporation, a Utah corporation ("*LoveSac UT*"). LoveSac DE and LoveSac UT are sometimes referred to herein as the "*Constituent Corporations*."

## R E C I T A L S

**A.**    LoveSac DE is a corporation duly organized and existing under the laws of the State of Delaware and has an authorized capital of 15,000,000 shares, all of which consists of "Common Stock," $0.0001 par value per share. As of the date of this Agreement and Plan of Merger, 100 shares of Common Stock are issued and outstanding.

**B.**    LoveSac UT is a corporation duly organized and existing under the laws of the State of Utah and has an authorized capital of 15,000,000 shares, all of which consists of "Common Stock," no par value. As of the date of this Agreement and Plan of Merger, 896,226 shares of Common Stock are issued and outstanding.

**C.**    The Board of Directors of LoveSac UT has determined that, for the purpose of effecting the reincorporation of LoveSac UT in the State of Delaware, it is advisable and in the best interests of LoveSac UT and its shareholders that LoveSac UT merge with and into LoveSac DE upon the terms and conditions herein provided.

**D.**    The Board of Directors of LoveSac UT has further determined that it is in the best interests of LoveSac UT and its shareholders to approve this Agreement and the transactions contemplated herein and has empowered the undersigned officers of LoveSac UT to submit this Agreement to its shareholders for adoption and approval. The Board of Directors of LoveSac UT has empowered the undersigned officers of LoveSac UT, upon the approval of this Agreement by the shareholders of LoveSac UT, to execute and deliver this Agreement.

**E.**    The Board of Directors of LoveSac DE has approved this Agreement and the transactions contemplated herein and has empowered the undersigned officers of LoveSac DE to submit it to a vote of its sole stockholder, LoveSac UT, for adoption and approval. The Board of Directors of LoveSac DE has empowered the undersigned officers of LoveSac DE, upon the approval of this Agreement by the shareholders of LoveSac UT, to execute and deliver this Agreement.

*NOW, THEREFORE*, in consideration of the mutual agreements and covenants set forth herein, LoveSac DE and LoveSac UT hereby agree, subject to the terms and conditions hereinafter set forth, as follows:

2939423_1.doc

# I. MERGER

1.1    Merger.    In accordance with the provisions of this Agreement, the Delaware General Corporation Law (the "*DGCL*") and the Utah Revised Business Corporation Act (the "*URBCA*"), LoveSac UT shall be merged with and into LoveSac DE (the "*Merger*"), the separate existence of LoveSac UT (the "*Non-Surviving Corporation*") shall cease and LoveSac DE shall be the surviving corporation (sometimes referred to herein as the "*Surviving Corporation*"), and the name of the Surviving Corporation shall be The LoveSac Corporation.

1.2    Filing and Effectiveness.    The Merger shall become effective when the following actions shall have been completed:

(a)    This Agreement and Merger shall have been adopted and approved by the stockholders of each Constituent Corporation in accordance with the requirements of the DGCL and the URBCA;

(b)    All of the conditions precedent to the consummation of the Merger specified in this Agreement shall have been satisfied or duly waived by the party entitled to satisfaction thereof;

(c)    An executed Certificate of Ownership and Merger, in the form of **Exhibit A** attached hereto, meeting the requirements of Section 253 of the DGCL, shall have been filed with the Secretary of State of the State of Delaware and the Surviving Corporation and the Non-Surviving Corporation hereby stipulate that they will cause to be performed all necessary acts therein and elsewhere to effectuate the Merger; and

(d)    An executed Articles of Merger, in the form of **Exhibit B** attached hereto, meeting the requirements of Section 16-10a-1105 of the URBCA, shall have been filed with the Utah Division of Corporations and Commercial Code and the Surviving Corporation and the Non-Surviving Corporation hereby stipulate that they will cause to be performed all necessary acts therein and elsewhere to effectuate the Merger.

The date and time when the Merger shall become effective, pursuant to the provisions of (i) Section 103 of the DGCL and (ii) Section 16-10a-1104 of the URBCA, is herein called the "*Effective Date of the Merger.*"

1.3    Effect of the Merger.    Upon the Effective Date of the Merger, the separate existence of LoveSac UT shall cease and LoveSac DE, as the Surviving Corporation, (i) shall continue to possess all of its assets, rights, powers and property as constituted immediately prior to the Effective Date of the Merger, (ii) shall be subject to all actions previously taken by LoveSac UT's Board of Directors, (iii) shall succeed, without other transfer, to all of the assets, rights, powers and property of LoveSac UT in the manner more fully set forth in Section 259 of the DGCL, (iv) shall continue to be subject to all of the debts, liabilities and obligations of LoveSac UT as constituted immediately prior to the Effective Date of the Merger and (v) shall succeed, without other transfer, to all of the debts, liabilities and obligations of LoveSac UT in the same manner as if LoveSac DE had itself incurred them, all as more fully provided under the applicable provisions of the DGCL and the URBCA.

00002

## II. CHARTER DOCUMENTS, DIRECTORS AND OFFICERS

2.1     Certificate of Incorporation.  The Certificate of Incorporation of LoveSac DE as in effect on the Effective Date of the Merger in the jurisdiction of its organization will be the Certificate of Incorporation of the Surviving Corporation and such Certificate of Incorporation shall continue in full force and effect until amended and changed in the manner prescribed by the provisions of the DGCL.

2.2     Bylaws.  The Bylaws of LoveSac DE on the Effective Date of the Merger in the jurisdiction of its organization will be the Bylaws of the Surviving Corporation and will continue in full force and effect until changed, altered, or amended as therein provided and in the manner prescribed by the provisions of the DGCL.

2.3     Directors and Officers.   The directors and officers of LoveSac DE on the Effective Date of the Merger shall be the directors and officers of the Surviving Corporation until their successors shall have been duly elected and qualified or until as otherwise provided by law, the Certificate of Incorporation of the Surviving Corporation or the Bylaws of the Surviving Corporation.  For information purposes, the directors and officers of LoveSac DE are also the same officers and directors of LoveSac UT.

## III. MANNER OF CONVERSION OF STOCK

3.1     LoveSac UT Common Shares.  Upon the Effective Date of the Merger, each share of LoveSac UT Common Stock, no par value, issued and outstanding immediately prior thereto shall by virtue of the Merger and without any action by the Constituent Corporations, the holder of such shares or any other person, be converted into and exchanged for one fully paid and non-assessable share of Common Stock, with a par value of $0.0001 per share, of the Surviving Corporation.  No fractional share interests of Surviving Corporation Common Stock shall be issued.  In lieu thereof, any fractional share interests to whom a holder would otherwise be entitled shall be aggregated and rounded up on a holder-by-holder basis to a whole share amount.

3.2     LoveSac UT Options, Stock Purchase Rights and Convertible Securities.

(a)     Upon the Effective Date of the Merger, the Surviving Corporation shall assume the obligations of LoveSac UT under, and continue, the option plans and all other employee benefit plans of LoveSac UT and certain stock option agreements by and between certain LoveSac UT employees and LoveSac UT.  Each outstanding and unexercised option, warrant, other right to purchase, or security convertible into, LoveSac UT Common Stock (a *"Right"*) shall become, subject to the provisions in paragraph (c) hereof, an option, right to purchase or a security convertible into the Surviving Corporation's Common Stock on the basis of one share of the Surviving Corporation's Common for each share of LoveSac UT Common Stock issuable pursuant to any such Right, on the same terms and conditions and at an exercise price equal to the exercise price applicable to any such LoveSac UT Right at the Effective Date of the Merger.  This paragraph 3.2(a) shall not apply to LoveSac UT Common Stock.  Such Common Stock is subject to paragraph 3.1 hereof.

(b)    A number of shares of the Surviving Corporation's Common shall be reserved for issuance upon the exercise of options, stock purchase rights and convertible securities equal to the number of shares of LoveSac UT Common Stock so reserved immediately prior to the Effective Date of the Merger.

(c)    The assumed Rights shall not entitle any holder thereof to a fractional share upon exercise or conversion (unless the holder was entitled to a fractional interest immediately prior to the Merger). In lieu thereof, any fractional share interests to whom a holder of an assumed Right would otherwise be entitled upon exercise or conversion shall be aggregated (but only with other similar Rights which have the same per share terms). To the extent that after such aggregation, the holder would still be entitled to a fractional share with respect thereto upon exercise or conversion, the holder shall be entitled upon the exercise or conversion of all such assumed Rights pursuant to their terms (as modified herein), to one full share of Common Stock in lieu of such fractional share. With respect to each class of such similar Rights, no holder will be entitled to more than one full share in lieu of a fractional share upon exercise or conversion.

Notwithstanding the foregoing, with respect to options issued under the LoveSac UT 2003 Stock Plan that are assumed in the Merger, the number of shares of Common Stock to which the holder would be otherwise entitled upon exercise of each such assumed options following the Merger shall be rounded down to the nearest whole number and the exercise price shall be rounded up to the nearest whole cent. In addition, no "additional benefits" (within the meaning of Section 424(a)(2) of the Internal Revenue Code of 1986, as amended) shall be accorded to the optionees pursuant to the assumption of their options.

3.3    LoveSac DE Common Stock. Upon the Effective Date of the Merger, each share of Common Stock, with a par value of $0.0001 per share, of LoveSac DE issued and outstanding immediately prior thereto shall, by virtue of the Merger and without any action by LoveSac DE, the holder of such shares or any other person, be canceled and returned to the status of authorized but unissued shares.

3.4    Exchange of Certificates. After the Effective Date of the Merger, each holder of an outstanding certificate representing shares of LoveSac UT Common Stock may be asked to surrender the same for cancellation to an exchange agent, whose name will be delivered to holders prior to any requested exchange (the "*Exchange Agent*"), and each such holder shall be entitled to receive in exchange therefor a certificate or certificates representing the number of shares of the Surviving Corporation's Common Stock into which the surrendered shares were converted as herein provided. Until so surrendered, each outstanding certificate theretofore representing shares of LoveSac UT Common Stock shall be deemed for all purposes to represent the number of shares of the Surviving Corporation's Common Stock into which such shares of LoveSac UT Common Stock were converted in the Merger.

The registered owner on the books and records of the Surviving Corporation or the Exchange Agent of any such outstanding certificate shall, until such certificate shall have been surrendered for transfer or conversion or otherwise accounted for to the Surviving Corporation or the Exchange Agent, have and be entitled to exercise any voting and other rights with respect to· and to receive dividends and other distributions upon the shares of Common

00004

Stock of the Surviving Corporation represented by such outstanding certificate as provided above.

Each certificate representing Common Stock of the Surviving Corporation so issued in the Merger shall bear the same legends, if any, with respect to the restrictions on transferability as the certificates of LoveSac UT so converted and given in exchange therefore, unless otherwise determined by the Board of Directors of the Surviving Corporation in compliance with applicable laws.

If any certificate for shares of the Surviving Corporation's stock is to be issued in a name other than that in which the certificate surrendered in exchange therefor is registered, it shall be a condition of issuance thereof that the certificate so surrendered shall be properly endorsed and otherwise in proper form for transfer, that such transfer otherwise be proper and comply with applicable securities laws and that the person requesting such transfer pay to the Exchange Agent any transfer or other taxes payable by reason of issuance of such new certificate in a name other than that of the registered holder of the certificate surrendered or establish to the satisfaction of the Surviving Corporation that such tax has been paid or is not payable.

## IV.  GENERAL

4.1    <u>Covenants of LoveSac DE</u>.  LoveSac DE covenants and agrees that it will:

(a)    Qualify to do business as a foreign corporation in the State of Utah by filing an application of authority with the Utah Division of Corporations and in connection therewith irrevocably appoint an agent for service of process as required under the provisions of Sections 16-10a-501 and 16-10a-504 of the URBCA; and

(b)    Take such other actions as may be required by the URBCA.

4.2    <u>Further Assurances</u>.  From time to time, as and when required by LoveSac DE or by its successors or assigns, there shall be executed and delivered on behalf of LoveSac UT such deeds and other instruments, and there shall be taken or caused to be taken by it such further and other actions as shall be appropriate or necessary in order to vest or perfect in or conform of record or otherwise by LoveSac DE the title to and possession of all the property, interests, assets, rights, privileges, immunities, powers, franchises and authority of LoveSac UT and otherwise to carry out the purposes of this Agreement, and the officers and directors of LoveSac DE are fully authorized in the name and on behalf of LoveSac UT or otherwise to take any and all such action and to execute and deliver any and all such deeds and other instruments.

4.3    <u>Abandonment</u>.  At any time before the Effective Date of the Merger, this Agreement may be terminated and the Merger may be abandoned for any reason whatsoever by the Board of Directors of either LoveSac UT or of LoveSac DE, or of both, notwithstanding the approval of this Agreement by the shareholders of LoveSac UT or by the stockholders of LoveSac DE, or by both.

4.4    <u>Amendment</u>.  The Boards of Directors of the Constituent Corporations may amend this Agreement (or certificate in lieu thereof) at any time before the Effective Date of the

Merger, provided that an amendment made subsequent to the adoption of this Agreement by the stockholders of either Constituent Corporation shall not:  (i) alter or change the amount or kind of shares, securities, cash, property and/or rights to be received in exchange for or on conversion of all or any of the shares of any class or series thereof of such Constituent Corporation, (ii) alter or change any term of the Certificate of Incorporation of the Surviving Corporation to be effected by the Merger or (iii) alter or change any of the terms and conditions of this Agreement if such alteration or change would adversely affect the holders of any class or series of capital stock of any Constituent Corporation.

4.5    Registered Office.  The registered office of the Surviving Corporation in the State of Delaware is 1209 Orange Street, Wilmington, New Castle County, Delaware 19801 and Corporation Trust Center is the registered agent of the Surviving Corporation at such address.

4.6    Agreement.  Executed copies of this Agreement will be on file at the principal place of business of the Surviving Corporation at 155 North 400 West, Suite 520, Salt Lake City, UT, 84103, and copies thereof will be furnished to any stockholder of either Constituent Corporation, upon request and without cost.

4.7    Governing Law.  This Agreement shall in all respects be construed, interpreted and enforced in accordance with and governed by the laws of the State of Delaware and, so far as applicable, the merger provisions of the URBCA.

4.8    FIRPTA Notification.

(a)    On the Effective Date of the Merger, LoveSac UT shall deliver to LoveSac DE, as agent for the shareholders of LoveSac UT, a properly executed statement (the "*Statement*") substantially in the form attached hereto as **Exhibit C**.  LoveSac DE shall retain the Statement for a period of not less than seven (7) years and shall, upon request, provide a copy thereof to any person that was a shareholder of LoveSac UT immediately prior to the Merger.  In consequence of the approval of the Merger by the shareholders of LoveSac UT, (i) such shareholders shall be considered to have requested that the Statement be delivered to LoveSac DE as their agent and (ii) LoveSac DE shall be considered to have received a copy of the Statement at the request of the LoveSac UT shareholders for purposes of satisfying LoveSac DE's obligations under Treasury Regulation Section 1.1445 2(c)(3).

(b)    LoveSac UT shall deliver to the Internal Revenue Service a notice regarding the Statement in accordance with the requirements of Treasury Regulation Section 1.897 2(h)(2).

*[SIGNATURE PAGE FOLLOWS]*

*IN WITNESS WHEREOF*, this Agreement having first been approved by the resolutions of the Board of Directors of LoveSac DE and LoveSac UT is hereby executed on behalf of each of such two corporations and attested by their respective officers thereunto duly authorized.

**THE LOVESAC CORPORATION**
a Delaware corporation

By: _____

Shawn D. Nelson
Chief Executive Officer

**THE LOVESAC CORPORATION**
a Utah corporation

By: _____

Shawn D. Nelson
Chief Executive Officer

*[SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER]*

Exhibit B

# THE LOVESAC CORPORATION
a Delaware corporation

## SERIES A PREFERRED STOCK PURCHASE AGREEMENT

**Dated as of March 3, 2005**

# TABLE OF CONTENTS

Page

SECTION 1 AUTHORIZATION, SALE AND ISSUANCE OF SERIES A
  PREFERRED STOCK...................................................................................1

    1.1    Authorization .................................................................................1
    1.2    Sale and Issuance of Shares .........................................................1
    1.3    Option of Certain Investors..........................................................1

SECTION 2 CLOSING DATE AND DELIVERY ............................................2

    2.1    Closing ..........................................................................................2
    2.2    Delivery.........................................................................................2
    2.3    Nelson, McDonough, Judd, Weiland and Wright Options. ......2

SECTION 3 REPRESENTATIONS AND WARRANTIES OF THE COMPANY ......................3

    3.1    Organization, Good Standing and Qualification.......................3
    3.2    Subsidiaries ..................................................................................4
    3.3    Capitalization...............................................................................4
    3.4    Authorization ...............................................................................5
    3.5    Financial Statements ...................................................................5
    3.6    Changes.........................................................................................6
    3.7    Agreements; Action .....................................................................7
    3.8    Intellectual Property....................................................................8
    3.9    Title to Properties and Assets:  Liens ........................................9
    3.10    Compliance with Other Instruments .......................................10
    3.11    Litigation....................................................................................10
    3.12    Governmental Consent..............................................................10
    3.13    Permits ........................................................................................10
    3.14    Legal Compliance ......................................................................11
    3.15    Product Warranty.......................................................................11
    3.16    Product Liability ........................................................................11
    3.17    Inventory.....................................................................................11
    3.18    Offering.......................................................................................11
    3.19    Registration and Voting Rights.................................................11
    3.20    Brokers or Finders.....................................................................12
    3.21    Tax Returns and Payments........................................................12
    3.22    Qualified Small Business Stock.................................................12
    3.23    Employee Matters ......................................................................12
    3.24    Employee Benefit Plans.............................................................13
    3.25    Obligations to Related Parties...................................................13
    3.26    Insurance.....................................................................................13
    3.27    Environmental and Safety Laws ...............................................14
    3.28    Projections; Material Facts .......................................................14
    3.29    Franchise Agreements................................................................14

LoveSac - Series A Stock Purchase Agreement (936771_13).DOC

00009

**TABLE OF CONTENTS**
**(continued)**

Page

SECTION 4 REPRESENTATIONS AND WARRANTIES OF THE INVESTORS....................14

| | | |
|---|---|---|
| 4.1 | No Registration | 14 |
| 4.2 | Investment Intent | 14 |
| 4.3 | Investment Experience | 15 |
| 4.4 | Speculative Nature of Investment | 15 |
| 4.5 | Access to Data | 15 |
| 4.6 | Accredited Investor | 15 |
| 4.7 | Residency | 15 |
| 4.8 | Rule 144 | 15 |
| 4.9 | No Public Market | 16 |
| 4.10 | Authorization | 16 |
| 4.11 | No Brokers or Finders | 16 |
| 4.12 | Tax Advisors | 17 |
| 4.13 | Legends | 17 |
| 4.14 | Representations by Non-United States Persons | 17 |

SECTION 5 CONDITIONS TO INVESTORS' OBLIGATIONS TO CLOSE............................18

| | | |
|---|---|---|
| 5.1 | Representations and Warranties | 18 |
| 5.2 | Covenants | 18 |
| 5.3 | Blue Sky | 18 |
| 5.4 | Qualifications | 18 |
| 5.5 | Closing Deliverables | 18 |
| 5.6 | Proceedings and Documents | 19 |
| 5.7 | Consents and Waivers | 19 |
| 5.8 | Walnut SBIC Side Letter Agreement | 19 |
| 5.9 | Indemnification Agreement | 19 |
| 5.10 | Bridge Note Termination | 19 |
| 5.11 | Repayment of Existing Debt Facilities | 19 |
| 5.12 | Reincorporation Merger Dissents | 20 |

SECTION 6 CONDITIONS TO COMPANY'S OBLIGATION TO CLOSE............................20

| | | |
|---|---|---|
| 6.1 | Representations and Warranties | 20 |
| 6.2 | Covenants | 20 |
| 6.3 | Compliance with Securities Laws | 20 |
| 6.4 | Restated Certificate | 20 |
| 6.5 | Investors' Rights Agreement | 20 |
| 6.6 | Voting Agreement | 20 |
| 6.7 | Right of First Refusal and Co-Sale Agreement | 20 |

SECTION 7 MISCELLANEOUS ..............................................................................20

| | | |
|---|---|---|
| 7.1 | Amendment | 20 |
| 7.2 | Notices | 21 |
| 7.3 | Governing Law | 21 |
| 7.4 | Expenses | 21 |
| 7.5 | Survival | 22 |

LoveSac - Series A Stock Purchase Agreement (936771_13).DOC

00010

# TABLE OF CONTENTS
## (continued)

                                                                          **Page**

7.6     Successors and Assigns.................................................................22
7.7     Entire Agreement.......................................................................22
7.8     Delays or Omissions...................................................................22
7.9     Severability.............................................................................22
7.10    Counterparts............................................................................22
7.11    Telecopy Execution and Delivery.................................................23
7.12    Further Assurances....................................................................23
7.13    Attorney's Fees.........................................................................23
7.14    Termination of Bridge Notes.......................................................23

LoveSac – Series A Stock Purchase Agreement (936771_13).DOC

00011

## SCHEDULES

Schedule I    Schedule of Investors

Schedule II    Schedule of Exceptions

## EXHIBITS

Exhibit A    Amended and Restated Certificate of Incorporation

Exhibit B    Investors' Rights Agreement

Exhibit C    Right of First Refusal and Co-Sale Agreement

Exhibit D    Voting Agreement

Exhibit E    Nelson Option Agreement

Exhibit F    McDonough Option Agreement

Exhibit G    Judd Option Agreement

Exhibit H    Weiland Option Agreement

Exhibit I    Wright Option Agreement

Exhibit J    Capitalization Table

Exhibit K    Compliance Certificate

Exhibit L    Secretary's Certificate

Exhibit M    Walnut SBIC Letter Agreement

Exhibit N    Indemnification Agreement

Exhibit O    Repayment of Obligations

LoveSac - Series A Stock Purchase Agreement (936771_13).DOC

00012

# THE LOVESAC CORPORATION

## SERIES A PREFERRED STOCK PURCHASE AGREEMENT

THIS SERIES A PREFERRED STOCK PURCHASE AGREEMENT (this "*Agreement*") is made as of March 3, 2005, by and among The LoveSac Corporation, a Delaware corporation (the "*Company*"), and the persons and entities (each, an "*Investor*" and collectively, the "*Investors*") listed on the Schedule of Investors attached hereto as **Schedule I** (the "*Schedule of Investors*").

## SECTION 1

## AUTHORIZATION, SALE AND ISSUANCE OF SERIES A PREFERRED STOCK

1.1    *Authorization.*    The Company will, prior to the Closing (as defined below), authorize: (a) the sale and issuance of up to 18,632,027 shares of the Company's Series A Preferred Stock, par value $0.0001 per share (the "*Series A Preferred Stock*"), having the rights, privileges, preferences and restrictions set forth in the Amended and Restated Certificate of Incorporation of the Company, in the form attached hereto as **Exhibit A** (the "*Restated Certificate*"), where all 18,632,027 shares of Series A Preferred Stock have been reserved for issuance under this Agreement (the "*Shares*"), and (b) the reservation of shares of Common Stock for issuance upon conversion of the Shares (the "*Conversion Shares*").

1.2    *Sale and Issuance of Shares.*    Subject to the terms and conditions of this Agreement, each Investor agrees, severally and not jointly, at the Closing, to purchase, and the Company agrees to sell and issue to each Investor, severally and not jointly, the number of Shares set forth in the column designated "Number of Series A Shares" opposite such Investor's name on the Schedule of Investors, at a purchase price of $0.80 per share (the "*Purchase Price*"). The Company's agreement with each Investor is a separate agreement, and the sale and issuance of the Shares to each Investor is a separate sale and issuance. No Investor shall be liable for the failure of any other Investor to perform its, his or her obligations under this Section 1.2.

1.3    *Option of Certain Investors.*    For a period commencing on the date hereof and ending on the earlier of (i) the date of the two-year anniversary of the Closing; (ii) the date of the Company's initial public offering of its securities pursuant to a registration statement filed with the Securities and Exchange Commission, (iii) the date of the closing of the Company's next round of Preferred Equity Financing (as defined below), then, subject to the terms herein, each of Brand Equity Ventures II, L.P. or its affiliates ("*BEV*"), Walnut Investment Partners, LP or its affiliates ("*Walnut*"), and Millevere Holdings Limited or its affiliates ("*Millevere*") shall have the option to purchase up to 1,250,000 shares of the Series A Preferred at a per share purchase price equal to the Purchase Price (the "*Option*"), *provided, that,* a majority vote of the Board of Directors of Company (the "*Board*") shall approve the timing and determine the number of shares that may be exercised by each such Investor pursuant to the Option. The Company hereby reserves 3,750,000 of the Shares for issuance pursuant to the Option under this Agreement. At such time that the Option is exercised, the Schedule of Investors attached hereto as **Schedule I**

-1-

00013

shall be revised without any required consent or action of the Investors to reflect the exercise of the Option hereunder.

## SECTION 2

## CLOSING DATE AND DELIVERY

2.1    *Closing.*

(a)    The closing of the purchase, sale and issuance of the Shares (the "*Closing*") shall take place contemporaneously with the execution of this Agreement at the offices of Wilson Sonsini Goodrich & Rosati, Professional Corporation, 2795 East Cottonwood Parkway, Suite 300, Salt Lake City, Utah, on such date as the Company and Investors representing a majority of the Shares to be sold in the Closing shall agree.

(b)    In connection with the execution of this Agreement, each Investor shall execute the Investors' Rights Agreement in substantially the form attached hereto as **Exhibit B** (the "*Investors' Rights Agreement*"), the Right of First Refusal and Co-Sale Agreement in substantially the form attached hereto as **Exhibit C** (the "*Right of First Refusal and Co-Sale Agreement*"), the Voting Agreement in substantially the form attached hereto as **Exhibit D** (the "*Voting Agreement*," and together with this Agreement, the Right of First Refusal and Co-Sale Agreement and the Investors' Rights Agreement, the "*Agreements*").

2.2    *Delivery.* At the Closing, the Company will deliver to each Investor a certificate registered in such Investor's name representing the number of Shares that such Investor is purchasing against payment of the purchase price therefore as set forth in the column designated "Purchase Price" opposite such Investor's name on the Schedule of Investors, by (a) check payable to the Company, (b) wire transfer in accordance with the Company's instructions, (c) cancellation of indebtedness or (d) any combination of the foregoing.  In the event that payment by an Investor is made, in whole or in part, by cancellation of indebtedness, then such Investor shall surrender to the Company for cancellation at the Closing any evidence of indebtedness or shall execute an instrument of cancellation in form and substance acceptable to the Company.

2.3    *Nelson, McDonough, Judd, Weiland and Wright Options.*

(a)    Simultaneously with the Closing, the Company and Shawn D. Nelson shall enter into an Option Agreement in substantially the form attached hereto as **Exhibit E** (the "*Nelson Option Agreement*") pursuant to which Mr. Nelson will be granted options to acquire 4,964,144 shares of Common Stock.

(b)    Simultaneously with the Closing, the Company and Scott W. McDonough shall enter into an Option Agreement in substantially the form attached hereto as **Exhibit F** (the "*McDonough Option Agreement*") pursuant to which Mr. McDonough will be granted options to acquire 1,433,543 shares of Common Stock.

(c)    Simultaneously with the Closing, the Company and Doyle Judd shall enter into an Option Agreement in substantially the form attached hereto as **Exhibit G** (the "*Judd*

-2-

*Option Agreement*") pursuant to which Mr. Judd will be granted options to acquire 514,874 shares of Common Stock.

      (d)    Simultaneously with the Closing, the Company and Tim Weiland shall enter into an Option Agreement in substantially the form attached hereto as **Exhibit H** (the *"Weiland Option Agreement"*) pursuant to which Mr. Weiland will be granted options to acquire 514,847 shares of Common Stock.

      (e)    Simultaneously with the Closing, the Company and Simon Wright shall enter into an Option Agreement in substantially the form attached hereto as **Exhibit I** (the *"Wright Option Agreement"*) pursuant to which Mr. Wright will be granted options to acquire 257,423 shares of Common Stock.

## SECTION 3

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to, and agrees with, each Investor that, except as set forth in the Schedule of Exceptions furnished to the Investors and attached to this Agreement as **Schedule II** (the *"Schedule of Exceptions"*), which disclosures shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the Closing, except as otherwise indicated. The Schedule of Exceptions shall be arranged in Sections corresponding to the numbered and lettered Sections and Subsections contained in this Section 3 and the disclosures in any Section or Subsection of the Schedule of Exceptions shall qualify other Sections and Subsections of this Section 3 to the extent it is apparent from a reading of the disclosure that the disclosure is applicable to such other Sections and Subsections. For purposes of these representations and warranties, the phrase *"to the Company's knowledge"* or words of similar import shall mean the actual knowledge, after reasonable inquiry of employees who might reasonably be expected to have knowledge regarding such information, of the following officers of the Company: the Chief Executive Officer, the President, the Chief Operating Officer and the Chief Financial Officer, which, as of the date of this Agreement, are Shawn D. Nelson, Scott W. McDonough and Doyle Judd. For the avoidance of doubt, for purposes of this Section 3 (excepting Sections 3.1, 3.2, 3.3 and 3.4), the "Company" includes The LoveSac Corporation, a Utah corporation and the corporate predecessor to the Company.

    3.1    *Organization, Good Standing and Qualification.* The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The Company has the requisite corporate power and authority to own and operate its properties and assets, to carry on its business as presently conducted or proposed to be conducted, to execute and deliver the Agreements, to issue and sell the Shares and the Conversion Shares and to perform its obligations pursuant to the Agreements and the Restated Certificate. The Company is presently qualified to do business as a foreign corporation and in good standing (or the local law equivalent) in each jurisdiction where the failure to be so qualified could reasonably be expected to have a material adverse effect on the financial condition, business as now conducted or as proposed to be conducted or properties of the Company and its Subsidiaries, taken as a whole (a *"Material Adverse Effect"*).

3.2     *Subsidiaries.*  The Schedule of Exceptions sets forth a list of all Subsidiaries of the Company.  Each Subsidiary is a corporation or other entity duly organized or formed, validly existing and in good standing (or the local law equivalent) under the laws of its jurisdiction of organization or formation, has all necessary corporate or other entity power and authority to own, lease and operate its properties and to carry on its business as now conducted or proposed to be conducted and is duly qualified and in good standing (or the local law equivalent) in all jurisdictions in which it is required to be so qualified.  Each Subsidiary is wholly owned by the Company and no person has any right to participate in, or receive any payment based on any amount relating to, the revenue, income, value or net worth of the Subsidiary or any portion or component thereof, or any increase or decrease in any of the foregoing.  For purposes of this Agreement, "Subsidiary" of the Company means any corporation or other entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other governing body are at the time directly or indirectly owned or controlled by the Company.  Other than the Subsidiaries listed on the Schedule of Exceptions, the Company owns no capital stock or other securities, or rights or obligations to acquire stock or other securities, of any other entity.

3.3     *Capitalization.*

(a)     Immediately prior to the Closing, the authorized capital stock of the Company will consist of 50,000,000 shares of Common Stock, of which 896,226 shares are issued and outstanding, and 18,633,000 shares of Preferred Stock, all of which are designated Series A Preferred Stock, and of which no shares are issued and outstanding.  The Company has reserved:

(i)     the Shares for issuance pursuant to this Agreement;

(ii)    18,632,027 shares of Common Stock (as may be adjusted in accordance with the provisions of the Restated Certificate) for issuance upon conversion of the Shares;

(iii)   9,937,538 shares of Common Stock authorized for issuance to employees, consultants and directors pursuant to its 2003 Stock Plan (the "*Stock Plan*"), under which options to purchase 7,700,525 shares are issued and outstanding as of the date of this Agreement; and

(iv)    26,600 shares of Common Stock for issuance upon the exercise of outstanding warrants to purchase shares of Common Stock.

(b)     A true, complete and correct capitalization table for the Company that gives effect to the transactions contemplated by this Agreement is attached hereto as **Exhibit J**.

(c)     All issued and outstanding shares of the Company's Common Stock and Preferred Stock have been duly authorized and validly issued and are fully paid and non-assessable.

(d)     The rights, preferences, privileges and restrictions of the Common Stock and the Series A Preferred Stock are as stated in the Restated Certificate.

-4-

(e)    No stock plan, stock purchase, stock option or other agreement or understanding between the Company and any holder of any equity securities or rights to purchase equity securities provides for acceleration or other changes in the vesting provisions or other terms of such agreement or understanding as the result of: (i) termination of employment (whether actual or constructive); (ii) any merger, consolidated sale of stock or assets, change in control or any other transaction(s) by the Company; or (iii) the occurrence of any other event or combination of events.

(f)    The Shares, when issued and delivered and paid for in compliance with the provisions of this Agreement, will be validly issued, fully paid and non-assessable. The Conversion Shares have been duly and validly reserved and, when issued in compliance with the provisions of this Agreement, the Restated Certificate, and applicable law, will be validly issued, fully paid and non-assessable. The Shares and the Conversion Shares will be free of any liens or encumbrances, other than any liens or encumbrances created by or imposed upon the Investors; provided, however, that the Shares and the Conversion Shares are subject to restrictions on transfer under U.S. state and/or federal securities laws and as set forth herein and in the Agreements. Except as set forth in the Agreements, the Shares and the Conversion Shares are not subject to any preemptive rights or rights of first refusal.

(g)    Except for the conversion privileges of the Series A Preferred Stock, the rights provided pursuant to the Agreements, and as otherwise described in this Agreement, there are no options, warrants or other rights to purchase any of the Company's authorized and unissued capital stock (including any preemptive rights and rights of first refusal or similar rights).

3.4    *Authorization.* All corporate action on the part of the Company and its directors, officers and stockholders necessary for the authorization, execution and delivery of the Agreements by the Company, the authorization, sale, issuance and delivery of the Shares and the Conversion Shares has been taken or will be taken prior to the Closing. The Agreements, when executed and delivered by the Company, shall constitute valid and binding obligations of the Company, enforceable in accordance with their terms, except: (i) as limited by laws of general application relating to bankruptcy, insolvency and the relief of debtors; (ii) as limited by rules of law governing specific performance, injunctive relief or other equitable remedies and by general principles of equity; and (iii) to the extent the indemnification provisions contained in the Investors' Rights Agreement may further be limited by applicable laws and principles of public policy.

3.5    *Financial Statements.* The Company has delivered or made available to the Investors its unaudited consolidated balance sheet and statement of operations for the year ended December 31, 2003 and its unaudited consolidated balance sheet and statement of operations for the 10 accounting periods ended October 3, 2004 (the *"Financial Statements"*). The Financial Statements are complete and correct in all material respects, have been prepared in accordance with United States generally accepted accounting principles, consistently applied (*"GAAP"*), except for the absence of footnotes and other presentation items and, in the case of the October 3, 2004 Financial Statements, for normal year end adjustments, none of which (individually or in the aggregate) will be material, and present fairly the financial condition and operating results of the Company and its Subsidiaries as of the dates and for the periods therein indicated.

3.5.1 *Absence of Undisclosed Liabilities*. As of October 3, 2004, the Company had (and as of the date hereof has) no material liabilities (matured or unmatured, fixed or contingent) which are not fully reflected or provided for on the balance sheet of the Company as of October 3, 2004 or any material loss contingency (as defined in Statement of Financial Accounting Standards No. 5), whether or not required by GAAP to be shown on a balance sheet except (i) obligations to perform under commitments incurred in the ordinary course of business since October 3, 2004; and (ii) other material liabilities set forth on the Schedule of Exceptions.

3.6    *Changes*. Since October 3, 2004, there has not been

(a)    any change in the assets, liabilities, financial condition or operating results of the Company or its Subsidiaries from that reflected in the Financial Statements, except changes in the ordinary course of business, that has had a Material Adverse Effect;

(b)    any material damage, destruction or loss, whether or not covered by insurance that has had a Material Adverse Effect;

(c)    any waiver by the Company or any Subsidiary of a valuable right or of a material debt owed to it;

(d)    any material change or amendment to any material agreement by which the Company or any Subsidiary or any of its or their assets or properties is bound or subject that has had a Material Adverse Effect;

(e)    any loans made by the Company or any Subsidiary to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

(f)    any resignation or termination of any executive officer or key employee of the Company or any Subsidiary;

(g)    any material change in any compensation arrangement or agreement with any employee;

(h)    any sale, assignment or transfer of any patents, trademarks, copyrights, trade secrets or other intangible assets;

(i)    any satisfaction or discharge of any lien, claim, or encumbrance or payment of any obligation by the Company or any Subsidiary, except in the ordinary course of business and that is not material to the business, properties, prospects or financial condition of the Company and its Subsidiaries, taken as a whole;

(j)    any declaration, setting aside or payment or other distribution in respect of any of the Company's capital stock, or any direct or indirect redemption, purchase or other acquisition of any of such stock by the Company;

(k)    any mortgage, pledge, transfer of a security interest in, or lien, created by the Company or any Subsidiary, with respect to any of its material properties or assets, except liens for taxes not yet due or payable;

(l)    any receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Company or any Subsidiary; or

(m)    any agreement or commitment by the Company or any Subsidiary to do any of the things described in this Section 3.6.

3.7    *Agreements; Action.*

(a)    Except for the Agreements and agreements between the Company and its employees with respect to sales of the Company's Common Stock, there are no agreements, understandings or proposed transactions between the Company and any of its officers, directors, affiliates, or any affiliate thereof.

(b)    There are no agreements, understandings, instruments, contracts, proposed transactions, judgments, orders, writs or decrees to which the Company or any Subsidiary is a party or by which it is bound that may involve: (i) obligations (contingent or otherwise) of, or payments by the Company or any Subsidiary in excess of, $50,000 other than in the ordinary course of the business of the Company and its Subsidiaries; or (ii) the license of any patent, copyright, trade secret or other proprietary right to or from the Company or any Subsidiary; or (iii) the granting of any rights affecting the development, manufacture, licensing, marketing, sale or distribution of the products or services of the Company and its Subsidiaries; or (iv) indemnification by the Company with respect to infringements of proprietary rights.

(c)    Neither the Company nor any Subsidiary has: (i) declared or paid any dividends or authorized or made any distribution upon or with respect to any class or series of its capital stock; (ii) incurred any indebtedness for money borrowed or any other liabilities individually in excess of $10,000 or, in the case of indebtedness and/or liabilities individually less than $10,000, in excess of $30,000 in the aggregate other than liabilities (excluding indebtedness for money borrowed) incurred in the ordinary course of business; (iii) made any loans or advances to any person, other than ordinary advances for travel expenses, or (iv) sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory in the ordinary course of business.

(d)    The Company has not entered into any letter of intent, memorandum of understanding or other similar document in the past three months: (i) with any representative of any corporation or corporations regarding the merger of the Company or any Subsidiary with or into any such corporation or corporations; (ii) with any representative of any corporation, partnership, association or other business entity or any individual regarding the sale, conveyance or disposition of all or substantially all of the assets of the Company or any Subsidiary or a transaction or series of related transactions in which more than 50% of the voting power of the Company or any Subsidiary would be disposed of; or (iii) regarding any other form of liquidation, dissolution or winding up of the Company or any Subsidiary.

00019

(e)    For the purposes of subsections (b) and (c) above, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same person or entity (including persons or entities the Company has reason to believe are affiliated therewith) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such subsections.

3.8    *Intellectual Property.*

(i)    To the Company's knowledge, the Company and its Subsidiaries own or possess or have the right to use pursuant to a valid and enforceable written license, sublicense, agreement, or permission all Intellectual Property necessary for the operation of the business of the Company and its Subsidiaries as presently conducted and as presently proposed to be conducted within the United States. Each of the Company and its Subsidiaries has taken all reasonable action to maintain and protect each material item of Intellectual Property that it owns or uses, where the failure to take such action would have a Material Adverse Effect. As used in this Agreement, *"Intellectual Property"* means all of the following in any jurisdiction throughout the world: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, slogans, trade names, corporate names, Internet domain names and rights in telephone numbers, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (d) all mask works and all applications, registrations, and renewals in connection therewith, (e) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (f) all computer software (including source code, executable code, data, databases, and related documentation), (g) all advertising and promotional materials, (h) all other proprietary rights, and (i) all copies and tangible embodiments thereof (in whatever form or medium).

(ii)    To the Company's knowledge, neither the Company nor any of its Subsidiaries has interfered with, infringed upon, misappropriated, or otherwise come into conflict with any Intellectual Property rights of third parties, and no director or officer (or employee with responsibility for Intellectual Property matters) of the Company or any of its Subsidiaries has ever received any charge, complaint, claim, demand, or notice alleging any such interference, infringement, misappropriation, or violation (including any claim that the Company or any of its Subsidiaries must license or refrain from using any Intellectual Property rights of any third party). To the Company's knowledge, no third party has interfered with, infringed upon, misappropriated, or otherwise come into conflict with any Intellectual Property rights of the Company or any of its Subsidiaries.

(iii)    The Schedule of Exceptions identifies each patent and trademark or copyright registration that has been issued to the Company or any of its Subsidiaries with respect to any of its Intellectual Property, identifies each pending patent application and

LoveSac - Series A Stock Purchase Agreement (936771_13).DOC

application for trademark and copyright registration that the Company or any of its Subsidiaries has made with respect to any of its Intellectual Property, and identifies each license, sublicense, agreement, or other permission that the Company or any of its Subsidiaries has granted to any third party with respect to any of its Intellectual Property (together with any exceptions). The Schedule of Exceptions also identifies each material unregistered trademark, service mark, trade name, corporate name or Internet domain name. With respect to each item of Intellectual Property required to be identified in the Schedule of Exceptions:

(A)    To the Company's knowledge, the Company and its Subsidiaries own and possess all right, title, and interest in and to the item, free and clear of any lien, license, or other restriction or limitation regarding use or disclosure;

(B)    the item is not subject to any outstanding injunction, judgment, order, decree, ruling, or charge;

(C)    no action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand is pending or, to the Company's knowledge is threatened that challenges the legality, validity, enforceability, use, or ownership of the item, and there are no grounds for the same;

(D)    neither the Company nor any of its Subsidiaries has ever agreed to indemnify any person for or against any interference, infringement, misappropriation, or other conflict with respect to the item; and

(E)    no loss or expiration of the item is threatened, pending, or reasonably foreseeable, except for patents expiring at the end of their statutory terms (and not as a result of any act or omission by the Company or its Subsidiaries, including without limitation, a failure by the Company or its Subsidiaries to pay any required maintenance fees).

(iv)    To the Company's knowledge: (A) neither the Company nor any of its Subsidiaries has interfered with, infringed upon, misappropriated, or otherwise come into conflict with, any Intellectual Property rights of third parties as a result of the operation of its business; (B) there are no facts that indicate a likelihood of any of the foregoing; and (C) no notices regarding any of the foregoing (including, without limitation, any demands or offers to license any Intellectual Property from any third party) have been received.

3.9    *Title to Properties and Assets: Liens.* The Company and each of its Subsidiaries has good and marketable title to its properties and assets, and has good title to all its leasehold interests, in each case subject to no material mortgage, pledge, lien, lease, encumbrance or charge, other than (i) liens for current taxes not yet due and payable, (ii) liens imposed by law and incurred in the ordinary course of business for obligations not past due, (iii) liens in respect of pledges or deposits under workers' compensation laws or similar legislation, and (iv) liens, encumbrances and defects in title which do not in any case materially detract from the value of the property subject thereto or have a Material Adverse Effect, and which have arisen in the ordinary course of business. With respect to the property and assets it leases, the Company and each of its Subsidiaries is in compliance with such leases in all material respects and holds a

LoveSac - Series A Stock Purchase Agreement (936771_13).DOC

00021

valid leasehold interest free of any liens, claims or encumbrances, subject to clauses (i)-(iv) above.

3.10    *Compliance with Other Instruments.*  The Company is not in violation of any term of its Certificate of Incorporation or Bylaws, each as amended to date.  Nor, to the Company's knowledge, is the Company or any of its Subsidiaries in violation of any term or provision of any mortgage, indebtedness, indenture, contract, agreement, instrument, judgment, order or decree to which it is party or by which it is bound which would have a Material Adverse Effect.  The execution and delivery of the Agreements by the Company, the performance by the Company of its obligations pursuant to the Agreements, and the issuance of the Shares, and the Conversion Shares, will not: (i) result in any violation of, or conflict with, or constitute a default under, the Company's Certificate of Incorporation or Bylaws, each as amended to date; or (ii) to the Company's knowledge, result in any violation of, conflict with or constitute a default under any of the agreements, mortgages, indemnities, covenants, instruments, judgments, orders or decrees to which the Company or any of its Subsidiaries is a party, result in the creation of any mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of the Company or any of its Subsidiaries or the suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to the Company, or its or their business or operations or any of its or their assets or properties, in each case that would have a Material Adverse Effect.

3.11    *Litigation.*  There are no actions, suits, proceedings or investigations pending or, to the Company's knowledge, threatened, against the Company or any of its Subsidiaries or its or their properties before any court or governmental agency.  To the Company's knowledge, neither the Company nor any of its Subsidiaries is a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality specifically directed toward the Company.  There is no action, suit or proceeding initiated by the Company or any of its Subsidiaries currently pending or which the Company or any of its Subsidiaries currently intends to initiate.

3.12    *Governmental Consent.*  No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Agreement, or the offer, sale or issuance of the Shares and the Conversion Shares, or the consummation of any other transaction contemplated by this Agreement, except: (i) filing of the Restated Certificate with the office of the Secretary of State of the State of Delaware; (ii) the filing of such notices as may be required under the Securities Act of 1933, as amended (the *"Securities Act"*); and (iii) such filings as may be required under applicable state securities laws.

3.13    *Permits.*  The Company has all franchises, permits, licenses, and any similar authority necessary for the conduct of its business as now being conducted by it, the lack of which would have a Material Adverse Effect, and believes it can obtain, without undue burden or expense, any similar authority for the conduct of its business as presently planned to be conducted.  The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

-10-

3.14    *Legal Compliance.* Each of the Company, its Subsidiaries, and their respective predecessors and affiliates has complied with all applicable laws (including rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, and charges thereunder and including the Foreign Corrupt Practices Act, 15 U.S.C. 78dd-1 et seq., the Federal Trade Commission rule on franchise disclosure and state franchise registration and termination laws and regulations) of federal, state, local, and foreign governments (and all agencies thereof), where the failure to so comply would have a Material Adverse Effect, and to the Company's knowledge, no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice has been filed or commenced against any of them alleging any failure so to comply.

3.15    *Product Warranty.* To the Company's knowledge, each product manufactured, sold, leased, or delivered by the Company or any of its Subsidiaries has been in conformity with all applicable contractual commitments and all express and implied warranties, and neither the Company nor any of its Subsidiaries has any liability (and there is no basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any liability) for replacement or repair thereof or other damages in connection therewith. To the Company's knowledge, no product manufactured, sold, leased, or delivered by the Company or any of its Subsidiaries is subject to any guaranty, warranty, or other indemnity beyond the applicable standard terms and conditions of sale or lease set forth in the Schedule of Exemptions.

3.16    *Product Liability.* To the Company's knowledge, neither the Company nor any of its Subsidiaries has any material liability (and there is no basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any liability) arising out of any injury to individuals or property as a result of the ownership, possession, or use of any product manufactured, sold, leased, or delivered by the Company or any of its Subsidiaries.

3.17    *Inventory.* The inventory of the Company and its Subsidiaries consists of raw materials and supplies, manufactured and purchased parts, goods in process, and finished goods, all of which is merchantable and fit for the purpose for which it was procured or manufactured, and none of which is obsolete, damaged, or defective, except as such inventory has been excluded from the balance sheets included in the Financial Statements.

3.18    *Offering.* Subject to the accuracy of the Investors' representations and warranties in <u>Section 4</u>, the offer, sale and issuance of the Shares to be issued in conformity with the terms of this Agreement and the issuance of the Conversion Shares, constitute transactions exempt from the registration requirements of Section 5 of the Securities Act and from the registration or qualification requirements of applicable state securities laws, and neither the Company nor any authorized agent acting on its behalf will take any action hereafter that would cause the loss of such exemption.

3.19    *Registration and Voting Rights.* Except as set forth in the Investors' Rights Agreement, the Company is presently not under any obligation and has not granted any rights to register under the Securities Act any of its presently outstanding securities or any of its securities that may hereafter be issued. To the Company's knowledge, except as contemplated in the

-11-

Voting Agreement, no stockholder of the Company has entered into any agreements with respect to the voting of capital shares of the Company.

3.20    *Brokers or Finders*.  Except as set forth in <u>Section 3.20</u> of the Schedule of Exceptions, the Company has not incurred, and will not incur, directly or indirectly, as a result of any action taken by the Company, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or any of the transactions contemplated hereby.

3.21    *Tax Returns and Payments*.  The Company and each Subsidiary has timely filed all tax returns required to be filed by it with appropriate federal, state and local governmental agencies, except where the failure to do so would not have a Material Adverse Effect.  Such returns and reports are true and correct in all material respects.  All taxes shown to be due and payable on such returns, any assessments imposed, and, to the Company's knowledge, all other taxes due and payable by the Company or any Subsidiary on or before the Closing have been paid or will be paid prior to the time they become delinquent.  The Company has not been advised in writing (i) that any of its returns have been or are being audited as of the date hereof, or (ii) of any deficiency in assessment or proposed judgment with respect to its federal, state or local taxes.

3.22    *Qualified Small Business Stock*.  As of the date hereof, the Shares, to the Company's knowledge, constitute "qualified small business stock" within the meaning of Section 1202 of the Internal Revenue Code of 1986, as amended.

3.23    *Employee Matters*.

(a)    Neither the execution or delivery of the Agreements, nor the carrying on of the business of the Company and its Subsidiaries by the employees of the Company or any of its Subsidiaries, nor the conduct of the business of the Company and its Subsidiaries as now conducted and as presently proposed to be conducted, will, to the Company's knowledge, conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant or instrument under which any such employee is now obligated.

(b)    Neither the Company nor any of its Subsidiaries is delinquent in payments to any of its employees, consultants, or independent contractors for any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to such employees, consultants, or independent contractors.  The Company and each of its Subsidiaries has complied with all applicable state and federal equal employment opportunity laws and with other laws related to employment, including those related to wages, hours, worker classification, collective bargaining, and the payment and withholding of taxes and other sums as required by law except where noncompliance with any applicable law would not result in a Material Adverse Effect.  The Company and each of its Subsidiaries has withheld and paid to the appropriate governmental entity or is holding for payment not yet due to such governmental entity all amounts required to be withheld from employees of the Company or any of its Subsidiaries and is not liable for any arrears of wages, taxes, penalties, or other sums for failure to comply with any of the foregoing.

-12-

(c)    Neither the Company nor any of its Subsidiaries has any liabilities to former employees for unpaid wages.

(d)    To the Company's knowledge, none of the officers or directors of the Company or any Subsidiary during the previous 5 years has been (a) subject to voluntary or involuntary petition under the federal bankruptcy laws or any state insolvency law or the appointment of a receiver, fiscal agent or similar officer by a court for his business or property; (b) convicted in a criminal proceeding or named as a subject of a pending criminal proceeding (excluding traffic violations and other minor offenses); (c) subject to any order, judgment, or decree (not subsequently reversed, suspended, or vacated) of any court of competent jurisdiction permanently or temporarily enjoining him from engaging, or otherwise imposing limits or conditions on his engagement in any securities, investment advisory, banking, insurance, or other type of business or acting as an officer or director of a public company; or (d) found by a court of competent jurisdiction in a civil action or by the Securities and Exchange Commission or the Commodity Futures Trading Commission to have violated any federal or state securities, commodities, or unfair trade practices law, which such judgment or finding has not been subsequently reversed, suspended, or vacated.

3.24    *Employee Benefit Plans*.    The Company and each of its Subsidiaries is in substantial compliance with its "employee benefit plans" as defined in the Employee Retirement Income Security Act of 1974, as amended.

3.25    *Obligations to Related Parties*.    No employee, officer, director or, to the Company's knowledge, stockholder of the Company or member of his or her immediate family is indebted to the Company, nor is the Company indebted (or committed to make loans or extend or guarantee credit) to (a) any of them in excess of $25,000 or (b) all of them, with respect to those not in excess of $25,000, in the aggregate in excess of $75,000, in each case, other than (i) for payment of salary for services rendered, (ii) reimbursement for reasonable expenses incurred on behalf of the Company and (iii) for other standard employee benefits made generally available to all employees (including stock option agreements outstanding under any stock option plan approved by the Board and stock purchase agreements approved by the Board).  To the Company's knowledge, none of such persons has any direct or indirect ownership interest in any firm or corporation with which the Company is affiliated or with which the Company has a business relationship, or any firm or corporation that competes with the Company, except in connection with the ownership of stock in publicly-traded companies.  To the Company's knowledge, no employee, officer, director or stockholder, nor any member of their immediate families, is, directly or indirectly, interested in any material contract with the Company (other than such contracts as relate to any such person's ownership of capital stock or other securities of the Company).

3.26    *Insurance*.    The Schedule of Exceptions sets forth a complete list of the Company's insurance policies currently in effect. With respect to each such insurance policy: (A) the policy is legal, valid, binding, enforceable, and in full force and effect; (B) the policy will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated hereby; (C) neither the Company nor any of its Subsidiaries nor any other party to the policy is in material breach or default (including with respect to the payment of premiums or the giving of notices), and no event has

-13-

00025

occurred that, with notice or lapse of time, would constitute such a material breach or default, or permit termination, modification, or acceleration, under the policy; and (D) no party to the policy has repudiated any provision thereof. The Schedule of Exceptions describes any self-insurance arrangements affecting the Company or any of its Subsidiaries.

3.27    *Environmental and Safety Laws.* To the Company's knowledge, the Company or any of its Subsidiaries is not in violation in any material respect of any applicable statute, law, or regulation relating to the environment or occupational health and safety (including, without limitation, the Americans with Disabilities Act), and to its knowledge, no material expenditures are or will be required in order for the Company or any Subsidiary to comply with any such existing statute, law, or regulation.

3.28    *Projections; Material Facts.* In connection with the transactions contemplated by this Agreement, the Company has furnished to the Investors certain projected budgets, projected financial information and forecasts. Such projected budgets, projected financial information and forecasts were prepared by the Company in good faith based on assumptions the Company and Messrs. Nelson, McDonough and Judd believe to be reasonable and otherwise based on their respective best knowledge. No representation or warranty by the Company contained in this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or herein not misleading, when all are taken together as a whole. The Company does not know of any information or fact which has or would have a Material Adverse Effect.

3.29    *Franchise Agreements.* The Schedule of Exceptions sets forth a list of all area development agreements and franchise agreements to which the Company or any Subsidiary is a party as franchisor (the ***"Franchise Agreements"***). To the Company's knowledge, all Franchise Agreements were entered into with franchisees in accordance with the statutes, rules and regulations governing the sale of franchises in effect at the time of execution of such Franchise Agreements.

## SECTION 4

## REPRESENTATIONS AND WARRANTIES OF THE INVESTORS

Each Investor hereby, severally and not jointly, represents and warrants to the Company as of the date of the Closing, as follows:

4.1    *No Registration.* Such Investor understands that the Shares and the Conversion Shares, have not been, and will not be, registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of such Investor's representations as expressed herein or otherwise made pursuant hereto.

4.2    *Investment Intent.* Such Investor is acquiring the Shares, and the Conversion Shares, for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof, and that such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Such

Investor further represents that it does not have any contract, undertaking, agreement or arrangement with any person or entity to sell, transfer or grant participation to such person or entity or to any third person or entity with respect to any of the Shares or the Conversion Shares.

4.3    *Investment Experience.*  Such Investor, has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company and acknowledges that such Investor, can protect its own interests. Such Investor has such knowledge and experience in financial and business matters so that such Investor is capable of evaluating the merits and risks of its investment in the Company.

4.4    *Speculative Nature of Investment.*  Such Investor understands and acknowledges that the Company has a limited financial and operating history and that an investment in the Company is highly speculative and involves substantial risks. Such Investor can bear the economic risk of such Investor's investment and is able, without impairing such Investor's financial condition, to hold the Shares and the Conversion Shares for an indefinite period of time and to suffer a complete loss of such Investor's investment.

4.5    *Access to Data.*  Such Investor has had an opportunity to ask questions of, and receive answers from, the officers of the Company concerning the Agreements, the exhibits and schedules attached hereto and thereto and the transactions contemplated by the Agreements, as well as the Company's business, management and financial affairs, which questions were answered to its satisfaction. Such Investor believes that it has received all the information such Investor considers necessary or appropriate for deciding whether to purchase the Shares and the Conversion Shares. Such Investor acknowledges that any business plans prepared by the Company have been, and continue to be, subject to change and that any projections included in such business plans or otherwise are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results.

4.6    *Accredited Investor.*  The Investor is an "accredited investor" within the meaning of Regulation D, Rule 501(a), promulgated by the Securities and Exchange Commission under the Securities Act and shall submit to the Company such further assurances of such status as may be reasonably requested by the Company.

4.7    *Residency.*  The residency of the Investor (or, in the case of a partnership or corporation, such entity's principal place of business) is correctly set forth on the Schedule of Investors.

4.8    *Rule 144.*  Such Investor acknowledges that the Shares and the Conversion Shares must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available. Such Investor is aware of the provisions of Rule 144 promulgated under the Securities Act which permit limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions, including among other things, the existence of a public market for the shares, the availability of certain current public information about the Company, the resale occurring not less than one year after a party has purchased and paid for the security to be sold, the sale being effected through a "broker's transaction" or in transactions directly with a "market maker" and the number of shares being

sold during any three-month period not exceeding specified limitations. Such Investor understands that the current public information referred to above is not now available and the Company has no present plans to make such information available. Such Investor acknowledges and understands that notwithstanding any obligation under the Investors' Rights Agreement, the Company may not be satisfying the current public information requirement of Rule 144 at the time the Investor wishes to sell the Shares or the Conversion Shares, and that, in such event, the Investor may be precluded from selling such securities under Rule 144, even if the other requirements of Rule 144 have been satisfied. Such Investor acknowledges that, in the event all of the requirements of Rule 144 are not met, registration under the Securities Act or an exemption from registration will be required for any disposition of the Shares or the underlying Common Stock. Such Investor understands that, although Rule 144 is not exclusive, the Securities and Exchange Commission has expressed its opinion that persons proposing to sell restricted securities received in a private offering other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales and that such persons and the brokers who participate in the transactions do so at their own risk.

4.9    *No Public Market.* Such Investor understands and acknowledges that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

4.10    *Authorization.*

(a)    Such Investor has all requisite power and authority to execute and deliver the Agreements, to purchase the Shares hereunder and to carry out and perform its obligations under the terms of the Agreements. All action on the part of the Investor necessary for the authorization, execution, delivery and performance of the Agreements, and the performance of all of the Investor's obligations under the Agreements, has been taken or will be taken prior to the Closing.

(b)    The Agreements, when executed and delivered by the Investor, will constitute valid and legally binding obligations of the Investor, enforceable in accordance with their terms except: (i) to the extent that the indemnification provisions contained in the Investors' Rights Agreement may be limited by applicable law and principles of public policy, (ii) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (iii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies or by general principles of equity.

(c)    No consent, approval, authorization, order, filing, registration or qualification of or with any court, governmental authority or third person is required to be obtained by the Investor in connection with the execution and delivery of the Agreements by the Investor or the performance of the Investor's obligations hereunder or thereunder.

4.11    *No Brokers or Finders.* Such Investor has not engaged any brokers, finders or agents, and neither the Company nor any other Investor has, nor will, incur, directly or indirectly,

as a result of any action taken by such Investor, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with the Agreements.

4.12    *Tax Advisors.*  Such Investor has reviewed with its own tax advisors the U.S. federal, state, local and foreign tax consequences of this investment and the transactions contemplated by the Agreements.  With respect to such matters, such Investor relies solely on such advisors and not on any statements or representations of the Company or any of its agents, written or oral. The Investor understands that it (and not the Company) shall be responsible for its own tax liability that may arise as a result of this investment or the transactions contemplated by the Agreements.

4.13    *Legends.*  Such Investor understands and agrees that the certificates evidencing the Shares or the Conversion Shares, or any other securities issued in respect of the Shares or the Conversion Shares upon any stock split, stock dividend, recapitalization, merger, consolidation or similar event, shall bear the following legend (in addition to any legend required by the Investors' Rights Agreement or under applicable state securities laws):

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE, AND MAY NOT BE OFFERED, SOLD OR TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER SUCH ACT AND/OR APPLICABLE STATE SECURITIES LAWS, OR UNLESS THE ISSUER HAS RECEIVED AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER AND ITS COUNSEL THAT OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH SUCH ACT AND ANY APPLICABLE STATE SECURITIES LAWS."

4.14    *Representations by Non-United States Persons.*  If an Investor is not a United States person, such Investor hereby represents that such Investor is satisfied as to the full observance of the laws of such Investor's jurisdiction in connection with any invitation to subscribe for the Shares and the Conversion Shares or any use of this Agreement, including (i) the legal requirements within such Investor's jurisdiction for the purchase of Shares and the Conversion Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of such securities.  Such Investor's subscription and payment for, and such Investor's continued beneficial ownership of, the Shares and the Conversion Shares will not violate any applicable securities or other laws of such Investor's jurisdiction.

## SECTION 5

## CONDITIONS TO INVESTORS' OBLIGATIONS TO CLOSE

Each Investor's obligation to purchase the Shares at the Closing (except as otherwise indicated) is subject to the fulfillment on or before the Closing of each of the following conditions, unless waived by the applicable Investor purchasing the Shares:

5.1     *Representations and Warranties.*  The representations and warranties made by the Company in Section 3 (as modified by the disclosures on the Schedule of Exceptions) shall be true and correct in all material respects as of the date of the Closing (except for representations and warranties having materiality qualifiers, which shall be true and correct in all respects).

5.2     *Covenants.*  All covenants, agreements and conditions contained in this Agreement to be performed by the Company on or prior to the Closing shall have been performed or complied with in all material respects.

5.3     *Blue Sky.*  The Company shall have obtained all necessary Blue Sky law permits and qualifications, or have the availability of exemptions therefrom, required by any state for the offer and sale of the Shares and the Conversion Shares.

5.4     *Qualifications.*  All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares and the Conversion Shares pursuant to this Agreement shall be obtained.

5.5     *Closing Deliverables.*  The Company shall have delivered to counsel to the Investors the following:

(a)     The Restated Certificate shall have been duly authorized, executed and filed with and accepted by the Secretary of State of the State of Delaware.

(b)     The Investors (each as defined in the Investors' Rights Agreement) shall have executed and delivered the Investors' Rights Agreement.

(c)     The Stockholders and the Investors (each as defined in the Voting Agreement) shall have executed and delivered the Voting Agreement.

(d)     The Stockholders and the Investors (each as defined in the Right of First Refusal and Co-Sale Agreement) shall have executed and delivered the Right of First Refusal and Co-Sale Agreement.

(e)     A certificate executed by the Chief Executive Officer, President or Chief Financial Officer of the Company on behalf of the Company, in substantially the form attached hereto as **Exhibit K**, certifying the satisfaction of the conditions to the Closing listed in Sections 5.1 and 5.2.

-18-

00030

(f)    A certificate of the Secretary of State of the State of Delaware, dated as of a date within five days of the date of the Closing, with respect to the good standing of the Company.

(g)    A certificate of the Company executed by the Company's Secretary, in substantially the form attached hereto as **Exhibit L**, attaching and certifying to the truth and correctness of (1) the Restated Certificate, (2) the Bylaws and (3) the board and stockholder resolutions adopted in connection with the transactions contemplated by this Agreement.

(h)    A certificate of the Director of the Utah Division of Corporations and Commercial Code, dated as of a date within five days of the date of the Closing, with respect to the good standing of the Company.

(i)    An executed copy of that certain letter agreement regarding Mr. Nelson's appearance on and prize money related to that certain television show titled the *Rebel Billionaire*.

(j)    Certificates evidencing the purchased Shares.

5.6    *Proceedings and Documents*.  The corporate and other proceedings required to carry out the transactions contemplated by this Agreement, and all instruments and other documents relating to such transactions, shall be reasonably satisfactory in form and substance to the Investors and their counsel, and the Investors shall have been furnished with such instruments and documents as it shall have reasonably requested.

5.7    *Consents and Waivers*.  The Company shall have obtained any and all consents, permits and waivers necessary or appropriate for the performance by the Company of its obligations pursuant to the Agreements.

5.8    *Walnut SBIC Side Letter Agreement*.  The Company shall have entered into the SBIC side letter agreement with Walnut in the form attached hereto as **Exhibit M** (the "*Walnut SBIC Side Letter Agreement*"), which contains certain representations and covenants relating to the status of Walnut as a "Small Business Investment Company" licensed by the Small Business Administration.

5.9    *Indemnification Agreement*.    The Company shall have entered into an indemnification agreement with each of the directors of the Company substantially in the form attached as **Exhibit N** (the "*Indemnification Agreement*").

5.10    *Bridge Note Termination*.  The transactions contemplated by Section 7.14 of this Agreement shall have been consummated.

5.11    *Repayment of Existing Debt Facilities*.  The Company shall have repaid (or arranged for the repayment) in full all of its indebtedness for money borrowed and all of the indebtedness for money borrowed of any of its Subsidiaries, all in a manner that shall be reasonably satisfactory to the Investors and their counsel, which is set forth on **Exhibit O**. Without limiting the generality of the foregoing, all holders of the Company's (or any Subsidiary's) indebtedness for money borrowed that shall be repaid shall, at the time of

-19-

repayment, release all liens, security interests, mortgages and other collateral that secured such indebtedness.

5.12    *Reincorporation Merger Dissents.* The holders of not more than five percent (5%), in the aggregate, of the outstanding capital stock of The LoveSac Corporation, a Utah corporation and the corporate predecessor of the Company, shall have given notice of intent to demand payment under Section 16-10a-1321 of the Utah Revised Business Corporation Act ("*URBCA*").

## SECTION 6

## CONDITIONS TO COMPANY'S OBLIGATION TO CLOSE

The Company's obligation to sell and issue the Shares at the Closing is subject to the fulfillment on or before the Closing of the following conditions, unless waived by the Company:

6.1    *Representations and Warranties.* The representations and warranties made by the Investors in <u>Section 4</u> shall be true and correct when made and shall be true and correct as of the date of the Closing.

6.2    *Covenants.*    All covenants, agreements and conditions contained in the Agreements to be performed by Investors on or prior to the date of the Closing shall have been performed or complied with.

6.3    *Compliance with Securities Laws.* The Company shall be satisfied that the offer and sale of the Shares and the Conversion Shares shall be qualified or exempt from registration or qualification under all applicable federal and state securities laws (including receipt by the Company of all necessary blue sky law permits and qualifications required by any state, if any).

6.4    *Restated Certificate.* The Restated Certificate shall have been duly authorized, executed and filed with and accepted by the Secretary of State of the State of Delaware.

6.5    *Investors' Rights Agreement.* The Investors (each as defined in the Investors' Rights Agreement) shall have executed and delivered the Investors' Rights Agreement.

6.6    *Voting Agreement.* The Stockholders and the Investors (each as defined in the Voting Agreement) shall have executed and delivered the Voting Agreement.

6.7    *Right of First Refusal and Co-Sale Agreement.* The Stockholders and the Investors (each as defined in the Right of First Refusal and Co-Sale Agreement) shall have executed and delivered the Right of First Refusal and Co-Sale Agreement.

## SECTION 7

## MISCELLANEOUS

7.1    *Amendment.* Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written

instrument referencing this Agreement and signed by the Company and the Investors holding at least fifty-five percent (55%) of the Common Stock issued or issuable upon conversion of the Shares issued pursuant to this Agreement; *provided, that*, Investors, or any affiliates of such Investors, purchasing Shares pursuant to the Option may, without any amendment of this Agreement pursuant to this Section 7.1 or any consent or approval of any other Investor, become parties to this Agreement by executing a counterpart signature page to this Agreement, if such Investor or affiliate has not already done so; Schedule I of this Agreement shall be updated to reflect such a purchase under the Option. Any such amendment, waiver, discharge or termination effected in accordance with this paragraph shall be binding upon each holder of any securities purchased under this Agreement at the time outstanding (including securities into which such securities have been converted or exchanged or for which such securities have been exercised) and each future holder of all such securities. Each Investor acknowledges that by the operation of this paragraph, the holders of fifty-five percent (55%) of the Common Stock issued or issuable upon conversion of the Shares issued pursuant to this Agreement will have the right and power to diminish or eliminate all rights of such Investor under this Agreement.

7.2    *Notices.* All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile, with receipt confirmed, or otherwise delivered by hand or by messenger addressed:

(a)    if to an Investor, at the Investor's address, facsimile number as shown in the Company's records, as may be updated in accordance with the provisions hereof;

(b)    if to any other holder of any Shares or Conversion Shares, at such address, facsimile number as shown in the Company's records, or, until any such holder so furnishes an address or facsimile number to the Company, then to and at the address of the last holder of such Shares or Conversion Shares for which the Company has contact information in its records; or

(c)    if to the Company, to 155 North 400 West, Suite 520, Salt Lake City, UT 84103, Facsimile: (801) 532-3936, *Attn: Chief Executive Officer*, or at such other address as the Company shall have furnished to the Investors.

With respect to any notice given by the Company under any provision of the Delaware General Corporation Law or the Company's charter or bylaws, each Investor agrees that such notice may given by facsimile.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given when delivered if delivered personally, or, if sent by mail, at the earlier of its receipt or 48 hours after the same has been deposited in a regularly maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid or, if sent by facsimile, upon confirmation of facsimile transfer.

7.3    *Governing Law.* This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law.

7.4    *Expenses.* The Company and the Investors shall each pay their own expenses in connection with the transactions contemplated by this Agreement; provided, however, that if the

LoveSac - Series A Stock Purchase Agreement (936771_13).DOC

00033

Closing is effected, the Company shall reimburse the Investors the reasonable and documented fees and expenses of one investor counsel to the Investors up to a maximum of $25,000.

7.5     *Survival*.  The representations, warranties, covenants and agreements made in this Agreement shall survive any investigation made by any party hereto and the closing of the transactions contemplated hereby for eighteen (18) months from the date of the Closing.

7.6     *Successors and Assigns*.  This Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by any Investor without the prior written consent of the Company; provided, however, that any Investor may assign its rights hereunder to any affiliate with respect to any Shares that have been transferred to such affiliate.  Any attempt by an Investor without such permission to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void.  Subject to the foregoing and except as otherwise provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

7.7     *Entire Agreement*.  This Agreement, including the exhibits attached hereto, constitute the full and entire understanding and agreement among the parties with regard to the subjects hereof and thereof.  No party shall be liable or bound to any other party in any manner with regard to the subjects hereof or thereof by any warranties, representations or covenants except as specifically set forth herein or therein.

7.8     *Delays or Omissions*.  Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to any party to this Agreement upon any breach or default of any other party under this Agreement shall impair any such right, power or remedy of such non-defaulting party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any party to this Agreement, shall be cumulative and not alternative.

7.9     *Severability*.  If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision.  The balance of this Agreement shall be enforceable in accordance with its terms.

7.10     *Counterparts*.  This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

-22-

7.11 *Telecopy Execution and Delivery.* A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto and delivered by such party by facsimile or any similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen. Such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute and deliver an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

7.12 *Further Assurances.* Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and do all such other acts and things as may be necessary to more fully effectuate this Agreement.

7.13 *Attorney's Fees.* In the event that any suit or action is instituted to enforce any provisions in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party all fees, costs and expenses of enforcing any right of such prevailing party under or with respect to this Agreement, including without limitation, such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals.

7.14 *Termination of Bridge* Notes. Each of P. Steven McDonough, First Trust Corporation TTEE FBO: SCOTT W. MCDONOUGH, Paul and Kristina McDonough Family Limited Partnership, Wayne Sorensen, CAD Industries, LTD., M. Daniel Lunt, David L. Nelson, Western Development & Construction, LLC, Brett Blake, Bradford Richardson, Jacob Sverdlov, Lighthouse Equity, LLC, W. Russell Erskine, Megan Erskine, Urania Erskine, Seth McCormick, Monarch Partners, LLC, Thomas Lloyd Gardner, Nathan Wallace Gardner, Dinesh Patel, Doyle Judd, Brand Equity Ventures II, L.P. and Walnut Investment Partners, LP (collectively, the *"Bridge Investors"*) and the Company acknowledge that each of the Bridge Investors, was issued by the Company convertible promissory notes as follows (collectively, the *"Convertible Notes"* and individually, a *"Convertible Note"*):

| Noteholder | Dated | Principal Amount |
|---|---|---|
| P. Steven McDonough | September 28, 2004 | $ 22,000.00 |
| First Trust Corporation TTEE FBO: SCOTT W. MCDONOUGH | September 29, 2004 | $ 33,000.00 |
| Paul and Kristina McDonough Family Limited Partnership | September 29, 2004 | $ 27,500.00 |
| Wayne Sorenson | September 29, 2004 | $ 110,000.00 |
| CAD Industries, LTD. | October 10, 2004 | $ 55,000.00 |

-23-

00035

| Noteholder | Dated | Principal Amount |
|---|---|---|
| M. Daniel Lunt | September 27, 2004 | $ 16,500.00 |
| David L. Nelson | September 27, 2004 | $ 22,000.00 |
| Western Development & Construction, LLC. | October 11, 2004 | $ 44,000.00 |
| Brett Blake | November 16, 2004 | $ 55,000.00 |
| Bradford Richardson | November 16, 2004 | $ 82,500.00 |
| Jacob Sverdlov | December 1, 2004 | $ 25,000.00 |
| Lighthouse Equity, LLC | October 18, 2004 | $ 49,400.00 |
| W. Russell Erskine | October 18, 2004 | $ 60,515.00 |
| Megan Erskine | October 18, 2004 | $ 11,115.00 |
| Urania Erskine | October 18, 2004 | $ 2,470.00 |
| Seth McCormick | January 10, 2005 | $ 50,000.00 |
| Monarch Partners, LLC | January 21, 2005 | $ 68,750.00 |
| Thomas Lloyd Gardner | January 21, 2005 | $ 68,750.00 |
| Nathan Wallace Gardner | January 21, 2005 | $ 27,500.00 |
| Dinesh Patel | January 21, 2005 | $ 55,000.00 |
| Doyle Judd | September 22, 2004 | $ 33,000.00 |
| Brand Equity Ventures II, L.P. | February 18, 2005 | $ 200,000.00 |
| Walnut Investment Partners, LP | February 18, 2005 | $ 200,000.00 |

Each of the Company and each of the Bridge Investors hereby agree that, immediately prior to the Closing, each of the Convertible Notes and all rights title and interest arising under each such document are hereby canceled, released, extinguished and of no further force or effect and each of the Bridge Investors accepts in full satisfaction and accord the substitution of the rights granted to the Bridge Investors in this Agreement. Concurrently with the execution of this Agreement and the issuance by the Company to each Bridge Investor the number of Shares listed on **Schedule I**, each Bridge Investor, as applicable, has delivered to the Company such Convertible Note held by such Bridge Investor for cancellation by the Company.

Notwithstanding the foregoing, the cancellation, release and extinguishment of each such Convertible Note are effective whether or not such note is delivered to and canceled by the Company.

*[The remainder of this page is left intentionally blank]*

00037

*IN WITNESS WHEREOF*, the parties have executed and delivered this Agreement as of the date first set forth above.

**"COMPANY"**

THE LOVESAC CORPORATION
a Delaware corporation

By: _____
Name:  Shawn D. Nelson
Title:   Chief Executive Officer

Address:   155 North 400 West, Suite 520
Salt Lake City, Utah 84103
F:  801.532.3936

[SIGNATURE PAGE TO THE LOVESAC CORPORATION SERIES A PREFERRED STOCK PURCHASE AGREEMENT]

**"INVESTOR"**

MILLEVERE HOLDINGS LIMITED

By:_____

Name:_____

Title:_____

NIALL M RITCHIE
DIRECTOR

# THE LOVESAC CORPORATION
a Delaware corporation

# RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT

**Dated as of March 3, 2005**

# TABLE OF CONTENTS

**Page**

1.  *Certain Definitions* ..................................................................................................... 1

2.  *Restrictions on Transfer* ............................................................................................. 3

3.  *Right of First Refusal.* ................................................................................................. 3

4.  *Right of Co-Sale.* ......................................................................................................... 4

5.  *Conditions to Valid Transfer.* ..................................................................................... 6

6.  *Restrictive Legend and Stop Transfer Orders; Legend* ............................................. 7

7.  *Termination* ................................................................................................................. 7

8.  *Miscellaneous Provisions.* .......................................................................................... 7

# RIGHT OF FIRST REFUSAL
# AND CO-SALE AGREEMENT

This Right of First Refusal and Co-Sale Agreement (this *"Agreement"*) is made as of March 3, 2005 by and among The LoveSac Corporation, a Delaware corporation (the *"Company"*), the individuals and entities listed on **Schedule I** attached hereto (each, an *"Investor,"* and collectively, the *"Investors"*) and the individuals listed on **Schedule II** attached hereto (each, a *"Stockholder,"* and collectively, the *"Stockholders"*).

## RECITALS

**WHEREAS:** Each Stockholder currently owns that number of Seller Shares (as defined below) indicated beside such Stockholder's name on **Schedule II** hereto.

**WHEREAS:** The Company proposes to sell shares of the Company's Series A Preferred Stock, $0.0001 par value per share (the *"Series A Preferred Stock"*) to the Investors listed on **Schedule I** hereto (the *"Series A Investors"*) pursuant to that certain Series A Preferred Stock Purchase Agreement (the *"Purchase Agreement"*) of even date herewith (the *"Series A Financing"*) and it is a condition to the closing of the sale of the Series A Preferred Stock to the Series A Investors that the Investors and the Company execute and deliver this Agreement.

**NOW, THEREFORE:** in consideration of the mutual promises and covenants herein contained, and other consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.    *Certain Definitions.* For purposes of this Agreement, the following terms have the following meanings:

A.    *"Common Stock"* means the Common Stock of the Company, $0.0001 par value per share.

B.    *"Convertible Securities"* means all then outstanding options, warrants, rights, convertible notes, Preferred Stock or other securities of the Company directly or indirectly convertible into, exchangeable for or exercisable for shares of Common Stock.

C.    *"Co-Sale Eligible Investor"* means each Investor who is not a Seller, in such instance.

D.    *"days"* means calendar days; provided that if any day falls on a weekend or a federal holiday, the term "day" shall mean the next business day.

E.    *"Preferred Stock"* means the Series A Preferred Stock.

F.    *"Qualified Initial Public Offering"* means the closing of the Company's first bona fide firm commitment underwritten initial public offering pursuant to an effective registration

-1-

00042

by the Company pursuant to its Rights of First Refusal ("*Residual Shares*"). Subject to the limitations of this Section 4, to the extent that the Company does not exercise its Right of First Refusal with respect to all or any part of the Offered Shares, as applicable, pursuant to Section 3 hereof, then, each Series A Investor receiving the Transfer Notice ("*Co-Sale Eligible Investor*") shall have the right to participate in such sale of the Residual Shares on the same terms and conditions as specified in the Transfer Notice. To exercise its rights hereunder, each Co-Sale Eligible Investor exercising its Right of Co-Sale (a "*Selling Series A Investor*") must provide a written notice to Seller within 20 days after delivery of the Update Notice indicating the number of shares it holds that it wishes to sell pursuant to this Section 4(A) (the "*Series A Investor Exercise Period*").

(2)    If the aggregate number of shares that the Selling Series A Investors desire to sell (as evidenced by written notices delivered to Seller) exceeds the number of Residual Shares, each Selling Series A Investor will be entitled to sell up to its *pro rata* share of the Residual Shares which shall be equal to that number of Residual Shares equal to the product obtained by multiplying (x) the number of Residual Shares by (y) a fraction, (i) the numerator of which shall be the number of shares of Common Stock issued or issuable upon conversion of the Series A Preferred Stock held on the date of the Transfer Notice by such Selling Series A Investor and (ii) the denominator of which shall be the number of shares of Common Stock issued or issuable upon conversion of the Series A Preferred Stock held on the date of the Transfer Notice by Seller and the Selling Series A Investors ("*Pro rata Co-Sale Share*").

(3)    Within five (5) days after the expiration of the Series A Investor Exercise Period, Seller will give written notice to the Company and each Selling Series A Investor specifying the number of Residual Shares to be sold by each Selling Series A Investor exercising its Right of Co-Sale (the "*Co-Sale Confirmation Notice*").

B.    *Closing; Consummation of the Co-Sale.*    Subject to compliance with applicable state and federal securities laws, the sale of the Residual Shares by the Selling Series A Investors shall occur within ten (10) days after deemed receipt of the Co-Sale Confirmation Notice (the "*Co-Sale Closing*"). If a Selling Series A Investor exercised the Right of Co-Sale in accordance with this Section 4, then such Selling Series A Investor shall deliver to Seller at or before the Co-Sale Closing, one or more certificates, properly endorsed for Transfer, representing the number of Residual Shares to which the Selling Series A Investor is entitled to sell pursuant to this Section 4. At the Co-Sale Closing, Seller shall cause such certificates or other instruments to be Transferred and delivered to the Transferee pursuant to the terms and conditions specified in the Transfer Notice, and Seller will remit, or will cause to be remitted, to each Selling Series A Investor, at the Co-Sale Closing, that portion of the proceeds of the Transfer to which each Selling Series A Investor is entitled by reason of each Selling Investor's participation in such Transfer pursuant to the Right of Co-Sale.

C.    *Seller's Right to Transfer.*    If any of the Offered Shares remain available after the exercise of all Rights of First Refusal and all Rights of Co-Sale, then the Seller shall be free to Transfer, subject to Section 5 below, any such remaining shares to the Proposed Transferee at the

-5-

Offered Price or a higher price in accordance with the terms set forth in the Transfer Notice; provided, however, that if the Offered Shares are not so Transferred during the seventy-five (75) day period following the deemed delivery of the Transfer Notice, then Seller may not Transfer any of such remaining Offered Shares without complying again in full with the provisions of this Agreement.

5.    *Conditions to Valid Transfer.*

A.    *Generally.*  Any attempt by any Seller to Transfer any Seller Shares in violation of any provision of this Agreement will be void.  No securities shall be transferred by Seller unless such Transfer is made in compliance with all of the terms of this Agreement and all applicable federal and state securities laws.  The Company will not be required to (i) transfer on its books any shares that have been Transferred in violation of any provisions of this Agreement or (ii) to treat as owner of such shares, or accord the right to vote or pay dividends to any purchaser, donee or other transferee to whom such shares may have been so Transferred.

B.    *Put Right.*  If a Seller Transfers any Seller Shares in contravention of the Right of Co-Sale under this Agreement (a "*Prohibited Transfer*"), or if the Proposed Transferee of Offered Shares desires to purchase a class, series or type of stock offered by Seller but not held by a Selling Series A Investor, or the Proposed Transferee is unwilling to purchase any securities from a Selling Series A Investor, such Selling Series A Investor may, by delivery of written notice to such Seller (a "*Put Notice*") within ten (10) days after the later of (i) the Co-Sale Closing and (ii) the date on which such Selling Series A Investor becomes aware of the Prohibited Transfer or the terms thereof, require such Seller to purchase from such Selling Series A Investor that number of shares of Preferred Stock (on an as-converted basis) or Common Stock subject to Section 5(B)(2)) that is equal to the number of Residual Shares such Selling Series A Investor would have been entitled to Transfer to the purchaser (the "*Put Shares*").  Such sale shall be made on the following terms and conditions:

(1)    The price per share at which the Put Shares are to be sold to Seller shall be equal to the price per share that the Selling Series A Investor would have received at the Co-Sale Closing of such Prohibited Transfer if such Selling Series A Investor had sold such Put Shares at the Co-Sale Closing.  Such purchase price of the Put Shares shall be paid in cash or such other consideration as Seller received in the Prohibited Transfer or at the Co-Sale Closing.  Seller shall also reimburse the Selling Series A Investor for any and all fees and expenses, including, but not limited to, legal fees and expenses, incurred pursuant to the exercise or attempted exercise of such Selling Series A Investor's Rights of Co-Sale pursuant to Section 4 or in the exercise of its rights under this Section 5 with respect to the Put Shares.

(2)    The Put Shares of Stock to be sold to Seller shall be of the same class or type as Transferred in the Prohibited Transfer or at the Co-Sale Closing if such Selling Series A Investor then owns securities of such class or type.  If such Selling Series A Investor does not own any of such class or type, the Put Shares shall be shares of Common Stock (or Preferred Stock convertible into Common Stock at the option of the holder thereof).

LoveSac – ROFR and Co-Sale Agreement (2937602_13).DOC

00044

(3)    The closing of such sale to Seller will occur within ten (10) days after the date of such Selling Series A Investor's Put Notice to such Seller. At such closing, the Selling Series A Investor shall deliver to Seller the certificate or certificates representing the Put Shares to be sold, each certificate to be properly endorsed for transfer, and immediately upon receipt thereof, such Seller shall pay the aggregate purchase price therefore, and the amount of reimbursable fees and expenses, as specified in Section 5(B)(1).

6.    *Restrictive Legend and Stop Transfer Orders; Legend.*    Each Stockholder and Investor understands and agrees that the Company will cause the legend set forth below, or a legend substantially equivalent thereto, to be placed upon any certificate(s) or other documents or instruments evidencing ownership of Seller Shares by such Stockholder or Investor:

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO AND MAY ONLY BE SOLD, DISPOSED OF OR OTHERWISE TRANSFERRED IN COMPLIANCE WITH A RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT ENTERED INTO BY THE HOLDER OF THESE SHARES, THE COMPANY AND CERTAIN STOCKHOLDERS OF THE COMPANY.  A COPY OF SUCH AGREEMENT IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY. SUCH RIGHTS OF FIRST REFUSAL AND RIGHTS OF CO-SALE ARE BINDING ON CERTAIN TRANSFEREES OF THESE SHARES.

A.    *Stop Transfer Instructions.*  In order to ensure compliance with the restrictions referred to herein, each Seller agrees that the Company may issue appropriate "stop transfer" certificates or instructions in the event of a Transfer in violation of any provision of this Agreement and that it may make appropriate notations to the same effect in its records.

7.    *Termination.* The Investors' Rights of Co-Sale shall terminate upon the earliest to occur of (i) the closing of a Qualified Initial Public Offering, (ii) the date on which this Agreement is terminated by a writing executed by holders of at least fifty-five percent (55%) of the then-outstanding shares of Series A Preferred Stock (or of the Common Stock issued upon conversion of the Series A Preferred Stock) then held by the Series A Investors, or (iii) the dissolution or winding-up of the Company. The Company's Right of First Refusal will terminate upon the earliest to occur of (i) a written election of the Company pursuant to an action by the Board of Directors, or (ii) the occurrence of either of (i) or (iii) in the preceding sentence.

8.    *Miscellaneous Provisions.*

A.    *Notices.*    All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or otherwise delivered by hand or by messenger addressed:

LoveSac - ROFR and Co-Sale Agreement (2937602_13).DOC

00045

(1)    if to an Investor, at the Investor's address, facsimile number or electronic mail address as shown in the Company's records, as may be updated in accordance with the provisions hereof;

(2)    if to the Company, one copy should be sent to The LoveSac Corporation, 155 North 400 West, Suite 520, Telephone: (801) 532-3366, Facsimile: (801) 532-3936, Attn: *President*, or to such other address as the Company shall have furnished to the Investors or Stockholders; or

(3)    if to a Stockholder, one copy should be sent to the Stockholder's address or facsimile number or electronic mail address as shown in the Company's records, as may be updated in accordance with the provisions hereof.

With respect to any notice given by the Company under any provision of the Delaware General Corporation Law or the Company's Amended and Restated Certificate of Incorporation or Bylaws, each Investor agrees that such notice may be given by facsimile or by electronic mail.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given when delivered if delivered personally, or, if sent by mail, at the earlier of its receipt or 48 hours after the same has been deposited in a regularly maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid or, if sent by facsimile, upon confirmation of facsimile transfer.

B.    *Successors and Assigns.* This Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by any Investor or Stockholder without the prior written consent of the Company except that the rights of any Investor hereunder may be assigned or otherwise transferred to any affiliate thereof or to the partners of such Investor. Any attempt by an Investor or Stockholder without such permission to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void, other than as provided in the sentence immediately proceeding. Subject to the foregoing and except as otherwise provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto (including any successor to the Company by merger, consolidation, conversion transaction or mandatory share exchange).

C.    *Severability.* If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision. The balance of this Agreement shall be enforceable in accordance with its terms.

D.    *Amendment.* Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written

-8-

00046

instrument referencing this Agreement and signed by (i) the Company, (ii) the Investors holding at least fifty-five percent (55%) of the then-outstanding shares of Series A Preferred Stock (or of the Common Stock into which class of Series A Preferred Stock shall have been converted) then held by the Series A Investors, and (iii) the Stockholders holding at least a majority of the Convertible Securities then held by the Stockholders; *provided, that,* Investors, or any affiliates of such Investors, purchasing shares of Series A Preferred Stock pursuant to the Option (as defined in the Purchase Agreement) may, without any amendment of this Agreement pursuant to this paragraph or any consent or approval of any other Investor, become parties to this Agreement by executing a counterpart signature page to this Agreement, if such Investor or affiliate has not already done so; **Schedule I** of this Agreement shall be updated to reflect such a purchase under the Option.    Any such amendment, waiver, discharge or termination effected in accordance with this paragraph shall be binding upon each Stockholder, each Investor and each future holder of shares of Preferred Stock with rights and obligations under this Agreement. Each Investor and Stockholder acknowledges that by the operation of this paragraph, the requisite number of Investors and Stockholders as described above will have the right and power to diminish or eliminate all rights of such Investor or Stockholder under this Agreement.

E.    *Continuity of Other Restrictions.*  Any Seller Shares not purchased by the Company to its Right of First Refusal hereunder will continue to be subject to all other restrictions imposed upon such Seller Shares hereunder and by law, including any restrictions imposed under the Company's Amended and Restated Certificate of Incorporation or Bylaws or by separate agreement.

F.    *Governing Law.*  This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law.

G.    *Counterparts.*    This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties that execute such counterparts, and all of which together shall constitute one instrument.

H.    *Further Assurances.*  Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and do all such other acts and things as may be necessary to more fully effectuate this Agreement.

I.    *Attorney's Fees.*  In the event that any suit or action is instituted to enforce any provision in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party all fees, costs and expenses of enforcing any right of such prevailing party under or with respect to this Agreement, including without limitation, such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals.

J.    *Titles and Subtitles.*  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All

references in this Agreement to sections, paragraphs, exhibits and schedules shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits and schedules attached hereto.

K.  *Entire Agreement.*  This Agreement and the exhibits hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof. No party hereto shall be liable or bound to any other party in any manner with regard to the subjects hereof or thereof by any warranties, representations or covenants except as specifically set forth herein.

L.  *Delays or Omissions.*  Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to any party to this Agreement upon any breach or default of any other party under this Agreement shall impair any such right, power or remedy of such non-defaulting party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any party to this Agreement, shall be cumulative and not alternative.

M.  *Telecopy Execution and Delivery.*  A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto and delivered by such party by facsimile or any similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen. Such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute and deliver an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

*[Remainder of page intentionally left blank.]*

LoveSac - ROFR and Co-Sale Agreement (2937602_13).DOC

00048

IN WITNESS WHEREOF, the parties hereto have executed this Right of First Refusal and Co-Sale Agreement on the day and year first above written.

"COMPANY"

THE LOVESAC CORPORATION
a Delaware corporation

By: _____

Name: Shawn D. Nelson
Title:   Chief Executive Officer

Address:   155 North 400 West, Suite 520
           Salt Lake City, Utah 84103
           F:  801.532.3936

"INVESTOR"

MILLEVERE HOLDINGS LIMITED

By:_____

Name:_____

Title:_____

NIALL M RITCHIE
DIRECTOR

[SIGNATURE PAGE TO THE LOVESAC CORPORATION ROFR AND CO-SALE AGREEMENT]

# THE LOVESAC CORPORATION
a Delaware corporation

## VOTING AGREEMENT

**Dated as of March 3, 2005**

# THE LOVESAC CORPORATION

## VOTING AGREEMENT

*THIS VOTING AGREEMENT* (this "*Agreement*") is made as of March 3, 2005, by and among The LoveSac Corporation, a Delaware corporation (the "*Company*"), the persons and entities listed on **Schedule I** attached hereto (each an "*Investor*," and collectively the "*Investors*"), and the persons listed on **Schedule II** hereto (each a "*Stockholder*," and collectively the "*Stockholders*"). The Stockholders and the Investors are referred to herein collectively as the "*Voting Parties*" and individually as a "*Voting Party*."

## RECITALS

*WHEREAS,* certain of the Investors are parties to that certain Series A Preferred Stock Purchase Agreement (the "*Purchase Agreement*") of even date herewith, and it is a condition to the closing of the sale and issuance of the Series A Preferred Stock pursuant to the Purchase Agreement that the Company, the Investors and the Stockholders enter into this Agreement; and

*WHEREAS,* the Company's Amended and Restated Certificate of Incorporation filed with the Secretary of State of the State of Delaware on March 3, 2005 (the "*Restated Certificate*") provides for the designation and election of the Company's Board of Directors.

*NOW, THEREFORE,* in consideration of the mutual promises and covenants herein contained, and other consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1. **Shares.** During the term of this Agreement, the Voting Parties each agree to vote all shares of the Company's voting securities now or hereafter acquired by them, whether owned of record or over which any person exercises, directly or indirectly, voting control, (the "*Shares*") in accordance with the provisions of this Agreement.

2. **Board Representation; Voting Agreement for Election of Directors.**

    (a) *Elections of Directors.* Subject to the provisions of this Section 2, at each annual meeting of the stockholders of the Company, or at any meeting of the stockholders of the Company at which members of the Board of Directors (the "*Board*") are to be elected, and at any other time at which stockholders of the Company will have the right to or will vote for or render consent in writing regarding the election of directors of the Company, then and in each event, each of the Investors and the Stockholders hereby covenants and agrees severally to vote all Shares of in favor of the following actions:

    (i) with respect to the one (1) Director to be designated under the Restated Certificate by Brand Equity Ventures II, L.P. and/or any of its affiliates (collectively "*BEV*"), to cause and maintain the election of one candidate designated by BEV, who shall initially be David Yarnell (the "*BEV Designee*");

(ii)    with respect to the (1) Director to be designated under the Restated Certificate by Walnut Investment Partners, L.P., Walnut Private Equity Fund, L.P. and/or their affiliates (collectively "Walnut"), to cause and maintain the election of one candidate designated by Walnut, who shall initially be James M. Gould (the "*Walnut Designee*");

(iii)    with respect to the one (1) Director to be designated under the Restated Certificate by Millevere Holdings Limited and/or any of its affiliates (collectively, "*Millevere*"), to cause and maintain the election of one candidate designated by Millevere, who shall initially be Simon Wright (the "*Millevere Designee*");

(iv)    with respect to one (1) Common Director elected under the Restated Certificate, to cause and maintain the election of the then-current Chief Executive Officer of the Company, initially Shawn D. Nelson (the "*CEO Designee*"); and

(v)    with respect to one (1) Common Director elected under the Restated Certificate, to cause and maintain the election of one (1) candidate designated by the holders of a majority of the outstanding shares of Common Stock, initially Scott W. McDonough (the "*Common Designee*").

For purposes of this Section 2: (i) any individual who is designated for election to the Board as the BEV Designee, the Walnut Designee, the Millevere Designee, the CEO Designee or the Common Designee pursuant to the foregoing provisions of this Section 2(a) (or the then-current Chief Executive Officer of the Company, in the case of the CEO Director) is sometimes hereinafter referred to as a "*Director Designee*"; and (ii) any individual, entity, or group of individuals or entities who has the right to designate any Director Designee for election to the Board pursuant to the foregoing provisions of this Section 2(a) is sometimes hereinafter referred to as a "*Designator*" or as "*Designators*," as applicable.

The Company shall furnish written notice to all holders of voting securities of the Company at least 10 days prior to any meeting or proposed action by written consent in lieu of a meeting for the election of directors. Any Designator or Designators that wish to name a different Director Designee to the Board of Directors shall furnish written notice to the Company and each Voting Party no later than 5 days following receipt of the Company's notice of any such meeting, or proposed action by written consent in lieu of meeting, that includes the name of the proposed Director Designee for the BEV Designee, the Walnut Designee, the Millevere Designee, the CEO Designee and the Common Designee, respectively. In the absence of such notice, the director then serving in accordance with Section 2(a) above shall be deemed to be the BEV Designee, the Walnut Designee, the Millevere Designee, the CEO Designee, and the Common Designee, respectively.

(b)    *Removal of Directors and Vacancies.* No Voting Party shall vote for the removal of a director nominated and elected pursuant to this Agreement, and no such vote shall be effective, unless the Designator who had the right to designate such director shall request such removal in writing. If such Designator requests the removal of a director that such Designator has the right to designate under the foregoing provisions of Section 2(a), then the Voting Parties agree to vote all Shares for the removal of such director. If a vacancy occurs on the Board, the remaining directors shall immediately elect the nominee of the Designator that nominated the departing

-2-

00053

director. If the remaining directors fail for any reason to elect such nominee immediately, then the Company or the Voting Parties acting together, shall either (i) cause a stockholders' meeting to be held at the earliest practicable date, at which meeting the Voting Parties shall vote, pursuant to this Agreement, all Shares for such nominee or (ii) promptly vote all Shares to elect such nominee by action taken by written consent without a meeting in accordance with the Delaware General Corporation Law, the Restated Certificate and Bylaws.

(c)     *Board Meetings; Reimbursement of Expenses.*   The Company shall use all reasonable efforts to ensure that Board meetings are held at least quarterly.   The Company shall promptly reimburse in full each non-employee director of the Company for all of such director's reasonable out-of-pocket expenses incurred as a result of travel to and from each Board meeting or any Board committee meeting or as a result of other Board business.

(d)     *Observer Rights.*   As long as BEV, Walnut or Millevere, as applicable, owns not less than 25% of the shares of Series A Preferred Stock such entity purchases under the Purchase Agreement (subject to appropriate adjustment for stock splits, stock dividends, combinations and other similar recapitalizations affecting such shares), the Company shall allow a representative, as applicable, of each of BEV, Walnut, and Millevere, initially Frederic H. Mayerson (for Walnut) and Chris Kirchen (for BEV), to attend all meetings of its Board in an observer capacity (with voice but without vote) and, in this respect, shall, upon request, give each such individual copies of all notices, minutes, consents, and other materials that it provides to its directors; *provided, however,* that such individual shall agree to hold in confidence and trust and to act in a fiduciary manner with respect to all information so provided; and, *provided, further,* that the Company reserves the right to withhold any information and to exclude each such individual from any meeting or portion thereof if access to such information or attendance at such meeting could, in the good faith opinion of the Board of Directors, adversely affect the attorney-client privilege between the Company and its counsel. The Company shall promptly reimburse in full each individual designated as an observer pursuant to this Section 2(d) for all of such individual's reasonable out-of-pocket expenses incurred as a result of travel to and from each Board meeting.

(e)     *D&O Insurance.*   The Company shall provide each director of the Company with directors' and officers' (**"D&O"**) liability insurance coverage in the aggregate policy amount approved from time to time by the holders of fifty five percent (55%) of the Series A Preferred Stock then outstanding.

(f)     *Successor Indemnification.*   In the event that the Company or any of its successors or assigns (i) consolidates with or merges into any other entity and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers or conveys all or substantially all of its properties and assets to any person or entity, then, in each such case, to the extent necessary, proper provision shall be made so that the successors and assigns of the Company assume the obligations of the Company with respect to indemnification of members of the Board as in effect immediately prior to such transaction, whether in the Company's Bylaws, the Restated Certificate, or elsewhere, as the case may be.

(g)    *Size of Board of Directors.*  During the term of this Agreement, each Voting Party agrees to take any and all action necessary, including without limitation voting all Shares, to maintain the authorized number of members of the Board at five (5) directors.

3.    *Drag-Along Rights.*  In the event that a Change of Control Transaction is approved by (a) the Investors holding at least seventy percent (70%) of the issued and outstanding shares of Series A Preferred Stock, voting together as a single class and on an as-converted basis, *and* (b) at least a super-majority of the Board (with such super-majority to consist of at least four (4) Directors) if the vote occurs on or before December 31, 2006 or a majority of the Board if the vote occurs after December 31, 2006, then each Voting Party hereby agrees with respect to all securities of the Company which it owns or otherwise exercises voting or dispositive authority:

(a)    in the event such transaction is to be brought to a vote at a stockholder meeting, after receiving proper notice of any meeting of stockholders of the Company to vote on the approval of a Change of Control Transaction, to be present, in person or by proxy, as a holder of shares of voting securities of the Company, at all such meetings and be counted for the purposes of determining the presence of a quorum at such meetings;

(b)    to vote (in person, by proxy or by action by written consent, as applicable) all Shares in favor of such Change of Control Transaction and in opposition of any and all other proposals that could reasonably be expected to delay or impair the ability of the Company to consummate such Change of Control Transaction;

(c)    to refrain from exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to such Change of Control Transaction;

(d)    to execute and deliver all related documentation and take such other action in support of the Change of Control Transaction as shall reasonably be requested by the Company or the Investors holding a majority of the outstanding shares of Series A Preferred Stock; *provided that* no Stockholder shall be required to make any representation, covenant or warranty in connection with the Liquidation Event, other than as to such Stockholder's ownership and authority to sell, free of liens, claims and encumbrances, the shares of Common Stock proposed to be sold by such Stockholder; and

(e)    except for this Agreement, neither any of the Voting Parties hereto nor any affiliates thereof shall deposit any shares of capital stock beneficially owned by such Voting Party or affiliate in a voting trust or subject any such shares of capital stock to any arrangement or agreement with respect to the voting of such shares of capital stock.

Notwithstanding the foregoing, no Voting Party shall be required to vote in the manner described by this Section 3 unless (i) the net proceeds of such Liquidation Event are to be distributed to stockholders of the Company in accordance with the Restated Certificate (as in effect on the date that such vote is to be taken) and the consideration payable with respect to each share in each class or series as a result of such Liquidation Event is the same (except for cash payments in lieu of fractional shares) as for each other share in such class or series, (ii) the Stockholder is not required to accept consideration in the Liquidation Event other than cash, freely-tradable equity

-4-

00055

securities registered under the Securities Exchange Act of 1934, as amended, and listed on the New York Stock Exchange, American Stock Exchange or the Nasdaq National Market or equity securities of a class that is registered under the Securities Exchange Act of 1934, as amended, and listed on the New York Stock Exchange, American Stock Exchange or Nasdaq National Market and as to which equity securities the recipients thereof have demand registration rights, and (iii) each class and series of capital stock of the Company will be entitled to receive the same form of consideration (and be subject to the same indemnity and escrow provisions) as a result of such Liquidation Event.

4.    *Covenants of the Company*.  The Company agrees to use its commercially reasonable efforts to ensure that the rights given to the Voting Parties hereunder are effective and that the Voting Parties enjoy the benefits thereof.  Such actions include, without limitation, the use of the Company's commercially reasonable efforts to cause the nomination and election of the Director Designees as provided in <u>Section 2</u>, to cause the size of the Board to remain as provided in <u>Section 2(e)</u>, to enforce the terms of this Agreement and to inform the Voting Parties of any breach hereof (to the extent the Company has knowledge thereof). The Company will not, by any voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all of the provisions of this Agreement and in the taking of all such actions within its control as may be necessary, appropriate or reasonably requested by the holders of a majority of the outstanding voting securities held by the Voting Parties assuming exercise and conversion of all outstanding securities in order to protect the rights of the parties hereunder against impairment and to assist the Voting Parties in the exercise of their rights and the performance of their obligations hereunder.

5.    *Termination*.  This Agreement shall terminate and be of no further force and effect upon the earlier to occur of (i) the closing of a Qualified Public Offering (defined below) or (ii) the closing of a Change of Control Transaction (defined below) *provided that* the voting provisions contained in <u>Section 2</u> above shall terminate when such rights are no longer provided for in the Restated Certificate and in any event no later than on the 10th anniversary of the date of this Agreement.  For purposes of this Section, the term *"Qualified Public Offering"* means the closing of a firm commitment underwritten initial public offering pursuant to an effective registration statement filed under the Securities Act of 1933, as amended, covering the offer and sale of the Company's Common Stock, *provided that* the net proceeds to the Company are not less than $25,000,000 and the Company has a market capitalization, after giving effect to the public offering, equal to or in excess of $75,000,000.

6.    *Additional Shares*.  In the event that subsequent to the date of this Agreement any shares or other securities (other than pursuant to a Change of Control Transaction, as defined below) are issued on, or in exchange for, any of the Shares by reason of any stock dividend, stock split, consolidation of shares, reclassification or consolidation involving the Company, such shares or securities shall be deemed to be Shares for purposes of this Agreement.

7.    *Restrictive Legend*.  Each certificate representing any of the Shares subject to this Agreement shall be marked by the Company with a legend reading as follows:

> "THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A VOTING AGREEMENT (A COPY OF WHICH MAY BE OBTAINED

-5-

00056

FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN THESE SHARES THE PERSON HOLDING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID VOTING AGREEMENT."

The Company agrees that, during the term of this Agreement, it will not remove, and will not permit to be removed (upon registration of transfer, reissuance or otherwise), the legend from any such certificate and will place or cause to be placed the legend on any new certificate issued to represent Shares theretofore represented by a certificate carrying the legend. Each Voting Party agrees to undertake all actions as needed to enable the Company to place or cause to be placed the legend on any certificate representing Shares subject to this Agreement.

8.    *Miscellaneous*

(a)    *Certain Definitions*. Shares "*held*" by a Voting Party shall mean any Shares directly or indirectly owned (of record or beneficially) by such Voting Party or as to which such Voting Party has voting power. For purposes hereof, the term "*Vote*" shall include any exercise of voting rights whether at an annual or special meeting or by written consent or in any other manner permitted by applicable law. For purposes hereof, the term "*Change of Control Transaction*" means either (i) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any stock acquisition, reorganization, merger, consolidation or sale of securities of the Company but excluding any sale of securities of the Company for bona fide capital raising purposes) that results in the holders of the voting securities of the Company outstanding immediately prior thereto failing to hold immediately after such transaction or series of transactions a majority of the outstanding voting securities of the Company, such surviving entity or the entity that controls such surviving entity, measured by voting power rather than number of shares; or (ii) a sale, lease or other conveyance of all or substantially all of the assets of the Company.

(b)    *Notices*. All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed, or delivered to each party as follows: (i) if to a Voting Party, at such Voting Party's address or facsimile number set forth in the Company's records, or at such other address or facsimile number as such Investor shall have furnished the Company in writing, or (ii) if to the Company, at 155 North 400 West, Suite 520, Salt Lake City, Utah 84103, Facsimile: 801.532.3936, *Attn: President*, or at such other address or facsimile number as the Company shall have furnished to the Voting Parties in writing. All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid and with return receipt requested. With respect to any notice given by the Company under any provision of the Delaware General Corporation Law or the Company's Restated Certificate or Bylaws, each Investor agrees that such notice may be given by facsimile with appropriate confirmation of receipt. In the event of any conflict between the Company's books and

-6-

00057

records and this Agreement or any notice delivered hereunder, the Company's books and records will control absent fraud or error.

(c)    *Successors and Assigns.* In addition to any restriction on transfer that may be imposed by any other agreement by which any Voting Party hereto may be bound, this Agreement shall be binding upon the Company and its successors and assigns (including any successor by merger, consolidation, conversion transaction or mandatory share exchange) and upon the Voting Parties, their respective heirs, successors, transferees and assigns and to such additional individuals or entities that may become stockholders of the Company and that desire to become Voting Parties hereto; *provided that* for any such transfer to be deemed effective, the transferee shall have executed and delivered an Adoption Agreement in substantially the form attached hereto as **Exhibit A**. Upon the execution and delivery by a transferee of an Adoption Agreement reasonably acceptable to the Company, such transferee shall be deemed to be either a Stockholder (if the transferor was a Stockholder) or an Investor (if the transferor was an Investor), as the case may be, as if such transferee's signature appeared on the signature pages hereto.

(d)    *Aggregation of Stock.* For the purpose of determining the availability of any rights under this Agreement, all shares of Common Stock or Series A Preferred Stock held or acquired by affiliated entities or persons shall be aggregated together.

(e)    *Governing Law.* This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law.

(f)    *Titles and Subtitles.* The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto.

(g)    *Further Assurances.* Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and so all such other acts and things as may be necessary to more fully effectuate this Agreement.

(h)    *Entire Agreement.* This Agreement and the exhibits hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof. No party hereto shall be liable or bound to any other party in any manner with regard to the subjects hereof or thereof by any warranties, representations or covenants except as specifically set forth herein.

(i)    *No Liability for Election of Recommended Directors.* Neither the Company, the Stockholders, the Investors, nor any officer, director, stockholder, partner, member, employee or agent of any such Voting Party, makes any representation or warranty as to the fitness or competence of the nominee/designee of any Voting Party hereunder to serve on the Board by virtue of such Voting Party's execution of this Agreement or by the act of such Voting Party in voting for such nominee/designee pursuant to this Agreement.

-7-

(j)   *Not a Voting Trust.* This Agreement is not a voting trust governed by Section 218 of the Delaware General Corporation Law and should not be interpreted as such.

(k)   *Specific Performance.* It is agreed and understood that monetary damages would not adequately compensate an injured party for the breach of this Agreement by any party, that this Agreement shall be specifically enforceable, and that any breach or threatened breach of this Agreement shall be the proper subject of a temporary or permanent injunction or restraining order. Further, each party hereto waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

(l)   *Amendment.* Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated (including amendment, waiver, discharge or termination by operation of law, such as in a merger, consolidation, conversion transaction or mandatory share exchange) other than by a written instrument referencing this Agreement and signed by the Company, the holders of eighty percent (80%) of the then-outstanding shares of Series A Preferred Stock held by the Investors, voting separately as a class, and the holders of a majority of the then outstanding voting securities held by the Stockholders; *provided, however,* that if any amendment, waiver, discharge or termination operates in a manner that treats any Investor differently from the class of all other Investors or that treats any Stockholder differently form the call of all other Stockholders, then the consent of such Investor or Stockholder, as applicable, shall also be required for such amendment, waiver, discharge or termination. Any such amendment, waiver, discharge or termination effected in accordance with this paragraph shall be binding upon each Voting Party that has entered into this voting agreement; *provided, further,* that Investors, or any affiliates of such Investors, purchasing shares of Series A Preferred Stock pursuant to the Option (as defined in the Purchase Agreement) may, without any amendment of this Agreement pursuant to this paragraph or any consent or approval of any other Voting Party, become parties to this Agreement by executing a counterpart signature page to this Agreement, if such Investor or affiliate has not already done so; **Schedule I** of this Agreement shall be updated to reflect such a purchase under the Option. Each Voting Party acknowledges that by the operation of this paragraph, the holders of a majority of the Shares held by the Stockholders and the holders of eighty percent (80%) of the then-outstanding shares of Series A Preferred Stock held by the Investors will have the right and power to diminish or eliminate all rights of such Voting Party under this Agreement.

(m)   *No Waiver.* The failure or delay by a party to enforce any provision of this Agreement will not in any way be construed as a waiver of any such provision or prevent that party from thereafter enforcing any other provision of this Agreement. The rights granted both parties hereunder are cumulative and will not constitute a waiver of either party's right to assert any other legal remedy available to it.

(n)   *Severability.* If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and

-8-

00059

other purposes of the illegal, void or unenforceable provision. The balance of this Agreement shall be enforceable in accordance with its terms.

(o)    *Counterparts*. This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. Facsimile copies of signed signature pages will be deemed binding originals.

[*SIGNATURE PAGE FOLLOWS*]

00060

*IN WITNESS WHEREOF*, the parties have executed and delivered this Agreement as of the date first set forth above.

"COMPANY"

THE LOVESAC CORPORATION
a Delaware corporation

By: _____

Name:  Shawn D. Nelson
Title:   Chief Executive Officer

Address:    155 North 400 West, Suite 520
Salt Lake City, Utah 84103
F:  801.532.3936

[SIGNATURE PAGE TO THE LOVESAC CORPORATION VOTING AGREEMENT]

"INVESTOR"

MILLEVERE HOLDINGS LIMITED

By:_____

Name:_____

Title:_____

~~NIALL M RITCHIE~~
DIRECTOR

**THE LOVESAC CORPORATION**
a Delaware corporation

**INVESTORS' RIGHTS AGREEMENT**

Dated as of March 3, 2005

00063

# TABLE OF CONTENTS

Page

Section 1 Definitions ...................................................................................................................... 1

   1.1     Certain Definitions ........................................................................................................... 1

Section 2 Registration Rights ......................................................................................................... 4

   2.1     Requested Registration. ..................................................................................................... 4
   2.2     Company Registration. ...................................................................................................... 6
   2.3     Registration on Form S-3 .................................................................................................. 7
   2.4     Expenses of Registration ................................................................................................... 8
   2.5     Registration Procedures .................................................................................................... 8
   2.6     Indemnification ............................................................................................................... 10
   2.7     Information by Holder ..................................................................................................... 12
   2.8     Restrictions on Transfer ................................................................................................. 12
   2.9     Rule 144 Reporting ......................................................................................................... 14
   2.10    Market Standoff Agreement ........................................................................................... 15
   2.11    Delay of Registration ...................................................................................................... 15
   2.12    Transfer or Assignment of Registration Rights .............................................................. 15
   2.13    Termination of Registration Rights ................................................................................ 15

Section 3 Covenants of the Company ............................................................................................ 16

   3.1     Basic Financial Information ............................................................................................ 16
   3.2     Budget ............................................................................................................................. 16
   3.3     Confidentiality ................................................................................................................ 16
   3.4     Protective Provision ........................................................................................................ 16
   3.5     Termination of Covenants ............................................................................................... 17

Section 4 Preemptive Rights ......................................................................................................... 17

   4.1     Preemptive Rights ........................................................................................................... 17

Section 5 Miscellaneous ............................................................................................................... 19

   5.1     Amendment ..................................................................................................................... 19
   5.2     Notices ............................................................................................................................ 19
   5.3     Governing Law ............................................................................................................... 20
   5.4     Successors and Assigns ................................................................................................... 20
   5.5     Entire Agreement ............................................................................................................ 20
   5.6     Delays or Omissions ....................................................................................................... 20
   5.7     Severability .................................................................................................................... 20
   5.8     Titles and Subtitles ......................................................................................................... 21
   5.9     Counterparts .................................................................................................................... 21
   5.10    Telecopy Execution and Delivery ................................................................................... 21
   5.11    Further Assurances .......................................................................................................... 21
   5.12    Aggregation .................................................................................................................... 21

-i-

00064

# THE LOVESAC CORPORATION
## INVESTORS' RIGHTS AGREEMENT

*THIS INVESTORS' RIGHTS AGREEMENT* (this *"Agreement"*) is made and entered into as of March 3, 2005, by and among The LoveSac Corporation, a Delaware corporation (the *"Company"*), and the persons and entities (each, an *"Investor"* and collectively, the *"Investors"*) listed on **Schedule I** hereto. Unless otherwise defined herein, capitalized terms used in this Agreement have the meanings ascribed to them in **Section 1**.

## RECITALS

*WHEREAS*: The Company proposes to sell shares of the Company's Series A Preferred Stock, $0.0001 par value per share (the *"Series A Preferred Stock"*) to certain of the Investors listed on **Schedule I** hereto (the *"Series A Investors"*) pursuant to that certain Series A Preferred Stock Purchase Agreement (the *"Purchase Agreement"*) of even date herewith (the *"Series A Financing"*), and it is a condition to the closing of the sale of the Series A Preferred Stock to the Series A Investors that the Investors and the Company execute and deliver this Agreement.

*NOW, THEREFORE*: In consideration of the mutual promises and covenants set forth herein, and other consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

## SECTION 1
## DEFINITIONS

1.1     *Certain Definitions.* As used in this Agreement, the following terms shall have the meanings set forth below:

(a)     *"Commission"* shall mean the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

(b)     *"Common Stock"* means the Company's Common Stock, par value $0.0001 per share.

(c)     *"Conversion Stock"* shall mean shares of Common Stock issued upon conversion of the Series A Preferred Stock in accordance with the provisions of the Restated Certificate.

(d)     *"Exchange Act"* shall mean the Securities Exchange Act of 1934, as amended, or any similar successor federal statute and the rules and regulations thereunder, all as the same shall be in effect from time to time.

(e)    *"Holder"* shall mean any Series A Investor who holds Registrable Securities and any holder of Registrable Securities to whom the registration rights conferred by this Agreement have been duly and validly transferred in accordance with Section 2.12 of this Agreement.

(f)    *"Indemnified Party"* shall have the meaning set forth in Section 2.6(c) hereto.

(g)    *"Indemnifying Party"* shall have the meaning set forth in Section 2.6(c) hereto.

(h)    *"Initial Closing"* shall mean the date of the initial sale of shares of the Company's Series A Preferred Stock pursuant to the Purchase Agreement.

(i)    *"Initial Public Offering"* shall mean the closing of the Company's first firm commitment underwritten public offering of the Company's Common Stock registered under the Securities Act.

(j)    *"Initiating Holders"* shall mean any Holder or Holders who in the aggregate hold not less than thirty 30% of the outstanding Registrable Securities.

(k)    *"Investors"* shall mean the persons and entities listed on Schedule I hereto.

(l)    *"Major Investor"* shall have the meaning set forth in Section 3.1(a) hereto.

(m)    *"New Securities"* shall have the meaning set forth in Section 4.1(a) hereto.

(n)    *"Other Shares"* shall mean shares of Common Stock, other than Registrable Securities (as defined below), (including shares of Common Stock issuable upon conversion of shares of any currently unissued series of Preferred Stock of the Company) sought to be included in any registration.

(o)    *"Preferred Stock"* shall mean the Company's Preferred Stock, par value $0.0001 per share.

(p)    *"Purchase Agreement"* shall have the meaning set forth in the Recitals hereto.

(q)    *"Registrable Securities"* shall mean (i) shares of Common Stock issued or issuable pursuant to the conversion of the Shares (as defined below); (ii) any Common Stock issued as a dividend or other distribution with respect to or in exchange for or in replacement of the shares referenced in (i) above and (iii) shares issued in respect of the shares of Common Stock referenced in (i) above in any reorganization or in connection with any stock split, reverse stock split, recapitalization or combination; *provided, however,* that Registrable Securities shall not include any shares of Common Stock described in clause (i), (ii) or (iii) above which have previously been registered or which have been sold to the public either pursuant to a registration statement or

00066

Rule 144, or which have been sold in a private transaction in which the transferor's rights under this Agreement are not validly assigned in accordance with this Agreement.

(r)    The terms *"register," "registered"* and *"registration"* shall refer to a registration effectuated by preparing and filing a registration statement in compliance with the Securities Act and applicable rules and regulations thereunder, and the declaration or ordering of the effectiveness of such registration statement.

(s)    *"Registration Expenses"* shall mean all expenses incurred in effecting any registration pursuant to this Agreement, including, without limitation, all registration, qualification, and filing fees, printing expenses, escrow fees, the reasonable fees and disbursements of counsel for the Company and one special counsel for the Holders, blue sky fees and expenses, and expenses of any regular or special audits incident to or required by any such registration, but shall not include Selling Expenses, fees and disbursements of other counsel for the Holders, and the compensation of regular employees of the Company, which shall be paid in any event by the Company.

(t)    *"Restated Certificate"* shall mean the Company's Amended and Restated Certificate of Incorporation accepted for filing by the Secretary of State of the State of Delaware on March 3, 2005, as subsequently amended from time to time in accordance with its terms.

(u)    *"Restricted Securities"* shall mean any Registrable Securities required to bear the first legend set forth in <u>Section 2.8(c)</u> hereof.

(v)    *"Rule 144"* shall mean Rule 144 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

(w)    *"Rule 145"* shall mean Rule 145 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission

(x)    *"Securities Act"* shall mean the Securities Act of 1933, as amended, or any similar successor federal statute and the rules and regulations thereunder, all as the same shall be in effect from time to time.

(y)    *"Selling Expenses"* shall mean all underwriting discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities and fees and disbursements of counsel for any Holder (other than the fees and disbursements of one special counsel to the Holders included in Registration Expenses).

(z)    *"Series A Preferred Stock"* shall have the meaning set forth in the Recitals.

(aa)    *"Shares"* shall mean the Series A Preferred Stock held by the Investors.

(bb)  "*Withdrawn Registration*" shall mean a forfeited demand registration under Section 2.1 in accordance with the terms and conditions of Section 2.4.

## SECTION 2
## REGISTRATION RIGHTS

2.1    *Requested Registration.*

(a)    Request for Registration.    Subject to the conditions set forth in this Section 2.1, if the Company receives from Initiating Holders a written request signed by such Initiating Holders that the Company effect any registration with respect to all or a part of the Registrable Securities (such request shall state the number of shares of Registrable Securities to be disposed of and the intended method of disposition of such shares by such Initiating Holders), the Company will:

(i)    promptly give written notice of the proposed registration to all other Holders; and

(ii)    as soon as practicable, file and use its commercially reasonable efforts to effect such registration (including, without limitation, filing post-effective amendments, appropriate qualifications under applicable blue sky or other state securities laws, and appropriate compliance with the Securities Act) and to permit or facilitate the sale and distribution of all or such portion of such Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any Holder or Holders joining in such request as are specified in a written request received by the Company within 20 days after such written notice from the Company is mailed or delivered.

(b)    Limitations on Requested Registration.  The Company shall not be obligated to effect, or to take any action to effect, any such registration pursuant to this Section 2.1:

(i)    Prior to 180 days following the effective date of the first registration statement filed by the Company covering an underwritten offering of any of its securities to the general public;

(ii)    If the Initiating Holders, together with the holders of any other Registrable Securities entitled to inclusion in such registration statement, propose to sell less than the lesser of (i) 10% of the number of shares of Registrable Securities or (ii) such lesser number of shares as shall have an aggregate offering price to the public of at least $3,000,000;

(iii)    In any particular jurisdiction in which the Company would be required to execute a general consent to service of process in effecting such registration, qualification, or compliance, unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act;

(iv)     After the Company has initiated two (2) such registrations pursuant to this <u>Section 2.1</u> (counting for these purposes only (x) registrations which have been declared or ordered effective and pursuant to which securities have been sold, and (y) Withdrawn Registrations);

(v)     If the Initiating Holders propose to dispose of shares of Registrable Securities which may be immediately registered on Form S-3 (or any successor or replacement form) pursuant to a request made under <u>Section 2.3</u> hereof; or

(vi)     If the Company has effectuated one (1) other such registration pursuant to this <u>Section 2.1</u> within the prior 12 month period.

(c)     <u>Deferral</u>.  If (i) in the good faith judgment of the Board of Directors of the Company (the "**Board**"), the filing of a registration statement covering the Registrable Securities would be materially detrimental to the Company and the Board concludes, as a result, that it is in the best interests of the Company to defer the filing of such registration statement at such time, and (ii) the Company shall furnish to such Holders a certificate signed by the President of the Company stating that in the good faith judgment of the Board, it would be materially detrimental to the Company for such registration statement to be filed in the near future and that it is, therefore, in the best interests of the Company to defer the filing of such registration statement, then the Company shall have the right to defer such filing for a period of not more than 90 days after receipt of the request of the Initiating Holders, and, provided further, that the Company shall not defer its obligation in this manner more than once in any 12-month period; and, provided further, that during such deferral period the Company shall not file a registration statement for securities to be issued and sold for its own account.

(d)     <u>Underwriting</u>.  If the Initiating Holders intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to this <u>Section 2.1</u> and the Company shall include such information in the written notice given pursuant to <u>Section 2.1(a)(i)</u>.  In such event, the right of any Holder to include all or any portion of its Registrable Securities in such registration pursuant to this <u>Section 2.1</u> shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities to the extent provided herein.  The Company shall (together with all Holders and other persons proposing to distribute their securities through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected for such underwriting by a majority in interest of the Initiating Holders, which underwriters are reasonably acceptable to the Company.

Notwithstanding any other provision of this <u>Section 2.1</u>, if the underwriters advise the Initiating Holders in writing that marketing factors require a limitation on the number of shares to be underwritten, the number of Registrable Securities and Other Shares that may be so included shall be allocated as follows: (i) first, among all Holders requesting to include Registrable Securities in such registration statement based on the <u>pro rata</u> percentage of Registrable Securities held by such Holders, assuming conversion; (ii) second, to the Company, for its own account; and (iii) to other selling stockholders holding Other Shares.

If a person who has requested inclusion in such registration as provided above does not agree to the terms of any such underwriting, such person shall be excluded therefrom by written notice from the Company, the underwriter or the Initiating Holders. The securities so excluded shall also be withdrawn from registration. Any Registrable Securities or other securities excluded or withdrawn from such registration shall also be withdrawn from such registration. If shares are so withdrawn from the registration and if the number of shares to be included in such registration was previously reduced as a result of marketing factors pursuant to this Section 2.1(d), then the Company shall then offer to all Holders who have retained rights to include securities in the registration the right to include additional Registrable Securities in the registration in an aggregate amount equal to the number of shares so withdrawn, with such shares to be allocated among such Holders requesting additional inclusion, as set forth above.

2.2    *Company Registration.*

(a)    Company Registration. If the Company shall determine to register any of its securities either for its own account or the account of a security holder or holders, other than a registration pursuant to Section 2.1 or Section 2.3, a registration relating solely to employee benefit plans, a registration relating to the offer and sale of debt securities, a registration relating to a corporate reorganization or other Rule 145 transaction, or a registration on any registration form that does not permit secondary sales, the Company will:

(i)    promptly give written notice of the proposed registration to all Holders; and

(ii)    use its commercially reasonable efforts to include in such registration (and any related qualification under blue sky laws or other compliance), except as set forth in Section 2.2(b) below, and in any underwriting involved therein, all of such Registrable Securities as are specified in a written request or requests made by any Holder or Holders received by the Company within 15 days after such written notice from the Company is mailed or delivered. Such written request may specify all or a part of a Holder's Registrable Securities.

(b)    Underwriting. If the registration of which the Company gives notice is for a registered public offering involving an underwriting, the Company shall so advise the Holders as a part of the written notice given pursuant to Section 2.2(a)(i). In such event, the right of any Holder to registration pursuant to this Section 2.2 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall (together with the Company and the other holders of securities of the Company proposing to distribute their securities through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected by the Company.

Notwithstanding any other provision of this Section 2.2, if the underwriters advise the Company in writing that marketing factors require a limitation on the number of shares to be underwritten, the underwriters may (subject to the limitations set forth below) limit the number of

00070

Registrable Securities to be included in, the registration and underwriting. The Company shall so advise all holders of securities requesting registration, and the number of shares of securities that are entitled to be included in the registration and underwriting shall be allocated, as follows: (i) first, to the Company for securities being sold for its own account, (ii) second, to the Holders requesting to include Registrable Securities in such registration statement based on the *pro rata* percentage of Registrable Securities held by such Holders, assuming conversion and (iii) third, to the other selling stockholders requesting to include Other Shares in such registration statement based on the pro rata percentage of Other Shares held by such other selling stockholders, assuming conversion; *provided, however*, that, except in the case of the Company's Initial Public Offering, the amount of Registrable Securities included in the registration and underwriting shall not be reduced below thirty percent (30%) of the total amount of securities included in such registration.

If a person who has requested inclusion in such registration as provided above does not agree to the terms of any such underwriting, such person shall also be excluded therefrom by written notice from the Company or the underwriter. The Registrable Securities or other securities so excluded shall also be withdrawn from such registration. Any Registrable Securities or other securities excluded or withdrawn from such underwriting shall be withdrawn from such registration. If shares are so withdrawn from the registration and if the number of shares of Registrable Securities to be included in such registration was previously reduced as a result of marketing factors pursuant to Section 2.2(b), the Company shall then offer to all persons who have retained the right to include securities in the registration the right to include additional securities in the registration in an aggregate amount equal to the number of shares so withdrawn, with such shares to be allocated among the persons requesting additional inclusion, in the manner set forth above.

(c)     Right to Terminate Registration.    The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 2.2 prior to the effectiveness of such registration whether or not any Holder has elected to include securities in such registration.

2.3    *Registration on Form S-3.*

(a)     Request for Form S-3 Registration.    After its initial public offering, the Company shall use its commercially reasonable efforts to promptly qualify for registration on Form S-3 (or any successor or replacement form). After the Company has qualified for the use of Form S-3, in addition to the rights contained in the foregoing provisions of this Section 2 and subject to the conditions set forth in this Section 2.3, if the Company shall receive from a Holder or Holders of Registrable Securities a written request that the Company effect any registration on Form S-3 or any similar short form registration statement with respect to all or part of the Registrable Securities (such request shall state the number of shares of Registrable Securities to be disposed of and the intended method of disposition of such shares by such Holder or Holders), the Company will take all such action with respect to such Registrable Securities as required by Section 2.1(a)(i) and Section 2.1(a) (ii).

00071

(b)    Limitations on Form S-3 Registration. The Company shall not be obligated to effect, or take any action to effect, any such registration pursuant to this Section 2.3:

(i)    In the circumstances described in 2.1(b)(ii); or

(ii)    If the Holders, together with the holders of any other securities of the Company entitled to inclusion in such registration, propose to sell less than the lesser of (i) 10% of the number of shares of Registrable Securities or (ii) such lesser number of shares as shall have an aggregate offering price to the public of at least $2,000,000.

(c)    Deferral. The provisions of Section 2.1(c) shall apply to any registration pursuant to this Section 2.3.

(d)    Underwriting. If the Holders of Registrable Securities requesting registration under this Section 2.3 intend to distribute the Registrable Securities covered by their request by means of an underwriting, the provisions of Section 2.1(d) shall apply to such registration. Notwithstanding anything contained herein to the contrary, registrations effectuated pursuant to this Section 2.3 shall not be counted as requests for registration or registrations effectuated pursuant to Section 2.1.

2.4    *Expenses of Registration.* All Registration Expenses incurred in connection with registrations pursuant to Section 2.1, Section 2.2 and Section 2.3 hereof (exclusive of underwriting discounts and commissions) shall be borne by the Company; *provided, however,* that the Company shall not be required to pay the fees of more than one counsel to all Holders of Registrable Securities; *provided, however,* that the Company shall not be required to pay for any expenses of any registration proceeding begun pursuant to Sections 2.1 and Section 2.3 if the registration request is subsequently withdrawn at the request of the Holders of a majority of the Registrable Securities to be registered (a "*Withdrawn Registration*") or because a sufficient number of Holders have withdrawn so that the minimum offering conditions set forth in Sections 2.1 and Section 2.3 are no longer satisfied (in which case all participating Holders shall bear such expenses *pro rata* among each other based on the number of Registrable Securities requested to be so registered), unless the Holders of a majority of the Registrable Securities in a Withdrawn Registration agree to forfeit their right to a demand registration pursuant to Section 2.1; *provided, however,* in the event that a withdrawal by the Holders is based upon material adverse information relating to the Company that is different from the information known or made available to the Holders requesting registration at the time of their request for registration under Section 2.1, such registration shall not be treated as a Withdrawn Registration for purposes of Section 2.1 hereof, even though the Holders do not bear the Registration Expenses for such registration. All Selling Expenses relating to securities registered on behalf of the Holders shall be borne by the holders of securities included in such registration pro rata among each other on the basis of the number of Registrable Securities so registered.

2.5    *Registration Procedures.* In the case of each registration effectuated by the Company pursuant to Section 2, the Company will keep each Holder advised in writing as to the initiation of each registration and as to the completion thereof. At its expense, the Company will use its commercially reasonable efforts to and will as expeditiously as possible:

00072

(a)    Keep such registration effective for a period ending on the earlier of the date which is 120 days from the effective date of the registration statement or such time as the Holder or Holders have completed the distribution described in the registration statement relating thereto; *provided, however,* that (i) such 120-day period shall be extended for a period of time equal to the period the Holder refrains from selling any securities included in such registration at the request of an underwriter of Common Stock (or other securities) of the Company; and (ii) in the case of any registration of Registrable Securities on Form S-3 which are intended to be offered on a continuous or delayed basis, subject to compliance with applicable SEC rules, such 120-day period shall be extended for up to 90 days, if necessary, to keep the registration statement effective until all such Registrable Securities are sold.

(b)    Prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement for the period set forth in subsection (a) above;

(c)    Furnish such number of prospectuses, including any preliminary prospectuses, and other documents incident thereto, including any amendment of or supplement to the prospectus, as a Holder from time to time may reasonably request;

(d)    Register and qualify the securities covered by such registration statement under such other securities or Blue Sky laws of such jurisdiction as shall be reasonably requested by the Holders; *provided,* that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

(e)    Cause its accountants to issue to the underwriter, if any, a comfort letter and updates thereof, in customary form and covering matters of the type customarily covered in such letter with respect to underwritten offerings; if such a letter is issued to the underwriter, upon request, the Company shall deliver a copy of the letter addressed to the underwriter to any Holder selling Registrable Securities in such underwritten offering.

(f)    Notify each seller of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading or incomplete in light of the circumstances then existing, and following such notification promptly prepare and furnish to such seller a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such shares, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading or incomplete in light of the circumstances then existing;

00073

(g)     Provide a transfer agent and registrar for all Registrable Securities registered pursuant to such registration statement and a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

(h)    Otherwise comply with all applicable rules and regulations of the Commission, and make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least 12 months, but not more than 18 months, beginning with the first month after the effective date of the Registration Statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act; and

(i)     Cause all such Registrable Securities registered pursuant hereunder to be listed on each securities exchange on which similar securities issued by the Company are then listed.

2.6    *Indemnification.*

(a)     To the extent permitted by law, the Company will indemnify and hold harmless each Holder, each of its officers, directors and partners, legal counsel, and accountants and each person controlling such Holder within the meaning of Section 15 of the Securities Act, with respect to which registration, qualification, or compliance has been effected pursuant to this Section 2, and each underwriter, if any, and each person who controls within the meaning of Section 15 of the Securities Act any underwriter, against all expenses, claims, losses, damages, and liabilities (or actions, proceedings, or settlements in respect thereof) arising out of or based on: (i) any untrue statement (or alleged untrue statement) of a material fact contained or incorporated by reference in any prospectus, offering circular, or other document (including any related registration statement, notification, or the like) incident to any such registration, qualification, or compliance, (ii) any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (iii) any violation (or alleged violation) by the Company of the Securities Act, any state securities laws or any rule or regulation thereunder applicable to the Company and relating to action or inaction required of the Company in connection with any offering covered by such registration, qualification, or compliance, and the Company will reimburse each such Holder, each of its officers, directors, partners, legal counsel, and accountants and each person controlling such Holder, each such underwriter, and each person who controls any such underwriter, for any legal and any other expenses reasonably incurred in connection with investigating and defending or settling any such claim, loss, damage, liability, or action; *provided* that the Company will not be liable in any such case to the extent that any such claim, loss, damage, liability, or action arises out of or is based on any untrue statement or omission based upon written information furnished to the Company by such Holder, any of such Holder's officers, directors, partners, legal counsel or accountants, any person controlling such Holder, such underwriter or any person who controls any such underwriter and stated to be specifically for use therein; and *provided, further* that, the indemnity agreement contained in this Section 2.6(a) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability, or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld, delayed or conditioned).

(b)    To the extent permitted by law, each Holder will, if Registrable Securities held by such Holder are included in the securities as to which such registration, qualification, or compliance is being effected, indemnify and hold harmless the Company, each of its directors, officers, partners, legal counsel, and accountants and each underwriter, if any, of the Company's securities covered by such a registration statement, each person who controls the Company or such underwriter within the meaning of Section 15 of the Securities Act, each other such Holder, and each of their officers, directors, and partners, and each person controlling such Holder, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on: (i) any untrue statement (or alleged untrue statement) of a material fact contained or incorporated by reference in any such registration statement, prospectus, offering circular, or other document, or (ii) any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse the Company and such Holders, directors, officers, partners, legal counsel, and accountants, persons, underwriters, or control persons for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability, or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such registration statement, prospectus, offering circular, or other document in reliance upon and in conformity with written information furnished to the Company by such Holder and stated to be specifically for use therein; *provided, however*, that the obligations of such Holder hereunder shall not apply to amounts paid in settlement of any such claims, losses, damages, or liabilities (or actions in respect thereof) if such settlement is effected without the consent of such Holder (which consent shall not be unreasonably withheld, delayed or conditioned); and *provided* that in no event shall any indemnity under this Section 2.6 exceed the gross proceeds from the offering received by such Holder.

(c)    Each party entitled to indemnification under this Section 2.6 (the *"Indemnified Party"*) shall give notice to the party required to provide indemnification (the *"Indemnifying Party"*) promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and shall permit the Indemnifying Party to assume the defense of such claim or any litigation resulting therefrom; *provided* that counsel for the Indemnifying Party, who shall conduct the defense of such claim or any litigation resulting therefrom, shall be approved by the Indemnified Party (whose approval shall not be unreasonably withheld or delayed), and the Indemnified Party may participate in such defense at such party's expense; and *provided further* that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 2.6, to the extent such failure is not prejudicial. No Indemnifying Party, in the defense of any such claim or litigation, shall, except with the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation. Each Indemnified Party shall furnish such information regarding itself or the claim in question as an Indemnifying Party may reasonably request in writing and as shall be reasonably required in connection with defense of such claim and litigation resulting therefrom.

(d)     If the indemnification provided for in this <u>Section 2.6</u> is held by a court of competent jurisdiction to be unavailable to an Indemnified Party with respect to any loss, liability, claim, damage, or expense referred to herein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party hereunder, shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, liability, claim, damage, or expense in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and of the Indemnified Party on the other in connection with the statements or omissions that resulted in such loss, liability, claim, damage, or expense as well as any other relevant equitable considerations. The relative fault of the Indemnifying Party and of the Indemnified Party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the Indemnifying Party or by the Indemnified Party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission. Notwithstanding the foregoing, the amount any Holder shall be obligated to contribute pursuant to this <u>Section 2.6(d)</u> shall be limited to an amount equal to the gross proceeds to the Holder of the Registrable Securities sold pursuant to the registration statement which gives rise to such obligation to contribute.

(e)     Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control.

2.7     *Information by Holder.*  Each Holder of Registrable Securities shall furnish to the Company such information regarding such Holder and the distribution proposed by such Holder as the Company may reasonably request in writing and as shall be reasonably required in connection with any registration, qualification, or compliance referred to in this <u>Section 2</u>.

2.8     *Restrictions on Transfer.*

(a)     The holder of each certificate representing Registrable Securities by acceptance thereof agrees to comply in all respects with the provisions of this <u>Section 2.8</u>. Each Holder agrees not to make any sale, assignment, transfer, pledge or other disposition of all or any portion of the Restricted Securities, or any beneficial interest therein, unless and until the transferee thereof has agreed in writing for the benefit of the Company to take and hold such Restricted Securities subject to, and to be bound by, the terms and conditions set forth in this Agreement, including, without limitation, this <u>Section 2.8</u> and <u>Section 2.10</u>, except for transfers permitted under <u>Section 2.8(b)</u> or unless:

(i)     There is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(ii)     Such Holder has given prior written notice to the Company of such Holder's intention to make such disposition and shall have furnished the Company with a detailed description of the manner and circumstances of the proposed disposition, and, if requested by the

Company, such Holder has furnished the Company, at its expense, with (i) an opinion of counsel, reasonably satisfactory to the Company, to the effect that such disposition will not require registration of such Restricted Securities under the Securities Act or (ii) a "no action" letter from the Commission to the effect that the transfer of such securities without registration will not result in a recommendation by the staff of the Commission that action be taken with respect thereto, whereupon the holder of such Restricted Securities shall be entitled to transfer such Restricted Securities in accordance with the terms of the notice delivered by the Holder to the Company. It is agreed that the Company will not require opinions of counsel for transactions made pursuant to Rule 144 except in unusual circumstances.

(b)    Permitted transfers include (i) a transfer not involving a change in beneficial ownership, or (ii) in transactions involving the distribution without consideration of Restricted Securities by any Holder to (x) a parent, subsidiary or other affiliate of Holder, or (y) any of its partners, members or other equity owners, or retired partners, retired members or other equity owners, or to the estate of any of its partners, members or other equity owners or retired partners, retired members or other equity owners, or (iii) transfers in compliance with Rule 144(k), as long as the Company is furnished with satisfactory evidence of compliance with such Rule; *provided*, in each case, that the Holder thereof shall give written notice to the Company of such Holder's intention to effect such disposition and shall have furnished the Company with a detailed description of the manner and circumstances of the proposed disposition.

(c)    Each certificate representing Registrable Securities shall (unless otherwise permitted by the provisions of this Agreement) be stamped or otherwise imprinted with a legend substantially similar to the following (in addition to any legend required under applicable state securities laws):

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATES, AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER SUCH ACT AND/OR APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER AND ITS COUNSEL THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD IN THE EVENT OF A PUBLIC OFFERING, ALL AS SET FORTH IN

AN INVESTORS' RIGHTS AGREEMENT, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY.

The Holders consent to the Company making a notation on its records and giving instructions to any transfer agent of the Restricted Securities in order to implement the restrictions on transfer established in this Section 2.8.

(d)     The first legend referring to federal and state securities laws identified in Section 2.8(c) hereof stamped on a certificate evidencing the Restricted Securities and the stock transfer instructions and record notations with respect to such Restricted Securities shall be removed and the Company shall issue a certificate without such legend to the holder of such Restricted Securities if (i) such securities are registered under the Securities Act, or (ii) such holder provides the Company with an opinion of counsel reasonably acceptable to the Company to the effect that a public sale or transfer of such securities may be made without registration under the Securities Act, or (iii) such holder provides the Company with reasonable assurances, that such securities can be sold pursuant to Section (k) of Rule 144 under the Securities Act.

2.9     *Rule 144 Reporting.* With a view to making available the benefits of certain rules and regulations of the Commission that may permit the sale of the Restricted Securities to the public without registration, the Company agrees to:

(a)     Make and keep public information regarding the Company available as those terms are understood and defined in Rule 144 under the Securities Act, at all times from and after ninety (90) days following the effective date of the first registration under the Securities Act filed by the Company for an offering of its securities to the general public; *provided* that if the Company is not current in its reporting obligations, then it shall have 30 days to become current in its reporting obligations;

(b)     File with the Commission in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act at any time after it has become subject to such reporting requirements; and

(c)     So long as a Holder owns any Restricted Securities, furnish to the Holder forthwith upon written request a written statement by the Company as to its compliance with the reporting requirements of Rule 144 (at any time from and after ninety (90) days following the effective date of the first registration statement filed by the Company for an offering of its securities to the general public), and of the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), and such other reports and documents so filed as a Holder may reasonably request in availing itself of any rule or regulation of the Commission allowing a Holder to sell any such securities without registration; *provided* that if the Company is unable to state as to its compliance with reporting requirements of Rule 144, then it shall have 30 days from the date of the request for such a written statement to become compliant with the reporting requirements of Rule 144.

2.10 *Market Standoff Agreement.* If requested by the Company or an underwriter of Common Stock (or other securities) of the Company, each Holder shall not sell or otherwise transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, of any Common Stock (or other securities) of the Company held by such Holder (other than those included in the registration) during the 180 day period following the effective date of the Company's Initial Public Offering filed under the Securities Act (or such longer period as the underwriters shall request in order to facilitate compliance with NASD Rule 2711). The obligations described in this Section 2.10 shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions and may stamp each such certificate with the second legend set forth in Section 2.8(c) hereof with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of such period. Each Holder agrees to execute a market standoff agreement with such underwriters in customary form consistent with the provisions of this Section 2.10, in which case such agreement shall supersede this Section 2.10.

2.11 *Delay of Registration.* No Holder shall have any right to take any action to restrain, enjoin, or otherwise delay any registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Section 2.

2.12 *Transfer or Assignment of Registration Rights.* The rights to cause the Company to register securities granted to a Holder by the Company under this Section 2 may be transferred or assigned by a Holder to affiliates, current and former partners and members and to a transferee, assignee or holder of not less than one-half (1/2) of the Registrable Securities (as presently constituted and subject to subsequent adjustments for stock splits, stock dividends, reverse stock splits, and the like) acquired by that Holder in the Purchase Agreement; *provided* that (i) such transfer or assignment of Registrable Securities is effected in accordance with the terms of Section 2.8 hereof and applicable securities laws and (ii) the transferee or assignee of such rights assumes in writing the obligations of such Holder under this Agreement, including without limitation the obligations set forth in Section 2.10.

2.13 *Termination of Registration Rights.* The right of any Holder to request registration or inclusion in any registration pursuant to Section 2.1, Section 2.2 or Section 2.3 shall terminate on the earlier of (i) such date, on or after the closing of the Company's Initial Public Offering, on which all shares of Registrable Securities held or entitled to be held upon conversion by such Holder, holding less than 1% of the outstanding capital stock of the Company, may immediately be sold under Rule 144 during any 90 day period, and (ii) 5 years after the closing of the Company's Initial Public Offering.

## SECTION 3
## COVENANTS OF THE COMPANY

The Company hereby covenants and agrees, as follows:

3.1    *Basic Financial Information.*

(a)    <u>Basic Financial Information</u>. The Company will furnish the following reports to each Investor who, together with the affiliates of such Investor, owns at least 25% of the then-outstanding shares of Series A Preferred Stock (each, a *"Major Investor"*):

(i)    Within 120 days after the end of each fiscal year of the Company, an audited consolidated balance sheet of the Company and its subsidiaries, if any, as at the end of such fiscal year, and audited consolidated statements of income and cash flows of the Company and its subsidiaries, if any, for such year, prepared in accordance with U.S. generally accepted accounting principles consistently applied, each certified by independent public accountants selected by the Company.

(ii)    Within 30 days after the end of each of the Company's thirteen (13) four (4) week accounting periods, an unaudited consolidated balance sheet of the Company and its Subsidiaries, if any, as of the end of such accounting periods, and unaudited consolidated statements of income and cash flows of the Company and its subsidiaries, if any, for such accounting periods, prepared in accordance with U.S. generally accepted accounting principles consistently applied, subject to changes resulting from normal year-end adjustments and a comparison between the actual figures for such periods, the comparable figures for the periods in the prior year and the comparable figures included in the Budget (as defined below) for such periods.

(iii)    At least 30 days prior to the end of each fiscal year a Budget as defined below and, promptly after any revisions thereof, any revised Budget.

3.2    *Budget.* At least 30 days prior to the end of each fiscal year, the Company shall prepare a budget for the next fiscal year, which shall be prepared on a four (4) week basis for the next years thirteen (13) accounting periods, including balance sheet projections, profit and loss projections and statements of cash flows projections for such months (collectively, the *"Budget"*).

3.3    *Confidentiality.* Each Investor acknowledges that the information received by them pursuant to this Agreement may be confidential and for its use only, and it will not use such confidential information in violation of the Exchange Act or reproduce, disclose or disseminate such information to any other person (other than its employees or agents having a need to know the contents of such information, and its attorneys), except in connection with the exercise of rights under this Agreement, unless the Company has made such information available to the public generally or such Investor is required to disclose such information by a governmental authority.

3.4    *Protective Provision.* The Company shall not, without first obtaining the written consent of Shawn D. Nelson, sell or otherwise convey all or substantially all of the assets of the

00080

Company to, or enter into any consolidation or merger or mandatory share exchange with, an affiliate of Walnut Investment Partners, LP or BEV Capital, LP.

3.5     *Termination of Covenants.* The covenants set forth in this Section 3 shall terminate and be of no further force and effect after the closing of the Company's Initial Public Offering; *provided* that the net proceeds to the Company are not less than $25,000,000 and the Company has a market capitalization, after giving effect to the public offering, equal to or in excess of $75,000,000 ("*Qualified Initial Public Offering*").

## SECTION 4
## PREEMPTIVE RIGHTS

4.1     *Preemptive Rights* . The Company hereby grants to each Series A Investor the right of first refusal to purchase its pro rata share of New Securities (as defined in this Section 4.1(a)) which the Company may, from time to time, propose to sell and issue after the date of this Agreement. A Series A Investor's pro rata share, for purposes of this right of first refusal, is equal to the ratio of (a) the number of shares of Common Stock owned by such Series A Investor immediately prior to the issuance of New Securities (assuming full conversion of the Preferred Stock and exercise of all outstanding convertible securities, rights, options and warrants, directly or indirectly, into Common Stock held by such Series A Investor) to (b) the total number of shares of Common Stock outstanding immediately prior to the issuance of New Securities (assuming full conversion of the Preferred Stock and exercise of all outstanding convertible securities, rights, options and warrants, directly or indirectly, all outstanding options (other equity awards) and shares reserves under stock plans of the Company).

(a)     "*New Securities*" shall mean any capital stock (including Common Stock and/or Preferred Stock) of the Company whether now authorized or not, and rights, convertible securities, options or warrants to purchase such capital stock, and securities of any type whatsoever that are, or may become, exercisable or convertible into capital stock; provided that the term "*New Securities*" does not include:

(i)     shares of Series A Preferred Stock issued pursuant to the Option (as defined in the Purchase Agreement);

(ii)     shares of Common Stock issued or issuable upon conversion of the Preferred Stock;

(iii)     shares of Common Stock issued or issuable to officers, directors and employees of, or consultants to, the Company pursuant to stock grants, option plans, purchase plans or other employee stock incentive programs or arrangements in existence as of March 3, 2005, or shares of Common Stock issued or issuable to such parties pursuant to any new plan or arrangement, provided that each such issuance or grant is approved by the Board and any increase after March 3, 2005, to the number of shares reserved for issuance under such plans, programs or arrangements is approved by the holders of at least fifty-five percent (55%) of the then-outstanding shares of Series A Preferred Stock;

00081

(iv)    securities issued upon the exercise or conversion of Options or Convertible Securities outstanding as of the Filing Date (as that term is defined in the Restated Certificate);

(v)    securities issued or issuable as a dividend or distribution on Preferred Stock or pursuant to any event for which adjustment is made pursuant to Section 4(e), Section 4(f) or Section 4(g) or Article V of the Restated Certificate;

(vi)    shares of Common Stock issued in a registered public offering under the Securities Act pursuant to which all outstanding shares of Preferred Stock are automatically converted into Common Stock pursuant to an Automatic Conversion Event (as defined in the Restated Certificate);

(vii)    securities issued or issuable pursuant to the acquisition of another corporation by the Company by merger, purchase of substantially all of the assets or other reorganization, *provided, that* such issuances are approved by the Board and by the holders of at least fifty-five percent (55%) of the then-outstanding shares of Series A Preferred Stock;

(viii)    securities issued upon a stock split, stock dividend, or any subdivision of shares of Common Stock;

(ix)    securities that are otherwise excluded by vote or written consent, prior to or after such issuance, of the Investors holding at least fifty-five percent (55%) of the then-outstanding shares of Series A Preferred Stock; or

(x)    shares of Series A Preferred Stock issued under the Purchase Agreement.

(b)    In the event the Company proposes to undertake an issuance of New Securities, it shall give each Series A Investor written notice of its intention, describing the type of New Securities, and their price and the general terms upon which the Company proposes to issue the same. Each Series A Investor shall have 30 days after any such notice is mailed or delivered to agree to purchase such Series A Investor's pro rata share of such New Securities for the price and upon the terms specified in the notice by giving written notice to the Company, in substantially the form attached hereto as **Exhibit A**, and stating therein the quantity of New Securities to be purchased. If any Series A Investor fails to so agree in writing within such 30-day period to purchase such Investor's full pro rata share of an offering of New Securities (a "*Nonpurchasing Investor*"), then such Nonpurchasing Investor shall forfeit the right hereunder to purchase that part of his pro rata share of such New Securities that he, she or it did not so agree to purchase.

(c)    In the event the Purchasing Investors fail to exercise fully the right of first refusal within such 30-day period (the "*Election Period*"), the Company shall have sixty (60) days thereafter to sell or enter into an agreement to sell that portion of the New Securities with respect to which the Series A Investors' right of first refusal option set forth in this Section 4.1 was not exercised, at a price and upon terms no more favorable to the purchasers thereof than specified in the

00082

Company's notice to Series A Investors delivered pursuant to Section 4.1(b). In the event the Company has not sold within such 60-day period following the Election Period, or such 60-day period following the date of said agreement, the Company shall not thereafter issue or sell any New Securities, without first again offering such securities to the Series A Investors in the manner provided in this Section 4.1.

(d)　　The preemptive rights granted under this Section 4 shall expire and terminate immediately prior to and not be applicable to the Qualified Initial Public Offering.

(e)　　Notwithstanding anything herein to the contrary, the Company shall not issue any securities convertible into capital stock of the Company or any shares of a series of Preferred Stock, other than Series A Preferred Stock, which allows for payments of interest or dividends in cash without the affirmative vote or written consent of the holders of fifty-five percent (55%) of the shares of Series A Preferred Stock then outstanding.

## SECTION 5
## MISCELLANEOUS

5.1　　*Amendment.* Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument referencing this Agreement and signed by (i) the Company and (ii) the Series A Investors holding at least fifty-five percent (55%) of the then-outstanding shares of Series A Preferred Stock; *provided, that,* Investors, or any affiliates of such Investors, purchasing shares of Series A Preferred Stock pursuant to the Option (as defined in the Purchase Agreement) may, without any amendment of this Agreement pursuant to this Section 5.1 or any consent or approval of any other Investor, become parties to this Agreement by executing a counterpart signature page to this Agreement, if such Investor or affiliate has not already done so; **Schedule I** of this Agreement shall be updated to reflect such a purchase under the Option. Any such amendment, waiver, discharge or termination effected in accordance with this paragraph shall be binding upon each Investor and each future holder of all such securities of Investor. Each Investor acknowledges that by the operation of this paragraph, the holders of at least fifty-five percent (55%) of the then-outstanding shares of Series A Preferred Stock will have the right and power to diminish or eliminate all rights of such Investor under this Agreement.

5.2　　*Notices.* All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or otherwise delivered by hand or by messenger addressed:

(a)　　if to an Investor, at the Investor's address, facsimile number as shown in the Company's records, as may be updated in accordance with the provisions hereof;

(b)　　if to any Holder, at such address, facsimile number as shown in the Company's records, or, until any such holder so furnishes an address, facsimile number or electronic mail address to the Company, then to and at the address of the last holder of such shares for which the Company has contact information in its records; or

00083

(c)     if to the Company, one copy should be sent to The LoveSac Corporation, 155 North 400 West, Suite 520, Salt Lake City, UT 84103, Facsimile: (801) 532-3936, Attn: President, or at such other address as the Company shall have furnished to the Investors.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given when delivered if delivered personally, or, if sent by mail, at the earlier of its receipt or 48 hours after the same has been deposited in a regularly maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid or, if sent by facsimile, upon confirmation of facsimile transfer.

5.3     *Governing Law.* This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law.

5.4     *Successors and Assigns.* Except as provided in <u>Section 2.12</u>, this Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by any Investor without the prior written consent of the Company. Any attempt by an Investor without such permission to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void. Subject to the foregoing and except as otherwise provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto, including any successor of the Company by means of a merger, consolidation, conversion transaction or mandatory share exchange.

5.5     *Entire Agreement.* This Agreement and the exhibits hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof. No party hereto shall be liable or bound to any other party in any manner with regard to the subjects hereof or thereof by any warranties, representations or covenants except as specifically set forth herein.

5.6     *Delays or Omissions.* Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to any party to this Agreement upon any breach or default of any other party under this Agreement shall impair any such right, power or remedy of such non-defaulting party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party to this Agreement, shall be cumulative and not alternative.

5.7     *Severability.* If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and

00084

enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision. The balance of this Agreement shall be enforceable in accordance with its terms.

5.8    *Titles and Subtitles.* The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto.

5.9    *Counterparts.* This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties that execute such counterparts, and all of which together shall constitute one instrument.

5.10    *Telecopy Execution and Delivery.* A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto and delivered by such party by facsimile or any similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen. Such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute and deliver an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

5.11    *Further Assurances.* Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and do all such other acts and things as may be necessary to more fully effectuate this Agreement.

5.12    *Aggregation.* All shares of Preferred Stock held or acquired by affiliated entities or persons of an Investor (including but not limited to: (i) a constituent partner or a retired partner of an Investor that is a partnership; (ii) a parent, subsidiary or other affiliate of an Investor that is a corporation; (iii) an immediate family member living in the same household, a descendant, or a trust therefor, in the case of an Investor who is an individual; or (iv) a member of an Investor that is a limited liability company) shall be aggregated together for the purpose of determining the availability of any rights under this Agreement which are triggered by the beneficial ownership of a threshold number of shares of the Company's capital stock.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]*

00085

IN WITNESS WHEREOF, the parties hereto have executed this Investors' Rights Agreement effective as of the day and year first above written.

"COMPANY"

THE LOVESAC CORPORATION
a Delaware corporation

By: _____

Name:  Shawn D. Nelson
Title:   Chief Executive Officer

Address:   155 North 400 West, Suite 520
Salt Lake City, Utah 84103
F:  801.532.3936

[SIGNATURE PAGE TO THE LOVESAC CORPORATION INVESTORS' RIGHTS AGREEMENT]

"INVESTOR"

MILLEVERE HOLDINGS LIMITED

By:_____

Name:_____

Title:_____

NIALL M RITCHIE
DIRECTOR

Exhibit C

## John Bernloehr

**From:** David Yarnell [David@bevcapital.com]
**Sent:** Thursday, October 20, 2005 1:15 PM
**To:** Wright, Simon; James Gould; John Bernloehr; walspo@comcast.net; shawnd@lovesac.com; Doyle Judd; Frederic H. Mayerson
**Subject:** RE: FW: LOVESAC BOARD CONF CALL

It is time that we stop caving in . I agree with Jimmy and Simon. We have to get in front of Trent and let him know "A promise is a promise".
Dick Martin and now G&G have been difficult since we put dollars in...we let people off easy early and now they are not supporting the company.
We cannot stand for this !!!


-----Original Message-----
From: Wright, Simon [mailto:SWright@virginmega.com]
Sent: Thursday, October 20, 2005 1:04 PM
To: James Gould; John Bernloehr; David Yarnell; walspo@comcast.net; shawnd@lovesac.com;
Doyle Judd; Frederic H. Mayerson
Subject: RE: FW: LOVESAC BOARD CONF CALL

You are dead right Jimmy - This was entirely my reaction. I wanted to get tough with all the lenders in the first place and for the sake of the existing shareholders reputations I think we gave them a soft ride given the alternative was they would lose their money. They have to understand there position and I suggest we call their bluff - they have the security of the land - let them go for that if they want. I am also tired of new issues coming up - the question mark over this funding from GG should have been checked out BEFORE asking the investors to stump up another $3m.

What time is this call - I have a Virgin Board meeting until 2pm PT ?

Simon

-----Original Message-----
From: James Gould [mailto:james.gould@thewalnutgroup.com]
Sent: Thursday, October 20, 2005 9:48 AM
To: John Bernloehr; david@bevcapital.com; Wright, Simon; walspo@comcast.net;
shawnd@lovesac.com; Doyle Judd; Frederic H. Mayerson
Subject: RE: FW: LOVESAC BOARD CONF CALL

With all due respect to my partner John, I disagree that we should continue to bend over for the benefit of G&G. The promises made by them when we funded were absolute, and now they are unilaterally changing the arrangement. I am sick and tired of this type of behavior in this company. We've got a lot of heavy lifting to do but this arrangement with G&G is not acceptable. I would like to keep the 3:00 p.m. ET call for today for a discussion because I am thoroughly disgusted with all financial matters regarding this company. I appreciate Walt's efforts for a cohesive organization and I believe in Shawn's vision, but find the financial underpinnings of this company to be unbelievably weak. We need to discuss this issue as it relates to today and particularly how it relates to tomorrow. This is one person's opinion who is tired of being the BEAR who had his porridge eaten by someone else EVERY TIME HE TURNS HIS BACK and NOT KNOW IT UNTIL IT IS TOO LATE.

Jimmy

-----Original Message-----
From: John Bernloehr
Sent: Thursday, October 20, 2005 12:24 PM
To: 'Doyle Judd'; David Yarnell
Cc: Wright, Simon; Walt Spokowski Email Forward; Shawn Nelson; James Gould; Frederic H.
Mayerson; Jane King
Subject: RE: FW: LOVESAC BOARD CONF CALL

WA01066    00088

On the G&G matter, I have drafted a response to the attorney which I have shown below.  If no one has issues this should be sent today.

Demetris,

Doyle Judd forwarded your response to my message from Tuesday.
LoveSac's intention has always been to renew the loan as was indicated in an e-mail from Doyle to Jennifer on October 14th.  We will send you a copy of this e-mail for your files.

Some background from my notes might be helpful to show LoveSac's intentions.  As Jennifer should remember both Doyle and I called her after we received your letter dated October 5, 2005.  I spoke with her on October 6th to discuss the letter and to discuss the possibly of altering the terms laid out in your letter.  Doyle received an e-mail from Jennifer on October 7th indicating that Gourley & Gourley would not change the terms of the renewal.  Upon returning to my office last week, I left Jennifer a voicemail to see if I could speak with Trent Gourley directly, because the terms in your letter to renew the Line of Credit were different than the oral discussion that I had with him on February 28, 2005 (highlighted in my message from Tuesday) which was prior to Walnut, BEV and Millevere investing in LoveSac.  When I spoke to Jennifer this past Monday (October 17th), she indicated that I should send something in writing to explain our request and rationale and that this would be discussed internally.  It was my belief that I was still in active negotiations concerning the renewal terms at this point in time.

Based on your e-mail from yesterday, the answer is clearly stated that the terms offered in your letter of October 5th are final.  Therefore, LoveSac will execute your letter and return to your attention.  Since the letter states that the principal curtailments will begin in December, but does not mention a definite date, LoveSac requests the payment due date be set on the last business day of the month.

We look forward to receiving the renewal documents and will respond to them promptly when received.

Regards, .

John Bernloehr

-----Original Message-----
From: Doyle Judd [mailto:doyle@lovesac.com]
Sent: Thursday, October 20, 2005 11:51 AM
To: John Bernloehr; David Yarnell
Cc: Wright, Simon; Walt Spokowski Email Forward; Shawn Nelson; James Gould; Frederic H. Mayerson; Jane King
Subject: FW: FW: LOVESAC BOARD CONF CALL

John and David -

Simon has now had a chance to more thoroughly understand the Geoff Field transaction, and, as noted below, he is willing to proceed on the basis that the deal does not change.

Thus, there is no need for the Board call that had been scheduled for later today.

I will continue to try to push this to the finish line by November 1.

If there are questions, please advise.

Doyle

-----Original Message-----
From: simon wright [mailto:simon.wright@virginmega.co.uk]
Sent: Thursday, October 20, 2005 9:33 AM
To: Doyle Judd
Cc: Shawn Nelson
Subject: Re: FW: LOVESAC BOARD CONF CALL

Exhibit D

December 7, 2005

To the Stockholders of
The LoveSac Corporation

Re:    **Bridge Financing**

Dear LoveSac Stockholder:

Over the past few months, The LoveSac Corporation (the "**Company**") has diligently sought capital to refinance existing indebtedness and to fund operations and strategic growth initiatives. All traditional institutional sources of capital – banks, non-bank lenders and leasing companies – have been contacted. Non-traditional funding sources were also approached, all to no avail.

The Company had no alternative but to obtain interim funding from holders of its Series A Preferred Stock. These holders advanced to the Company Two Hundred Sixty Thousand Dollars ($260,000) on September 1, 2005 and Six Hundred Thirty Thousand Dollars ($630,000) on September 15, 2005 in interim loans (the "**Interim Loans**") to keep the Company afloat while the search for capital continued.

Due to the continuing unavailability of capital from third parties on terms acceptable to the Company's Board of Directors, the Company and three (3) investors consisting of Barfair Limited (an affiliate of Series A Preferred Stockholder Millevere Holdings Limited) and two (2) Series A Preferred Stockholders – the Walnut Group (Walnut Investment Partners, L.P and Walnut Private Equity Fund, L.P.) and Brand Equity Ventures (collectively, the "**Bridge Investors**") entered into a bridge financing arrangement (the "**Bridge Financing**") intended to provide funding for the Company through the remainder of calendar year 2005 and into early 2006. In the Bridge Financing, the Company issued Three Million Dollars ($3,000,000) in convertible notes and warrants to the Bridge Investors, which borrowing was netted against the repayment of the Interim Loans. The total cash disbursement to the Company resulting from the Interim Loans and the Bridge Financing was Three Million Dollars ($3,000,000). As part of the Bridge Financing, an additional Two Hundred Fifty Thousand Dollars ($250,000) in convertible notes and warrants is now being made available to other Company stockholders that desire to participate in this Bridge Financing.

This letter is being provided to you to explain the terms of the Bridge Financing and to solicit your approval for certain actions related to the Bridge Financing. The Company's Board of Directors has unanimously approved the Bridge Financing and encourages you to do the same.

If you are an "accredited investor," this letter also offers you the opportunity to participate in the Bridge Financing.

A summary of the Bridge Financing terms (the "**Term Sheet**") is attached as Exhibit A to this letter. In connection with the Bridge Financing, enclosed for your review and/or approval are the following documents:

1.   Action by Written Consent of the Stockholders (with separate signature page)

3.  Amended and Restated Investors' Rights Agreement (with separate signature page) – applies only to Series A Preferred Stockholders; and

4.  Financial Statements of the Company.

## What Should I Do with the Enclosed Documents?

After reviewing this letter and the enclosed documents, if you consent to the transactions contemplated therein, please execute the signature pages of the Action by Written Consent and Amended and Restated Investors' Rights Agreement (applicable only to Series A Preferred Stockholders) and return (i) a copy of each signature page by facsimile to the Company's counsel, Wilson Sonsini Goodrich & Rosati, Attention: Lily Langen at (801) 993-6499 using the enclosed fax cover sheet and (ii) return the originals by mail in the enclosed envelope to Lily Langen at 2795 East Cottonwood Parkway, Suite 300, Salt Lake City, Utah 84121. *Please fax your signature pages by December 14, 2005.*

If you are an "accredited investor" and desire to participate in the Bridge Financing, please so indicate on the enclosed fax cover sheet. Please also indicate the maximum amount you desire to invest in the Bridge Financing. Formal subscription documents will, upon confirmation of your "accredited investor" status, be sent to you promptly.

## Terms of Bridge Financing

*The following describes certain terms and implications of the Bridge Financing. This overview is not intended to describe fully the financing, or to set forth all the implications of the financing, but rather to highlight the terms and implications that the Company believes are most material. This overview is qualified in its entirety by reference to the enclosed Term Sheet. If you would like to see any of the transaction documents referred to in the Term Sheet or this overview, please contact the undersigned at the Company for a copy. If you are an "accredited investor" and elect to participate in the Bridge Financing, you will receive a full set of the transaction documents prior to your investment.*

The Bridge Financing provides for the Company to borrow up to the principal sum of Three Million Two Hundred Fifty Thousand Dollars ($3,250,000) (the "**Bridge Loan**") at an interest rate of fifteen percent (15%) per annum. The Bridge Loan will be evidenced by Secured Convertible Promissory Notes (the "**Convertible Notes**") that mature on January 31, 2006. The Bridge Loan will be secured by a security interest in the Company's tangible and intangible personal property created under a security agreement that is subordinated to the Company's existing creditors.

The Convertible Notes may be converted into a new class of Series B Preferred Stock of the Company ("**Series B Preferred**") with rights and privileges as set forth in the enclosed Second Amended and Restated Certificate of Incorporation (the "**Restated Certificate of Incorporation**"). Additionally, the Company will issue warrants (the "**Warrants**") to purchase shares of Series B Preferred equal to ten percent (10%) of the average amount of the principal of, and accrued but unpaid interest under, the Convertible Notes outstanding during the calendar month (prorated, if only outstanding for a portion of a month) with respect to which the Warrants are issued.

The Bridge Investors committed to invest in three (3) tranches up to Three Million Dollars ($3,000,000) of the Bridge Loan. The three (3) tranches are as follows: (a) on the Initial Closing, the Company borrowed an aggregate principal amount of One Million Three Hundred Thirty Five Thousand

in a disbursement by the Bridge Investors of Four Hundred Forty-Five Thousand Dollars ($445,000); (b) on any Business Day (as defined hereinafter) between October 3, 2005 and October 15, 2005, upon reasonable written notice from the Company, in an aggregate principal amount of up to Six Hundred Sixty Five Thousand Dollars ($665,000); and (c) on any Business Day between October 16, 2005 and November 15, 2005, upon reasonable written notice from the Company, in an aggregate principal amount of up to One Million Two Hundred Fifty Thousand Dollars ($1,250,000) (the "**Third Tranche**"); *provided* that the Third Tranche shall be in a principal amount of not more than $250,000 unless the Company's Board of Directors has approved, pursuant to a Board discussion to occur between the date hereof and October 26, 2005 (such discussion to include and be based upon updated financial statements and an updated weekly cash flow forecast), a borrowing in the full amount of the Third Tranche. "**Business Day**" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

As of the date of this letter, the Company has taken down Three Million Dollars ($3,000,000) of the Bridge Loan.

The Company is also offering all of its stockholders who are "accredited investors" the opportunity to participate as investors pro rata to their ownership interest in the Company in $250,000 of the Bridge Financing. **Current Company stockholders who do not participate in the Bridge Financing will have their interest in the Company substantially diluted.**

## Interests of Directors and Bridge Investors

The Bridge Investors and/or their affiliates have representatives on the Company's Board of Directors and hold approximately 89.9% of the Company's outstanding shares of Series A Preferred Stock and approximately 51.0% of the Company's fully-diluted capitalization. Directors David Yarnell, James Gould and Simon Wright are representatives of Brand Equity, Walnut and Barfair, respectively.

## Amendment to the Company's Certificate of Incorporation to Authorize a New Series of Preferred Stock

As a condition to the Bridge Financing, it is required that the Company's Amended and Restated Certificate of Incorporation be further amended and restated to authorize the creation of a new series of Preferred Stock, to be designated Series B Preferred Stock, and to establish the rights, preferences, privileges and restrictions of the Series B Preferred. Among other things, the Series B Preferred will have so called "full ratchet" anti-dilution protection that will adjust the Series B Preferred conversion price to the lowest purchase price paid by investors for certain securities of the Company issued subsequent to the Bridge Financing if such purchase price is below the existing Series B Preferred conversion price. Holders of the Series B Preferred will receive, in preference to any other series or class of stock, a 1.5x return of capital invested in the Series B Preferred upon a liquidation event, with the right to participate on a pro rata basis alongside the common stock for any remaining proceeds after payment of the Series A Preferred liquidation preference. Holders of the Series B Preferred will also receive cumulative dividends at a rate of 15% per annum.

WA00559   00092

## Waiver of Preemptive Right for Bridge Financing

Pursuant to Section 4.1 of the Investors' Rights Agreement, dated March 3, 2005 (the "**Investors' Rights Agreement**"), by and among the Company and the persons and entities (the "**Series A Investors**") listed on Schedule I thereto, the Company granted the Series A Investors certain preemptive rights (the "**Preemptive Right**") with respect to their pro rata share (as determined pursuant to the Investors' Rights Agreement) of New Securities (as defined in the Investors' Rights Agreement) issued by the Company. The Investors' Rights Agreement also provides that the Company will provide the Series A Investors with notice in connection with issuances of New Securities and that the Company will sell such New Securities within sixty (60) days from the expiration of the thirty (30) day period in which the Series A Investors have to exercise their Preemptive Right. **The Company also requests that you waive your Preemptive Right, as well as your rights to notice and requirement that the Company wait to complete the Bridge Financing until after the expiration of the thirty (30) day period in which the Series A Investors have to exercise their Preemptive Right, under the Investors' Rights Agreement with respect to the Convertible Notes and Warrants to be issued pursuant to the Bridge Financing by signing the enclosed Written Consent of the Stockholders.** Signing the enclosed Written Consent of the Stockholders does not preclude accredited stockholders from participating in the Bridge Financing, and you should indicate on the enclosed fax cover sheet if you wish to participate in the Bridge Financing and avoid dilution of your interest in the Company.

## Amended and Restated Investors' Rights Agreement

As a condition to the Bridge Financing, it is required that the Investors' Rights Agreement be amended and restated to provide for the holders of Series B Preferred Stock to have, among other things, the registration rights and Preemptive Right that the Series A Investors enjoy. If you are a Series A Investor, please indicate your approval by signing the enclosed Written Consent of the Stockholders and Amended and Restated Investors' Rights Agreement.

## Solicitation of Approval

Pursuant to this stockholder distribution, you are being asked to approve the following:

- the Second Amended and Restated Certificate of Incorporation, which, among other things, creates the Series B Preferred and sets forth the rights, preferences and privileges thereof; and

- the waiver of your Preemptive Right, as well as your rights to notice and requirement that the Company wait to complete the Bridge Financing until after the expiration of the thirty (30) day period in which the Series A Investors have to exercise their Preemptive Right, under the Investors' Rights Agreement with respect to the Convertible Notes and Warrants to be issued pursuant to the Bridge Financing; and

- for Series A Preferred Stockholders only, the Amended and Restated Investors' Rights Agreement.

WA00560   00093

**Who can I contact for more information?**

Should you have any questions regarding these documents or the Bridge Financing please contact the undersigned at (801) 456-1593.

Very truly yours,

Doyle Judd
Senior Vice President and
Chief Financial Officer

Enclosures

WA00561    00094

Exhibit A

Term Sheet

| | |
|---|---|
| **Amount of Financing:** | Up to $3,250,000. |
| **Type of Security:** | Secured Subordinated Convertible Promissory Notes (the "**Notes**"). |
| **Purchase Price:** | Face value. |
| **Interest Rate:** | Annual interest rate of 15%, payable at maturity. |
| **Convertibility:** | The investors may elect to convert the Notes into shares of New Participating Preferred: (x) on January 31, 2006; or (y) at any time prior to the prepayment of the Notes by the Company; or (z) in connection with any merger, consolidation, conversion transaction or mandatory share exchange to which the Company is a party prior to January 31, 2006 or any sale by the Company of all or substantially all its assets prior to January 31, 2006. Upon the repayment in full of the principal (and all accrued and unpaid interest) of this Note, the Company shall enter into documentation giving the investors the right to invest a sum equal to the principal amount of this Note in shares of New Participating Preferred at any time on or prior to May 31, 2006, which documentation shall be reasonably acceptable to the holders of two-thirds or more of the then outstanding principal amount of the Notes (the "**Requisite Holders**"). The number of shares of New Participating Preferred into which the Notes may be converted shall be determined by dividing the aggregate principal amount together with all accrued interest to the date by the conversion price in effect at the time of such conversion (the "**Conversion Price**"). The Conversion Price shall initially be established by the Board of Directors of the Company and shall be adjusted from time to time by the Board of Directors of the Company. The Company's Certificate of Incorporation, as previously amended and restated, shall be further amended to authorize the New Participating Preferred. |
| **Term; Prepayment:** | January 31, 2006 (the "**Maturity Date**"). All principal and accrued interest under the Note is due and payable on the Maturity Date. The Notes may be prepaid, in whole or in part in minimum increments of Five Hundred Thousand Dollars ($500,000), at any time, without penalty or premium, at the option of the Company; *provided, however, that no prepayment of the Notes shall defer...* |

the right of the investors or any other action by the Company to convert the then-outstanding amount of principal of, and all accrued but unpaid interest under, the Notes into shares of New Participating Preferred.

**Warrant Coverage:**

The Company shall issue to the investors warrants to acquire shares of New Participating Preferred at an acquisition price of $0.54 per share (subject to adjustments for stock splits, combinations and the like) with respect to each whole or partial calendar month while the Notes remain outstanding (the "**Warrants**"). The number of shares of New Participating Preferred that may be obtained by exercise of the Warrants shall be equal to ten percent (10%) of the average amount of the principal of, and accrued but unpaid interest under, the Notes outstanding during the calendar month (prorated, if only outstanding for a portion of a month) with respect to which the Warrants were issued divided by $0.54. The warrants will be exercisable for ten (10) years from the Initial Closing of the Financing.

**Initial Closing:**

October 4, 2005

**Subordination:**

The Notes shall be subordinated to all existing indebtedness of the Company to banks, commercial finance lenders, insurance companies, leasing or equipment financing institutions or other lending institutions regularly engaged in the business of lending money.

**Security Interest:**

Subject to existing indebtedness of the Company, the Notes will be secured by all assets of the Company.

**Bridge Loan Agreement:**

The Notes will be (i) issued pursuant to a definitive Bridge Loan Agreement containing customary covenants and representations and warranties of the Company and (ii) secured pursuant to a Security Agreement.

**Rights Offering:**

Promptly after the Closing, the Company shall commence a rights offering (the "**Rights Offering**") to each holder of the Company's capital stock who is an accredited investor under the Securities Act. The Rights Offering shall offer each such stockholder the right to purchase such stockholder's pro rata portion of the aggregate Notes, based upon such stockholder's proportionate ownership of the Company outstanding capital stock immediately prior to the Closing.

Exhibit E

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  | : | CHAPTER 11 |
| --- | --- | --- |
| In re: | : |  |
|  | : | CASE NO 06-10080(CSS) |
| THE LOVESAC CORPORATION, et al., | : |  |
|  | : | (Jointly Administered) |
| Debtors. | : |  |

**MOTION OF DEBTORS FOR AN ORDER (I) AUTHORIZING THE DEBTORS (A) TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§105, 361, 362, 364(c) AND 364(e) AND (II) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

LoveSac Corporation, LoveSac of Nevada, LLC, ChillSack, LLC, and LoveSac Franchising, Inc. (collectively, the "Debtors") hereby submit this Motion (the "Motion") for the entry of an interim order, in substantially the form attached hereto as Exhibit "A" (the "Interim Order"), and a final order (the "Final Order;" "together with the Interim Order, the "Financing Orders") authorizing the Debtor pursuant to sections 105, 361, 362, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 et al.(the "Bankruptcy Code"), and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to (a) obtain post-petition secured financing on an interim and final basis pursuant to the terms of the DIP Documents (as hereinafter defined) in the amounts set forth below; (b) grant first priority liens and security interests in favor of the DIP Lenders (as hereinafter defined) on the assets and in the priority described herein, whether now or hereinafter existing, to secure the Post-Petition Obligations (as hereinafter defined), subject in certain instances in existing perfected liens, if any; and (c) grant super-priority administrative status to certain of the Post-Petition Obligations. In support of the Motion, the Debtors represent as follows:

## I.    Jurisdiction

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)

2.    Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

3.    The statutory predicates for the relief requested herein are sections 105, 361, 362, and 364 of the Bankruptcy Code

## II.    Background

4.    On January 30, 2006 (the "Filing Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101 et seq. (as amended, the "Bankruptcy Code"). The Debtors continue to manage the operation of their businesses and properties pursuant to sections 1107(a) and 1108 of the Bankruptcy Code  No trustee or examiner has been appointed in this Chapter 11 case.

5.    In accordance with the provisions of Section 1102(b) of the Bankruptcy Code, on February 10, 2006, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in the Debtors' cases

6.    The Debtors are manufacturers of specialty home furnishings, marketed and sold primarily under the "LoveSac" brand. Since the commencement of these cases, the Debtors have been funding their operations through the use of cash on hand as of the Filing Date and cash generated from their business operations.

7.    On or about April 12, 2006, the Bankruptcy Court entered a final order regarding the use of cash collateral (the "Cash Collateral Order") after a series of contested cash collateral hearings involving the Debtors, the Committee and G&G, LLC ("G&G")  At the conclusion of these hearings, the Court entered the Cash Collateral Order, under which the Court concluded, inter alia, that:

627495v1

00098

(a)    G&G did not maintain a perfected lien in the cash proceeds of the sale of the Debtors' inventory;

(b)    for purposes of cash collateral use under section 363 of the Bankruptcy Code, the Debtors were required to segregate the cash proceeds of certain accounts receivable pending further order of Court;

(c)    the extent of G&G's liens on other assets owned by the Debtors that were not going to be used or sold in the ordinary course of the Debtors' businesses was expressly reserved for further Order of Court; and

(d)    no post-petition replacement liens were conveyed to G&G under the Cash Collateral Order.

8.    The Court's ruling with respect to G&G's lien on the Debtors' inventory, as reflected in the Cash Collateral Order, is premised on the fact that G&G did not file a UCC-1 financing statement with the Delaware Secretary of State after Debtor The LoveSac Corporation reincorporated in Delaware in 2005. Therefore, the Court concluded that G&G was not perfected in the Debtors' inventory.

9.    Beginning in April, the Debtors began an aggressive effort to market and sell their assets pursuant to Section 363 of the Bankruptcy Code  To this end, the Debtors retained Capitalink, L.C. as their investment banker and the Court approved an auction and bidding process under which the assets were to be marketed and sold.

10.    Unfortunately, the Debtors' marketing efforts did not yield a suitable offer for the assets. While the Debtors effort to sell their assets under section 363 was not successful, the Debtors and the Committee were able to reach an agreement with certain of the Debtors' equity

627495v1

3

investors for a consensual sale pursuant to a plan of liquidation that would be filed by the Debtors and the Committee, which plan would also include a settlement and release of claims maintained by the Debtors' estates against these investors. The Debtors and the Committee are preparing a joint plan of liquidation (the "Joint Plan") to effectuate the agreement with the investors and enable the Debtors to exit chapter 11 by July 31.

11.    While the Debtors, the Committee and the investors have reached agreement on the terms of the asset sale and settlement that will serve as the cornerstone of the Joint Plan, the Debtors do not have a sufficient cash flow necessary to fund their operations and satisfy their administrative expenses until the anticipated confirmation date. The Debtors' need for additional cash is magnified by the fact that the Debtors must fund a significant inventory purchase to complete an order placed by Costco that will need to be delivered in July. Under the terms of the order, the Debtors will generate positive cash flow from the sale, but the order will not be paid for by Costco until after the Debtors are required to pay for the goods needed to fill the order.

12.    As a result of the foregoing, the Debtors will require financing in order to operate their businesses and perform the Costco agreement prior to the anticipated confirmation date of the Joint Plan.

### III.    Relief Requested

13.    By this Motion, and as more specifically set forth in, and subject in all respects to, the Financing Orders, the Debtors request, among other things, authority to:

(a) obtain post-petition financing pursuant to the DIP Facility up to an aggregate principal amount not to exceed $990,000 ($650,000 pending the Final Hearing) on the terms set forth in the DIP Documents and the other ancillary documents executed in connection therewith (the "Post-Petition Obligations");

627495v1

4

(b) grant the DIP Lenders liens and security interests under sections 364(c) of the Bankruptcy Code as security for repayment of the Post-Petition Obligations, subject to certain existing perfected liens on certain of the assets, as described more fully herein; and

(c) accord the Post-Petition Obligations "superpriority" administrative claim status under section 503(b) of the Bankruptcy Code with priority over all other administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code.[1]

14.    Following intense negotiations, the Debtors have obtained commitments from Walnut Investment Partners, L.P., Walnut Private Equity Fund, L.P, Brand Equity Ventures II, L.P., Hauser 41, LLC, Millevere Holdings, (collectively, the "Series A Lender") and Transcap ("Transcap"), collectively with the Series A Lender, the "DIP Lenders"), to extend debtor-in-possession financing (the "DIP Facility") to enable the Debtors to continue in operation pending confirmation of the Joint Plan and closing of the sale of substantially all of the Debtors' assets (the "Asset Sale").

15.    The DIP Facility will be extended under two loans, a revolving line of credit by the Series A Lender (the "Series A Loan"), and a letter of credit by Transcap (the "Transcap Loan"). The terms of the DIP Facility are set forth in the Loan Agreement with Series A Lender

---

[1]       Transcap has not stated whether a super-priority claim will be required as a condition to the Transcap Loan Therefore, the Debtors may withdraw the request for a superpriority claim in favor of Transcap at the time of the interim DIP hearing.

627495v1

attached hereto as Exhibit B, together with any and all other documents required to be executed and delivered in connection therewith (collectively, the "DIP Documents") [2]

16.    Upon entry of the Interim Order and the satisfaction of other customary closing conditions, the DIP Lenders will extend loans to the Debtors under the following terms, provided that, in all respects, the terms and conditions of the DIP Documents shall control over any inconsistencies with the following summary of terms:

### The Series A Loan

(a) Facility Amount: $500,000 revolving loan.

(b) Maturity Date. July 31, 2006, if the Asset Sale is not consummated. If the Asset Sale is consummated, either through a 363 sale or through plan confirmation, the Series A Loan will be assumed in full by the Purchaser, with no remaining recourse to the Debtors' estates, and all liens securing the Series A Loan filed against assets not transferred to the Purchaser shall be extinguished, at which time the terms of the Series A Loan may be modified and amended by the Purchaser and the Series A Lender without further Court Order.

(c) Interest Rate. Two and one half percent (2.5 %) *per month*, based upon the Facility Amount.

(d) Fees. The Series A Lender's legal fees and costs will be paid at Closing. The amount of these fees shall be disclosed at or before the Interim Hearing

(e) Guarantor. The debtor affiliates of LoveSac Corporation

---

[2]    Given the time constraints facing the Debtors, the Debtors are filing this Motion with a summary of the terms of the purchase order financing to be extended by Transcap  The Debtors anticipate filing a final agreement with Transcap prior to the Interim Hearing on this Motion

00102

(f) <u>Liens and Claims of DIP Lenders</u>. The Series A Loan shall be secured by:

      (i)    A superpriority administrative claim against the Debtors' estates pursuant to Section 364(c)(1) of the Bankruptcy Code;

      (ii)    A perfected first priority lien on all inventory of the Borrower and the Guarantors,

      (iii)    A perfected first priority lien on all property of the Debtors that is not subject to valid, perfected and non-avoidable liens as of the Filing Date, but excluding Estate Causes of Action (as defined in the DIP Documents);

      (iv)    a perfected lien, junior in priority only to the lien of Transcap, on the accounts receivable payable to the Debtors by the Costco organization ("Costco A/R"); and

      (v)    a perfected junior lien on all property of the Debtors that is subject to valid, perfected and non-avoidable liens in existence on the Filing Date or to valid liens in existence on the Filing Date that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, including the Costco A/R; but excluding Estate Causes of Action.

(g) <u>Usage of Loan Proceeds</u>. For items described on the budget appended to the DIP Documents, subject to a 10% variance.

(h) <u>Events of Default</u>. Failure to pay the outstanding balance on or before the Maturity Date or the failure to close the Asset Sale on or before the Maturity Date. Upon the occurrence and during the continuance of any default in the payment of principal, interest or other amounts due under the Agreement, interest shall be payable on demand at one percent (1%) above the then applicable rate.

(i) <u>Lenders' Remedies Upon Event of Default</u>. As described in the DIP Documents.

00103

### The Transcap Loan

(a) <u>Facility Amount</u>: $490,000 under a letter of credit issued in favor of the Debtors' inventory suppliers, which letter of credit may be drawn upon by such suppliers upon shipment of goods to the Debtors.

(b) <u>Maturity Date</u>. 45 days from issuance.

(c) <u>Interest Rate</u>. 2.75% per month on the outstanding balance.

(d) <u>Liens and Claims of Transcap</u>. The Transcap Loan shall be secured by a first lien on the Costco A/R.

(e) <u>Events of Default</u>. Failure to repay at the time of maturity.

(f) <u>Lenders' Remedies Upon Event of Default</u> Foreclosure on Costco A/R

17.    In addition to these terms, if the Transcap Loan has not been repaid at the time Asset Sale is consummated, either through a 363 sale or through plan confirmation, the Transcap Loan will be assumed in full by the Purchaser, with no remaining recourse to the Debtors' estates.

### IV.    Basis for Relief

18.    The Debtors submit that the applicable provisions of the Bankruptcy Code support approval of the DIP Facility Section 364(c) of the Bankruptcy Code provides, in relevant part, as follows:

(c)    If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or, the incurring of debt -

00104

(1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)    secured by a junior- lien on property of the estate that is subject to a lien.

19.    Because the Debtors' existing cash on hand and projected operating revenues will not be sufficient to fund their ongoing working capital requirements and expenses, the Debtors believe that approval of the DIP Facility is required to enable the Debtors to confirm the Joint Plan and close the Asset Sale. The Debtors' value is in the continuation of their business as a going concern, which depends upon access to the funds necessary to operate in the ordinary course.

20.    The Debtors believe that approval of the DIP Facility is in the best interest of their creditors and will facilitate an orderly sale of the Debtors' assets, which would provide the best benefit for creditors and other constituents in these cases. Moreover, should the asset sale be approved, the Series A Lender will assume the Debtors' remaining obligations under the Series A Loan. Thus, in the event the Debtors and the Committee successfully confirm the Joint Plan, the DIP Facility will become non-recourse to the Debtors

21.    Approval of the DIP Facility is also warranted because, given the present circumstances of the Debtors' cases, the Debtors have exercised their reasonable business judgment that the execution of the DIP Facility is in the best interest of their estates. Under these circumstances, the Court's discretion under Section 364 to approve post-petition financing should be utilized to facilitate the exercise of the Debtors' reasonable business judgment. *In re Ames Department Stores*, 115 B.R. 34, 40 (S.D.N.Y. 1990).

00105

22      The Debtors do not believe that the proposed security to be offered to the DIP Lenders would result in a priming lien on any property of the Debtors' estates that is currently subject to a lien. As a result, the Debtors initially are requesting that this Court approve the proposed DIP Facility under Section 364(c) of the Bankruptcy Code, but reserve the right to request that the Court approve the Motion under section 364(d) any creditor establish a lien on assets to be pledged to the DIP Lender that would not allow the Debtors to convey the port-petition liens in the order of priority described above. Although a number of liens were recorded against the Debtors' assets prior to the Filing Date, the Debtors assert for the following reasons that consideration of this Motion under section 364(d) of the Bankruptcy Code is not required:

(a)     <u>G&G</u>:  While G&G filed certain liens against LoveSac prior to the Filing Date, under the Cash Collateral Order, the Court determined that G&G was not perfected as to the Debtors' inventory. The Court also determined that G&G was entitled to adequate protection as to some of the accounts receivable and leases sold by the Debtors, and the proceeds of this property are being segregated from the Debtors' principal operating funds as required by the Cash Collateral Order. Under the proposed DIP Facility, the Debtors would convey a first lien on their inventory to the Series A Lender, first and second liens on the Costco A/R, which will not be generated until July 2006, and certain other liens that shall be junior in priority to any existing liens that may be maintained by G&G. In light of the foregoing, the Debtors do not believe that approval of the post-petition liens under section 364(d) is required because none of the proposed post-petition liens would prime G&G's valid and perfected pre-petition security interests, if any.

00106

(b)    <u>Liens Filed By The Series A Investors</u>:  The liens recorded by the Series A investors, if any, shall be subordinated by agreement of the Series A investors to the liens conveyed to the DIP Lenders.

(c)    <u>REM, LLC</u>:  REM, LLC ("REM"), allegedly filed a UCC-1 Financing Statement on the inventory and proceeds thereof of The LoveSac Corp, a Utah corporation ("LoveSac Utah").  REM did not file a UCC-1 Financing Statement with the Secretary of State of Delaware.  REM was granted a replacement lien in the Cash Collateral Order to the extent of REM's pre-petition collateral  However, since REM did not file a UCC-1 Financing Statement against any of the Debtors, for the same reasons that the Court determined that G&G did not perfect a lien of the Debtors' inventory, REM also did not perfect.  As a result, the conveyance of the post-petition liens under the DIP Facility will not prime any perfected security interest maintained by REM.

(d)    <u>Celtic Bank</u>:  Celtic Bank allegedly filed a UCC-1 financing statement in Utah against LoveSac Utah, but did not file a lien against LoveSac Delaware  As a result, for the same reasons articulated with respect to the liens filed by G&G, Celtic Bank does not maintain a lien on any of the Debtors' inventory or accounts receivable that would be primed by the proposed DIP Facility.

23.    The terms of the DIP Facility, which the Debtors believe are fair and reasonable, were negotiated in good faith and at arm's length, with all parties represented by experienced counsel. Before finally agreeing on the terms of the DIP Facility, the Debtors, the Committee and the DIP Lenders engaged in vigorous negotiations regarding the monetary and non-monetary

627495v1

00107

terms and conditions of the DIP Facility, and respective counsel exchanged several drafts of the DIP Documents as well as the form of Interim Order.

24      Accordingly, the DIP Lenders should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, so that if any of the provisions of the Financing Orders are later modified, vacated, stayed or terminated by subsequent order of this or any other Court, the DIP Lenders shall be fully protected with respect to any amounts previously advanced

25.     In sum, the Debtors have concluded in the sound exercise of its business judgment that the DIP Facility is their best financing alternative  Accordingly, the Debtors respectfully requests that this Court grant the relief requested herein.

### V.      **Emergency Hearing**

26.     The Debtors are without sufficient funds to be able to operate for fifteen (15) or more days until a final hearing on this Motion can be held without interim, emergency relief  The Debtors require cash to meet payroll, and to pay other indispensable expenses. Failure to pay such items will result in irreparable injury to the Debtors and harm their unsecured creditors.

### VI.      **Notice**

27.     In accordance with Bankruptcy Rules 4001(b) and (c), notice of this Motion has been provided to:  (a) the Office of the United States Trustee, (b) the Debtors' 2002 list, (c) counsel for the Lenders and (d) counsel for the Official Committee of Unsecured Creditors.  The Debtors submit that the foregoing constitutes good and sufficient notice and that no other or further notice need be provided.

627495v1

12

00108

Dated: June 9, 2006

THE BAYARD FIRM

/s/ Christopher A. Ward
Charlene D. Davis (#2336)
Christopher A. Ward (#3877)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801

-and-

SQUIRE, SANDERS
& DEMPSEY,    LLP
P. Casey Coston, Esquire
312 Walnut Street, Suite 3500
Cincinnati, Ohio 45202

*Counsel to Debtors and Debtors in Possession*

627495v1

13

00109

Exhibit F



# REINCORPORATION OF THE LOVESAC CORPORATION

## CLOSING VOLUME

February 25, 2005

WGR  Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

WA00358 00110

## EXHIBIT G

## SIGNIFICANT DIFFERENCES BETWEEN THE
## CORPORATION LAWS OF UTAH AND DELAWARE

The General Corporation Laws of Utah and Delaware differ in many respects. Although it is not practical to summarize all of such differences in this statement, some of the principal differences which could materially affect the rights of shareholders are discussed below.

*Separate Class Vote by Classes of Shares.* Under Utah law if the number of shares of any class are increased or decreased by amendment to a company's articles of incorporation, then that class of shares would be entitled to separate class vote on the amendment. Similarly, under Utah law if an amendment to a company's articles of incorporation would change certain rights of an existing class of shares or create a class or series of shares with rights and preferences in priority to such existing class of shares, then the existing class would also be entitled to a separate class vote on the amendment. Separate class votes required under Utah law may not be eliminated through amendment of articles of incorporation, even though the shares may be designated as nonvoting or other classes or series of shares are purported to vote as part of the same voting group. Alternatively, under Delaware law, Delaware courts have determined that the creation of a class or series of stock does not entitle the existing class to a class vote, merely because the rights and preferences are superior to the existing class. Also under Delaware law, if a company provides in its certificate of incorporation that the number of authorized shares of any such class or classes of stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the stock of the corporation entitled to vote, then a separate class vote is not required to increase or decrease the number of shares of that class.

*Calling Annual Meetings of Shareholders.* Under Delaware law, unless otherwise authorized by the certificate of incorporation or bylaws, a special meeting of stockholders may only be called by the Board of Directors. In contrast, in Utah, a special meeting of shareholders may be called by either (a) the Board of Directors or such other person or persons authorized by the bylaws or (b) a shareholder or group of shareholders entitled to cast at least 10% of the votes at such meeting.

*Required Number of Directors.* In Delaware, a corporation may have any number of directors. In contrast, under Utah law, a corporation must have at least three directors unless it has fewer than three shareholders, in which case the number of directors must at least equal the number of shareholders, but in no event may a Utah corporation have fewer than one director. Further, Delaware law permits the Board of Directors to change the authorized number of directors by amendment to the bylaws unless the number of directors is fixed in the certificate of incorporation, in which case a change in the number of directors may be made only by amendment to the certificate of incorporation. Similarly, Utah law permits the board of directors to change the authorized number of directors by amendment to the bylaws unless the number of directors is fixed (and not allowed to be changed) by the articles of incorporation, in which case a change in the number of directors may be made only by amendment to the articles of incorporation. Under Utah law, no decrease in the number of directors is permitted to shorten the term of any incumbent director.

*Classified Board; Differential Voting Power.* Both Delaware and Utah law provide for creation of a classified board of directors with one-half or one-third of the directors coming up for reelection to a two or three-year term (as applicable) each year. Delaware law also allows differences in voting power among directors or classes of directors, whereas Utah law has no such provision.

*Removal of Directors.* In Delaware, a director serving on a classified board can be removed only for cause unless otherwise specified in the certificate of incorporation. In contrast, under Utah law, a

director serving on a classified board may be removed, with or without cause, unless otherwise specified in the articles of incorporation. Further, under Utah law, if a director is elected by a voting group of shareholders, only the shareholders of that voting group may participate in the vote to remove him. In the case of a corporation with cumulative voting, Delaware requires that where less than the entire board is to be removed, a director may not be removed without cause unless the number of shares voted against such a removal would not be sufficient to elect the director under cumulative voting. In Utah corporations with cumulative voting, a director may not be removed if the number of votes sufficient to elect the director under cumulative voting is voted against removal.

*Election by Written Consent.* Under Delaware law, directors may be elected by a written consent signed by a majority of the shareholders; provided, however, that if such consent is less than unanimous, such action by written consent may be in lieu of holding an annual meeting only if all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action. In contrast, Utah law requires a unanimous written consent for the election of directors. Most other shareholder actions may be taken by a written consent of the majority entitled to vote in either jurisdiction.

*Delay in Completing Actions Approved by Written Consent.* When action is taken by written consent under Delaware law, the action may either be completed immediately or, in some situations, shortly after giving notice to any stockholders that did not sign the written consent. In contrast, Utah law requires that shareholders who did not sign the written consent be given notice ten days before the consummation of the action authorized.

*Percentage Required for a Quorum of Shareholders.* Under Delaware law, a quorum for purposes of a stockholder vote may be any percentage between 33 1/3% and 100%, as specified in the charter documents. In contrast, under Utah law, any percentage may constitute a quorum if specified in the articles of incorporation. In the absence of such specification, a majority of the votes entitled to be cast on the matter by the voting group constitutes a quorum of that voting group for action on that matter.

*Inspection of Records.* Delaware law allows stockholders and directors to inspect the corporation's records and stockholder's list for purposes reasonably related to such person's interests as a stockholder or director. In contrast, under Utah law, directors or shareholders may inspect certain documents and records for any purpose, but other records, including the shareholder list, only for a purpose reasonably related to such shareholder's or director's interest as such.

*Sale of All Assets.* Under Delaware law, a sale of substantially all of the corporation's assets requires the approval of holders of a majority of the stock entitled to vote, although no stockholder approval is required for a mortgage of substantially all corporate assets unless required by the certificate of incorporation. In contrast, under Utah law, the corporation's assets may be disposed of in the regular course of its business without any shareholder approval. If a corporation's assets are disposed of other than in the regular course of the corporation's business, approval of the majority of the outstanding shares of each class of stock is required.

*Dissolution.* Under Delaware law, a dissolution of the corporation requires approval of all stockholders unless initiated by the board of directors, in which case only a majority approval is required. Under Utah law, a dissolution must be approved by a majority of the holders of each class of stock of the corporation.

*Indemnification of Directors, Officers and Agents.* Delaware law generally permits indemnification from expenses incurred in the defense or settlement of a derivative or third-party action, provided, that, with respect to a person who is a director or officer at the time of determination, there is a determination by, a committee of such directors designated by majority vote of such directors, even though less than a quorum, by independent legal counsel or by a majority vote of a quorum of the

stockholders that the person seeking indemnification acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the corporation, and with respect to a criminal action or proceeding had no reasonable cause to believe that the person's conduct was unlawful. Without court approval, however, no indemnification may be made in respect of any derivative action in which such person is adjudged liable to the corporation. Delaware law requires indemnification of expenses when the individual being indemnified has successfully defended the action on the merits or otherwise. Delaware law provides that the indemnification provided by statute shall not be deemed exclusive of any other rights under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise.

Utah law generally permits indemnification from expenses incurred in the defense or settlement of a derivative or third-party action, provided there is a determination by a disinterested quorum of the directors, by a disinterested committee of the board of directors consisting of at least two directors, by special legal counsel or by a majority vote of a quorum of the shareholders that the person seeking indemnification acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the corporation. However, a director may not be indemnified in a derivative suit or in connection with any other proceeding in which the director is found liable to the corporation or in connection with any other proceeding charging that he derived an improper personal benefit in which he was judged liable. Unless otherwise provided in the articles of incorporation, indemnification is mandatory to a director who is successful in defending an action on the merits or otherwise.

*Elimination of Directors' Liability for Monetary Damages.* Delaware law permits a corporation to adopt a provision in its certificate of incorporation eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for the breach of fiduciary duty as a director, provided that such liability does not arise from certain prescribed conduct, including intentional misconduct, a breach of the duty of loyalty, unlawful distributions and transactions from which a director derives an improper personal benefit.

Utah law permits a corporation to adopt a provision in its charter documents eliminating or limiting the personal liability of a director to the corporation or its shareholders for monetary damages for acts or failures to act in the director's capacity as a director, except liability for financial benefits to which the director was not entitled, intentional infliction of harm to the corporation or shareholders, unlawful distributions or intentional violation of criminal laws.

*Stockholder Approval of Certain Business Combinations.* Under Section 203 of the Delaware General Corporation Law ("*Section 203*"), certain "business combinations" with "interested stockholders" of Delaware corporations are subject to a three-year moratorium unless specified conditions are met.

Section 203 prohibits a Delaware corporation from engaging in a "business combination" with an "interested stockholder" for three years following the date that such person becomes an interested stockholder. With certain exceptions, an interested stockholder is a person or group who or which owns 15% or more of the corporation's outstanding voting stock (including any rights to acquire stock pursuant to an option, warrant, agreement, arrangement or understanding, or upon the exercise of conversion or exchange rights, and stock with respect to which the person has voting rights only), or is an affiliate or associate of the corporation and was the owner of 15% or more of such voting stock at any time within the previous three years.

For purposes of Section 203, the term "business combination" is defined broadly to include mergers with or caused by the interested stockholder; sales or other dispositions to the interested stockholder (except proportionately with the corporation's other stockholders) of assets of the corporation or a subsidiary equal to ten percent or more of the aggregate market value of the corporation's consolidated assets or its outstanding stock; the issuance or transfer by the corporation or a subsidiary of stock of the corporation or such subsidiary to the interested stockholder (except for transfers in a

conversion or exchange or a pro rata distribution or certain other transactions, none of which increase the interested stockholder's proportionate ownership of any class or series of the corporation's or such subsidiary's stock); or receipt by the interested stockholder (except proportionately as a stockholder), directly or indirectly, of any loans, advances, guarantees, pledges or other financial benefits provided by or through the corporation or a subsidiary.

The three-year moratorium imposed on business combinations by Section 203 does not apply if: (i) prior to the date on which such stockholder becomes an interested stockholder the Board of Directors approves either the business combination or the transaction which resulted in the person becoming an interested stockholder; (ii) the interested stockholder owns 85% of the corporation's voting stock upon consummation of the transaction which made him an interested stockholder (excluding from the 85% calculation shares owned by directors who are also officers of the target corporation and shares held by employee stock plans which do not permit employees to decide confidentially whether to accept a tender or exchange offer); or (iii) on or after the date such person becomes an interested stockholder, the board approves the business combination and it is also approved at a stockholder meeting by sixty-six and two-thirds percent (66 2/3%) of the voting stock not owned by the interested stockholder.

Section 203 only applies to Delaware corporations which have a class of voting stock that is listed on a national securities exchange, are quoted on an interdealer quotation system such as Nasdaq or are held of record by more than 2,000 shareholders. However, a Delaware corporation may elect not to be governed by Section 203 by a provision in its original certificate of incorporation or an amendment thereto or to the bylaws, which amendment must be approved by majority stockholder vote and may not be further amended by the board of directors.

Section 203 will encourage any potential acquiror to negotiate with the Company's Board of Directors. Section 203 also has the effect of limiting the ability of a potential acquiror to make a two-tiered bid for a Delaware corporation in which all stockholders would not be treated equally. Shareholders should note that the application of Section 203 to the Company will confer upon the Board the power to reject a proposed business combination, even though a potential acquiror may be offering a substantial premium for the Company's stock over the then current market price (assuming the stock is then publicly traded). Section 203 should also discourage certain potential acquirors unwilling to comply with its provisions.

*Dividends and Repurchase of Shares.* Delaware law permits a corporation, unless restricted by its certificate of incorporation, to declare and pay dividends out of surplus or, if there is no surplus, out of net profits for the fiscal year in which the dividend is declared and for the preceding fiscal year as long as the amount of capital of the corporation is not less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets. In addition, Delaware law generally provides that a corporation may redeem or repurchase its shares only if such redemption or repurchase would not impair the capital of the corporation.

Under Utah law, a corporation may make distributions to shareholders so long as such action would not (a) make the corporation unable to pay its debts as they become due in the usual course of business or (b) cause the corporation's total assets to be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed to satisfy preferential rights of shareholders senior to those receiving the distribution. A Utah corporation may acquire its own shares, and such shares are either returned to the status of "authorized but unissued" or removed from the authorized number of shares, whichever is specified in the articles of incorporation. Limitations on payment of dividends also apply to redemptions of stock.

*Appraisal or Dissenter's Rights.* Under Delaware law, a stockholder of a corporation participating in certain major corporate transactions may, under varying circumstances, be entitled to appraisal rights pursuant to which such stockholder may receive cash in the amount of the fair market

value of the shares held by such stockholder (as determined by a court or by agreement of the corporation and the stockholder) in lieu of the consideration such stockholder would otherwise receive in the transaction. Appraisal rights are generally available for the shares of any class or series of stock of a constituent corporation in a merger or consolidation (but not in a sale of substantially all assets). Notwithstanding the above, appraisal rights are not available to (a) stockholders with respect to a merger or consolidation by a corporation the shares of which are either listed on a national securities exchange or are held of record by more than 2,000 stockholders if such stockholders receive only shares of the surviving corporation or shares of any other corporation which are either listed on a national securities exchange or held of record by more than 2,000 stockholders; or (b) stockholders of the corporation surviving a merger if no vote of the stockholders of the surviving corporation is required to approve the merger because certain conditions are met.

Under Utah law, certain events give rise to a right of a shareholder to dissent and have such shareholder's shares appraised and the appraised value paid. Such events include: a corporation participating in a merger that requires shareholder approval; a merger of a subsidiary with its parent where the subsidiary is the surviving corporation; a share exchange where the shareholder holds stock of the acquired entity; a sale, lease, exchange or other disposition of all, or substantially all, of the property of the corporation where shareholder approval is required (but not including a sale for cash if the cash would be distributed within one year); and a sale, lease, exchange or other disposition of all, or substantially all, of the property of an entity controlled by the corporation where shareholder approval is required. Upon such event the shareholder is entitled to appraisal rights pursuant to which such shareholder may receive cash in the amount of the fair market value of the shares held by such shareholder (as determined by a court or by agreement of the corporation and the shareholder) in lieu of the consideration such shareholder would otherwise receive in transaction. However, appraisal or dissenter's rights are generally not available to (a) holders of stock which is listed on a national securities exchange or the Nasdaq National Market or held of record by more than 2,000 shareholders so long as such shareholder will receive in exchange for his stock shares of the surviving corporation or shares of a corporation that are listed on a national securities exchange, in the Nasdaq National Market or held of record by more than 2,000 shareholders.

*Interested Director Transactions.* Under Delaware law, no contract or transaction between a corporation and one or more of its directors or officers, or entities related to any of them, is void or voidable solely for that reason, or solely because the director or officer is present at the meeting authorizing the contract or transaction, if (a) the contract or transaction is fair to the corporation as of the time it is authorized by the board of directors, committee of the board or stockholders, (b) full disclosure is given to the board of directors and it in good faith authorizes the contract or transaction by the affirmative vote of a majority of the disinterested directors or (c) full disclosure is given to stockholders and a majority of such stockholders, acting in good faith, approve the contract or transaction.

Under Utah law a transaction between a corporation and a party related to a director may not be enjoined, set aside or create a cause of action unless the director's relationship to such party would constitute a statutory "conflicting interest transaction." "Conflicting interest transactions" constitute beneficial financial interests of a director or persons or entities associated with the director so as to influence the director's decisions. A director's conflicting interest transaction may be protected against future challenge if approved by a majority of the disinterested directors, even if not otherwise a quorum, or if approved by disinterested shareholders holding a majority of the shares entitled to vote upon the matter, in each case after full disclosure or the transaction has been established to be fair to the corporation.

*Power to Amend Charter Documents.* Under Delaware law, a corporation's certificate of incorporation may be amended by resolution of the board of directors and approval by the holders of a majority of the outstanding stock entitled to vote thereon. If any particular class of stock has a right to vote on any amendment to the certificate of incorporation, a majority of such shares must be voted in

favor of the amendment. The holders of outstanding shares of a class of stock are entitled to vote as a class upon a proposed amendment if it would have certain specified effects, such as changing the aggregate number of authorized shares of such class, changing the par value of the shares of such class or changing the powers, preferences or special rights of the shares of such class adversely. Supermajority voting requirements may be imposed and maintained by the certificate of incorporation.

Under Delaware law, bylaws of a corporation may be adopted, amended or repealed by the stockholders, or if so specified in the certificate of incorporation, by the directors (this is typical), although conferring power upon the directors does not divest stockholders of the power to amend the bylaws.

Under Utah law a corporation's articles of incorporation may be amended by resolution of the board of directors and approval by the holders of a majority of the outstanding stock entitled to vote thereon. If any particular class of stock has a right to vote on any amendment to the articles of incorporation, a majority of such shares must be voted in favor of the amendment. The holders of outstanding shares of a class of stock are entitled to vote as a class upon a proposed amendment if it would have certain specified effects, such as changing the preferential rights of such shares, altering rights regarding redemption of such shares, altering preemptive rights of such shares, altering voting rights on such shares or reducing such shares to fractional shares that may be redeemed for cash. In addition, a unanimous approval is required for any amendment that would impose personal liability on shareholders for the debts of a corporation. Supermajority voting requirements may be imposed and maintained by the articles of incorporation.

Under Utah law, the bylaws of a corporation may be amended at any time by the corporation's board of directors, except to the extent that the articles of incorporation reserve this power exclusively to the shareholders, in whole or in part. However, the board of directors (without stockholder approval) may not change a bylaw regarding quorum or voting requirements applicable to approvals by shareholders once such a bylaw is adopted by shareholders, and may not change a bylaw regarding quorum or voting requirements applicable to approvals by directors if such a bylaw was adopted by shareholders or the prior action of the board of directors imposes a requirement of shareholder approval. Conferring power to amend the bylaws upon the directors does not divest shareholders of the power to amend the bylaws.

*Approval of Mergers.* Delaware law generally requires that a majority of the stockholders of both the acquiring and the target corporation approve statutory mergers. However, Delaware law does not require a stockholder vote of the surviving corporation in a merger (unless otherwise provided in the certificate of incorporation) if (a) the merger agreement does not amend the existing certificate of incorporation, (b) each share of the surviving corporation outstanding before the merger is an identical outstanding or treasury share after the merger and (c) the number of shares to be issued by the surviving corporation in the merger does not exceed 20% of the shares outstanding immediately prior to the merger.

Utah law generally requires that a majority of the shareholders of both the acquiring and the target corporation approve statutory mergers. However, Utah law does not require a stockholder vote of the surviving corporation in a merger if (a) the articles of incorporation of the surviving corporation are not amended, (b) each shareholder of the surviving corporation holds the same number of identical shares immediately after the merger and (c) the number of shares issued by the surviving corporation in the merger does not represent an increase by more than 20% of (i) the voting shares of the corporation or (ii) the shares that would participate without limitation in distributions.

*Stockholder Derivative Suits.* Under Delaware law, a stockholder may only bring a derivative action on behalf of the corporation if the stockholder was a stockholder of the corporation at the time of the transaction in question or his stock thereafter devolved upon him by operation of law. Dismissal of such a proceeding generally requires court approval.

WA00431  00116

Under Utah law, a shareholder may only bring a derivative action on behalf of the corporation if the shareholder was a shareholder when the transaction complained of occurred or he became a shareholder through transfer by operation of law from someone who was a shareholder at that time and he fairly represents the interests of the corporation. The suing shareholder must explain what request, if any, was made to the board of directors and that the request was refused or ignored or why the shareholder did not make such a demand. Dismissal of such a proceeding requires court approval.

Exhibit G

## INDEMNIFICATION AGREEMENT

*THIS INDEMNIFICATION AGREEMENT* (the *"Agreement"*) is made and entered into as of March 3, 2005, between The LoveSac Corporation, a Delaware corporation (the *"Company"*), and James M. Gould (*"Indemnitee"*).

## RECITALS

*WHEREAS*, highly competent persons have become more reluctant to serve corporations as directors or in other capacities unless they are provided with adequate protection through insurance or adequate indemnification against inordinate risks of claims and actions against them arising out of their service to and activities on behalf of the corporation;

*WHEREAS*, directors, officers, and other persons in service to corporations or business enterprises are being increasingly subjected to expensive and time-consuming litigation relating to, among other things, matters that traditionally would have been brought only against the Company or business enterprise itself. The Bylaws of the Company require indemnification of the officers and directors of the Company. Indemnitee may also be entitled to indemnification pursuant to the General Corporation Law of the State of Delaware (*"DGCL"*). The Bylaws and the DGCL expressly provide that the indemnification provisions set forth therein are not exclusive, and thereby contemplate that contracts may be entered into between the Company and members of the Board of Directors of the Company (the *"Board"*), officers and other persons with respect to indemnification;

*WHEREAS*, the uncertainties relating to such insurance and to indemnification have increased the difficulty of attracting and retaining such persons;

*WHEREAS*, the Board has determined that the increased difficulty in attracting and retaining such persons is detrimental to the best interests of the Company's stockholders and that the Company should act to assure such persons that there will be increased certainty of such protection in the future;

*WHEREAS*, it is reasonable, prudent and necessary for the Company contractually to obligate itself to indemnify, and to advance expenses on behalf of, such persons to the fullest extent permitted by applicable law so that they will serve or continue to serve the Company free from undue concern that they will not be so indemnified;

*WHEREAS*, this Agreement is a supplement to and in furtherance of the Bylaws of the Company and any resolutions adopted pursuant thereto, and shall not be deemed a substitute therefor, nor to diminish or abrogate any rights of Indemnitee thereunder; and

*WHEREAS*, Indemnitee does not regard the protection available under the Company's Bylaws and insurance as adequate in the present circumstances, and may not be willing to serve as an officer or director without adequate protection, and the Company desires Indemnitee to serve in such capacity. Indemnitee is willing to serve, continue to serve and to take on additional service for or on behalf of the Company on the condition that he be so indemnified.

*NOW, THEREFORE*, in consideration of Indemnitee's agreement to serve as a director after the date hereof, the parties hereto agree as follows:

1.      <u>Indemnity of Indemnitee</u>. The Company hereby agrees to hold harmless and indemnify Indemnitee to the fullest extent permitted by law, as such may be amended from time to time. In furtherance of the foregoing indemnification, and without limiting the generality thereof:

3012837_1.DOC

(a)    <u>Proceedings Other Than Proceedings by or in the Right of the Company</u>. Indemnitee shall be entitled to the rights of indemnification provided in this <u>Section 1(a)</u> if, by reason of Indemnitee's Corporate Status (as hereinafter defined), the Indemnitee is, or is threatened to be made, a party to or participant in any Proceeding (as hereinafter defined) other than a Proceeding by or in the right of the Company. Pursuant to this <u>Section 1(a)</u>, Indemnitee shall be indemnified against all Expenses (as hereinafter defined), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by Indemnitee, or on Indemnitee's behalf, in connection with such Proceeding or any claim, issue or matter therein, if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and with respect to any criminal Proceeding, had no reasonable cause to believe the Indemnitee's conduct was unlawful.

(b)    <u>Proceedings by or in the Right of the Company</u>. Indemnitee shall be entitled to the rights of indemnification provided in this <u>Section 1(b)</u> if, by reason of Indemnitee's Corporate Status, the Indemnitee is, or is threatened to be made, a party to or participant in any Proceeding brought by or in the right of the Company. Pursuant to this <u>Section 1(b)</u>, Indemnitee shall be indemnified against all Expenses actually and reasonably incurred by the Indemnitee, or on the Indemnitee's behalf, in connection with such Proceeding if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the Company; *provided, however*, that if applicable law so provides, no indemnification against such Expenses shall be made in respect of any claim, issue or matter in such Proceeding as to which Indemnitee shall have been adjudged to be liable to the Company unless and to the extent that the Court of Chancery of the State of Delaware shall determine that such indemnification may be made.

(c)    <u>Indemnification for Expenses of a Party Who is Wholly or Partly Successful</u>. Notwithstanding any other provision of this Agreement, to the extent that Indemnitee is, by reason of Indemnitee's Corporate Status, a party to and is successful, on the merits or otherwise, in any Proceeding, he shall be indemnified to the maximum extent permitted by law, as such may be amended from time to time, against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection therewith. If Indemnitee is not wholly successful in such Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf to the extent such Expenses were actually and reasonably incurred in connection with each successfully resolved claim, issue or matter. For purposes of this Section and without limitation, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

2.    <u>Contribution</u>.

(a)    If, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any threatened, pending or completed action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), the Company shall contribute to the amount of expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred and paid or payable by Indemnitee as appropriate to reflect (i) the relative benefits received by the Company and all officers, directors or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, from the transaction from which such action, suit or proceeding arose and (ii) the relative fault of the Company and all officers, directors or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, in connection with the events that resulted in such expenses, judgments, fines or settlement amounts, as well as any other equitable considerations which the Law may require to be considered. The relative fault of the Company and all officers, directors or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such action, suit or

00119

proceeding), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(b)    To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever other than (i) such indemnification being unlawful under applicable law or (ii) the provisions of Sections 8(a), 8(b) and 8(c) of this Agreement, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement or for Expenses, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) or transaction(s) giving cause to such Proceeding; and (ii) the relative fault of the Company (and its directors, officers, employees and agents) and Indemnitee in connection with such event(s) or transaction(s).

3.    Indemnification for Expenses of a Witness.  Notwithstanding any other provision of this Agreement, to the extent that Indemnitee is, by reason of Indemnitee's Corporate Status, a witness in any Proceeding to which Indemnitee is not a party, Indemnitee shall be indemnified against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with Indemnitee's service as such a witness.

4.    Advancement of Expenses.  Notwithstanding any other provision of this Agreement, but subject to the provisions of Section 8 of this Agreement, the Company shall advance all Expenses incurred by or on behalf of Indemnitee in connection with any Proceeding by reason of Indemnitee's Corporate Status within 30 days after the receipt by the Company of a written statement or statements from Indemnitee requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding.  Such statement or statements shall reasonably evidence the Expenses incurred by Indemnitee (such as, for example, by providing invoices from third parties for such Expenses) and shall include or be preceded or accompanied by an undertaking by or on behalf of Indemnitee to promptly repay any Expenses advanced if it shall ultimately be determined that Indemnitee is not entitled to be indemnified against such Expenses.  Any advances and undertakings to repay pursuant to this Section 4 shall be unsecured and interest free.  Notwithstanding the foregoing, the obligation of the Company to advance Expenses pursuant to this Section 4 shall be subject to the condition that, if, when and to the extent that the Company determines that such Indemnitee would not be permitted to be indemnified under applicable law, the Company shall be entitled to be reimbursed, within thirty (30) days of such determination, by such Indemnitee (who hereby agrees to reimburse the Company) for all such amounts theretofore paid; provided, however, that if such Indemnitee has commenced or thereafter commences legal proceedings in a court of competent jurisdiction to secure a determination that such Indemnitee should be indemnified under applicable law, any determination made by the Company that such Indemnitee would not be permitted to be indemnified under applicable law shall not be binding and such Indemnitee shall not be required to reimburse the Company for any advance of Expenses until a final judicial determination is made with respect thereto (and as to which all rights of appeal therefrom have been exhausted or lapsed).

5.    Procedures and Presumptions for Determination of Entitlement to Indemnification.  It is the intent of this Agreement to secure for Indemnitee rights of indemnity that are as favorable as may be permitted under the DGCL and public policy of the State of Delaware.  Accordingly, the parties agree that the following procedures and presumptions shall apply in the event of any question as to whether Indemnitee is entitled to indemnification under this Agreement:

00120

(a)      To obtain indemnification under this Agreement, Indemnitee shall submit to the Company a written request, including therein or therewith such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification. The Secretary of the Company shall, promptly upon receipt of such a request for indemnification, advise the Board in writing that Indemnitee has requested indemnification.

(b)      Upon written request by Indemnitee for indemnification pursuant to the first sentence of Section 5(a) hereof (unless Indemnitee's request is to be indemnified for amounts in a matter in which Indemnitee has succeeded on the merits or otherwise in the defense of a Proceeding (or any claim, issue or matter in such Proceeding) and Indemnitee is thus entitled to indemnification for such amounts under the DGCL), a determination with respect to Indemnitee's entitlement thereto shall be made in the specific case (A) prior to a Change of Control, by one of the following four methods, which shall be at the election of the Board: (1) by a majority vote of the Disinterested Directors, even though less than a quorum, (2) by a committee of Disinterested Directors designated by a majority vote of the Disinterested directors, even though less than a quorum, (3) if there are no Disinterested Directors or if the Disinterested Directors so direct, by Independent Counsel in a written opinion to the Board, a copy of which shall be delivered to the Indemnitee, or (4) if so directed by the Board, and subject to the prior written consent of the Indemnitee, by the stockholders of the Company; or (B) after a Change of Control, by Independent Counsel selected by Indemnitee and approved by the Company (which approval shall not be unreasonably withheld).

(c)      Prior to a Change of Control, if the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 5(b) hereof, the Independent Counsel shall be selected as provided in this Section 5(c); after a Change of Control, the Independent Counsel shall be selected as provided in Section 5(b). The Independent Counsel shall be selected by the Board. Indemnitee may, within 10 days after such written notice of selection shall have been given, deliver to the Company a written objection to such selection; *provided, however*, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of *"Independent Counsel"* as defined in Section 11 of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the person so selected shall act as Independent Counsel. If a written objection is made and substantiated, the Independent Counsel selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit. If, within 20 days after submission by Indemnitee of a written request for indemnification pursuant to Section 5(a) hereof, no Independent Counsel shall have been selected and not objected to, then either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware or other court of competent jurisdiction for resolution of any objection which shall have been made by the Indemnitee to the Company's selection of Independent Counsel or for the appointment as Independent Counsel of a person selected by the court or by such other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 5(b) hereof. Regardless of whether Independent Counsel was selected pursuant to Section 5(b) or this Section 5(c), the Company shall pay any and all reasonable fees and expenses of Independent Counsel incurred by such Independent Counsel in connection with acting pursuant to Section 5(b) hereof, and the Company shall pay all reasonable fees and expenses incident to the procedures of Section 5(b) and this Section 5(c), regardless of the manner in which such Independent Counsel was selected or appointed.

(d)      In making a determination with respect to entitlement to indemnification hereunder, the person, persons or entity making such determination shall presume that Indemnitee is entitled to indemnification under this Agreement. Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by a preponderance of the evidence. Neither the failure of the Company (including by its directors or independent legal counsel) to have made a determination prior to the commencement of any action pursuant to this Agreement that indemnification

is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor an actual determination by the Company (including by its directors or independent legal counsel) that Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that Indemnitee has not met the applicable standard of conduct.

(e)    Indemnitee shall be deemed to have acted in good faith to the extent that Indemnitee's action is based on the *bona fide* records or books of account of the Enterprise, including financial statements, or on information supplied to Indemnitee by the officers of the Enterprise (as hereinafter defined) in the course of their duties, or on the advice of legal counsel for the Enterprise or on information or records given or reports made to the Enterprise by an independent certified public accountant or by an appraiser or other expert selected with reasonable care by the Enterprise. In addition, the knowledge or actions, or failure to act, of any director, officer, agent or employee of the Enterprise shall not be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement. Whether or not the foregoing provisions of this <u>Section 5(e)</u> are satisfied, it shall in any event be presumed that Indemnitee has at all times acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company. Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by a preponderance of the evidence.

(f)    If the person, persons or entity empowered or selected under this <u>Section 5</u> to determine whether Indemnitee is entitled to indemnification shall not have made a determination within 60 days after receipt by the Company of the request therefor, then Indemnitee may immediately commence an adjudication proceeding in an appropriate Court of Chancery of the State of Delaware, and the Company shall not oppose Indemnitee's right to seek any such adjudication; *provided, however,* that such 60-day period may be extended for a reasonable time, not to exceed an additional 30 days, if the person, persons or entity making such determination with respect to entitlement to indemnification in good faith requires such additional time to obtain or evaluate documentation or information relating thereto; and *provided, further,* that the foregoing provisions of this <u>Section 5(f)</u> shall not apply if the determination of entitlement to indemnification is to be made by the stockholders pursuant to <u>Section 5(b)</u> of this Agreement and if (A) within 15 days after receipt by the Company of the request for such determination, the Board or the Disinterested Directors, if appropriate, resolve to submit such determination to the stockholders for their consideration at an annual meeting thereof to be held within 75 days after such receipt and such determination is made thereat, or (B) a special meeting of stockholders is called within 15 days after such receipt for the purpose of making such determination, such meeting is held for such purpose within 60 days after having been so called and such determination is made thereat.

(g)    Indemnitee shall cooperate with the person, persons or entity making such determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information which is not privileged or otherwise protected from disclosure and which is reasonably available to Indemnitee and reasonably necessary to such determination and attending any hearing at which Indemnitee's presence is requested and responding to questions of such person or entity. Any Independent Counsel, member of the Board or stockholder of the Company shall act reasonably and in good faith in making a determination regarding the Indemnitee's entitlement to indemnification under this Agreement. Any costs or expenses (including attorneys' fees and disbursements) incurred by Indemnitee in so cooperating with the person, persons or entity making such determination shall be borne by the Company (irrespective of the determination as to Indemnitee's entitlement to indemnification) and the Company hereby indemnifies and agrees to hold Indemnitee harmless therefrom.

(h)    The Company acknowledges that a settlement or other disposition short of final judgment may be successful if it permits a party to avoid expense, delay, distraction, disruption and uncertainty. In the event that any action, claim or proceeding to which Indemnitee is a party is resolved in any manner other than by adverse judgment against Indemnitee (including, without limitation,

settlement of such action, claim or proceeding with or without payment of money or other consideration if such settlement has been consented to by the Company) it shall be presumed that Indemnitee has been successful on the merits or otherwise in such action, suit or proceeding. Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by a preponderance of the evidence.

(i)    The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not (except as otherwise expressly provided in this Agreement) of itself bar Indemnitee from receiving indemnification under this Agreement or create a presumption that Indemnitee did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that Indemnitee's conduct was unlawful.

6.    Remedies of Indemnitee.

(a)    In the event that (i) a determination is made pursuant to Section 5 of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to Section 4 of this Agreement, (iii) no determination of entitlement to indemnification is made pursuant to Section 5(b) of this Agreement within 90 days after receipt by the Company of the request for indemnification, (iv) payment of indemnification is not made within 10 days after a determination has been made that Indemnitee is entitled to indemnification, Indemnitee shall be entitled to an adjudication in an appropriate Court of Chancery of the State of Delaware. Indemnitee shall commence such proceeding seeking adjudication within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 6(a). The Company shall not oppose Indemnitee's right to seek any such adjudication.

(b)    In the event that a determination shall have been made pursuant to Section 5(b) of this Agreement that Indemnitee is not entitled to indemnification, any judicial proceeding commenced pursuant to this Section 6 shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under Section 5(b).

(c)    If a determination shall have been made pursuant to Section 5(b) of this Agreement that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this Section 6, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d)    In the event that Indemnitee, pursuant to this Section 7, seeks a judicial adjudication of Indemnitee's rights under, or to recover damages for breach of, this Agreement, or to recover under any directors' and officers' liability insurance policies maintained by the Company, the Company shall pay on Indemnitee's behalf, in advance, any and all expenses (of the types described in the definition of Expenses in Section 11 of this Agreement) actually and reasonably incurred by Indemnitee in such judicial adjudication, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advancement of expenses or insurance recovery.

(e)    The Company shall be precluded from asserting in any judicial proceeding commenced pursuant to this Section 6 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court that the Company is bound by all of the provisions of this Agreement. The Company shall indemnify Indemnitee against any and all Expenses and, if requested by Indemnitee, shall (within 30 days after receipt by the Company of a written request therefor) advance to Indemnitee, to the extent not prohibited by law any and all Expenses that are

00123

actually and reasonably incurred by Indemnitee in connection with any action brought by Indemnitee for indemnification or advance of Expenses from the Company under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advancement of Expenses or insurance recovery, as the case may be.

(f)    Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification under this Agreement shall be required to be made prior to the final disposition of the Proceeding.

7.    Non-Exclusivity; Survival of Rights; Insurance; Subrogation.

(a)    The rights of indemnification as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the certificate of incorporation of the Company, the Bylaws, any agreement, a vote of stockholders, a resolution of directors or otherwise. To the extent that a change in the DGCL, whether by statute or judicial decision, permits greater indemnification than would be afforded currently under the Bylaws and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change. No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

(b)    To the extent that, and for so long as, the Company maintains an insurance policy or policies providing liability insurance for directors, officers, employees, or agents or fiduciaries of the Company or of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that such person serves at the request of the Company ("**_D&O Liability Insurance_**"), Indemnitee shall be covered by such policy or policies in accordance with its or their terms to the maximum extent of the coverage available for any director, officer, employee, agent or fiduciary under such policy or policies. If, at the time of the receipt of a notice of a claim pursuant to the terms hereof, the Company has D&O Liability Insurance in effect, the Company shall give prompt notice of the commencement of such proceeding to the insurers in accordance with the procedures set forth in the respective policies. The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of the Indemnitee, all amounts reasonably determined by the Company to be payable as a result of such proceeding in accordance with the terms of such policies. However, nothing in this Agreement obligates the Company to purchase, acquire or maintain, any D&O Liability Insurance.

(c)    In the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

(d)    The Company shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable hereunder if and to the extent that Indemnitee has otherwise actually received such payment under any insurance policy, contract, agreement or otherwise.

(e)    The Company's obligation to indemnify or advance Expenses hereunder to Indemnitee who is or was serving at the request of the Company as a director, officer, employee or agent of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall be reduced by any amount Indemnitee has actually received as indemnification or advancement of expenses from such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise.

8.    <u>Exception to Right of Indemnification.</u> Notwithstanding any provision in this Agreement, (other than <u>Section 6(d)</u>), the Company shall not be obligated under this Agreement to make any indemnity in connection with any claim made against Indemnitee:

(a)    for which payment has actually been made to or on behalf of Indemnitee under any insurance policy or other indemnity provision, except with respect to any excess beyond the amount paid under any insurance policy or other indemnity provision; or

(b)    for an accounting of profits made from the purchase and sale (or sale and purchase) by Indemnitee of securities of the Company within the meaning of <u>Section 16(b)</u> of the Securities Exchange Act of 1934, as amended, or similar provisions of state statutory law or common law; or

(c)    in connection with any Proceeding (or any part of any Proceeding) initiated by Indemnitee, including any Proceeding (or any part of any Proceeding) initiated by Indemnitee against the Company or its directors, officers, employees or other indemnitees, unless (i) the Board authorized the Proceeding (or any part of any Proceeding) prior to its initiation or (ii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under applicable law; or

(d)    if the making of such indemnity is not permitted by the DGCL.

9.    <u>Binding Effect; Successors and Assigns.</u>  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors, assigns, including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company, spouses, heirs, and personal and legal representatives.  This indemnification provided under this Agreement shall continue in effect as to Indemnitee for any action taken or not taken while serving in an indemnified capacity even though Indemnitee my have ceased to serve in such capacity at the time of any Proceeding.

10.    <u>Enforcement.</u>

(a)    The Company expressly confirms and agrees that it has entered into this Agreement and assumes the obligations imposed on it hereby in order to induce Indemnitee to serve as an officer or director of the Company, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving as an officer or director of the Company.

(b)    This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

11.    <u>Definitions.</u>  For purposes of this Agreement:

(a)    *"Change of Control"* shall be deemed to be occasioned by the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any stock acquisition, reorganization, merger, consolidation or sale of securities of the Company but excluding any sale of securities of the Company for bona fide capital raising purposes) that results in the holders of the voting securities of the Company outstanding immediately prior thereto failing to hold immediately after such transaction or series of transactions a majority of the outstanding voting securities of the Company, such surviving entity or the entity that controls such surviving entity, measured by voting power rather than number of shares.

00125

(b)    *"Corporate Status"* describes the status of a person who is or was a director, manager, officer, employee, agent or fiduciary of the Company or of any other corporation, partnership, joint venture, trust, limited liability company, employee benefit plan or other enterprise that such person is or was serving at the express written request of the Company.

(c)    *"Disinterested Director"* means a director of the Company who is not and was not a party to the Proceeding in respect of which indemnification is sought by Indemnitee.

(d)    *"Enterprise"* shall mean the Company and any other corporation, partnership, joint venture, trust, limited liability company, employee benefit plan or other enterprise that Indemnitee is or was serving at the express written request of the Company as a director, manager, officer, employee, agent or fiduciary.

(e)    *"Expenses"* shall include all reasonable attorneys' fees, retainers, court costs, transcript costs, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, participating, or being or preparing to be a witness in a Proceeding.  Expenses also shall include Expenses incurred in connection with any appeal resulting from any Proceeding (excluding the costs or expense of any bond).  Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments, penalties, sanctions or fines against Indemnitee.

(f)    *"Independent Counsel"* means a law firm, or a member of a law firm, that is experienced in matters of Delaware corporation law and neither presently is, nor in the past five (5) years prior to the time in question has been, retained to represent: (i) the Company or Indemnitee in any matter material to either such party, or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder.  Notwithstanding the foregoing, the term "Independent Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.  The Company agrees to pay the reasonable fees of the Independent Counsel referred to above and to fully indemnify such counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

(g)    *"Proceeding"* includes any threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought by or in the right of the Company or otherwise and whether civil, criminal, administrative or investigative, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of the fact that Indemnitee is or was an officer or director of the Company, by reason of any action taken by Indemnitee or of any inaction on Indemnitee's part while acting as an officer or director of the Company, or by reason of the fact that he is or was serving at the request of the Company as a director, officer, employee, agent or fiduciary of another corporation, partnership, joint venture, trust or other Enterprise; in each case whether or not he is acting or serving in any such capacity at the time any liability or expense is incurred for which indemnification can be provided under this Agreement; but excluding any such proceeding initiated by an Indemnitee pursuant to Section 6 of this Agreement to enforce Indemnitee's rights under this Agreement or otherwise initiated by Indemnitee.

(h)    *"Voting Securities"* shall mean any securities of the Company that vote generally in the election of directors.

12.    Severability.  The invalidity of unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.  Without limiting the generality of the

foregoing, this Agreement is intended to confer upon Indemnitee indemnification rights to the fullest extent permitted by applicable laws. In the event any provision hereof conflicts with any applicable law, such provision shall be deemed modified, consistent with the aforementioned intent, to the extent necessary to resolve such conflict.

13.    Modification and Waiver. No supplement, modification, termination or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

14.    Notice By Indemnitee. Indemnitee agrees promptly to notify the Company in writing upon being served with or otherwise receiving any summons, citation, subpoena, complaint, indictment, information or other document relating to any Proceeding or matter which may be subject to indemnification covered hereunder. The failure to so notify the Company shall not relieve the Company of any obligation which it may have to Indemnitee under this Agreement or otherwise unless and only to the extent that such failure or delay materially prejudices the Company.

15.    Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by telephonically confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent:

      (a)    To Indemnitee at the address set forth below Indemnitee signature hereto.

      (b)    To the Company at:

            The LoveSac Corporation
            155 North 500 West, Suite 520
            Salt Lake City, Utah 84103
            Facsimile: 801.532.3936
            *Attention: President*

or to such other address as may have been furnished to Indemnitee by the Company or to the Company by Indemnitee, as the case may be.

16.    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. This Agreement may also be executed and delivered by facsimile signature and in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

17.    Headings. The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

18.    Governing Law and Consent to Jurisdiction. This Agreement and the legal relations among the parties shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules. The Company and Indemnitee hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Chancery Court of the State of Delaware (the "***Delaware***

*Court*"), and not in any other state or federal court in the United States of America or any court in any other country, (ii) consent to submit to the exclusive jurisdiction of the Delaware Court for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) appoint, to the extent such party is not otherwise subject to service of process in the State of Delaware, irrevocably The Corporation Trust Company, 1209 Orange Street, Wilmington, County of New Castle, Zip Code 19801, as its agent in the State of Delaware as such party's agent for acceptance of legal process in connection with any such action or proceeding against such party with the same legal force and validity as if served upon such party personally within the State of Delaware, (iv) waive any objection to the laying of venue of any such action or proceeding in the Delaware Court, and (v) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the Delaware Court has been brought in an improper or inconvenient forum.

19.    Period of Limitations.  No legal action shall be brought and no cause of action shall be asserted by or in the right of the Company against Indemnitee, Indemnitee's estate, spouse, heirs, executors or personal or legal representatives after the expiration of two years from the date of accrual of such cause of action, and any claim or cause of action of the Company shall be extinguished and deemed released unless asserted by the timely filing of a legal action within such two-year period; *provided, however*, that if any shorter period of limitations is otherwise applicable to any such cause of action, such shorter period shall govern.

20.    No Construction as Employment Agreement.  Nothing contained in this Agreement shall be construed as giving Indemnitee any right to be retained in the employ of the Company or any of its subsidiaries.

*[Signature Page Follows]*

00128

*IN WITNESS WHEREOF*, the parties hereto have executed this Agreement as of the date first above written.

THE LOVESAC CORPORATION

By: _Scott W. McDon____

Name: _Scott W. McDonough_

Title: _PRESIDENT_


INDEMNITEE


_____
(Signature)

Print Name: James M. Gould

Address:_____

_____

_____

_____

*[Signature Page to Indemnification Agreement]*

*IN WITNESS WHEREOF*, the parties hereto have executed this Agreement as of the date first above written.

THE LOVESAC CORPORATION

By: _____

Name: _____

Title: _____


INDEMNITEE

_____
(Signature)

Print Name: James M. Gould

Address: 312 Walnut St
Suite 1151
Cincinnati OH 45202
_____
_____


*[Signature Page to Indemnification Agreement]*

00130

Exhibit I

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>THE LOVESAC CORPORATION, <u>et al.</u>,<br><br>          Debtors. | Chapter 11<br><br>Case No. 06-10080 (CSS)<br><br>(Jointly Administered) |

## JOINT PLAN OF LIQUIDATION BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS ON BEHALF OF THE LOVESAC CORPORATION, ET AL.

### JUNE 28, 2006

THE BAYARD FIRM


Charlene D. Davis (#2336)
Christopher A. Ward (#3877)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801

    -and-

SQUIRE, SANDERS & DEMPSEY, LLP
P. Casey Coston, Esquire
312 Walnut Street, Suite 3500
Cincinnati, Ohio 45202

*Counsel to Debtors and Debtors in
Possession*

KLEHR, HARRISON, HARVEY
BRANZBURG & ELLERS, LLP

Joanne B. Wills (#2357)
Richard M. Beck (#3370)
Michael W. Yurkewicz (#4165)
919 Market Street, Suite 1000
Wilmington, Delaware 19801

*Counsel to the Official Committee of
Unsecured Creditors*

(Attn: John R. Bernloehr)
Tel: 513-651-3300
Fax: 513-651-1084

with copies to:
Robert G. Sanker
Keating, Muething & Klekamp PLL
One East 4th Street
Cincinnati, Ohio 45202
Tel: 513-579-6400
Fax: 513-579-6457

Dated: Wilmington, Delaware
June 28, 2006

LOVESAC CORPORATION                LOVESAC OF NEVADA, LLC

By: _/s/ Walt Spokowski_           By: _/s/ Walt Spokowski_

LOVESAC FRANCHISING, INC.          CHILLSACK, LLC

By: _/s/ Spokowski_                By: _/s/ Walt Spokowski_

THE BAYARD FIRM                    KLEHR, HARRISON, HARVEY,
                                   BRANZBURG & ELLERS, LLP

By    _/s/ Christopher A. Ward_    By:    _/s/ Richard M. Beck_
      Charlene D. Davis (#2336)           Joanne B. Wills (#2357)
      Christopher A. Ward (#3877)         Richard M. Beck (#3370)
      222 Delaware Avenue, Suite 900      Michael W. Yurkewicz (#4165)
      Wilmington, Delaware 19801          919 Market Street, Suite 1000
                                          Wilmington, Delaware 19801

        -and-
                                   *Counsel to the Official Committee of*
SQUIRE, SANDERS & DEMPSEY,         *Unsecured Creditors*
LLP
P. Casey Coston, Esquire
312 Walnut Street, Suite 3500
Cincinnati, Ohio 45202

*Counsel to Debtors and Debtors in*
*Possession*

29

00133

Exhibit J

## John Bernloehr

| | |
|---|---|
| **From:** | Wright, Simon [SWright@virginmega.com] |
| **Sent:** | Monday, October 24, 2005 6:44 PM |
| **To:** | David Yarnell; James Gould |
| **Cc:** | John Bernloehr |
| **Subject:** | RE: Tranche |

David,

You hit on a point that I have not got my head around – the company seems to depend on our Bridge for payroll each time – I want Management to demonstrate that cash is being managed very aggressively. If we can get it down 0.5k that would be great.

I too have reflected on the G G situation – repayments of $0.3m starting 31 Dec down to $1.3m is not the end of the world given our desire to refinance this loan in any case. Therefore a tweak to February commencement of repayments does not seem a big ask given and is consistent with our wider aims. John – as and when please be sure there are no prepayment penalties in the renewal.

I have already told John that I want this settled before we fund any more.

Best

Simon

---

**From:** David Yarnell [mailto:David@bevcapital.com]
**Sent:** Monday, October 24, 2005 2:45 PM
**To:** Wright, Simon; james.gould@thewalnutgroup.com
**Cc:** John Bernloehr
**Subject:** Tranche

I understand that we need to pressure G&G to give us the longer time to pay back the loan and I believe we are doing the right thing to push to get Trent Gourley to the table. To push off a part of the 3rd tranche does have ramifications which I am not sure we want to face. The company needs to meet payroll this week and without $180M they will have a tough time. I think we can push back some vendors and contractors for a week or two but the cashflows are showing negative cash for a few more weeks. We may get pushed to $2.5MM and we may be able to push back on the last $500M.

On the G&G, we absolutely need to push for this meeting. He has already agreed to $1,5 MM to stay for a while – if we can push him to $2.8MM or even $2.25MM with payments starting in February, I would be OK. Has anybody done any lit searches on this guy and company?

David

---

**From:** Wright, Simon [mailto:SWright@virginmega.com]
**Sent:** Monday, October 24, 2005 5:25 PM
**To:** james.gould@thewalnutgroup.com; David Yarnell
**Subject:**

Jimmy/David,

I am presuming that this would be your position – but I would not recommend to Virgin funding the last tranche of the Bridge until the G G situation is settled satisfactorily. If anything the Investment Committee would take as tough a position or more than we are doing. I think Trent Gourley might be interested to know that the company

WA01060 00134

needs more funds as is without his demand – this would impact on his security and that we can exaggerate the decision point we are at – ie unless he extends to next June as previously agreed we will not fund ? What do you think – this should be done via a meeting asap. Simon

WA01061

00135

10/24/2005

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 26th day of October, 2007, a copy of the foregoing Answering Brief of Plaintiff G&G, LLC in Opposition to motion of Defendants David Yarnell, James Gould, Simon Wright, Walt Spokowski, and Millevere Holdings Limited to Dismiss Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(2) and Appendix , was served via postage paid, first-class mail, on the following:

Michael A. Weidinger
Joseph S. Naylor
Morris, James LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801

Michael L. Scheier
Joseph L. Bruemmer
Keating Muething & Klekamp PLL
One East Fourth St., Suite 400
Cincinnati, Ohio 45202

Derek C. Abbott
Ian Roberts McConnel
Morris, Nichols, Arsht & Tunnell
1201 North Market St.
P.O. Box 1347
Wilmington, DE 19899

/s/ Virginia Whitehill Guldi
Virginia Whitehill Guldi

17

1531298.1