## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| G&G, LLC, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Case No. 07-440 (SLR) |
| | : |
| JAMES HYDE, et al., | : |
| | : |
| Defendants. | : |

# APPENDIX

### TO THE

### ANSWERING BRIEF OF PLAINTIFF G&G, LLC IN OPPOSITION TO DEFENDANTS WILSON, SONSINI, GOODRICH & ROSATI, P.C. AND LILY WONG LANGEN'S MOTION TO DISMISS G&G, LLC'S COMPLAINT

ZUCKERMAN SPAEDER LLP
Thomas G. Macauley (ID No. 3411)
Virginia Whitehill Guldi (ID No. 2792)
919 Market Street, Suite 990
P.O. Box 1028
Wilmington, DE 19899
(302) 427-0400

STINSON MORRISON HECKER LLP
Marc E. Albert
Janet M. Nesse
Lawrence P. Block
Katherine M. Sutcliffe Becker
1150 18th Street NW, Ste. 800
Washington, DC  20036-3816
(202) 785-9100

*Attorneys for G&G, LLC*

1531480.1

# TABLE OF CONTENTS

Exhibit A:    Wilson, Sonsini, Goodrich & Rosati Brochure...................00001-00028

Exhibit B:    Securities Class Actions Motion to Dismiss Wins...............00029

Exhibit C:    Jurisdiction Map.....................................................00030

Exhibit D:    Litigation Successes................................................00031-00034

Exhibit E:    First Pages of Wilson Sonsini Cases..............................00035-00044

Exhibit F:    Significant Differences Between the Corporation Laws of
              Utah and Delaware.................................................00045-00051

Exhibit G:    First Page of Closing Volume.....................................00052

Exhibit H:    Certificate of Incorporation.......................................00053-00055

Exhibit I:    Letter to LoveSac Stockholders...................................00056-00062

1531480.1

Exhibit A



INNOVATION. EXPERIENCE. RESULTS.

W&R  Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION





THE PREMIER PROVIDER OF LEGAL SERVICES TO TECHNOLOGY, LIFE SCIENCES, AND GROWTH ENTERPRISES WORLDWIDE

# Our Focus

Wilson Sonsini Goodrich & Rosati is the premier provider of legal services to technology, life sciences, and growth enterprises worldwide, as well as the public and private capital markets that finance them. The firm's broad array of services and practice areas is focused on addressing the principal challenges faced by the management, boards of directors, shareholders, and in-house counsel of our clients. We represent companies at every stage of development, from entrepreneurial start-ups to multibillion-dollar global corporations. Our distinguished international roster of clients are leaders in a wide variety of industries, including information technology, life sciences, clean technology, media and entertainment, communications, retail, and financial services.

Client service is the cornerstone of our practice, and we strive to act as strategic partners to our clients by leveraging our expertise to provide innovative, responsive, and cost-effective legal services. We understand that the law is often a means to accomplish our clients' business objectives, and we pride ourselves on our intimate understanding of their industries and marketplaces. We also know that today's enterprises are facing unprecedented changes in the business, regulatory, and global landscapes, and we have the knowledge and experience to help our clients confidently adapt to such changes with state-of-the-art solutions.

Since our inception in the early days of Silicon Valley, we have grown alongside our entrepreneurial clients, expanding our legal services and business acumen to serve their evolving needs. We also have held steadfast to the core values that add strength and perspective to our practice, including a commitment to diversity, the establishment of a women's initiative, and a desire to give back to the community through a robust pro bono practice, a charitable foundation, and a firm-wide volunteer network.





A PROVEN RECORD OF SUCCESS

00004

## Unparalleled Experience and Resources

- More than 45 years' experience providing expert and effective legal services to business enterprises at every stage of development
- Founded in Silicon Valley and a leader in the growth of the technology industry
- Nearly 650 attorneys in eight key technology and business hubs across the United States and in Shanghai, China
- Exceptional understanding of the financial, regulatory, and industry environments important to our clients
- A proven record of success, making us recognized leaders in fields such as:
  - Corporate governance
  - Public and private offerings of equity and debt securities
  - Mergers and acquisitions
  - Venture capital
  - Private equity
  - Securities class action litigation
  - Employment law
  - Intellectual property litigation
  - Patent prosecution
  - Antitrust
  - Joint ventures and strategic alliances
  - Technology licensing and other IP transactions
  - Fund services

## We Know Your Business

At Wilson Sonsini Goodrich & Rosati, we pride ourselves on an in-depth understanding of our clients' industries and business objectives. This knowledge, combined with exceptionally strong client relationships, allows us to offer strategic counseling that goes beyond the typical legal representation. Our attorneys keep abreast of complex industry issues and trends, enabling them to provide timely, informed advice to clients across many different sectors, including:

- Communications and networking
- Electronics and computer hardware
- Clean technology and renewable energy
- Information services
- Biotechnology
- Medical devices
- Media and entertainment
- Retail and consumer products and services
- Semiconductors
- Software
- Venture capital and financial institutions





A WIDE-RANGING PRACTICE WITH PARTICULAR STRENGTH IN NORTH AMERICA, ASIA, AND EUROPE

00006



# Global Reach

With long-standing roots in Silicon Valley and offices in eight technology and business hubs throughout the United States and in Shanghai, China, Wilson Sonsini Goodrich & Rosati has a national presence with a global reach. Over the past four decades, we have developed a wide-ranging international practice, with particular strength in North America, Asia, and Europe.



Our global experience includes the representation of both U.S. and international clients in such matters as litigation, cross-border mergers and acquisitions, joint ventures, technology transactions, venture capital investment, project development and finance, branch operations, and intellectual property counseling. Among many other transactions and cases, our attorneys have represented an India-based software services company in a landmark Nasdaq IPO and its $1.6 billion secondary offering of American Depository Shares, as well as a China-based semiconductor company in its private-placement transactions and its $1.8 billion IPO of American Depository Shares. We also have represented one of the leading integrated physical suppliers of marine fuel products in its IPO on the Singapore exchange; Japanese companies in a variety of investments, acquisitions, joint ventures, licensing agreements, and formation of subsidiaries; a Taiwanese fabless semiconductor company in a high-profile litigation case before the International Trade Commission; and a leading global medical device company in its nearly $500 million sale of certain business segments to a Danish life sciences company.

Our roster of attorneys includes many multilingual speakers who have worked at law firms throughout the world, giving them experience and familiarity with international laws and regulations, courts, trade commissions, and other government agencies. In addition, our extensive network of alliances with leading law firms in major global markets enables us to provide our clients with the highest quality and consistency of legal representation and service.





REPRESENTS 300 PUBLIC AND 3,000 PRIVATE ENTERPRISES GLOBALLY




# Corporate Law & Governance

Today's companies are faced with unprecedented challenges as new laws and regulations change the way corporate America works, demanding increased transparency, responsibility, and accountability. Consistently ranked among the top U.S. law firms by *Corporate Board Member* magazine, Wilson Sonsini Goodrich & Rosati draws upon the expertise of our corporate, securities, governance, litigation, and compensation specialists to provide clients with the information and analysis they need to respond to this rapidly changing and increasingly complex regulatory environment.

We currently represent 300 public and 3,000 private companies in the United States and abroad. Our clients include Fortune 500 and middle-market companies in a diverse range of industries. We regularly advise our clients on state and federal securities laws (including '34 Act- and Sarbanes-Oxley-related matters), stock-exchange regulations, export controls and economic sanctions, and general corporate law. Our attorneys are experienced in all aspects of governance counseling, and several have served as advisors to major regulatory bodies in the areas of governance and disclosure.

# Venture Capital

Wilson Sonsini Goodrich & Rosati has laid the groundwork for some of the world's most innovative technology, life sciences, and growth companies. As the nation's leading law firm representing venture-backed companies, we counsel thousands of entrepreneurs starting new businesses, advising on the formation of companies, equity structures, and negotiations with investors. We consistently advise more companies in venture capital financings than any other law firm, providing representation in more than 20 percent of such financings nationwide.

In addition, we regularly represent venture capital and other private equity firms in their investments in private companies, as well as in their fund structuring, formation, governance, and operation.

# Public Equity & Debt Finance

Wilson Sonsini Goodrich & Rosati regularly addresses our clients' need to access worldwide capital markets. In the last 10 years, we have represented more companies in their initial public offerings than any other law firm. We have extensive experience structuring a variety of public equity and debt transactions, advising and representing issuers, underwriters, and selling shareholders in equity, equity-linked, and related transactions including SEC-registered and Rule 144A offerings. In addition to our strong domestic practice, we have advised on some of the largest and most innovative global equity offerings by non-U.S. issuers.

Our debt finance practice serves the legal needs of client companies and the investment banks, equipment lessors, commercial banks, and other lending institutions that provide important sources of capital to companies as they grow. Our experience includes syndicated and single-bank credit lines, acquisition financings, public-note issuances, structured finance, off-balance-sheet financings, capital leases, and a number of other debt and quasi-debt vehicles. We are a leader in representing business enterprises and investment banks in transactions involving investment-grade and high-yield notes, convertible notes, convertible exchangeable-preferred stock, and trust-preferred securities.

# Project Finance

Our project finance team has the specialized knowledge and skills needed to help sponsors secure the financing they require to start and grow their complex and sophisticated ventures, both in the U.S. and abroad. Our attorneys have experience in a wide variety of project finance transactions, including bank and insurance company financing, limited partnerships, syndications, mergers and acquisitions, joint ventures, credit arrangements, taxation, and sales of companies and subsidiaries.





UNPARALLELED EXPERIENCE COUNSELING COMPANIES
IN MERGERS, SALES, SPIN-OFFS, LEVERAGED
BUYOUTS, AND OTHER TRANSACTIONS

00010



# Mergers & Acquisitions/ Private Equity



Our firm is a leader in advising clients on the full range of merger and acquisition transactions involving domestic and foreign business enterprises at all stages of growth. We have unparalleled experience counseling companies in a wide variety of negotiated and contested transactions, including mergers, asset purchases and sales, spin-offs, exchange offers, tender offers, proxy contests, auctions, going-private transactions, and leveraged buyouts. We also are leaders in matters relating to corporate governance, hostile-takeover defense, stockholder activism, and other stockholder-relations issues. The firm is unique in representing technology, life sciences, and growth enterprises in the field of mergers and acquisitions because of our long history working with such companies and our corporate, technology, securities, securities litigation, and antitrust depth. We are consistently ranked among the top 10 M&A advisors in the United States by such authoritative sources as Bloomberg and Thomson Financial.

Wilson Sonsini Goodrich & Rosati has experience in a variety of private equity transactions, ranging from strategic investments, leveraged recapitalizations, leveraged buyouts, and going-private transactions. Our expertise in this arena includes the essential disciplines of private equity, such as high-yield debt, securities, and corporate finance. Among our recent transactions is the representation of a major semiconductor manufacturer in the largest-ever leveraged buyout of a technology company to date.

We represent larger companies and private equity funds that maintain ongoing acquisition programs for buying public and private companies and business units. We also represent selling companies that choose to be acquired as their preferred blueprint for maximizing stockholder value. In addition, we have experience representing other participants in merger and acquisition transactions, including investment banks, venture capital funds, and company management.

Our firm approaches transactions with a coordinated, interdisciplinary team of attorneys handling the various corporate, securities, acquisition finance, intellectual property, litigation, employee benefits, labor, tax, environmental, antitrust, and other issues inherent in mergers and acquisitions. To complement our considerable in-house resources, we have long-standing and efficient working relationships with leading law firms in the many foreign jurisdictions in which our clients conduct business.







THE MOST SOUGHT-AFTER SECURITIES DEFENSE TEAM
IN THE NATION

LITIGATES PRECEDENT-SETTING INTELLECTUAL PROPERTY CASES



# Litigation

The firm's strength in litigation rests on a sophisticated understanding of our clients' businesses and our ability to execute creative and aggressive responses to the problems commonly encountered by public and private companies—whether it's in their best interests to sue, defend, settle, or engage in alternative dispute resolution. The firm's litigators can guide clients through the complexities of case analysis, litigation, trial, and appeal.

## Securities Litigation

With the nation's largest team of dedicated securities defense attorneys, the firm's expertise in securities litigation long has gained national and international recognition. With more wins than any other law firm in the country, Wilson Sonsini Goodrich & Rosati consistently is ranked as the most sought-after securities defense firm in the United States. We have participated in many of the major precedent-setting securities cases involving the Private Securities Litigation Reform Act, insider trading, the "bespeaks caution" doctrine, IPO allocations, and materiality. Moreover, we handle derivative lawsuits and represent companies and individuals in investigations conducted by the Securities and Exchange Commission and the Department of Justice.

## Antitrust Litigation

The firm's antitrust litigation practice covers a broad range of claims in a variety of contexts, from litigation over competition issues in state and federal courts to investigations by regulatory agencies. We successfully have defended class actions alleging violations of federal antitrust law and California's unfair competition statute, and represented our clients in responding to investigations or litigation brought by the Federal Trade Commission, the Antitrust Division of the Department of Justice, and numerous state attorneys general. In conjunction with our intellectual property litigators, we frequently assert and defend against antitrust counterclaims made in the context of patent litigation. Our antitrust attorneys, several of whom have held senior positions with the Federal Trade Commission or the Department of Justice, have managed some of the nation's most complex private antitrust litigation matters across a spectrum of industries, including technology, life sciences, retail and consumer, media, and financial services.

## Intellectual Property Litigation

Wilson Sonsini Goodrich & Rosati employs a team of nearly 100 intellectual property litigators with deep technology and business experience, with more than half of our IP attorneys admitted as members of the patent bar. Our clients' businesses traditionally have focused on creating and marketing products rich in intellectual property, so enforcing IP rights and defending against claims of infringement or misappropriation always have been critical components of our practice. Consequently, we have the expertise and resources to provide our clients with the best available representation in IP cases, and we regularly litigate issues that result in the creation of new legal precedent. We are well acquainted with important IP trial venues, such as the Eastern District of Texas, the Northern District of California, and the International Trade Commission—in fact, the firm recently was ranked among the top firms handling cases before the ITC. We also address all aspects of cutting-edge IP protection, including patent, copyright and trademark, trade secret, privacy, and Internet law.

## Complex Business Litigation

Our complex business litigation practice mirrors the nature of the disputes most frequently encountered by our client base. We cover the gamut of business litigation, including breach of contract, unfair competition, fraud, breach of fiduciary duty, and indemnity. We also defend companies accused of violating consumer protection statutes and false advertising. Among many other types of cases, we have successfully defended class actions alleging violations of California's Consumers Legal Remedies Act and Consumer Warranty Act, private attorney-general actions under California's unfair competition statute, and false advertising actions brought by consumers.





EXPERT LEGAL ANALYSIS, SOPHISTICATED STRATEGY, EXTENSIVE TRIAL EXPERIENCE, AND IN-DEPTH KNOWLEDGE





# Litigation

## White Collar Crime & Internal Investigations

Our attorneys, including former federal prosecutors and Securities and Exchange Commission enforcement lawyers, have extensive experience representing corporations and individuals under investigation for, or charged with, violations of business-related federal and state criminal law. We successfully have defended clients in a wide range of cases, including securities fraud, price-fixing, tax evasion, bribery, export controls, and insider trading. We frequently are called upon to represent companies and individuals in connection with inquiries and investigations by federal and state prosecutors and the Securities and Exchange Commission. We also assist boards of directors in the investigation of allegations of misconduct, whether in connection with pending litigation or prior to the commencement of any adversarial process.

## Appellate Law

To effectively represent clients in a court of appeal takes expert legal analysis, a sophisticated strategy, extensive trial experience, and in-depth knowledge of the appellate process. At Wilson Sonsini Goodrich & Rosati, our nationwide appellate practice has the experience and skills necessary to help clients achieve optimum results at all levels of the federal and state appellate court systems. Our appellate attorneys are seasoned litigators who have represented clients in many high-profile trials and appeals involving matters of antitrust, intellectual property, securities, constitutional, consumer, employment, tax, and international law. They successfully have prosecuted or defended appeals in a wide variety of venues, including numerous state supreme courts, state appeals courts, federal courts of appeal, and the Court of Appeals for the Federal Circuit. Our attorneys also regularly offer strategic advice related to appeals; prepare motions regarding class certifications, dismissals, or summary judgments; file amicus briefs; and handle emergency applications for orders to show cause and preliminary injunctions.

## Employment Law

Our team of experienced attorneys counsels clients on every facet of the employer-employee relationship, including hiring practices, the establishment of personnel policies, compensation issues, union-organizing efforts, government-agency investigations and audits, layoffs and terminations, and mergers and acquisitions. The firm represents clients in high-stakes litigation such as employee-mobility disputes, class actions, sexual harassment, and whistleblower retaliation cases. We manage internal investigations into executive misconduct and advise boards of directors on executive employment decisions and management transitions. We handle the defense of employee complaints in federal and state courts and before all government agencies. In order to prevent employee disputes, or to minimize the exposure of such claims, our attorneys also provide on-site training to help our clients' managers and supervisors prevent employee-related litigation, which can be both costly and damaging to a company's reputation.

## Corporate Governance and Mergers & Acquisitions Litigation

At Wilson Sonsini Goodrich & Rosati, we take an integrated approach to all corporate governance matters and mergers and acquisitions, often involving one of our litigators at the initial stage of a situation or transaction. Enlisting this expertise early on allows our corporate governance and M&A litigators to provide critical advice about the scope of the board's fiduciary duties, structural issues relating to possible transactions, and other strategic issues. This timely input reduces the likelihood of litigation, while also reducing the risks if a suit is filed. The firm handles all types of corporate governance and M&A litigation, including cases arising out of business combinations, hostile takeovers, and proxy contests. In addition to our vast experience and success in the California courts, we have an impressive track record in the Delaware Chancery Court and the Delaware Superior Court, as well as many other federal and state courts.





PARTNERS WITH CUTTING-EDGE TECHNOLOGY,
LIFE SCIENCES, AND GROWTH ENTERPRISES TO
LEVERAGE AND PROTECT THEIR INTELLECTUAL PROPERTY ASSETS





# Intellectual Property Counseling & Transactions

At Wilson Sonsini Goodrich & Rosati, we partner with technology, life sciences, media, and growth enterprises to leverage their intellectual assets most effectively. We help companies build and implement successful new business models, develop and execute strategic intellectual property litigation, structure and negotiate technology and media transactions, and consult on long-term intellectual property strategies. Our clients are involved in many promising cutting-edge technologies, such as stem-cell research and alternative energy/biochemicals.

## Technology & Media Transactions

The firm's team of attorneys dedicated to technology and media transactions is second to none. Our attorneys negotiate hundreds of business and strategic collaborations such as license agreements, joint ventures, co-development arrangements, and manufacturing and distribution agreements, all of which place our clients in optimal positions to succeed in today's complex global marketplace. With extensive experience in these transactions and the particular industries in which they arise, we not only add value in crafting and negotiating the agreements, but also in establishing the most favorable business terms. In addition, we provide counseling on issues relating to technology and media law.

## Intellectual Property Counseling & Patents

Our IP patents and innovation strategies practice helps clients leverage their intellectual property in the life sciences field, interface with investors, defend against the claims of others, establish a competitive position for the future, and, ultimately, provide value to investors. Our IP attorneys have specialized backgrounds and particular experience in the areas of molecular biology, chemistry, pharmacology, and other life sciences. In addition, the former deputy commissioner of the U.S. Patent and Trademark Office (PTO) currently serves as our director of patent operations, we have a team of experienced patent agents on staff, and more than 65 of our attorneys have been admitted to practice before the PTO. We identify the areas in which intellectual property protection is most critical to achieve a company's business objectives, determine the most effective methods of protection, and identify strategies to avoid issues with third-party patents.

## Outsourcing & IT Procurement

Our extensive experience advising many of the world's leading technology and growth enterprises provides the firm with the expertise to offer responsive, efficient, and highly effective counsel to our outsourcing clients. We partner with our clients to evaluate, structure, negotiate, and manage all types of outsourcing transactions, including information technology outsourcing, business procurement outsourcing, application development and maintenance, and off-shore outsourcing. Our attorneys represent both vendors and customers, and our experience cuts across a broad range of industries and government institutions. In addition to our work in the United States, we regularly conduct transactions in India, China, and other countries with rapidly growing outsourcing businesses.

## Retail & Consumer Protection

The firm offers wide-ranging expertise in representing clients in transactions and lawsuits related to retail distribution and sales, consumer protection matters, and advertising practices. We represent a variety of clients—from start-ups to established public companies—in many areas involving consumer markets, including distribution and marketing agreements; pre-publication review of promotions and disclosures; compliance with privacy regulations and other Internet issues; handling of government advertising inquiries; and consumer fraud, false advertising, and unfair competition litigation.

## Trademarks, Copyrights, & Advertising

Our attorneys provide sophisticated and aggressive strategic representation of both large and small clients in a broad variety of industries. We counsel clients on the selection, protection, and enforcement of company names, brand names, slogans, and trade dress for U.S. and worldwide markets, including registration and licensing. We also assist clients with a variety of counseling, transactions, and litigation regarding copyright, Internet, consumer protection, unfair competition, and advertising and marketing practices.




ATTORNEYS WHO HAVE HELD **SENIOR POSITIONS** AT U.S. FEDERAL AGENCIES AND HAVE BEEN INVOLVED IN MANY OF THE MOST IMPORTANT ANTITRUST MATTERS OF THE PAST DECADE

## Antitrust

Recognized as one of the nation's most sought-after antitrust firms, Wilson Sonsini Goodrich & Rosati is uniquely positioned to assist clients on vital bet-the-company matters as well as with regular counseling and compliance issues. Our antitrust attorneys advise clients with respect to mergers and acquisitions, criminal and civil investigations by government agencies, antitrust litigation, and issues involving intellectual property. We also advise clients with respect to the full range of counseling matters, including pricing, distribution, vertical restrictions, standard-setting activities, joint ventures, and patent pooling. In working with Fortune 100 global enterprises as well as venture-backed start-up companies, our antitrust attorneys have experience in a broad array of industry sectors, ranging from software and medical devices to retail and media.

Wilson Sonsini Goodrich & Rosati attorneys have held senior positions at U.S. federal agencies and have been involved in many of the most important antitrust matters of the past decade. They have been successful in many high-profile litigation matters, such as monopolization cases brought against a leading beverage company and a global media and entertainment enterprise. The firm also successfully defended a major vision-correction company against FTC claims of unlawful monopolization in one of the few patent abuse cases litigated through trial. Our antitrust attorneys have represented clients in connection with two of the most

important criminal investigations by the Department of Justice in recent years, involving claims in the semiconductor industry and the provision of computer supplies to government-funded education programs.

Few firms can match the success that Wilson Sonsini Goodrich & Rosati has achieved in obtaining favorable agency reviews of proposed mergers. In more than 900 antitrust merger reviews since 1980, no Wilson Sonsini Goodrich & Rosati client has ever abandoned its transaction or had its transaction blocked as a result of action by the Federal Trade Commission or the Department of Justice.








AN INTERDISCIPLINARY TEAM BRINGS BEST-OF-BREED EXPERTISE FROM PRACTICE AREAS ACROSS THE FIRM

00020

## Employee Benefits & Compensation

Working closely with compensation committees and senior management on complex compensation and incentive issues, our attorneys have significant experience in a broad array of employee benefits and compensation matters. These include all facets of equity incentives and compensation programs designed for U.S. and international employees, such as stock option and purchase plans, qualified retirement plans, bonus programs, deferred compensation plans, severance and golden-parachute arrangements, fringe benefits, and employment agreements.

## Fund Services

As a leader in fund services for more than three decades, Wilson Sonsini Goodrich & Rosati has helped venture capitalists and other private equity fund managers raise and operate hundreds of separate investment funds. In addition to an in-depth knowledge of day-to-day fund operations, our expertise includes all aspects of fund structuring, such as terms and conditions, investor negotiations, tax-advantaged structures, and cross-border fundraising. We also represent large corporations making strategic investments in private equity funds and a select group of funds of funds.

## Real Estate & Environmental

Our real estate and environmental attorneys advise and represent clients with respect to real estate and facility issues for all of their office, commercial, and manufacturing needs. We regularly advise on facility leasing, acquisition, development, construction, and financing, as well as all aspects of environmental compliance, due diligence, investigations, and remediations.

## Tax

Our tax practice encompasses all areas of federal, state, and international tax law for technology, life sciences, and growth enterprises at all stages of development. We are experienced in domestic and international transactions, including corporate restructurings, acquisitions, recapitalizations, leveraged buyouts, joint ventures, financings, technology transfers, manufacturing and distribution agreements, and tax-free equity diversification and risk-minimizing transactions. We also assist in domestic and international tax planning and represent clients in matters before the U.S. Internal Revenue Service.

## Wealth Management

Our team of experienced attorneys provides clients with innovative strategies for the accumulation, management, and transfer of wealth. Specialty areas within the practice include charitable planning, contingency planning, trust and estate planning, wealth management and asset protection, and wealth transfers.





DEMONSTRATES OUR CORE VALUES THROUGH PRO BONO
LEGAL REPRESENTATION, A CHARITABLE FOUNDATION,
AND COMMUNITY SERVICE

00022



# Pro Bono & Other Community Services

A commitment to giving back to the communities in which our employees live and work has been one of the founding values of our firm. Wilson Sonsini Goodrich & Rosati demonstrates this core value in several ways: through pro bono legal representation, a charitable foundation, and an organized community service program.

## Pro Bono

All of our attorneys, from summer associates to partners, are encouraged to participate in our vigorous pro bono practice. Our work has ranged from securing a groundbreaking $4 million verdict against an operative of a Chilean dictatorship to providing trademark advice to a performing-arts school, representing victims of persecution in asylum cases to helping a brain-cancer institute obtain tax-exempt status. The firm also actively participates in several legal clinics in economically disadvantaged neighborhoods and partners with law schools and public-interest organizations across the country. Over the years, we've provided pro bono services to approximately 250 nonprofit agencies and numerous individuals nationwide, and we annually contribute millions of dollars' worth of legal services. We have been recognized for our efforts with many pro bono awards, including recent honors from the State Bar of California and the Bar Association of San Francisco.

## WSGR Foundation

The WSGR Foundation was established in 1990 to coordinate charitable giving to the legal profession and the community. To date, the foundation has donated approximately $7 million to nearly 450 charitable and educational organizations nationwide. Recently, the foundation set up ongoing fellowship programs at two prominent law schools, with preference given to qualified students from under-represented or economically disadvantaged communities. In addition to the foundation's charitable donations, our attorneys and staff regularly contribute to firm-sponsored fundraising drives, such as ones supporting the victims of the Asian tsunami and the Gulf Coast hurricanes, with the firm supplying matching funds.

## Community Outreach

The firm has established a Community Service Committee to help coordinate volunteer efforts in all our nationwide offices. Our activities have included caring for the trees planted in New York City to honor the victims of 9/11, cleaning up Austin's riverfront, walking to raise money for lymphoma and leukemia research in Washington, D.C., and building and repairing houses for families in need in the San Francisco Bay Area.





WELL AWARE OF THE VALUE THAT DIVERSE VIEWPOINTS, DIVERSE EXPERIENCES, AND DIVERSE BACKGROUNDS BRING TO AN ORGANIZATION

00024





## Diversity

As a law firm that thrives on change and serves a progressive clientele, Wilson Sonsini Goodrich & Rosati is well aware of the value that diverse viewpoints, diverse experiences, and diverse backgrounds bring to an organization. And while many businesses seek to put diversity on their agenda, our firm always has considered it a core value that lends a vibrancy to our workforce benefiting employees and clients alike. We aim to attract, retain, and reward the best legal talent from all backgrounds—regardless of race, ethnicity, sex, sexual orientation, or other classifications. Currently, nearly a third of our partners and half of our associates are women or belong to a racial, ethnic, or other minority group. The firm's efforts have been recognized with top rankings from many national organizations tracking diversity in the field of law, including the *Minority Law Journal*.

## A Focus on Women

With the introduction of its Women's Initiative Network (WIN) several years ago, the firm instituted a formal program to better serve the needs of our women attorneys, as well as female alumni and clients. Through professional-development training, mentoring opportunities, networking events, flexible work policies, and other means, WIN seeks to recruit, retain, and advance female attorneys and help them find satisfaction and balance in their professional and personal lives. Designed to enhance the work environment of all of our female employees, the program is managed by partners, associates, and professional staff. The Women's Leadership Series luncheons have been a premier component of the program; these popular annual events provide a forum for the firm's women attorneys, clients, and alumni to hear from prominent female business leaders, as well as to network and discuss issues of concern to working women. Past events have featured such keynote speakers as Carol Bartz, former CEO of Autodesk; Catherine Kinney, president and co-COO of the New York Stock Exchange; Carly Fiorina, former chairman and CEO of Hewlett-Packard; and Donna Dubinsky, CEO of Numenta.





INFORMATION. EXPERIENCE. RELATIONSHIPS.

00026

## re:source

### Information. Experience. Relationships.

As part of our value-added services, Wilson Sonsini Goodrich & Rosati
is committed to supporting our clients by leveraging the experience,
information, and networks that our firm has developed in the course of
nearly five decades of legal practice. Our re:source program is
available to all firm clients. The many client workshops available
focusing on timely industry and legal topics, as well as a range
of networking events such as the Wilson Sonsini Goodrich & Rosati
Entrepreneurs' Forum, CEO and General Counsel Information Counsels
Series and others. For more information, please visit
www.wsgr.com

EDUCATION
INFORMATION



**AUSTIN**
8911 Capital of Texas Highway, North
Westech 360, Suite 3350
Austin, Texas 78759-8497
Phone | 512-338-5400
Fax | 512-338-5499

**NEW YORK**
1301 Avenue of the Americas, 40th Floor
New York, New York 10019-6022
Phone | 212-999-5800
Fax | 212-999-5899

**PALO ALTO**
650 Page Mill Road
Palo Alto, California 94304-1050
Phone | 650-493-9300
Fax | 650-493-6811

**SAN DIEGO**
12235 El Camino Real, Suite 200
San Diego, California 92130-3002
Phone | 858-350-2300
Fax | 858-350-2399

**SAN FRANCISCO**
One Market Street
Spear Tower, Suite 3300
San Francisco, California 94105-1126
Phone | 415-947-2000
Fax | 415-947-2099

**SEATTLE**
701 Fifth Avenue, Suite 5100
Seattle, Washington 98104-7036
Phone | 206-883-2500
Fax | 206-883-2699

**SHANGHAI**
Jin Mao Tower
38F, Unit 01-04
88 Century Boulevard
Pudong, Shanghai 200121
People's Republic of China
Phone | 86-21-6165-1700
Fax | 86-21-6165-1799

**WASHINGTON, D.C.**
1700 K Street, NW, Fifth Floor
Washington, D.C. 20006-3817
Phone | 202-973-8800
Fax | 202-973-8899

WWW.WSGR.COM



Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

Copyright 2007 Wilson Sonsini Goodrich & Rosati. All rights reserved. Please address all questions and comments to wsgr@wsgr.com.

Exhibit B



**Wilson Sonsini Goodrich & Rosati Securities Class Action Motion to Dismiss Wins**

| CASE | CLIENTS | COURT |
|---|---|---|
| *Sync Research Securities Litigation* | Company, officers and directors | Central District of California |
| *Synopsys Securities Litigation* | Company, officers and directors | Northern District of California |
| *TIBCO Software Securities Litigation* | Company, officers and directors | Northern District of California |
| *Tularik Securities Litigation (M&A)* | Company, officers and directors | Superior Court of California for San Mateo County |
| *Ventana Medical Systems Securities Litigation* | Company, officers and directors | Delaware Chancery Court (affirmed by Delaware Supreme Court) |
| *VISX Securities Litigation* | Company, officers and directors | Northern District of California (Ninth Circuit Affirmed) |

Exhibit C




**WSGR** Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

# Jurisdictions

## Wilson Sonsini Goodrich & Rosati has defended securities class actions in the following jurisdictions:





= States where WSGR has handled securities class actions

- Alabama
- Alaska
- Arizona
- Arkansas
- California
- Colorado
- Connecticut
- Delaware
- Georgia
- Florida
- Idaho
- Illinois
- Indiana
- Iowa
- Maryland
- Massachusetts
- Minnesota
- Missouri
- Nevada
- New Hampshire
- New Jersey
- New York
- North Carolina
- Ohio
- Oregon
- Pennsylvania
- Texas
- Utah
- Virginia
- Washington
- West Virginia

New York

Reston

Seattle

San Francisco
Palo Alto

San Diego

★ = WSGR offices

00030

Exhibit D



WSGR  Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

*The premier provider of legal services ...*
*technology and growth enter*

ABOUT WSGR    OUR PRACTICE    OUR CLIENTS    INDUSTRY SPECIALIZATION    ATTORNEYS    PUBLICATIONS    NEWS & EVENTS    CAREERS    PRO BONO    Search | S

Home : Our Clients : Litigation Success

**Industry Specialization**

**Litigation Success**

## Litigation Success

### Amdocs Prevails in Securities Litigation

After several quarters of meeting analyst expectations, Amdocs, a company that designs sophisticated computer systems for global telecommunications companies, pre-announced that it would miss its revenue projection for the June 2002 quarter by $40 million. Plaintiffs sued on behalf of a putative class who purchased Amdocs stock between July 8, 2000, and June 20, 2002, claiming that Amdocs had misrepresented its growth and the demand for its products and services. In December 2003, after only one round of briefing, the Eastern District of Missouri dismissed the case with prejudice, and the Eighth Circuit affirmed, *per curiam*, in December 2004.

### Commercial Litigation Team Wins Defense Verdict for Amkor

In December 2004, the firm's commercial litigation team won a complete victory on behalf of client Amkor Technology in a jury trial in San Jose. The plaintiff, Philips Semiconductor, was seeking to collect nearly $25 million in damages for allegedly defective semiconductor chip packages assembled by Amkor. After a six-week trial, and a day and a half of deliberations, the jury returned a verdict entirely in Amkor's favor on breach of warranty and indemnity claims. In addition, the judge ruled in favor of Amkor on Philips' unfair-competition claim.

### Tularik Prevails in M&A Litigation

In August 2004, Wilson Sonsini Goodrich & Rosati obtained dismissals with prejudice for Tularik Inc. and its director defendants in purported class actions filed in San Mateo Superior Court and the Delaware Court of Chancery arising from a proposed merger between Tularik and Amgen Inc., valued at approximately $1.3 billion. The dismissals occurred following expedited discovery and a denial of plaintiffs' motion for a preliminary injunction. As a result, the merger with Amgen was consummated on August 13, 2004.

### Employment Law Team Wins Verdict on Behalf of Cypress Semiconductor

In May 2004, Wilson Sonsini Goodrich & Rosati's employment law team obtained a defense verdict on behalf of Cypress Semiconductor following a one-week trial in Santa Clara Superior Court. The plaintiff, a former co-founder of a company Cypress acquired, alleged that Cypress failed to repurchase approximately $1.9 million worth of unvested restricted shares in a timely manner following his resignation. The case hinged on contested factual and legal issues concerning whether or not the plaintiff had received proper notice. The plaintiff sued for Conversion, Declaratory, and Injunctive Relief. Following a trial that featured a vigorous cross-examination of the plaintiff, the court ruled that Cypress did indeed provide timely notice of its intent to repurchase the plaintiff's unvested shares, and that the plaintiff's version of events was not credible.

## Sun Microsystems Prevails in Employment Litigation

Wilson Sonsini Goodrich & Rosati's employment law team obtained a defense verdict on behalf of Sun Microsystems, Inc. after a trial in Santa Clara Superior Court. A senior executive brought numerous employment-related claims against Sun in connection with his separation from the company, and asserted fraud in connection with the negotiation of a separation and release agreement signed by the executive. In addition to suing the company, the plaintiff also sued his former supervisor, another senior Sun executive. The plaintiff sought over $8 million in damages. After extensive discovery and a trial, the Court determined that Sun had not committed any fraud in connection with the release agreement and, as a result, entered judgment in favor of Sun on all claims. This case, involving a sophisticated senior executive plaintiff, multiple claims, and successful resolution by trial rather than motion practice, is illustrative of cases routinely handled by Wilson Sonsini Goodrich & Rosati on behalf of our clients.

### *Cabello v. Fernández-Larios* (S.D. Fla.)

Wilson Sonsini Goodrich & Rosati obtained a $4 million verdict for family members of a Chilean economist, Winston Cabello. Cabello was slain by the Pinochet government shortly after the military junta took control of Chile in 1973. The suit was against Armando Fernández-Larios, then a member of the Chilean army, for his role in the torture; cruel, inhuman, and degrading treatment or punishment; extrajudicial killing; and crimes against humanity perpetrated by a squad that came to be known as "the Caravan of Death" and resulted in Mr. Cabello's murder. The case was brought under the Alien Tort Claims Act and Torture Victim Protection Act. The firm obtained two widely cited opinions over the course of the five years of litigation. The three-week trial before a Miami jury ended October 15, 2003. This case marked the first jury verdict in the United States for crimes against humanity, and one of the only

00032

instances in history of Chilean human rights abusers being held
accountable for widespread crimes committed during the Pinochet
regime. In March 2005, the verdict was affirmed by the Eleventh
Circuit Court of Appeals.

### Autodesk Prevails in Contract Dispute

Wilson Sonsini Goodrich & Rosati represented Autodesk, the
world's leading design software and digital content company, in a
breach of contract suit brought by Spatial Corporation, a subsidiary
of one of Autodesk's principal competitors. The case concerned a
license agreement between Spatial and Autodesk pursuant to
which Autodesk licensed certain technology that is incorporated
into nearly every Autodesk product. The license was executed
many years before Spatial was acquired by Autodesk's competitor.
The new, competitor-owned Spatial sought to terminate the
license. If Spatial had been successful, Autodesk would have had
to re-design its products, a very risky and expensive undertaking.
The case was tried to a jury in September 2003. Opposing counsel
was Cooley Godward LLP. Following the twelve-day trial, the jury
found for Autodesk on all issues, and the court ordered Spatial to
pay Autodesk more than $2 million in attorneys fees pursuant to
terms of the contract.

Spatial then appealed the verdict, challenging the jury's contention
that Autodesk had not breached the license agreement. The appeal
was argued on March 15, 2006. A week later, the California Court
of Appeal, First Appellate District, affirmed the Superior Court's
judgment in all respects and awarded Autodesk its costs of appeal.

### *McData v. Brocade* (D. Colo.)

Wilson Sonsini Goodrich & Rosati represented Brocade, a leading
manufacturer of fibre channel switches for the storage area
networking market, in a patent infringement suit brought by
McData, a Brocade competitor. The case involved a single patent
on technology for monitoring data flow through fibre channel
switches. McData sought a preliminary injunction against Brocade's
entire existing product line. The Court placed the case on an
expedited schedule and conducted a five-day evidentiary hearing.
Opposing counsel was Faegre & Benson LLP. Following the hearing
in July 2002, the Court issued a lengthy opinion denying the
preliminary injunction in its entirety and indicating that the patent-
in-suit was invalid.

### *Hewlett v. Hewlett-Packard*

In May of 2002, Wilson Sonsini Goodrich & Rosati worked with
long-time client Hewlett-Packard (HP) on a landmark corporate
transaction - its $19 billion purchase of Compaq Computer, the
largest technology merger in history. We represented HP in more

than eight months of negotiations and an unprecedented proxy battle led by the son of co-founder William Hewlett. After the shareholders voted to approve the merger, Hewlett sought to have the vote overturned by the Delaware Court. We defended HP in an expedited three-day trial in which the court ruled in our clients favor and allowed the merger to close. The Wilson Sonsini Goodrich & Rosati team that worked on this multi-faceted merger included more than 60 attorneys, representing nearly every practice at the firm including corporate finance, antitrust, employment law and litigation.

### *Intel v. Broadcom* (D. Del.)

Wilson Sonsini Goodrich & Rosati represented Broadcom, a major semiconductor manufacturer, in a multi-patent infringement action against Intel. The five patents at issue involved video compression, networking technology and semiconductor packaging. Intel sought monetary damages and an injunction sufficient to put Broadcom out of business. Opposing counsel was Fish & Richardson PC. After a two and a half week jury trial on two of the patents in November-December 2001, Wilson Sonsini Goodrich & Rosati and Broadcom obtained a complete defense verdict. The jury entered more than one hundred factual findings in our client's favor. The National Law Journal featured the verdict as one of the "Top 10" defense victories in the nation for 2001.

Copyright 2003 · Wilson Sonsini Goodrich & Rosati · All rights reserved · Privacy Policy · Disclaimer · Attorney Advertising · Principal Office · Fac Site · Questions/Comments ?

00034

Exhibit E

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 2372    Page 1 of 35

Case 1:07-cv-00440-SLR    Document 39-6    Filed 10/26/2007    Page 2 of 11

**LexisNexis®** *Total Research System*                Switch Client ┊ Preferences ┊ Sign Off ┊ ？ Help

┊ Search ▼ Research Tasks ▼ Get a Document ▼ *Shepard's®* ▼ Alerts ▼ Total Litigator ▼        Dossier ┊ History ┊ ⚙

Service:  **Get by LEXSEE®**
Citation:  **2003 U.S. Dist. LEXIS 2372**

*2003 U.S. Dist. LEXIS 2372, \**

INTEL CORPORATION, Plaintiff, v. BROADCOM CORPORATION, Defendant.

Civil Action No. 00-796-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2003 U.S. Dist. LEXIS 2372

February 13, 2003, Decided

**DISPOSITION:  [\*1]** Intel's motion for summary judgment denied. Intel's motion for new trial granted in part and denied in part. Broadcom's motion for judgment as a matter of law.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff patent holder sued defendant competitor alleging infringement of certain claims of five patents. The parties tried their claims regarding the two of the patents to a jury. Before the court were the patent holder's motions for judgment as a matter of law and motions for a new trial as well as the competitor's motion for judgment as a matter of law that its products did not meet the control means limitation of one patent claim.

**OVERVIEW:** The patents covered three different technologies (smart networking products, semiconductor chip packaging structures, and digital video encoding and decoding techniques) that the patent holder alleged intersected in the competitor's high-speed networking and communications products. Inter alia, the court held that substantial evidence existed for a reasonable jury to find the transfer format selection means claim element absent and to find that the another product anticipated one of the patents. As to the second patent, substantial evidence exists for a reasonable jury to find the pixel interpolating means, the sequencing means and the arithmetic data processing means claim elements absent from the accused products. However, the jury verdict on another claim of that patent was inherently inconsistent and warranted a new trial. Moreover, the jury's verdict with regards to the license defense was against the great weight of the evidence.

**OUTCOME:** The court denied the patent holder's motion for judgment as a matter of law and granted the patent holder's motion for a new trial in part and denied it in part. The court denied the competitor's motion for judgment as a matter of law.

**CORE TERMS:** node, format, arithmetic, pixel, destination, control signal, license, processing, bit, network, default, responsive, control means, new trial, video, sequencing, matter of law, interpolating, statistical, decoding, patent, string, signal, infringement, medium, coupled, substantial evidence, corresponding, performing, data processing

**COUNSEL:** William J. Marsden, Jr., Esquire of Fish & Richardson, P.C., Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: John E. Gartman, Esquire and Juanita Brooks, Esquire of Fish & Richardson, P.C., San Diego, California.

Richard H. Morse, Esquire and John W. Shaw, Esquire of Young Conaway Stargatt & Taylor, L.L.P., Wilmington, Delaware. Counsel for Defendant. Of Counsel: Wilson Sonsini Goodrich & Rosati, P.C., Palo Alto, California. McDermott Will & Emery, Palo Alto, California. McDermott Will & Emery, Washington, D.C.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

Dated: February 13, 2003

Wilmington, Delaware

**ROBINSON, Chief Judge**

## I. INTRODUCTION

On August 30, 2000, plaintiff Intel Corporation ("Intel") filed this action against defendant Broadcom Corporation ("Broadcom"), alleging infringement of certain claims **[*2]** of United States Patent Nos. 4,975,830 (the " '830 patent"), 4,823,201 (the " '201 patent"), 5,894,410 (the " '410 patent"), 5,079,630 (the " '630 patent") and 5,134,478 (the " '478 patent") (collectively, the "Intel patents"). The Intel patents cover three different technologies (smart networking products, semiconductor chip packaging structures, and digital video encoding and decoding techniques) that plaintiff alleges intersect in defendant's high-speed networking and communications products. The parties tried their claims regarding the '830 and '201 patents to a jury from November 28, 2001 to December 14, 2001. Currently before the court are the parties' motions for judgment as a matter of law and motions for a new trial.

## II. BACKGROUND

### A. The Patents in Suit

#### 1. The '830 Patent

The '830 patent, entitled "Computer Communication System Having Supplemental Formats," issued on December 4, 1990. The named inventors are George E. Gerpheide, Kerry D. Sharp, Daniel J. Lee, David C. Olsen, David B. Meyer and Mark E. Kohagen. The listed assignee is Dayna Communication, Inc. Intel acquired the rights to the '830 patent when it acquired Dayna Communications.

The '830 patent discloses **[*3]** a communication system, such as a computer network, in which devices on the network (called nodes) can dynamically choose between multiple formats (e.g., various transmission characteristics including transmission speeds, encoding protocols, compression protocols, and encryption protocols) by which to transmit and receive data to and from one another over a common communication medium. Using the invention, a device on the network that seeks to transmit information can dynamically determine all of the formats by which it can communicate with a device that it wishes to send information.

**LexisNexis®** *Total Research System*

Switch Client ¦ Preferences ¦ Sign Off ¦ ?¦Help

Search ▼ Research Tasks ▼ Get a Document ▼ *Shepard's®* ▼ Alerts ▼ Total Litigator ▼          Dossier ¦ History ¦ 🖳

Source: Delaware > Find Cases > DE Federal & State Cases, Combined ⓘ
Terms: **Wilson Sonsini Goodrich & Rosati** (Edit Search | Suggest Terms for My Search)

↰Select for FOCUS™ or Delivery
☐

*2004 Del. Ch. LEXIS 175, \**

WatchMark Corp. v. ARGO Global Capital, LLC, et al.

Civil Action No. 711-N

COURT OF CHANCERY OF DELAWARE, SUSSEX

2004 Del. Ch. LEXIS 175

November 11, 2004, Submitted
November 15, 2004, Decided

**NOTICE:**

 **[\*1]** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**SUBSEQUENT HISTORY:** Revised: November 19, 2004.

**PRIOR HISTORY:** WatchMark Corp. v. ARGO Global Capital, LLC, 2004 Del. Ch. LEXIS 168 (Del. Ch., Nov. 4, 2004)

**DISPOSITION:** Clarified; motion denied.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Defendant stockholders and third-party stockholders moved for a clarification of the court's opinion denying their motion for a preliminary injunction and partially granting plaintiff company's summary judgment motion on the stockholders' counterclaims to the company's declaratory judgment action. The stockholders also moved for a final partial judgment under Del. Ch. Ct. R. 54(b).

**OVERVIEW:** The company sought a declaratory judgment that it could proceed with a proposed merger without a separate vote of the stockholders' preferred stock. The stockholders filed five counterclaims. The company moved for summary judgment on the counterclaims and the stockholders moved for a preliminary injunction. After an opinion was entered granting the company's motion and denying the stockholders' motion, the stockholders sought clarification. They also moved for a final partial judgment. The court held that the stockholders' failure to establish a reasonable probability of success prevented a preliminary injunction. Also, the company plainly sought summary judgment on all of the counterclaims and the stockholders fully briefed and argued against summary judgment on all of their counterclaims. Since there was insufficient argument on the counterclaim that the company breached a duty to disclose, that counterclaim survived, but summary judgment was proper on the other four counterclaims. Finally, the court denied the Del. Ch. Ct. R. 54(b) motion. The standard of no just reason for delay was not met where the final counterclaim was inextricably tied to the stockholders' other issues.

**OUTCOME:** The court clarified the scope of its prior opinion. That opinion denied the stockholders' motion for a preliminary injunction and granted the company summary judgment as to all of the stockholders' counterclaims except the counterclaim alleging the company breached its duty of disclosure. The court denied the stockholders' motion for final partial judgment.

**CORE TERMS:** merger, counterclaim, summary judgment, financing, charter, fiduciary duties, preliminary injunction, oral argument, clarification, partial, briefed, briefing, block, preferred stockholders, disclosure, approve, opening, final judgment, partial judgment, reasons stated, contract interpretation, common stock, foregone conclusion, outstanding, conversion, stock, judgment rule, declaration, acquisition, predicated

**LEXISNEXIS® HEADNOTES**                                                           ⊟ **Hide**

Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview 🔦

Civil Procedure > Judicial Officers > Judges > Discretion 🔦

Civil Procedure > Judgments > Entry of Judgments > Multiple Claims & Parties 🔦

*HN1*⬆ Del. Ch. Ct. R. 54(b) provides that when more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, the court may direct the entry of a final judgment upon one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. When deciding to exercise its discretion in this manner, the court must consider the long established policy against piecemeal appeals that requires the court exercise that discretion sparingly. Indeed, Rule 54(b) exists to create a discretionary power to afford a remedy in the infrequent harsh case. More Like This Headnote

Civil Procedure > Judicial Officers > Judges > Discretion 🔦

Civil Procedure > Trials > Judgment as Matter of Law > General Overview 🔦

*HN2*⬆ In exercising its discretion under Del. Ch. Ct. R. 54(b), the court may consider any factor relevant to judicial administrative interests or the equities of the case. More Like This Headnote

**COUNSEL:** R. Judson Scaggs, Jr., Samuel T. Hirzel, II, Morris Nichols, Arsht & Tunnell, Wilmington, DE.

James A. DiBoise, David J. Berger, Tracy Tosh Lane, **Wilson Sonsini Goodrich & Rosati,** Palo Alto, CA.

Kurt M. Heyman, Peter B. Ladig, Patricia L. Enerio, The Bayard Firm, Wilmington, DE.

Barry B. White, Brandon F. White, Joshua A. McGuire, Kalun Lee, Foley Hoag LLP, Boston, MA.

**OPINION**

Defendants and third-party plaintiffs (collectively "ARGO") have moved for (1) clarification of

00038

**LexisNexis®** *Total Research System*                Switch Client ⁞ Preferences ⁞ Sign Off ⁞ ? Help

Search ▼ Research Tasks ▼ Get a Document ▼ *Shepard's®* ▼ Alerts ▼ Total Litigator ▼        Dossier ⁞ History ⁞ 📖

Source: Delaware > Find Cases > **DE Federal & State Cases, Combined** ⁞
Terms: **Wilson Sonsini Goodrich & Rosati** (Edit Search | Suggest Terms for My Search)

✔Select for FOCUS™ or Delivery
☐

*123 F. Supp. 2d 213, \*; 2000 U.S. Dist. LEXIS 19255, \*\*;*
*Fed. Sec. L. Rep. (CCH) P91,313*

ALEX TSE, et al., Plaintiffs, v. VENTANA MEDICAL SYSTEMS, INC., et al., Defendants.

C.A. No. 97-37-GMS, JURY TRIAL DEMANDED

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

123 F. Supp. 2d 213; 2000 U.S. Dist. LEXIS 19255; Fed. Sec. L. Rep. (CCH) P91,313

November 22, 2000, Decided
November 22, 2000, Filed

**DISPOSITION:** [\*\*1] Pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, the Motion for Summary Judgment filed by the Defendants GRANTED. Summary Judgment ENTERED in favor of DEFENDANTS and against plaintiffs on all claims in the complaint.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff former shareholders sued defendant company alleging violations of Rule 10b-5, 17 C.F.R. § 240.10b-5. Defendant moved for summary judgment.

**OVERVIEW:** Plaintiffs claimed that defendant failed to disclose a compensation package to a merging company's investors and misrepresented or fraudulently implied that the conversion price offered for defendant's exchange notes was the fair market value of their stock. The allegation that defendant misrepresented the basis for the conversion rate did not state a securities fraud claim because defendant disclosed the basis for the conversion rate to the merging company's board and defendant was under no duty to offer plaintiffs a fair price in a negotiated arms-length transaction. Defendant had a duty to disclose the compensation package because another judge had made that ruling in denying defendant's motion to dismiss and none of the exceptions to the law of the case doctrine applied. The compensation package was material because plaintiffs would have withheld their votes on the merger had they known of the package. Plaintiffs did not establish loss causation as the alleged losses were wholly speculative. Plaintiffs had not adequately alleged scienter because they did not show that defendant fraudulently concealed the compensation package to induce them to support the merger.

**OUTCOME:** Motion for summary judgment was granted because plaintiffs failed to establish that defendant's conduct caused them any economic loss or that defendants acted with requisite scienter.

**CORE TERMS:** package, conversion, merger, stock, scienter, omission, fair market value, shareholder, material fact, summary judgment, duty to disclose, misrepresentation, speculative, investor, disclose, favorable, causation, conscious, disclosure, predecessor,

unremitting obligation extends equally to board conduct in a contest for corporate control. More Like This Headnote ] *Shepardize:* Restrict By Headnote

Contracts Law > Contract Conditions & Provisions > General Overview 🔄
Contracts Law > Contract Interpretation > Fiduciary Responsibilities 🔄
Governments > Fiduciary Responsibilities 🔄

HN6⊥To the extent that a contract, or a provision thereof, purports to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable. More Like This Headnote | *Shepardize:* Restrict By Headnote

**COUNSEL:** Kenneth J. Nachbar, Esquire, William M. Lafferty, Esquire, and Donna L. Culver, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; and James A. DiBoise, Esquire and David J. Berger, Esquire (argued), of **Wilson, Sonsini, Goodrich & Rosati,** P.C., Palo Alto, California, attorneys for appellants.

Kevin G. Abrarns, Esquire (argued), Thomas A. Beck, Esquire, Lisa A. Schmidt, Esquire, J. Travis Laster, Esquire, Dominick Gatruso, Esquire, and Michael K. Reilly, Esquire, of Richards, Layton & Finger, Wilmington, Delaware; Fredric J. Zepp, Esquire, of Latham & Watkins, San Francisco, California; and Marc W. Rappel, Esquire, of Latham & Watkins, Los Angeles, California; attorneys for appellees, Mentor Graphics Corporation and MGZ Corporation.

Joseph A. Rosenthal, Esquire, and Norman M. Monhait, Esquire, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; and Stanley Bernstein, **[**2]** Esquire and Abraham I. Katsman, Esquire, of Bernstein, Liebhard & Lifshitz, LLP, New York, New York, for appellee, Howard Shapiro.

**JUDGES:** Before WALSH, HOLLAND and HARTNETT, Justices.

**OPINION BY:** HOLLAND

**OPINION**

**[*1282]** HOLLAND, Justice:

This is an expedited appeal from a final judgment entered by the Court of Chancery. The dispute arises out of an ongoing effort by Mentor Graphics Corporation ("Mentor"), a hostile bidder, to acquire Quickturn Design Systems, Inc. ("Quickturn"), the target company. **[*1283]** The plaintiffs-appellees are Mentor [1] and an unaffiliated stockholder of Quickturn. The named defendants-appellants are Quickturn and its directors.

**FOOTNOTES**

[1] Mentor and MGZ Corp., a wholly owned Mentor subsidiary specially created as a vehicle to acquire Quickturn, are referred to collectively as Mentor. Unless otherwise indicated, Mentor and Howard Shapiro, the shareholder plaintiff in Court of Chancery Civil Action No. 16588, are referred to collectively as "Mentor."

In response to Mentor's tender offer and proxy contest to replace the **[**3]** Quickturn board of directors, as part of Mentor's effort to acquire Quickturn, the Quickturn board enacted two defensive measures. First, it amended the Quickturn shareholder rights plan ("Rights Plan")

00040

**LexisNexis®** *Total Research System*

Switch Cl... ⋮ Preferences ⋮ Sign Off ⋮ [?] Help

ˋSearch ˅ Research Tasks ˅ Get a Document ˅ *Shepard's®* ˅ Alerts ˅ Total Litigator ˅

Dossier ⋮ History ⋮ 🖴

Source: Delaware > Find Cases > DE Federal & State Cases, Combined ⒤
Terms: **Wilson Sonsini Goodrich & Rosati** (Edit Search | Suggest Terms for My Search)

ˋSelect for FOCUS™ or Delivery
⌐

*316 F. Supp. 2d 174, *; 2004 U.S. Dist. LEXIS 8070, ***

DIGENE CORPORATION, Plaintiff, v. VENTANA MEDICAL SYSTEMS, INC. and BECKMAN
COULTER INC., Defendants.

Civil Action No. 01-752 KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

316 F. Supp. 2d 174; 2004 U.S. Dist. LEXIS 8070

May 7, 2004, Decided

**SUBSEQUENT HISTORY:** Reconsideration denied by Digene Corp. v. Ventana Med. Sys.,
2004 U.S. Dist. LEXIS 12783 (D. Del., July 6, 2004)
Claim dismissed by Digene Corp. v. Ventana Med. Sys., 2007 U.S. Dist. LEXIS 15368 (D.
Del., Mar. 6, 2007)

**DISPOSITION:** [**1] Court ordered Digene Corporation ˅and Beckman Coulter Inc. ˅to
arbitrate Digene ˅'s claims against Beckman. Case stayed pending the outcome of the
arbitration between Digene ˅and Beckman.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff patent owner sued defendants, a sublicensee and an
asset purchaser, alleging patent infringement as to two patents that related to biological
material and claimed a type of human papilloma virus. Defendants moved to compel
arbitration based upon a cross-license agreement (CLA).

**OVERVIEW:** The patent owner acquired its predecessor in interest's (POPII) rights to the
patents and the POPII's rights under the CLA between the POPII and a patent licensor. The
patent licensor licensed certain rights to the sublicensee. The sublicensee asserted a right
to arbitrate the patent owner's patent infringement claims against it based on the CLA.
The asset purchaser asserted a right to arbitrate based on retracted statements by the
patent owner regarding the sublicensee's status as a party to the CLA and based on a
purported acquisition of the sublicensee's assets. The court concluded that the sublicensee
sustained its burden of proving that it had a right to arbitrate the patent owner's claims
against it, but that the asset purchaser did not meet its burden. Certain facts weighed in
favor of the conclusion that the sublicensee was a party to, and therefore bound by, the
CLA, including the sublicensee's vice president's signing of the CLA and the patent owner's
judicial admissions in its first amended complaint that the sublicensee breached the terms
of the CLA. However, the asset purchaser did not acquire any assets under the CLA.

**OUTCOME:** The court ordered the patent owner and the sublicensee to arbitrate the
patent owner's claims against the sublicensee that arose out of the sublicensee's rights
under the CLA. The court ordered the case, including the proceedings against the asset

Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview 🔄

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses 🔄

HN7 ⟟ In determining whether a claim falls within the scope of an arbitration agreement, the focus is on the factual underpinnings of the claim rather than the legal theory alleged in the complaint. More Like This Headnote | *Shepardize:* Restrict By Headnote

Contracts Law > Contract Interpretation > General Overview 🔄

HN8 ⟟ Under Arizona's law pertaining to contract interpretation, a court must interpret a contract to effectuate the intent of the parties. Furthermore, to incorporate a document by reference, the incorporating instrument must clearly evidence an intent that the writing be made part of the contract. More Like This Headnote

**COUNSEL:** Richard D. Kirk, Esq., Morris James Hitchens & Williams LLP, Wilmington, Delaware, counsel for plaintiff Digene Corporation.

Of Counsel: Marc R. Labgold, Esq. and Kevin M. Bell, Esq., Patton Boggs LLP, McLean, Virginia; Richard J. Oparil, Esq., Patton Boggs LLP, Washington, D.C.

Richard H. Morse, Esq., Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, counsel for defendant Ventana Medical Systems, Inc.

Of Counsel: Ron E. Shulman, Esq. and Roger J. Chin, Esq., **Wilson Sonsini Goodrich & Rosati,** Palo Alto, California.

Allen M. Terrell, Jr., Esq., Richards, Layton & Finger, P.A., Wilmington, Delaware, counsel for defendant Beckman Coulter, Inc.

Of Counsel: Paul E. Rafferty, Esq., Sheppard, Mullin, Richter & Hampton LLP, Costa Mesa, California.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Kent A. Jordan

**OPINION**

[**2] [*175]  POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

Wilmington, Delaware

**JORDAN, District Judge**

**I. INTRODUCTION**

This is a patent infringement case. On November 19, 2001, plaintiff Digene Corporation ⌄ ("Digene ⌄") filed a complaint of patent infringement against defendant Ventana Medical Systems, Inc. ⌄ ("Ventana"). (Docket Item ["D.I."] 1.) Digene ⌄ subsequently amended its complaint twice, adding additional counts against Ventana and adding an additional defendant, Beckman Coulter, Inc. ⌄ ("Beckman"), to the lawsuit. (D.I. 119, 174.) The patents-in-suit are U.S. Patent No. 4,849,332, entitled "Human Papilloma Virus 35 Nucleic Acid Hybridization Probes and Methods for Employing the Same" (issued July

00042

**LexisNexis® *Total Research System***

❭ Search ❭ Research Tasks ❭ Get a Document ❭ *Shepard's*® ❭ Alerts ❭ Total Litigator ❭       Dossier ┊ History ┊ 🖨

Source: Delaware > Find Cases > DE Federal & State Cases, Combined ⓘ
Terms: **Wilson Sonsini Goodrich & Rosati** (Edit Search | Suggest Terms for My Search)

🖘Select for FOCUS™ or Delivery
☐

*2001 U.S. Dist. LEXIS 25579, \**

VISX INCORPORATED, Plaintiff, v. LASERSIGHT INCORPORATED, LASERSIGHT TECHNOLOGIES, INC., and LASERSIGHT CENTERS INCORPORATED, Defendants.

Civil Action No. 99-789 JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2001 U.S. Dist. LEXIS 25579

January 30, 2001, Decided

**DISPOSITION:** Parties ordered to submit protective order for entry in case.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Pending before the court was a dispute between the parties, plaintiff corporation, and defendants, two companies, concerning a provision in a proposed stipulated protective order. Counsel for the parties were in the process of drafting the proposed order to be used in the discovery phase of the matter. However, the parties could not reach agreement concerning the disclosure of certain information designated "confidential" in the proposed order.

**OVERVIEW:** In drafting the order, the parties agreed that certain information to be exchanged required a "confidential" designation. The dispute arose because the defendant companies wanted to be able to disclose such information to a representative of a defendant company who was the CEO of one of the defendant companies. They contended it was necessary for litigation that counsel to be able to share confidential information with him so they could discuss litigation strategy and options and other issues concerning the litigation. The plaintiff corporation objected to any disclosure that would allow the CEO of a direct competitor to access their confidential information, contending that such disclosures were particularly dangerous because the businesses were single product companies and the information sought was highly proprietary and of substantial commercial value. The court found that any disclosure, even restricted disclosure, could be harmful to the party producing the information and concluded that information properly designated "confidential" should not be disclosed to a highly placed business person of a direct competitor. Defendants' could find a more neutral representative.

**OUTCOME:** The court would direct the parties to submit a protective order for entry which did not permit the disclosure of confidential information to highly placed business persons of either party.

**CORE TERMS:** disclosure, confidential, protective order, designated, discovery, parties agree, designation, proprietary, competitive, competitor, discovery process, good cause,

proposed order, certain information, sub-categories, marketplace, designate, drafting

**LEXISNEXIS® HEADNOTES**                                                                    – **Hide**

Civil Procedure > Discovery > Protective Orders 🔙

HN1⊕ Fed. R. Civ. P. 26(c) provides various means for the federal courts to protect parties and witnesses during the discovery process. The rule requires parties to confer in good faith to resolve any dispute; and if not successful, any party may apply to the court for relief concerning the present dispute. More Like This Headnote

Civil Procedure > Discovery > Protective Orders 🔙

HN2⊕ See Fed. R. Civ. P. 26(c).

Civil Procedure > Discovery > General Overview 🔙

HN3⊕ A determination of what constitutes "good cause" is committed to the discretion of the court. In exercising this discretion, courts balance the need of the party seeking the discovery against the burden or harm on the party responding to the discovery request. More Like This Headnote

Civil Procedure > Discovery > General Overview 🔙

HN4⊕ Where disclosure is fairly characterized as proprietary, sensitive, or competitive in nature and it is not the type of business information generally available to those not employed by the parties, any disclosure, even restricted disclosure, may be harmful to the party producing the information. More Like This Headnote

**COUNSEL: [*1]** William J. Marsden, Jr., Esquire of FISH & RICHARDSON, P.C., Wilmington, Delaware.

Of Counsel: Ron E. Shulman, Esquire of **WILSON SONSINI GOODRICH & ROSATI,** P.C., Palo Alto, California. Attorneys for Plaintiff.

Thomas C. Grimm, Esquire and Mona A. Lee, Esquire of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware.

Of Counsel: Harry J. Roper, Esquire of ROPER & QUIGG, Chicago, Illinois. Attorneys for Defendants.

**JUDGES:** Farnan, District Judge.

**OPINION BY:** Farnan

**OPINION**

*MEMORANDUM OPINION*

Wilmington, Delaware

**Farnan, District Judge.**

Pending before the Court is a dispute between the parties, Visx, Incorporated ▾("Plaintiff") and LaserSight Incorporated, ▾LaserSight Technologies, Inc., and

Exhibit F

## EXHIBIT G

## SIGNIFICANT DIFFERENCES BETWEEN THE
## CORPORATION LAWS OF UTAH AND DELAWARE

The General Corporation Laws of Utah and Delaware differ in many respects. Although it is not practical to summarize all of such differences in this statement, some of the principal differences which could materially affect the rights of shareholders are discussed below.

*Separate Class Vote by Classes of Shares.* Under Utah law if the number of shares of any class are increased or decreased by amendment to a company's articles of incorporation, then that class of shares would be entitled to separate class vote on the amendment. Similarly, under Utah law if an amendment to a company's articles of incorporation would change certain rights of an existing class of shares or create a class or series of shares with rights and preferences in priority to such existing class of shares, then the existing class would also be entitled to a separate class vote on the amendment. Separate class votes required under Utah law may not be eliminated through amendment of articles of incorporation, even though the shares may be designated as nonvoting or other classes or series of shares are purported to vote as part of the same voting group. Alternatively, under Delaware law, Delaware courts have determined that the creation of a class or series of stock does not entitle the existing class to a class vote, merely because the rights and preferences are superior to the existing class. Also under Delaware law, if a company provides in its certificate of incorporation that the number of authorized shares of any such class or classes of stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the stock of the corporation entitled to vote, then a separate class vote is not required to increase or decrease the number of shares of that class.

*Calling Annual Meetings of Shareholders.* Under Delaware law, unless otherwise authorized by the certificate of incorporation or bylaws, a special meeting of stockholders may only be called by the Board of Directors. In contrast, in Utah, a special meeting of shareholders may be called by either (a) the Board of Directors or such other person or persons authorized by the bylaws or (b) a shareholder or group of shareholders entitled to cast at least 10% of the votes at such meeting.

*Required Number of Directors.* In Delaware, a corporation may have any number of directors. In contrast, under Utah law, a corporation must have at least three directors unless it has fewer than three shareholders, in which case the number of directors must at least equal the number of shareholders, but in no event may a Utah corporation have fewer than one director. Further, Delaware law permits the Board of Directors to change the authorized number of directors by amendment to the bylaws unless the number of directors is fixed in the certificate of incorporation, in which case a change in the number of directors may be made only by amendment to the certificate of incorporation. Similarly, Utah law permits the board of directors to change the authorized number of directors by amendment to the bylaws unless the number of directors is fixed (and not allowed to be changed) by the articles of incorporation, in which case a change in the number of directors may be made only by amendment to the articles of incorporation. Under Utah law, no decrease in the number of directors is permitted to shorten the term of any incumbent director.

*Classified Board; Differential Voting Power.* Both Delaware and Utah law provide for creation of a classified board of directors with one-half or one-third of the directors coming up for reelection to a two or three-year term (as applicable) each year. Delaware law also allows differences in voting power among directors or classes of directors, whereas Utah law has no such provision.

*Removal of Directors.* In Delaware, a director serving on a classified board can be removed only for cause unless otherwise specified in the certificate of incorporation. In contrast, under Utah law, a

WA00426  00045

director serving on a classified board may be removed, with or without cause, unless otherwise specified in the articles of incorporation. Further, under Utah law, if a director is elected by a voting group of shareholders, only the shareholders of that voting group may participate in the vote to remove him. In the case of a corporation with cumulative voting, Delaware requires that where less than the entire board is to be removed, a director may not be removed without cause unless the number of shares voted against such a removal would not be sufficient to elect the director under cumulative voting. In Utah corporations with cumulative voting, a director may not be removed if the number of votes sufficient to elect the director under cumulative voting is voted against removal.

*Election by Written Consent.* Under Delaware law, directors may be elected by a written consent signed by a majority of the shareholders; provided, however, that if such consent is less than unanimous, such action by written consent may be in lieu of holding an annual meeting only if all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action. In contrast, Utah law requires a unanimous written consent for the election of directors. Most other shareholder actions may be taken by a written consent of the majority entitled to vote in either jurisdiction.

*Delay in Completing Actions Approved by Written Consent.* When action is taken by written consent under Delaware law, the action may either be completed immediately or, in some situations, shortly after giving notice to any stockholders that did not sign the written consent. In contrast, Utah law requires that shareholders who did not sign the written consent be given notice ten days before the consummation of the action authorized.

*Percentage Required for a Quorum of Shareholders.* Under Delaware law, a quorum for purposes of a stockholder vote may be any percentage between 33 1/3% and 100%, as specified in the charter documents. In contrast, under Utah law, any percentage may constitute a quorum if specified in the articles of incorporation. In the absence of such specification, a majority of the votes entitled to be cast on the matter by the voting group constitutes a quorum of that voting group for action on that matter.

*Inspection of Records.* Delaware law allows stockholders and directors to inspect the corporation's records and stockholder's list for purposes reasonably related to such person's interests as a stockholder or director. In contrast, under Utah law, directors or shareholders may inspect certain documents and records for any purpose, but other records, including the shareholder list, only for a purpose reasonably related to such shareholder's or director's interest as such.

*Sale of All Assets.* Under Delaware law, a sale of substantially all of the corporation's assets requires the approval of holders of a majority of the stock entitled to vote, although no stockholder approval is required for a mortgage of substantially all corporate assets unless required by the certificate of incorporation. In contrast, under Utah law, the corporation's assets may be disposed of in the regular course of its business without any shareholder approval. If a corporation's assets are disposed of other than in the regular course of the corporation's business, approval of the majority of the outstanding shares of each class of stock is required.

*Dissolution.* Under Delaware law, a dissolution of the corporation requires approval of all stockholders unless initiated by the board of directors, in which case only a majority approval is required. Under Utah law, a dissolution must be approved by a majority of the holders of each class of stock of the corporation.

*Indemnification of Directors, Officers and Agents.* Delaware law generally permits indemnification from expenses incurred in the defense or settlement of a derivative or third-party action, provided, that, with respect to a person who is a director or officer at the time of determination, there is a determination by, a committee of such directors designated by majority vote of such directors, even though less than a quorum, by independent legal counsel or by a majority vote of a quorum of the

WA00427    00046



stockholders that the person seeking indemnification acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the corporation, and with respect to a criminal action or proceeding had no reasonable cause to believe that the person's conduct was unlawful. Without court approval, however, no indemnification may be made in respect of any derivative action in which such person is adjudged liable to the corporation. Delaware law requires indemnification of expenses when the individual being indemnified has successfully defended the action on the merits or otherwise. Delaware law provides that the indemnification provided by statute shall not be deemed exclusive of any other rights under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise.

Utah law generally permits indemnification from expenses incurred in the defense or settlement of a derivative or third-party action, provided there is a determination by a disinterested quorum of the directors, by a disinterested committee of the board of directors consisting of at least two directors, by special legal counsel or by a majority vote of a quorum of the shareholders that the person seeking indemnification acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the corporation. However, a director may not be indemnified in a derivative suit or in connection with any other proceeding in which the director is found liable to the corporation or in connection with any other proceeding charging that he derived an improper personal benefit in which he was judged liable. Unless otherwise provided in the articles of incorporation, indemnification is mandatory to a director who is successful in defending an action on the merits or otherwise.

*Elimination of Directors' Liability for Monetary Damages.* Delaware law permits a corporation to adopt a provision in its certificate of incorporation eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for the breach of fiduciary duty as a director, provided that such liability does not arise from certain prescribed conduct, including intentional misconduct, a breach of the duty of loyalty, unlawful distributions and transactions from which a director derives an improper personal benefit.

Utah law permits a corporation to adopt a provision in its charter documents eliminating or limiting the personal liability of a director to the corporation or its shareholders for monetary damages for acts or failures to act in the director's capacity as a director, except liability for financial benefits to which the director was not entitled, intentional infliction of harm to the corporation or shareholders, unlawful distributions or intentional violation of criminal laws.

*Stockholder Approval of Certain Business Combinations.* Under Section 203 of the Delaware General Corporation Law ("*Section 203*"), certain "business combinations" with "interested stockholders" of Delaware corporations are subject to a three-year moratorium unless specified conditions are met.

Section 203 prohibits a Delaware corporation from engaging in a "business combination" with an "interested stockholder" for three years following the date that such person becomes an interested stockholder. With certain exceptions, an interested stockholder is a person or group who or which owns 15% or more of the corporation's outstanding voting stock (including any rights to acquire stock pursuant to an option, warrant, agreement, arrangement or understanding, or upon the exercise of conversion or exchange rights, and stock with respect to which the person has voting rights only), or is an affiliate or associate of the corporation and was the owner of 15% or more of such voting stock at any time within the previous three years.

For purposes of Section 203, the term "business combination" is defined broadly to include mergers with or caused by the interested stockholder; sales or other dispositions to the interested stockholder (except proportionately with the corporation's other stockholders) of assets of the corporation or a subsidiary equal to ten percent or more of the aggregate market value of the corporation's consolidated assets or its outstanding stock; the issuance or transfer by the corporation or a subsidiary of stock of the corporation or such subsidiary to the interested stockholder (except for transfers in a

WA00428  00047

conversion or exchange or a pro rata distribution or certain other transactions, none of which increase the interested stockholder's proportionate ownership of any class or series of the corporation's or such subsidiary's stock); or receipt by the interested stockholder (except proportionately as a stockholder), directly or indirectly, of any loans, advances, guarantees, pledges or other financial benefits provided by or through the corporation or a subsidiary.

The three-year moratorium imposed on business combinations by Section 203 does not apply if: (i) prior to the date on which such stockholder becomes an interested stockholder the Board of Directors approves either the business combination or the transaction which resulted in the person becoming an interested stockholder; (ii) the interested stockholder owns 85% of the corporation's voting stock upon consummation of the transaction which made him an interested stockholder (excluding from the 85% calculation shares owned by directors who are also officers of the target corporation and shares held by employee stock plans which do not permit employees to decide confidentially whether to accept a tender or exchange offer); or (iii) on or after the date such person becomes an interested stockholder, the board approves the business combination and it is also approved at a stockholder meeting by sixty-six and two-thirds percent (66 2/3%) of the voting stock not owned by the interested stockholder.

Section 203 only applies to Delaware corporations which have a class of voting stock that is listed on a national securities exchange, are quoted on an interdealer quotation system such as Nasdaq or are held of record by more than 2,000 shareholders. However, a Delaware corporation may elect not to be governed by Section 203 by a provision in its original certificate of incorporation or an amendment thereto or to the bylaws, which amendment must be approved by majority stockholder vote and may not be further amended by the board of directors.

Section 203 will encourage any potential acquiror to negotiate with the Company's Board of Directors. Section 203 also has the effect of limiting the ability of a potential acquiror to make a two-tiered bid for a Delaware corporation in which all stockholders would not be treated equally. Shareholders should note that the application of Section 203 to the Company will confer upon the Board the power to reject a proposed business combination, even though a potential acquiror may be offering a substantial premium for the Company's stock over the then current market price (assuming the stock is then publicly traded). Section 203 should also discourage certain potential acquirors unwilling to comply with its provisions.

*Dividends and Repurchase of Shares.* Delaware law permits a corporation, unless restricted by its certificate of incorporation, to declare and pay dividends out of surplus or, if there is no surplus, out of net profits for the fiscal year in which the dividend is declared and for the preceding fiscal year as long as the amount of capital of the corporation is not less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets. In addition, Delaware law generally provides that a corporation may redeem or repurchase its shares only if such redemption or repurchase would not impair the capital of the corporation.

Under Utah law, a corporation may make distributions to shareholders so long as such action would not (a) make the corporation unable to pay its debts as they become due in the usual course of business or (b) cause the corporation's total assets to be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed to satisfy preferential rights of shareholders senior to those receiving the distribution. A Utah corporation may acquire its own shares, and such shares are either returned to the status of "authorized but unissued" or removed from the authorized number of shares, whichever is specified in the articles of incorporation. Limitations on payment of dividends also apply to redemptions of stock.

*Appraisal or Dissenter's Rights.* Under Delaware law, a stockholder of a corporation participating in certain major corporate transactions may, under varying circumstances, be entitled to appraisal rights pursuant to which such stockholder may receive cash in the amount of the fair market

value of the shares held by such stockholder (as determined by a court or by agreement of the corporation and the stockholder) in lieu of the consideration such stockholder would otherwise receive in the transaction. Appraisal rights are generally available for the shares of any class or series of stock of a constituent corporation in a merger or consolidation (but not in a sale of substantially all assets). Notwithstanding the above, appraisal rights are not available to (a) stockholders with respect to a merger or consolidation by a corporation the shares of which are either listed on a national securities exchange or are held of record by more than 2,000 stockholders if such stockholders receive only shares of the surviving corporation or shares of any other corporation which are either listed on a national securities exchange or held of record by more than 2,000 stockholders; or (b) stockholders of the corporation surviving a merger if no vote of the stockholders of the surviving corporation is required to approve the merger because certain conditions are met.

Under Utah law, certain events give rise to a right of a shareholder to dissent and have such shareholder's shares appraised and the appraised value paid. Such events include: a corporation participating in a merger that requires shareholder approval; a merger of a subsidiary with its parent where the subsidiary is the surviving corporation; a share exchange where the shareholder holds stock of the acquired entity; a sale, lease, exchange or other disposition of all, or substantially all, of the property of the corporation where shareholder approval is required (but not including a sale for cash if the cash would be distributed within one year); and a sale, lease, exchange or other disposition of all, or substantially all, of the property of an entity controlled by the corporation where shareholder approval is required. Upon such event the shareholder is entitled to appraisal rights pursuant to which such shareholder may receive cash in the amount of the fair market value of the shares held by such shareholder (as determined by a court or by agreement of the corporation and the shareholder) in lieu of the consideration such shareholder would otherwise receive in transaction. However, appraisal or dissenter's rights are generally not available to (a) holders of stock which is listed on a national securities exchange or the Nasdaq National Market or held of record by more than 2,000 shareholders so long as such shareholder will receive in exchange for his stock shares of the surviving corporation or shares of a corporation that are listed on a national securities exchange, in the Nasdaq National Market or held of record by more than 2,000 shareholders.

*Interested Director Transactions.* Under Delaware law, no contract or transaction between a corporation and one or more of its directors or officers, or entities related to any of them, is void or voidable solely for that reason, or solely because the director or officer is present at the meeting authorizing the contract or transaction, if (a) the contract or transaction is fair to the corporation as of the time it is authorized by the board of directors, committee of the board or stockholders, (b) full disclosure is given to the board of directors and it in good faith authorizes the contract or transaction by the affirmative vote of a majority of the disinterested directors or (c) full disclosure is given to stockholders and a majority of such stockholders, acting in good faith, approve the contract or transaction.

Under Utah law a transaction between a corporation and a party related to a director may not be enjoined, set aside or create a cause of action unless the director's relationship to such party would constitute a statutory "conflicting interest transaction." "Conflicting interest transactions" constitute beneficial financial interests of a director or persons or entities associated with the director so as to influence the director's decisions. A director's conflicting interest transaction may be protected against future challenge if approved by a majority of the disinterested directors, even if not otherwise a quorum, or if approved by disinterested shareholders holding a majority of the shares entitled to vote upon the matter, in each case after full disclosure or the transaction has been established to be fair to the corporation.

*Power to Amend Charter Documents.* Under Delaware law, a corporation's certificate of incorporation may be amended by resolution of the board of directors and approval by the holders of a majority of the outstanding stock entitled to vote thereon. If any particular class of stock has a right to vote on any amendment to the certificate of incorporation, a majority of such shares must be voted in



favor of the amendment. The holders of outstanding shares of a class of stock are entitled to vote as a class upon a proposed amendment if it would have certain specified effects, such as changing the aggregate number of authorized shares of such class, changing the par value of the shares of such class or changing the powers, preferences or special rights of the shares of such class adversely. Supermajority voting requirements may be imposed and maintained by the certificate of incorporation.

Under Delaware law, bylaws of a corporation may be adopted, amended or repealed by the stockholders, or if so specified in the certificate of incorporation, by the directors (this is typical), although conferring power upon the directors does not divest stockholders of the power to amend the bylaws.

Under Utah law a corporation's articles of incorporation may be amended by resolution of the board of directors and approval by the holders of a majority of the outstanding stock entitled to vote thereon. If any particular class of stock has a right to vote on any amendment to the articles of incorporation, a majority of such shares must be voted in favor of the amendment. The holders of outstanding shares of a class of stock are entitled to vote as a class upon a proposed amendment if it would have certain specified effects, such as changing the preferential rights of such shares, altering rights regarding redemption of such shares, altering preemptive rights of such shares, altering voting rights on such shares or reducing such shares to fractional shares that may be redeemed for cash. In addition, a unanimous approval is required for any amendment that would impose personal liability on shareholders for the debts of a corporation. Supermajority voting requirements may be imposed and maintained by the articles of incorporation.

Under Utah law, the bylaws of a corporation may be amended at any time by the corporation's board of directors, except to the extent that the articles of incorporation reserve this power exclusively to the shareholders, in whole or in part. However, the board of directors (without stockholder approval) may not change a bylaw regarding quorum or voting requirements applicable to approvals by shareholders once such a bylaw is adopted by shareholders, and may not change a bylaw regarding quorum or voting requirements applicable to approvals by directors if such a bylaw was adopted by shareholders or the prior action of the board of directors imposes a requirement of shareholder approval. Conferring power to amend the bylaws upon the directors does not divest shareholders of the power to amend the bylaws.

*Approval of Mergers.* Delaware law generally requires that a majority of the stockholders of both the acquiring and the target corporation approve statutory mergers. However, Delaware law does not require a stockholder vote of the surviving corporation in a merger (unless otherwise provided in the certificate of incorporation) if (a) the merger agreement does not amend the existing certificate of incorporation, (b) each share of the surviving corporation outstanding before the merger is an identical outstanding or treasury share after the merger and (c) the number of shares to be issued by the surviving corporation in the merger does not exceed 20% of the shares outstanding immediately prior to the merger.

Utah law generally requires that a majority of the shareholders of both the acquiring and the target corporation approve statutory mergers. However, Utah law does not require a stockholder vote of the surviving corporation in a merger if (a) the articles of incorporation of the surviving corporation are not amended, (b) each shareholder of the surviving corporation holds the same number of identical shares immediately after the merger and (c) the number of shares issued by the surviving corporation in the merger does not represent an increase by more than 20% of (i) the voting shares of the corporation or (ii) the shares that would participate without limitation in distributions.

*Stockholder Derivative Suits.* Under Delaware law, a stockholder may only bring a derivative action on behalf of the corporation if the stockholder was a stockholder of the corporation at the time of the transaction in question or his stock thereafter devolved upon him by operation of law. Dismissal of such a proceeding generally requires court approval.



Under Utah law, a shareholder may only bring a derivative action on behalf of the corporation if the shareholder was a shareholder when the transaction complained of occurred or he became a shareholder through transfer by operation of law from someone who was a shareholder at that time and he fairly represents the interests of the corporation. The suing shareholder must explain what request, if any, was made to the board of directors and that the request was refused or ignored or why the shareholder did not make such a demand. Dismissal of such a proceeding requires court approval.

Exhibit G



# REINCORPORATION OF THE LOVESAC CORPORATION

## CLOSING VOLUME

February 25, 2005

WSGR  Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

WA0035800052

Exhibit H

CM CORPORATION TRUST WILM TEAM #2          (FRI)12. 10' 04 14:2C/ST. 14:19/NO. 4863796951  P  2

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 02:20 PM 12/10/2004*
*FILED 02:14 PM 12/10/2004*
*SRV 040894285 - 3894418 FILE*

# CERTIFICATE OF INCORPORATION OF

# THE LOVESAC CORPORATION

## ARTICLE I

The name of the corporation is The LoveSac Corporation (the "*Corporation*").

## ARTICLE II

The address of the Corporation's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of its registered agent at such address is The Corporation Trust Company.

## ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware as the same exists or may hereafter be amended.

## ARTICLE IV

This Corporation is authorized to issue one class of shares to be designated Common Stock. The total number of shares of Common Stock the Corporation has authority to issue is 15,000,000 with par value of $0.0001 per share.

## ARTICLE V

The name and mailing address of the incorporator are as follows:

> Jason K. Robertson
> Wilson Sonsini Goodrich & Rosati
> 2795 East Cottonwood Parkway, Suite 300
> Salt Lake City, UT 84121

## ARTICLE VI

In furtherance and not in limitation of the powers conferred by statute, the board of directors of the Corporation is expressly authorized to make, alter, amend or repeal the bylaws of the Corporation.

## ARTICLE VII

Elections of directors need not be by written ballot unless otherwise provided in the bylaws of the Corporation.

PALIB2 2939372_1.DOC

## ARTICLE VIII

To the fullest extent permitted by the Delaware General Corporation Law, or any other applicable law, as the same exists or may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for any action taken, or any failure to take any action, as a director.

The corporation shall indemnify and hold harmless, to the fullest extent permitted by the Delaware General Corporation Law, or any other applicable law, as the same exists or may hereafter be amended, any director of the Corporation who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "*Proceeding*") by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director, officer, employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses reasonably incurred by such person in connection with any such Proceeding. The Corporation shall be required to indemnify a person in connection with a Proceeding initiated by such person only if the Proceeding was authorized by the Board.



The Corporation shall have the power to indemnify and hold harmless, to the extent permitted by the Delaware General Corporation Law, or any other applicable law, as the same exists or may hereafter be amended, any officer, employee or agent of the Corporation who was or is made or is threatened to be made a party or is otherwise involved in any Proceeding by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was an officer, employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses reasonably incurred by such person in connection with any such Proceeding.

Neither any amendment nor repeal of this Article, nor the adoption of any provision of this Certificate of Incorporation inconsistent with this Article, shall eliminate or reduce the effect of this Article in respect of any matter occurring, or any cause of action, suit or claim accruing or arising or that, but for this Article, would accrue or arise, prior to such amendment, repeal or adoption of an inconsistent provision.

## ARTICLE IX

Except as provided in **Article VIII** above, the Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

WA00461  00054

I, the undersigned, as the sole incorporator of the Corporation, have signed this Certificate of Incorporation on December 10, 2004.

/s/ Jason K. Robertson
Jason K. Robertson, Incorporator

WA00462 00055

Exhibit I

December 7, 2005

To the Stockholders of
The LoveSac Corporation

Re:　　Bridge Financing

Dear LoveSac Stockholder:

Over the past few months, The LoveSac Corporation (the "**Company**") has diligently sought capital to refinance existing indebtedness and to fund operations and strategic growth initiatives. All traditional institutional sources of capital – banks, non-bank lenders and leasing companies – have been contacted. Non-traditional funding sources were also approached, all to no avail.

The Company had no alternative but to obtain interim funding from holders of its Series A Preferred Stock. These holders advanced to the Company Two Hundred Sixty Thousand Dollars ($260,000) on September 1, 2005 and Six Hundred Thirty Thousand Dollars ($630,000) on September 15, 2005 in interim loans (the "**Interim Loans**") to keep the Company afloat while the search for capital continued.

Due to the continuing unavailability of capital from third parties on terms acceptable to the Company's Board of Directors, the Company and three (3) investors consisting of Barfair Limited (an affiliate of Series A Preferred Stockholder Millevere Holdings Limited) and two (2) Series A Preferred Stockholders – the Walnut Group (Walnut Investment Partners, L.P and Walnut Private Equity Fund, L.P.) and Brand Equity Ventures (collectively, the "**Bridge Investors**") entered into a bridge financing arrangement (the "**Bridge Financing**") intended to provide funding for the Company through the remainder of calendar year 2005 and into early 2006. In the Bridge Financing, the Company issued Three Million Dollars ($3,000,000) in convertible notes and warrants to the Bridge Investors, which borrowing was netted against the repayment of the Interim Loans. The total cash disbursement to the Company resulting from the Interim Loans and the Bridge Financing was Three Million Dollars ($3,000,000). As part of the Bridge Financing, an additional Two Hundred Fifty Thousand Dollars ($250,000) in convertible notes and warrants is now being made available to other Company stockholders that desire to participate in this Bridge Financing.

This letter is being provided to you to explain the terms of the Bridge Financing and to solicit your approval for certain actions related to the Bridge Financing. The Company's Board of Directors has unanimously approved the Bridge Financing and encourages you to do the same.

If you are an "accredited investor," this letter also offers you the opportunity to participate in the Bridge Financing.

A summary of the Bridge Financing terms (the "**Term Sheet**") is attached as Exhibit A to this letter. In connection with the Bridge Financing, enclosed for your review and/or approval are the following documents:

1.　　Action by Written Consent of the Stockholders (with separate signature page):

3. Amended and Restated Investors' Rights Agreement (with separate signature page) – applies only to Series A Preferred Stockholders; and

4. Financial Statements of the Company.

## What Should I Do with the Enclosed Documents?

After reviewing this letter and the enclosed documents, if you consent to the transactions contemplated therein, please execute the signature pages of the Action by Written Consent and Amended and Restated Investors' Rights Agreement (applicable only to Series A Preferred Stockholders) and return (i) a copy of each signature page by facsimile to the Company's counsel, Wilson Sonsini Goodrich & Rosati, Attention: Lily Langen at (801) 993-6499 using the enclosed fax cover sheet and (ii) return the originals by mail in the enclosed envelope to Lily Langen at 2795 East Cottonwood Parkway, Suite 300, Salt Lake City, Utah 84121. *Please fax your signature pages by December 14, 2005.*

If you are an "accredited investor" and desire to participate in the Bridge Financing, please so indicate on the enclosed fax cover sheet. Please also indicate the maximum amount you desire to invest in the Bridge Financing. Formal subscription documents will, upon confirmation of your "accredited investor" status, be sent to you promptly.

## Terms of Bridge Financing

*The following describes certain terms and implications of the Bridge Financing. This overview is not intended to describe fully the financing, or to set forth all the implications of the financing, but rather to highlight the terms and implications that the Company believes are most material. This overview is qualified in its entirety by reference to the enclosed Term Sheet. If you would like to see any of the transaction documents referred to in the Term Sheet or this overview, please contact the undersigned at the Company for a copy. If you are an "accredited investor" and elect to participate in the Bridge Financing, you will receive a full set of the transaction documents prior to your investment.*

The Bridge Financing provides for the Company to borrow up to the principal sum of Three Million Two Hundred Fifty Thousand Dollars ($3,250,000) (the "**Bridge Loan**") at an interest rate of fifteen percent (15%) per annum. The Bridge Loan will be evidenced by Secured Convertible Promissory Notes (the "**Convertible Notes**") that mature on January 31, 2006. The Bridge Loan will be secured by a security interest in the Company's tangible and intangible personal property created under a security agreement that is subordinated to the Company's existing creditors.

The Convertible Notes may be converted into a new class of Series B Preferred Stock of the Company ("**Series B Preferred**") with rights and privileges as set forth in the enclosed Second Amended and Restated Certificate of Incorporation (the "**Restated Certificate of Incorporation**"). Additionally, the Company will issue warrants (the "**Warrants**") to purchase shares of Series B Preferred equal to ten percent (10%) of the average amount of the principal of, and accrued but unpaid interest under, the Convertible Notes outstanding during the calendar month (prorated, if only outstanding for a portion of a month) with respect to which the Warrants are issued.

The Bridge Investors committed to invest in three (3) tranches up to Three Million Dollars ($3,000,000) of the Bridge Loan. The three (3) tranches are as follows: (a) on the Initial Closing, the Company borrowed an aggregate principal amount of One Million Three Hundred Thirty Five Thousand

in a disbursement by the Bridge Investors of Four Hundred Forty-Five Thousand Dollars ($445,000); (b) on any Business Day (as defined hereinafter) between October 3, 2005 and October 15, 2005, upon reasonable written notice from the Company, in an aggregate principal amount of up to Six Hundred Sixty Five Thousand Dollars ($665,000); and (c) on any Business Day between October 16, 2005 and November 15, 2005, upon reasonable written notice from the Company, in an aggregate principal amount of up to One Million Two Hundred Fifty Thousand Dollars ($1,250,000) (the "Third Tranche"); *provided* that the Third Tranche shall be in a principal amount of not more than $250,000 unless the Company's Board of Directors has approved, pursuant to a Board discussion to occur between the date hereof and October 26, 2005 (such discussion to include and be based upon updated financial statements and an updated weekly cash flow forecast), a borrowing in the full amount of the Third Tranche. "**Business Day**" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

As of the date of this letter, the Company has taken down Three Million Dollars ($3,000,000) of the Bridge Loan.

## Interests of Directors and Bridge Investors

The Bridge Investors and/or their affiliates have representatives on the Company's Board of Directors and hold approximately 89.9% of the Company's outstanding shares of Series A Preferred Stock and approximately 51.0% of the Company's fully-diluted capitalization. Directors David Yarnell, James Gould and Simon Wright are representatives of Brand Equity, Walnut and Barfair, respectively.

The Company is also offering all of its stockholders who are "accredited investors" the opportunity to participate as investors pro rata to their ownership interest in the Company in $250,000 of the Bridge Financing.  **Current Company stockholders who do not participate in the Bridge Financing will have their interest in the Company substantially diluted.**

## Amendment to the Company's Certificate of Incorporation to Authorize a New Series of Preferred Stock

As a condition to the Bridge Financing, it is required that the Company's Amended and Restated Certificate of Incorporation be further amended and restated to authorize the creation of a new series of Preferred Stock, to be designated Series B Preferred Stock, and to establish the rights, preferences, privileges and restrictions of the Series B Preferred.  Among other things, the Series B Preferred will have so called "full ratchet" anti-dilution protection that will adjust the Series B Preferred conversion price to the lowest purchase price paid by investors for certain securities of the Company issued subsequent to the Bridge Financing if such purchase price is below the existing Series B Preferred conversion price. Holders of the Series B Preferred will receive, in preference to any other series or class of stock, a 1.5x return of capital invested in the Series B Preferred upon a liquidation event, with the right to participate on a pro rata basis alongside the common stock for any remaining proceeds after payment of the Series A Preferred liquidation preference.  Holders of the Series B Preferred will also receive cumulative dividends at a rate of 15% per annum.

## Waiver of Preemptive Right for Bridge Financing

Pursuant to Section 4.1 of the Investors' Rights Agreement, dated March 3, 2005 (the "**Investors' Rights Agreement**"), by and among the Company and the persons and entities (the "**Series A Investors**") listed on Schedule I thereto, the Company granted the Series A Investors certain preemptive rights (the "**Preemptive Right**") with respect to their pro rata share (as determined pursuant to the Investors' Rights Agreement) of New Securities (as defined in the Investors' Rights Agreement) issued by the Company. The Investors' Rights Agreement also provides that the Company will provide the Series A Investors with notice in connection with issuances of New Securities and that the Company will sell such New Securities within sixty (60) days from the expiration of the thirty (30) day period in which the Series A Investors have to exercise their Preemptive Right. **The Company also requests that you waive your Preemptive Right, as well as your rights to notice and requirement that the Company wait to complete the Bridge Financing until after the expiration of the thirty (30) day period in which the Series A Investors have to exercise their Preemptive Right, under the Investors' Rights Agreement with respect to the Convertible Notes and Warrants to be issued pursuant to the Bridge Financing by signing the enclosed Written Consent of the Stockholders.** Signing the enclosed Written Consent of the Stockholders does not preclude accredited stockholders from participating in the Bridge Financing, and you should indicate on the enclosed fax cover sheet if you wish to participate in the Bridge Financing and avoid dilution of your interest in the Company.

## Amended and Restated Investors' Rights Agreement

As a condition to the Bridge Financing, it is required that the Investors' Rights Agreement be amended and restated to provide for the holders of Series B Preferred Stock to have, among other things, the registration rights and Preemptive Right that the Series A Investors enjoy. If you are a Series A Investor, please indicate your approval by signing the enclosed Written Consent of the Stockholders and Amended and Restated Investors' Rights Agreement.

## Solicitation of Approval

Pursuant to this stockholder distribution, you are being asked to approve the following:

- the Second Amended and Restated Certificate of Incorporation, which, among other things, creates the Series B Preferred and sets forth the rights, preferences and privileges thereof; and

- the waiver of your Preemptive Right, as well as your rights to notice and requirement that the Company wait to complete the Bridge Financing until after the expiration of the thirty (30) day period in which the Series A Investors have to exercise their Preemptive Right, under the Investors' Rights Agreement with respect to the Convertible Notes and Warrants to be issued pursuant to the Bridge Financing; and

- for Series A Preferred Stockholders only, the Amended and Restated Investors' Rights Agreement.

**Who can I contact for more information?**

Should you have any questions regarding these documents or the Bridge Financing please contact the undersigned at (801) 456-1593.

Very truly yours,

Doyle Judd
Senior Vice President and
Chief Financial Officer

Enclosures

WA00561    00060

Exhibit A

Term Sheet

| | |
|---|---|
| **Amount of Financing:** | Up to $3,250,000. |
| **Type of Security:** | Secured Subordinated Convertible Promissory Notes (the "**Notes**"). |
| **Purchase Price:** | Face value. |
| **Interest Rate:** | Annual interest rate of 15%, payable at maturity. |
| **Convertibility:** | The investors may elect to convert the Notes into shares of New Participating Preferred: (x) on January 31, 2006; or (y) at any time prior to the prepayment of the Notes by the Company; or (z) in connection with any merger, consolidation, conversion transaction or mandatory share exchange to which the Company is a party prior to January 31, 2006 or any sale by the Company of all or substantially all its assets prior to January 31, 2006. Upon the repayment in full of the principal (and all accrued and unpaid interest) of this Note, the Company shall enter into documentation giving the investors the right to invest a sum equal to the principal amount of this Note in shares of New Participating Preferred at any time on or prior to May 31, 2006, which documentation shall be reasonably acceptable to the holders of two-thirds or more of the then outstanding principal amount of the Notes (the "**Requisite Holders**"). The number of shares of New Participating Preferred into which the Notes may be converted shall be determined by dividing the aggregate principal amount together with all accrued interest to the date by the conversion price in effect at the time of such conversion (the "**Conversion Price**"). The Conversion Price shall initially be established by the Board of Directors of the Company and shall be adjusted from time to time by the Board of Directors of the Company. The Company's Certificate of Incorporation, as previously amended and restated, shall be further amended to authorize the New Participating Preferred. |
| **Term; Prepayment:** | January 31, 2006 (the "**Maturity Date**"). All principal and accrued interest under the Note is due and payable on the Maturity Date. The Notes may be prepaid, in whole or in part in minimum increments of Five Hundred Thousand Dollars ($500,000), at any time, without penalty or premium, at the option of the Company; *provided*, however, that no prepayment of the Notes shall be ... |

WA00562    00061

**Warrant Coverage:**

the right of the investors or any other action by the Company to convert the then-outstanding amount of principal of, and all accrued but unpaid interest under, the Notes into shares of New Participating Preferred.

The Company shall issue to the investors warrants to acquire shares of New Participating Preferred at an acquisition price of $0.54 per share (subject to adjustments for stock splits, combinations and the like) with respect to each whole or partial calendar month while the Notes remain outstanding (the "**Warrants**"). The number of shares of New Participating Preferred that may be obtained by exercise of the Warrants shall be equal to ten percent (10%) of the average amount of the principal of, and accrued but unpaid interest under, the Notes outstanding during the calendar month (prorated, if only outstanding for a portion of a month) with respect to which the Warrants were issued divided by $0.54. The warrants will be exercisable for ten (10) years from the Initial Closing of the Financing.

**Initial Closing:**

October 4, 2005

**Subordination:**

The Notes shall be subordinated to all existing indebtedness of the Company to banks, commercial finance lenders, insurance companies, leasing or equipment financing institutions or other lending institutions regularly engaged in the business of lending money.

**Security Interest:**

Subject to existing indebtedness of the Company, the Notes will be secured by all assets of the Company.

**Bridge Loan Agreement:**

The Notes will be (i) issued pursuant to a definitive Bridge Loan Agreement containing customary covenants and representations and warranties of the Company and (ii) secured pursuant to a Security Agreement.

**Rights Offering:**

Promptly after the Closing, the Company shall commence a rights offering (the "**Rights Offering**") to each holder of the Company's capital stock who is an accredited investor under the Securities Act. The Rights Offering shall offer each such stockholder the right to purchase such stockholder's pro rata portion of the aggregate Notes, based upon such stockholder's proportionate ownership of the Company outstanding capital stock immediately prior to the Closing.

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 26th day of October, 2007, a copy of the foregoing ANSWERING BRIEF OF PLAINTIFF G&G, LLC IN OPPOSITION TO DEFENDANTS WILSON, SONSINI, GOODRICH & ROSATI, P.C. AND LILY WONG LANGEN'S MOTION TO DISMISS G&G, LLC'S COMPLAINT, and Appendix was served via postage paid, first-class mail, on the following:

Michael A. Weidinger
Joseph S. Naylor
Morris, James LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801

Michael L. Scheier
Joseph L. Bruemmer
Keating Muething & Klekamp PLL
One East Fourth St., Suite 400
Cincinnati, Ohio 45202

Derek C. Abbott
Ian Roberts McConnel
Morris, Nichols, Arsht & Tunnell
1201 North Market St.
P.O. Box 1347
Wilmington, DE 19899

/s/ Virginia Whitehill Guldi
Virginia Whitehill Guldi