## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

G&G, LLC,                        )
                                 )
                    Plaintiff,   )
                                 )
          -v-                    )    Case No. 07-440 (SLR)
                                 )
James L. Hyde, et al.,           )
                                 )
                    Defendants.  )

## REPLY IN SUPPORT OF MOTION OF DEFENDANTS
## DAVID YARNELL, JAMES GOULD, SIMON WRIGHT, WALT SPOKOWSKI
## AND MILLEVERE HOLDINGS LIMITED TO DISMISS AMENDED
## COMPLAINT PURSUANT TO
## FEDERAL RULE OF CIVIL PROCEDURE 12(b)(2)

Michael A. Weidinger (I.D. No. 3330)
Joseph S. Naylor (I.D. No. 3886)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19801
Tel: (302) 888-6800
Fax: (302) 571-1750
mweidinger@morrisjames.com
jnaylor@morrisjames.com

Michael L. Scheier (0055512)
Joseph L. Bruemmer (0079120)
KEATING, MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202
Tel: (513) 579-6952
Fax: (513) 579-6457
mscheier@kmklaw.com
jbruemmer@kmklaw.com

*Attorneys for Defendants, Brand Equity
Ventures II, LP, Walnut Investment
Partners, LP, Walnut Private Equity Fund,
LP, The Walnut Group, Millevere Holdings
Limited, David Yarnell, James Gould, Simon
Wright, & Walt Spokowski*

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    LEGAL STANDARD............................................................................................1

III.   LAW AND ARGUMENT ......................................................................................1

      A.     Millevere is Not Subject to Personal Jurisdiction
            in Delaware ..................................................................................................2

            1.     The Delaware Choice of Law Clause in the
                  Merger Agreement Does Not Equate to Millevere's
                  Consent to Jurisdiction....................................................................2

            2.     Jurisdiction Does Not Exist over Millevere under
                  Section 3104(c)(1) ...........................................................................5

            3.     Jurisdiction Does Not Exist over Millevere under
                  Section 3104(c)(4) ...........................................................................8

      B.     The Director/Officer Defendants are Not Subject to
            Personal Jurisdiction in Delaware.............................................................10

            1.     The Director/Officer Defendants Are Not Subject
                  to Jurisdiction under the Conspiracy Theory
                  of Jurisdiction................................................................................10

            2.     The Director/Officer Defendants Have Not Consented
                    to Jurisdiction in this Forum ..........................................................12

            3.     The Director/Officer Defendants Are Not Subject to
                    Specific Jurisdiction under the Long-Arm Statute.........................14

      C.     Exercising Jurisdiction over the Moving Defendants Would
            Violate Constitutional Due Process ...........................................................16

IV.    CONCLUSION....................................................................................................18

# TABLE OF AUTHORITIES

**Citations**                                                                          **Page**

*Accord Siren Gaming, LLC v. Arviso,*
    153 Fed. Appx. 420 (9th Cir. 2005) ........................................................2

*Applied Biosystems, Inc. v. Cruachem, Ltd.,*
    772 F. Supp. 1458 (D. Del. 1991) .................................................5, 14

*Atofina Chem., Inc. v. Sierra Chem. Co.,*
    No. 03-2528, 2004 WL 739953, (E.D. Pa. Apr. 5, 2004) ........................................2

*Bell Helicopter Textron, Inc. v. C & C Helicopter Sales, Inc.,*
    295 F. Supp. 2d 400 (D. Del. 2002) ........................................................9

*Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,*
    Civ. A. No. 13950, 1996 WL 608492, (Del. Ch. Oct. 16, 1996) ..........................17

*Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,*
    No. Civ. A. 13950, 1995 WL 694397, (Del. Ch. Nov. 21, 1995) ...................11, 17

*Computer People, Inc. v. Best International Group, Inc.,* .................................................10
    No. Civ. A. 16648, 1999 WL 288119, (Del. Ch. Apr. 27, 1999)

*Daewoo Int'l (America) Corp. v. Orion Eng. & Serv., Inc.,*
    No. 02 Civ. 8809(RCC), 2003 WL 22400198, (S.D.N.Y. Oct. 20, 2003) ..............7

*Dollar Sav. Bank v. First Sec. Bank of Utah, N.A.,*
    746 F.2d 208 (3d Cir. 1984) .................................................7

*Foster Wheeler Energy Corp v. Metallgesellschaft AG,*
    1993 U.S. Dist. LEXIS 20450 (D. Del. 1993) ........................................................9

*Greene v. New Dana Perfumes Corp.,*
    DPC, 287 B.R. 328 (D. Del. 2002) .................................................2,5

*In re DaimlerChrysler AG Sec. Litig.,*
    197 F. Supp. 2d 86 (D. Del. 2002) .................................................8, 9, 15

*M&M Tech., Inc. v. Burlington Chem. Co., Inc.,*
    No. Civ. A. 03-994 GMS, 2005 WL 293509, (D. Del. Feb. 8, 2005) ..............9, 10

*Madison Realty Partners 7, LLC v. AG ISA, LLC,*
    No. Civ. A. 18094, 2001 WL 406268, (Del. Ch. Apr. 17, 2001) ..........................3

*Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.,*
    619 F.2d 1001 (3d Cir. 1980) ............................................................13

*Metcap Sec. LLC v. Pearl Senior Care, Inc.,*
    No. Civ. A. 2129-VCN, 2007 WL 1498989, (Del. Ch. May 16, 2007) .................3

*Newspan, Inc. v. Hearthstone Funding Corp.,*
    No. Civ. A. 13304, 1994 WL 198721, (Del. Ch. May 10, 1994) .........................10

*NRG Bariers, Inc. v. Jelin,*
    C.A. No. 15013, 1996 Del. Ch. LEXIS 81 (Del. Ch. July 1, 1996) ........................8

*Patterson v. Fed. Bureau of Investigations,*
    893 F.2d 595 (3d Cir. 1990) .................................................................1

*Prime Leasing, Inc. v. Jackson-Madison County Gen. Hosp. Dist.,*
    No. 91 C 5726, 1992 WL 80410, (N.D. Ill. Apr. 7, 1992) ...................................3, 5

*Reach & Assocs., P.C. v. Dencer,*
    269 F. Supp. 2d 497 (D. Del. 2003) ....................................................16

*Siren Gaming, LLC v. Arviso,*
    153 Fed. Appx. 421 (9th Cir. 2005).......................................................5

*Steinman v. Levine,*
    C.A. No. 19107, 2002 Del. Ch. LEXIS 132
    (Del. Ch. Nov. 27, 2002), aff'd 822 A.2d 397 (Del. 2003) ..............................8, 15

*Time Share Vacation Club v. Atlantic Resorts, Ltd.,*
    735 F.2d 61 (3d Cir. 1984) ...................................................................1

*Tristrata Tech., Inc. v. Neoteric Cosmetics, Inc.,*
    961 F. Supp. 686 (D. Del. 1997) ..........................................5, 14, 15, 16

*Troy Corp. v. Schoon,*
    No. C.A. 1959-VCL, 2007 WL 949441 (Del. Ch. Mar. 26, 2007) .......................13

*United States v. Consol. Rail Corp.,*
    674 F. Supp. 138 (D. Del. 1987) ...........................................................9

*Venoco, Inc. v. Marquez,*
    No. 02-1685 GMS, 2003 WL 21026787, (D. Del. May 5, 2003) ................8, 9, 15

*Wall Street Aubrey Golf, LLC v. Aubrey,*
    189 Fed. Appx. 82 (3d Cir. 2006) ......................................................13

*Werner v. Miller Tech. Mgmt., L.P.*,
    831 A.2d 318 (Del. Ch. 2003) ............................................................................2, 17

## Other Authorities

10 Del. C. § 3104(c)(1) ........................................................................5, 6, 14, 15

10 Del. C. § 3104(j) ......................................................................................8, 15

Fed. R. Civ. P. 12(b)(2) ......................................................................................1

## I.     INTRODUCTION.

G&G claims that the Moving Defendants are all subject to jurisdiction in Delaware for a variety of reasons.  But G&G offers insufficient evidence to support its allegations, contrary to its burden in opposing a Rule 12(b)(2) motion.  Furthermore, the little evidence G&G does offer has been held inadequate to impose jurisdiction on a nonresident defendant as a matter of law.  Accordingly, the Moving Defendants' motion to dismiss (D.I. 26) should be granted.[1]

## II.    LEGAL STANDARD.

The United States Court of Appeals for the Third Circuit has explained that the analysis of a Rule 12(b)(2) motion requires "resolution of factual issues outside the pleadings." *Patterson v. Fed. Bureau of Investigations*, 893 F.2d 595, 603-04 (3d Cir. 1990).  Once the non-resident defendant puts jurisdictional facts before the Court by affidavit or otherwise, the plaintiff may not oppose the motion merely by reference to its pleadings. *Id.* "Once the motion is made, plaintiff must respond with actual proofs." *Id.* (*quoting Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61 (3d Cir. 1984)).

Accordingly, in responding to the Moving Defendants' 12(b)(2) motion, G&G must offer proof that jurisdiction over the Moving Defendants in this Court is proper, particularly when, in G&G's own words, it has already engaged in "extensive discovery" relating to this action.  (D.I. 40 at 9; *see also id.* at 13, 16).

## III.   LAW AND ARGUMENT.

G&G fails to provide sufficient evidence or a viable legal theory upon which this Court may assert personal jurisdiction over Millevere or the Director/Officer Defendants.

---

[1] Capitalized terms shall have the same meanings ascribed to them in the motion to dismiss and memorandum in support, (D.I. 26-27), unless otherwise noted.

### A.    Millevere is Not Subject to Personal Jurisdiction in Delaware.

1.    The Delaware Choice of Law Clause in the Merger Agreement Does Not Equate to Millevere's Consent to Jurisdiction.

G&G first contends that Millevere is subject to jurisdiction solely by virtue of what G&G incorrectly describes as a forum-selection clause in the Merger Agreement between LoveSac Utah and LoveSac Delaware. The clause provides:

> Governing Law. This Agreement shall in all respects be construed, interpreted and enforced in accordance with and governed by the laws of the State of Delaware and, so far as applicable, the merger provisions of the URBCA [Utah Revised Business Corporations Act].

(D.I. 36, Exh. B, ¶ 4.7). There are two critical flaws in this argument: the cited clause is not a forum-selection clause, and Millevere is not a party to the Merger Agreement.[2]

In regard to the interplay between personal jurisdiction and choice-of-law clauses, courts have repeatedly held that a choice-of-law clause, standing alone, cannot confer jurisdiction over a nonresident defendant. *Greene v. New Dana Perfumes Corp., DPC*, 287 B.R. 328, 343 (D. Del. 2002) ("[T]he language in question is a choice-of-law clause (not a forum-selection clause) which would not equate to a consent to jurisdiction."); *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318, 331 (Del. Ch. 2003) ("Because, in this case, the [choice-of-law] provision is essentially standing alone, it cannot be said to bestow personal jurisdiction on the defendants.".) Accordingly, G&G's argument fails.[3]

---

[2] There is actually an additional material flaw in G&G's argument; it does not have standing to enforce any of the terms in the Merger Agreement, including the choice of law provision, because it is not a signatory to it.

[3] *Accord Siren Gaming, LLC v. Arviso*, 153 Fed. Appx. 420, 421 (9th Cir. 2005) ("Because the non-disclosure agreement incorporated only the choice of law clause, and not the forum selection clause, of the joint venture agreement, Smith Bagley did not consent to personal jurisdiction in Nevada."); *Atofina Chem., Inc. v. Sierra Chem. Co.*,

The second flaw in G&G's analysis is that Millevere was not a party to the Merger Agreement. To get around this fact, G&G claims that Millevere is a third-party beneficiary of that agreement, and thus is bound by its terms. Merely alleging that someone is a third-party beneficiary of a contract, as G&G does, is not sufficient. *Metcap Sec. LLC v. Pearl Senior Care, Inc.*, No. Civ. A. 2129-VCN, 2007 WL 1498989, at *7 (Del. Ch. May 16, 2007).

To establish third-party beneficiary status, there must be proof (1) of an intent between the contracting parties to benefit a third party through the contract, (2) that the benefit was intended to serve as a gift or in satisfaction of a pre-existing obligation to a third party, and (3) that benefiting the third party was a material aspect to the parties agreeing to the contract. *Id.* (*citing Madison Realty Partners 7, LLC v. AG ISA, LLC*, No. Civ. A. 18094, 2001 WL 406268, at *5, *7 (Del. Ch. Apr. 17, 2001)) (emphasis omitted). G&G does not even allege, much less offer evidence, that these elements have been satisfied here.[4]

Even if G&G did attempt to plead or prove the requisite elements, it could not succeed. As to the first element, the causal chain between Millevere's purchase of

---

No. 03-2528, 2004 WL 739953, at *4 (E.D. Pa. Apr. 5, 2004) ("Defendant's purchase orders...provide that the parties agree that the purchase order 'shall be governed by the laws of the State of Nevada.' Defendant's clause is a choice of law provision, not a forum selection clause."); *Prime Leasing, Inc. v. Jackson-Madison County Gen. Hosp. Dist.*, No. 91 C 5726, 1992 WL 80410, at *5 (N.D. Ill. Apr. 7, 1992) ("While a choice-of-law provision is a factor that courts consider, it is not controlling and does not function as a forum selection clause in the event of litigation.... This [choice-of-law] clause does not represent defendant's consent to be sued in Illinois.").

[4]    G&G claims that Millevere is a third-party beneficiary of the Merger Agreement because Millevere purchased LoveSac DE shares, which were authorized by the Amended and Restated Articles of Incorporation, which in turn was executed pursuant to the Merger Agreement. (D.I. 36 and 7-8). Connecting these three indirectly related events, however, does not address the three-part test.

LoveSac Delaware's stock and the execution of the Merger Agreement, as described by G&G, is too attenuated to establish that LoveSac Utah and LoveSac Delaware, the parties to that agreement, intended to benefit Millevere by executing it. The two events are separated by the execution of the Merger Agreement, the execution of the Amended Articles pursuant to the Merger Agreement, the creation of a new class of stock pursuant to the Amended Articles, and finally Millevere's purchase of some of the shares of the new class of stock. (*See* D.I. 36 at 7-8). G&G has cited no authority holding that the intent to create a third-party beneficiary can be inferred from such a series of contracts and events.[5]

As to the second element, G&G concedes that Millevere *purchased* its stock in LoveSac Delaware, the only benefit it allegedly derived from the Merger Agreement, so there can be no contention that the agreement was executed to grant Millevere a gift (D.I. 19 ¶¶ 42, 45), and there is no allegation or evidence that a debt existed between LoveSac and Millevere at the time the Merger Agreement was executed. (*See* D.I. 19 ¶ 50 (identifying February 25, 2005 as date of Merger); D.I. 36, Exh. B, Series A Preferred Stock Purchase Agreement, at Cover Page (setting closing date of stock purchase as March 3, 2005)). There is similarly no evidence that LoveSac Utah and LoveSac

---

[5] G&G has not substantiated its assertions that the Amended Articles were in fact executed as a result of the Merger Agreement, which alone serves to break the alleged causal connection between Millevere's purchase of LoveSac Delaware's stock and the execution of the Merger Agreement, the document containing the choice of law. Indeed, G&G did not even attach a copy of the Amended Articles as an exhibit to its opposition brief. Had it done so, it still would not be able to show that the Amended Articles were executed pursuant to the terms of the Merger Agreement, because, contrary to G&G's assertion, the Amended Articles were executed on March 3, 2005, not February 25, 2005 (the date the Merger Agreement was executed). (Amended Articles, attached as Exhibit A, at 1).

Delaware specifically intended to benefit Millevere, so the third element is also absent. Hence, G&G cannot make the showing necessary to label Millevere a third-party beneficiary of the Merger Agreement.[6]

2.    Jurisdiction Does Not Exist over Millevere under Section 3104(c)(1).

G&G also contends that Millevere is subject to jurisdiction in Delaware pursuant to Title 10, Section 3104(c)(1) of the Delaware Code. That section allows for jurisdiction over a nonresident defendant when the defendant "[t]ransacts any business or performs any character of work or service in the State." 10 *Del. C.* § 3104(c)(1). It is well-established that a defendant must have committed some act in Delaware for this section to apply. *See, e.g., Tristrata Tech., Inc. v. Neoteric Cosmetics, Inc.*, 961 F. Supp. 686, 690 (D. Del. 1997) (*citing Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F. Supp. 1458, 1462 (D. Del. 1991)).

G&G alleges that Millevere transacted business in Delaware through a number of purported activities. First, G&G contends that Millevere "insisted" that the Merger take place, and equates this purported "insistence" with actual participation in the Merger. Even if Millevere's purported "insistence" that the Merger take place was a significant jurisdictional fact, and G&G has cited no law on this point, G&G has not identified what actions Millevere took in insisting that the Merger occur or, more importantly, where

---

[6]    G&G also claims that Millevere has consented to jurisdiction in this Court pursuant to purported choice-of-law clauses in certain other contracts to which Millevere is a party, but this argument suffers from the same infirmities. The clauses in those contracts, like the clause in the Merger Agreement, are really choice-of-law clauses, (*see* D.I. 36, Exh. B), which do not subject Millevere to jurisdiction. *Greene*, 287 B.R. at 343; *Werner*, 831 A.2d at 331; *Siren Gaming*, 153 Fed. Appx. at 421; *Prime Leasing*, 1992 WL 80410, at *5. Moreover, G&G is not a signatory to those contracts, (*see* D.I. 36, Exh. B), and, therefore, lacks standing to enforce them.

5

Millevere was located when it took those actions. (*See* D.I. 36 at 9-11). G&G certainly has not alleged or proved that Millevere was in Delaware at the time the alleged actions, whatever they may be, occurred. (*See id.*). This failure of proof is fatal to G&G's claim to jurisdiction. *See* 10 *Del. C.* § 3104(c)(1).[7]

As to post-merger events, G&G claims that Millevere transacted business in Delaware through various actions. Again, however, G&G has provided no evidence or allegation that even one of these actions occurred in Delaware, or that any of the actions carry jurisdictional significance.

First, G&G claims that Millevere transacted business in Delaware because Simon Wright, its representative on the LoveSac Delaware board, was supposedly "actively involved in financial management of LoveSac Delaware." Assuming this allegation to be true, there is no reason why it would establish contacts between Millevere and Delaware. Although LoveSac Delaware is incorporated in this state, it is headquartered in Connecticut, and Simon Wright resides in the United Kingdom. (LoveSac Delaware website, http://www.lovesac.com/lovesac/contact.php (identifying "The LoveSac Corporate Offices" as being in Stamford, Connecticut); D.I. 27, Exh. C, ¶ 2). Whatever actions Mr. Wright might have taken to assist with LoveSac's management, therefore, occurred in those jurisdictions, not Delaware. Indeed, Mr. Wright explicitly states in his affidavit that he did not participate in any business meetings for LoveSac Delaware in

---

[7] Importantly, G&G does not contend that Millevere actually participated in the Merger or even incorporated LoveSac Delaware. Nor can it. The Merger Agreement was executed by Shawn Nelson, who is an employee of LoveSac, not Millevere. (D.I. 36, Exh. A, at 7). And LoveSac Delaware's Certificate of Incorporation was signed by Jason K. Robertson, who is not alleged to have any connection with Millevere. (LoveSac Delaware Certificate of Incorporation, attached as Exhibit B, at 3). Therefore, G&G's assertion that a single act of incorporation in Delaware can vest a court with jurisdiction over a nonresident defendant is irrelevant. (*See* D.I. 36 at 6).

Delaware, and that upon his information and belief, LoveSac Delaware did not conduct any business meetings in Delaware. (D.I. 27, Exh. C, ¶¶ 6-7). Likewise, Millevere's representative has attested that Millevere has no agents or employees in Delaware and has not conducted business meetings in Delaware. (D.I. 27, Exh. E, ¶¶ 6-7). G&G has not provided any contrary proof.

Second, G&G states that Millevere has transacted business in this State by extending bridge financing to LoveSac Delaware. Given the fact that Millevere is located in the British Virgin Islands and LoveSac Delaware is located in Connecticut, G&G has not provided any evidence that the funds were transmitted to or from Delaware. And even if they were, courts have held that the transmittal of funds to and from the forum state is not enough to justify exerting jurisdiction over a nonresident defendant. *Dollar Sav. Bank v. First Sec. Bank of Utah, N.A.*, 746 F.2d 208, 213 (3d Cir. 1984) (finding that Utah bank was not subject to jurisdiction in Pennsylvania simply because it received loan funds from and made repayments to Pennsylvania bank); *Daewoo Int'l (America) Corp. v. Orion Eng. & Serv., Inc.*, No. 02 Civ. 8809(RCC), 2003 WL 22400198, at *2 (S.D.N.Y. Oct. 20, 2003) ("Admittedly, the loan was disbursed through (and interest payments were made to) a New York bank. Wiring of money, however, is insufficient to establish jurisdiction under New York's long-arm statute.").

Third, G&G points to Millevere's debtor-in-possession loan to LoveSac Delaware. Again, the funds from this loan almost certainly did not pass through Delaware, and, even if they did, that fact would not support the exercise of jurisdiction over Millevere. *Dollar Sav. Bank*, 746 F.2d at 213; *Daewoo Int'l (America)*, 2003 WL 22400198, at *2. Nor is there any evidence that the loan negotiations occurred in

7

Delaware, despite G&G's implication to the contrary. (*See* D.I. 36 at 9). Furthermore, the loan was made sometime after June 9, 2006, well after LoveSac Delaware's bankruptcy had been filed and the alleged conspiracy to deprive G&G of its security interest thus had been completed. Consequently, G&G's cause of action against Millevere did not "arise from" this event, rendering it irrelevant to the jurisdictional analysis. 10 *Del. C.* § 3104(j) ("When jurisdiction over a person is based solely upon this section, only a cause of action arising from any act enumerated in this section may be asserted against the person.").

Fourth, G&G notes that Millevere owned shares in LoveSac Delaware and had an option to purchase additional shares. The case law is clear, however, that mere stock ownership does not subject a nonresident defendant to jurisdiction in the corporation's forum, as noted in the Moving Defendants' Opening Brief. (D.I. 27 at 10); *see also Venoco, Inc. v. Marquez*, No. 02-1685 GMS, 2003 WL 21026787, at *3 (D. Del. May 5, 2003); *In re DaimlerChrysler AG Sec. Litig.*, 197 F. Supp. 2d 86, 98 (D. Del. 2002); *Steinman v. Levine*, C.A. No. 19107, 2002 Del. Ch. LEXIS 132, at *35 (Del. Ch. Nov. 27, 2002), *aff'd* 822 A.2d 397 (Del. 2003).[8]

### 3. Jurisdiction Does Not Exist over Millevere under Section 3104(c)(4).

G&G also claims that jurisdiction over Millevere is appropriate under Section 3104(c)(4) because Millevere allegedly derived "substantial revenue" from Delaware.

---

[8] Given the complete absence of any evidence to verify the alleged contacts between Millevere and Delaware, G&G's citation of *NRG Bariers, Inc. v. Jelin*, C.A. No. 15013, 1996 Del. Ch. LEXIS 81 (Del. Ch. July 1, 1996), cannot aid its argument. The *Jelin* court's finding that it had jurisdiction over the defendants pursuant to Section 3104(c)(1) was incontestably based on the facts of the case. Here, there are simply no facts to support a finding of jurisdiction.

G&G, however, has not established that any return Millevere might have received from its investment in LoveSac Delaware would constitute "revenue" within the meaning of Section 3104(c)(4).[9]  In the cases subjecting a nonresident company to jurisdiction in Delaware for deriving "substantial revenue" from the state (including *Foster Wheeler Energy Corp v. Metallgesellschaft AG*, 1993 U.S. Dist. LEXIS 20450 (D. Del. 1993), the case cited by G&G, the company's "revenues" consisted of proceeds from the sale of goods or services. *Bell Helicopter Textron, Inc. v. C & C Helicopter Sales, Inc.*, 295 F. Supp. 2d 400, 405 (D. Del. 2002) ("[T]he Court must determine if [defendant] derives substantial revenue from services or things used or consumed in Delaware."); *United States v. Consol. Rail Corp.*, 674 F. Supp. 138, 141,144 (D. Del. 1987) (revenues derived from newspaper company's advertising sales and mail subscriptions in Delaware); *Foster Wheeler Energy*, 1993 WL 669447, at *6-7 (revenues derived from license fees and sales of products and services); *M&M Tech., Inc. v. Burlington Chem. Co., Inc.*, No. Civ. A. 03-994 GMS, 2005 WL 293509, at *5 (D. Del. Feb. 8, 2005) (revenues derived from "sales of products to customers").

But in any event, the established rule is that the mere ownership of stock is not enough confer jurisdiction over a nonresident defendant. *Venoco*, 2003 WL 21026787, at *3; *In re DaimlerChrysler AG Sec. Litig.*, 197 F. Supp. 2d at 98; *Steinman*, 2002 Del. Ch. LEXIS 132, at *35. If G&G's argument were given credence, it would eviscerate this rule and subject every nonresident shareholder who received a dividend from a company

---

[9] In point of fact, Millevere lost its entire investment in LoveSac Delaware, totaling $4.5 million, when LoveSac DE filed for bankruptcy.

incorporated (but not located) in Delaware to jurisdiction in Delaware. Neither the statutory language nor the case law supports such a result.[10]

### B. The Director/Officer Defendants are Not Subject to Personal Jurisdiction in Delaware.

#### 1. The Director/Officer Defendants Are Not Subject to Jurisdiction under the Conspiracy Theory of Jurisdiction.

"The conspiracy theory of jurisdiction is narrowly and strictly construed; otherwise, that theory would become a facile way for a plaintiff to circumvent the minimum contact requirements of *International Shoe Co. v. Washington*." *Computer People, Inc. v. Best International Group, Inc.*, No. Civ. A. 16648, 1999 WL 288119, at *6 (Del. Ch. Apr. 27, 1999) (footnote omitted). "For that reason, where a conspiracy is alleged and the defendants submit factual evidence controverting personal jurisdiction as to them, the plaintiff may not rely upon conclusory allegations in his pleading that are unsupported by evidence. Such allegations will not be sufficient to overcome a motion to dismiss for lack of personal jurisdiction." *Id.*; *see also Newspan, Inc. v. Hearthstone Funding Corp.*, No. Civ. A. 13304, 1994 WL 198721, at *8 (Del. Ch. May 10, 1994) ("Plaintiffs' pleadings and legal conclusions alone, unsupported by facts are certainly not enough here to survive a motion to dismiss for lack of personal jurisdiction where a conspiracy is alleged and defendants have submitted contrary evidence."). Instead, all

---

[10]    G&G also has failed to cite any support for its implicit assertion that an individual derives substantial revenue from Delaware by receiving payments from a corporation that is incorporated in Delaware but is located elsewhere and generates its revenues from sales in several states. The case law suggests that revenues are derived from the place where the sales generating those revenues were made (or, in this case, the place from which the funds were sent). *See M&M Tech.*, 2005 WL 293509, at *5 (focusing on defendant's "sales of products *to Delaware customers*" in determining whether defendant derived substantial revenue from Delaware (emphasis added)). Hence, if Millevere received any revenue from LoveSac Delaware at all, it would have been derived from Connecticut, not Delaware.

10

five elements of the conspiracy theory of jurisdiction must be proven with evidence, and where even one is not, the entire theory supporting jurisdiction topples. *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.*, No. Civ. A. 13950, 1995 WL 694397, at *12 (Del. Ch. Nov. 21, 1995) ("Proper invocation of this basis of jurisdiction requires factual proof of each enumerated element.").

The Director/Officer Defendants have proffered sufficient evidence to negate G&G's conclusory allegations of conspiracy. The financing statements the Director/Officer Defendants have attached as Exhibit C to this brief demonstrate that in September 2005, when the Director/Officer Defendants were allegedly conspiring with the Investor Defendants and others to deprive G&G of its first priority security interest in LoveSac's collateral, the Director/Officer Defendants not only believed that G&G still had its security interest in LoveSac's assets, but also believed that G&G's security interest was *senior* to the security interest obtained by the Investor Defendants. (UCC Financing Statement, attached as Exhibit C (stating that certain of the Investor Defendants took only a "second priority security interest" in certain of LoveSac Delaware's assets, in which G&G also claims to have had a security interest)). In the face of such evidence, the burden falls on G&G to make a factual showing of jurisdiction. G&G has not done so.

Its opposition brief attempts to establish each element of this jurisdictional theory solely by reference to the allegations in its Amended Complaint. (D.I. 36 at 12). Those allegations, however, are insufficient to establish jurisdiction by way of a conspiracy allegation as a matter of law. Accordingly, G&G's conspiracy theory of jurisdiction fails.

11

2.    The Director/Officer Defendants Have Not
Consented to Jurisdiction in this Forum.

The Director/Officer Defendants no more consent to jurisdiction through the

Merger Agreement than did Millevere.  As previously discussed, the clause on which

G&G bases this argument is a choice-of-law clause, not a forum-selection clause, and as

such does not amount to a consent to jurisdiction. (*Supra* Part III.A.1).  Moreover, G&G

has once again failed to plead or prove any of the elements necessary to establish that the

Director Defendants are third-party beneficiaries of that agreement or that G&G has

standing to enforce the terms of that agreement. (*See* D.I. 36; *supra* Part III.A.1).

Nor have James Gould, David Yarnell, or Simon Wright ("Director Defendants")

consented to jurisdiction in this Court by way of the forum-selection clause in the

Indemnification Agreement between each of them and LoveSac Delaware.   The clause

provides in pertinent part:

> Governing Law and Consent to Jurisdiction.   This
> Agreement and the legal relations among the parties shall
> be governed by, and construed and enforced in accordance
> with, the laws of the State of Delaware, without regard to
> its conflicts of laws rules.   The Company and the
> Indemnitee hereby irrevocably  and unconditionally (i)
> agree that any action or proceeding *arising out of or in
> connection with* this Agreement *shall be brought only in
> the Chancery Court of the State of Delaware* (the
> "Delaware Court"), *and not in any other state or federal
> court in the United States of America* or any court in any
> other country, (ii) consent to submit to the exclusive
> jurisdiction of the Delaware Court for purposes of any
> action or proceeding arising out of or in connection with
> this Agreement.

(Indemnification Agreement of James Gould, ¶ 18 (D.I. 36, Exh. G) (emphasis added)).

On its face, the clause makes clear that the Director Defendants only consent to

jurisdiction in a Delaware state court, not a federal court sitting in Delaware.  Given that

a forum-selection clause must be enforced according to its terms, the plain language of the Indemnification Agreement nullifies G&G's argument for jurisdiction in this Court. *Wall Street Aubrey Golf, LLC v. Aubrey*, 189 Fed. Appx. 82, 85 (3d Cir. 2006) (noting with respect to a forum selection clause that "[t]he plain language of the agreement guides our construction: '[a] court is not authorized to construe a contract in such a way as to modify the plain language of its words, under the guise of interpretation'" (*quoting Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1010 (3d Cir. 1980)); *Troy Corp. v. Schoon*, No. C.A. 1959-VCL, 2007 WL 949441, at *3-4 (Del. Ch. Mar. 26, 2007) (noting that courts "giv[e] effect to the parties' intention as expressed by the written words of their agreements" and therefore rejecting the contention that suit could be brought in New York state courts pursuant to forum-selection clause because clause provided that suit would be brought in the "Southern District of New York").

Furthermore, G&G has not explained why a forum-selection clause in a contract between LoveSac Delaware and a Director Defendant would apply in an action against the Director Defendants by G&G. Again turning to the plain language of the Indemnification Agreement, it is clear that the clause only applies to claims "arising out of or in connection with" that agreement. G&G has asserted no such claims. Indeed, the Indemnification Agreement is not even mentioned in the Amended Complaint. (*See generally* D.I. 19). Accordingly, the Indemnification Agreement's forum-selection clause is not applicable to this action.[11]

---

[11] Essentially, G&G is trying to make a narrow agreement created for the benefit of the Director Defendants into a sweeping "waiver" agreement, which is unavailing. Directors often choose the Court of Chancery and summary proceedings available therein to hear and decide specific claims they may bring as a plaintiff should that be necessary,

Finally, G&G has made no showing that it, as a non-signatory to the Indemnification Agreements, has standing to enforce the forum-selection clauses they contain. (*Supra* Part III.A.1).

### 3. The Director/Officer Defendants Are Not Subject to Specific Jurisdiction under the Long-Arm Statute.

As mentioned before, Title 10, Section 3104(c)(1) of the Delaware Code subjects a defendant to jurisdiction only if he has taken some action *in Delaware* that relates to the plaintiff's claim. *See, e.g., Tristrata Tech., Inc. v. Neoteric Cosmetics, Inc.*, 961 F. Supp. 686, 690 (D. Del. 1997) (*citing Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F. Supp. 1458, 1462 (D. Del. 1991)). Therefore, section 3104(c)(1) does not provide a statutory basis for jurisdiction over the Director/Officer Defendants in this suit, because G&G has offered no proof, and has made almost no allegations, that the Director/Officer Defendants performed any actions in this state.

As evidence that the Director Defendants transacted business in Delaware, G&G submits a single email between the Director Defendants and an unsubstantiated allegation that Mr. Wright held an option to purchase shares in an unidentified company, presumably LoveSac Delaware, pursuant to a stock option agreement. There is nothing in the email to indicate that it was sent to or from Delaware, and G&G makes no allegations to that effect. (*See* D.I. 36 at 13-14 & Exh. C). Consequently, it fails to satisfy the prerequisite for jurisdiction under Section 3104(c)(1). *See, e.g., Tristrata*

---

but it hardly means they agree to defend all manner of claims against them in Delaware. *See* 8 *Del. C.* § 145(k).

*Tech.*, 961 F. Supp. at 690 (holding that Section 3104(c)(1) is only satisfied if an act occurs in Delaware).[12]

As for Mr. Wright's alleged stock options, G&G has failed to produce a copy of the agreement purportedly granting him those options, and, thus, has failed to meet its burden of proof in responding to the motion to dismiss. Furthermore, even if G&G had proven that Mr. Wright held such options, that fact alone would not be enough to show that he can be sued in this Court. *Venoco*, 2003 WL 21026787, at *3; *In re DaimlerChrysler AG Sec. Litig.*, 197 F. Supp. 2d at 98; *Steinman*, 2002 Del. Ch. LEXIS 132, at *35.

G&G also alleges that Walt Spokowski is amenable to personal jurisdiction because he, as the Chief Executive Officer of LoveSac Delaware, allegedly signed a Joint Plan of Liquidation in Wilmington, Delaware on June 28, 2006 as part of LoveSac Delaware's bankruptcy. There are several flaws with this argument. First, G&G once again has not provided any evidence to back up its assertion; hence, it cannot stave off a motion to dismiss. Second, the alleged act occurred well after LoveSac Delaware had filed for bankruptcy, and, accordingly, is irrelevant to the jurisdictional analysis. 10 *Del. C.* § 3104(j). Third, Mr. Spokowski performed the act in his official capacity as an officer of LoveSac Delaware, bringing him within the protection of the fiduciary shield

---

[12] G&G also contends that the email is evidence that the Director Defendants "all worked with LoveSac to 'manage G&G.'" (D.I. 36 at 13). Significantly, the words "manage G&G" never appear in the email, and the words that are actually in the email do not support G&G's characterization of the Director Defendants' conduct. (*See* D.I. 36, Exh. C). The email does not show that the Director Defendants were contemplating ways to control G&G, as G&G implies; rather, it shows the Director Defendants considering how they should deal with G&G's exploitation of LoveSac and G&G's breach of a contract it had with other defendants in this action that is now the subject of an ongoing and earlier-filed action in the United States District Court for the Southern District of Ohio.

doctrine. *Reach & Assocs., P.C. v. Dencer*, 269 F. Supp. 2d 497, 503-04 (D. Del. 2003); *Tristrata Tech.*, 961 F. Supp. at 690-91.

G&G argues that the doctrine does not invariably shelter Mr. Spokowski from this Court's jurisdiction because an officer of a Delaware corporation can still be subject to jurisdiction in Delaware when the totality of his contacts with the forum, including those taken in his fiduciary capacity, demonstrate the overall reasonableness of subjecting him to personal jurisdiction. The weakness in G&G's argument is that it has not identified any contact between Mr. Spokowski and Delaware beyond his single act of executing the Joint Plan of Liquidation, an act that Mr. Spokowski performed as a corporate employee. G&G offers no authority to show that this sole contact can subject a corporate officer to jurisdiction, which is unsurprising given that such a result would completely undermine the purpose of the fiduciary shield doctrine to "prohibit acts performed by an individual in the individual's capacity as a corporate employee from serving as the basis for personal jurisdiction over that individual" (a purpose this Court has indicated endures even though the fiduciary shield doctrine is not an absolute bar to jurisdiction). *Dencer*, 269 F. Supp. 2d at 503; *Tristrata Tech.*, 961 F. Supp. at 690. Consequently, the fiduciary shield doctrine protects Mr. Spokowski from being haled into this forum based on his single purported act relating to the LoveSac Delaware bankruptcy plan.

## C.    Exercising Jurisdiction over the Moving Defendants Would Violate Constitutional Due Process.

G&G's abbreviated due process argument is based solely on G&G's optimistic assumption that it has shown Millevere and the Director/Officer Defendants subject to jurisdiction under Delaware's Long-Arm Statute. As demonstrated above, however, that assumption is unfounded. The Long-Arm Statute does not reach the Moving Defendants

16

on any of the grounds G&G claims. Consequently, G&G's assertion that constitutional due process is generally satisfied where there is a statutory basis for jurisdiction is of no consequence.

The motion to dismiss shows the inequity of asserting jurisdiction over the Moving Defendants in this case. The Director/Officer Defendants do not live, work, or own property in Delaware. (D.I. 27, Exhs. A-D, ¶¶ 2-5, 7, 9). Likewise, Millevere is not incorporated or located in Delaware, does not carry on business in Delaware, and has no assets in Delaware, save for its ownership of LoveSac Delaware stock. (D.I. 27, Exh. E, ¶¶ 2-8). Accordingly, the exercise of personal jurisdiction over the Moving Defendants in this forum would not comport with traditional notions of fair play and substantial justice, as required by constitutional due process. *Werner*, 831 A.2d at 331; *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.*, Civ. A. No. 13950, 1996 WL 608492, at *2 (Del. Ch. Oct. 16, 1996).

17

IV.    **CONCLUSION.**

For the foregoing reasons and for the reasons set forth in our opening brief, the Court should grant the Moving Defendants' motion to dismiss for lack of personal jurisdiction. (D.I. 26).

Respectfully submitted,

Michael A. Weidinger (3330)
Joseph S. Naylor (3886)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19801
Tel: (302) 888-6800
Fax: (302) 571-1750
mweidinger@morrisjames.com
jnaylor@morrisjames.com

-and-

Michael L. Scheier (0055512)
Joseph L. Bruemmer (0079120)
KEATING, MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202
Tel: (513) 579-6952
Fax: (513) 579-6457
mscheier@kmklaw.com
jbruemmer@kmklaw.com

*Attorneys for Defendants, Brand Equity Ventures II, LP, Walnut Investment Partners, LP, Walnut Private Equity Fund, LP, The Walnut Group, Millevere Holdings Limited, David Yarnell, James Gould, Simon Wright, & Walt Spokowski*

18

# EXHIBIT A

# Delaware

PAGE 1

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE RESTATED CERTIFICATE OF "THE LOVESAC CORPORATION", FILED IN THIS OFFICE ON THE THIRD DAY OF MARCH, A.D. 2005, AT 11:18 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

*Harriet Smith Windsor*

Harriet Smith Windsor, Secretary of State

3894418   8100

050185041

AUTHENTICATION: 3725723

DATE: 03-07-05

FROM CORPORATION TRUST WILM TEAM #2          (MON) 3. 7'05 12:20/ST. 12:19/No.4868765848 P  2
                                                            Secretary of State
                                                          Division of Corporations
                                                      Delivered 11:18 PM 03/03/2005
                                                         FILED 11:18 PM 03/03/2005
                                                      SRV 050185041 - 3894418 FILE

# AMENDED AND RESTATED

## CERTIFICATE OF INCORPORATION

### OF

## THE LOVESAC CORPORATION

a Delaware corporation

The LoveSac Corporation, a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the "*General Corporation Law*"), hereby certifies as follows:

*FIRST*:  That the name of this corporation is The LoveSac Corporation (the "*Corporation*"). The original Certificate of Incorporation of the Corporation was filed with the Secretary of State of the State of Delaware (the "*Delaware Secretary*") on December 10, 2004.

*SECOND*: That the Amended and Restated Certificate of Incorporation of the Corporation attached hereto as **Exhibit A** (the "*Restated Certificate*"), which is incorporated herein by this reference and restates, integrates and further amends the provisions of the Certificate of Incorporation of the Corporation as previously amended, restated or supplemented, was duly adopted and approved in accordance with Section 242 and Section 245 of the General Corporation Law.

*THIRD*: That the Restated Certificate was approved by (i) the Board of Directors of the Corporation by unanimous written consent in lieu of a meeting thereof in accordance with Section 141(f) of the General Corporation Law and (ii) the stockholders of the Corporation by written consent in lieu of a meeting in accordance with Section 228 of the General Corporation Law.

*FOURTH*: That Restated Certificate shall become effective immediately upon being filed with the Delaware Secretary.

*IN WITNESS WHEREOF*, the Corporation has caused the Restated Certificate to be executed by Shawn D. Nelson, a duly authorized officer of the Corporation, on March 3, 2005.

THE LOVESAC CORPORATION,
a Delaware corporation

By: /s/ Shawn D. Nelson
      Shawn D. Nelson
      Chief Executive Officer

FROM CORPORATION TRUST WILM. TEAM #2        (MON) 3. ?' 05 12:20/ST. 12:19/NC. 4863796908 P  3

## EXHIBIT A

### AMENDED AND RESTATED
### CERTIFICATE OF INCORPORATION
### OF

### THE LOVESAC CORPORATION
a Delaware corporation

---

### ARTICLE I

The name of this corporation is The LoveSac Corporation (the *"Corporation"*).

### ARTICLE II

The purpose of this corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

### ARTICLE III

The address of the Corporation's registered office in the State of Delaware is 1209 Orange Street, City of Wilmington, County of New Castle, 19801. The name of the registered agent at such address is The Corporation Trust Company.

### ARTICLE IV

The total number of shares of stock that the Corporation shall have authority to issue is Sixty-Eight Million Six Hundred Thirty-Three Thousand (68,633,000) consisting of Fifty Million (50,000,000) shares of Common Stock, $0.0001 par value per share, and Eighteen Million Six Hundred Thirty-Three Thousand (18,633,000) shares of Preferred Stock, $0.0001 par value per share. The first Series of Preferred Stock shall be designated *"Series A Preferred Stock"* and shall consist of Eighteen Million Six Hundred Thirty-Three Thousand (18,633,000) shares.

### ARTICLE V

The respective designations, rights, powers, preferences, restrictions and limitations of the Common Stock and the Series A Preferred Stock are as follows:

    1.    Definitions. For purposes of this Article V, the following definitions shall apply:

PALIB2_2940840_11.DOC

(a)    "*Accrued Dividend Amount*" shall mean an amount equal to the Dividend Rate accumulated from the Original Issuance Date of such share (where such amount shall be pro rated per day for partial years based upon a 365-day year) through the date of measurement.

(b)    "*BEV Director*" means the member of the Corporation's Board of Directors designated by Brand Equity Ventures II, L.P. and/or its affiliates.

(c)    "*Change of Control*" shall be deemed to be occasioned by, the acquisition of the Corporation by another entity by means of any transaction or series of related transactions to which the Corporation is party (including, without limitation, any stock acquisition, reorganization, merger, consolidation, conversion transaction, mandatory share exchange or sale of securities of the Corporation but excluding any sale of securities of the Corporation for bona fide capital raising purposes) other than a transaction or series of transactions in which the holders of the voting securities of the Corporation outstanding immediately prior to such transaction continue to retain (either by such voting securities remaining outstanding or by such voting securities being converted into voting securities of the surviving or resulting entity), more than 50% of the total voting power represented by the voting securities of the Corporation or such surviving or resulting entity outstanding immediately after such transaction or series of transactions.

(d)    "*Conversion Price*" shall mean $0.80 per share for the Series A Preferred Stock (subject to adjustment from time to time for Recapitalizations and as otherwise set forth elsewhere herein).

(e)    "*Convertible Securities*" shall mean any evidences of indebtedness, shares or other securities convertible into or exchangeable for Common Stock.

(f)    "*Distribution*" shall mean the transfer of cash or other property without fair consideration whether by way of dividend or otherwise, other than dividends on Common Stock payable in Common Stock, or the purchase or redemption, by the Corporation or by any subsidiary or affiliate of the Corporation, of shares of the Corporation for cash or property other than: (i) repurchases of Common Stock issued to or held by employees, officers, directors or consultants of the Corporation or its subsidiaries pursuant to rights of first refusal contained in agreements or arrangements providing for such right (but specifically excluding any shares of Common Stock beneficially owned by Shawn D. Nelson) and with any such repurchases to be at prices determined by the Board of Directors; or (ii) any other repurchase or redemption of capital stock of the Corporation approved by the holders of at least fifty-five percent (55%) of the then-outstanding shares of Series A Preferred Stock.

(g)    "*Dividend Rate*" shall mean $0.04 per annum for each share of Series A Preferred Stock (subject to adjustment from time to time for Recapitalizations and as otherwise set forth elsewhere herein).

(h)    "*Filing Date*" shall mean the date on which this Amended and Restated Certificate of Incorporation is accepted for filing by the Secretary of State of the State of Delaware.

(i)     *"Junior Stock"* shall mean the Common Stock and any other class or series of capital stock of the Corporation that, any of its express terms, is junior to the Series A Preferred Stock in terms of entitlement to dividends and other Distributions or in terms of entitlement to payments or distributions of assets in any Liquidation Event.

(j)     *"Liquidation Event"* shall be deemed to be occasioned by, or to include, (a) a Change of Control; (b) a Sale of Assets; or (c) any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, unless such event is deemed to not constitute a Liquidation Event hereunder by vote or written consent of the holders of at least fifty-five percent (55%) of the then-outstanding shares of Series A Preferred Stock.

(k)     *"Liquidation Preference"* shall mean an amount per share equal to the sum of the Original Issue Price (subject to adjustment from time to time for Recapitalizations and as otherwise set forth elsewhere herein), plus any accumulated but unpaid portion of the Accrued Dividend Amount and any other declared but unpaid dividends on or with respect to the Series A Preferred Stock.

(l)     *"Millevere Director"* means the member of the Corporation's Board of Directors designated by Millevere Holdings Limited and/or its affiliates.

(m)     *"Options"* shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Common Stock or Convertible Securities.

(n)     *"Original Issue Date"* shall mean the date of first issuance of any shares of Series A Preferred Stock.

(o)     *"Original Issue Price"* shall mean $0.80 per share for the Series A Preferred Stock (subject to adjustment from time to time for Recapitalizations and as otherwise set forth elsewhere herein).

(p)     *"Recapitalization"* shall mean any stock dividend, stock split, combination of shares, reorganization, recapitalization, reclassification or other similar event.

(q)     *"Sale of Assets"* shall be, or be deemed to be, occasioned by, the sale, lease, license, transfer or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, except where such sale, lease, license, transfer or other disposition is to a wholly owned subsidiary of the Corporation that remains a wholly owned subsidiary of the Corporation upon the consummation of such sale, lease, license, transfer or other disposition.

(r)     *"Walnut Director"* means the member of the Corporation's Board of Directors designated by Walnut Investment Partners, L.P., Walnut Private Equity Fund, L.P. and/or their affiliates.

2.    Dividends.

(a)    Series A Preferred Stock Dividends.  The holders of outstanding shares of Series A Preferred Stock shall be entitled to receive dividends, out of any assets at the time legally available therefor, in preference and priority to any declaration or payment of any Distribution on Common Stock or any other shares of Junior Stock, equal to the Accrued Dividend Amount.  Such dividends on each share of Series A Preferred Stock shall accrue from the Original Issue Date of such share and thereafter shall be deemed to accrue from day to day whether or not earned or declared and whether or not there exists profits, surplus or other funds legally available for the payment of dividends, shall be cumulative, shall be payable on a Liquidation Event, each Redemption Date, upon conversion pursuant to Section 4 below and otherwise when, as and if declared by the Board of Directors of this Corporation (the "*Board*"), and shall be payable only in cash.  The holders of outstanding Series A Preferred Stock shall be entitled to waive any dividend right or preference that such holders are entitled to receive pursuant to this Section 2(a) upon the affirmative vote or written consent of the holders of at least fifty-five percent (55%) of the shares of Series A Preferred Stock then outstanding.

(b)    Other Dividends.  No Distributions shall be made with respect to Common Stock or any other shares of Junior Stock so long as any shares of Series A Preferred Stock remain outstanding, without first paying the entire Accrued Dividend Amount with respect to the Series A Preferred Stock and obtaining the requisite consent of the holders of Series A Preferred Stock.  If, after the entire Accrued Dividend Amount has been paid, with the affirmative vote or written consent of the holders of at least fifty-five percent (55%) of the shares of Series A Preferred Stock then outstanding, a Distribution is made with respect to the Common Stock or any other shares of Junior Stock while shares of Series A Preferred Stock remain outstanding, then the holders of the Series A Preferred Stock shall be entitled to participate in such Distribution, with the amount of Distribution on each share of Series A Preferred Stock to be equal to the Distribution that would be made with respect to that number of shares of Common Stock into which such share of Series A Preferred Stock would then, on the record date for payment of the Distribution, be converted to Section 4 hereof.  After the time that no shares of Series A Preferred Stock remain outstanding, dividends declared or paid in any fiscal year may be declared or paid among the holders of the Common Stock or other shares of Junior Stock then outstanding.

(c)    Non-Cash Distributions.  Whenever a Distribution provided for in this Section 2 shall be payable in securities or property other than cash, the value of such Distribution shall be the fair market value of such securities or other property as determined in good faith by the Board; *provided, however*, that any securities to be delivered to the holders of Series A Preferred Stock or Common Stock shall be valued as follows:

(i)    Securities not subject to investment letter or other similar restrictions on free marketability:

(1)    If traded on a securities exchange or the Nasdaq National Market or SmallCap Market, the value shall be deemed to be the average of the closing prices of the securities on such exchange over the 10-trading-day period ending 3 days prior to the date of Distribution;

(2)    If actively traded over-the-counter, the value shall be deemed to be the average of the closing bid prices over the 10-trading-day period ending 3 days prior to the date of Distribution; and

(3)    If there is no active public market, the value shall be the fair market value thereof, as determined in good faith by the Board of Directors.

(ii)    The method of valuation of securities subject to investment letters or other restrictions on free marketability shall be to make an appropriate discount from the market value, determined as provided in paragraphs (i)(1), (i)(2) and (i)(3) above, to reflect the approximate fair market value thereof, as determined in good faith by the Board of Directors.

For the purposes of this Section 2(c), *"trading day"* shall mean any day which the exchange or system on which the securities to be distributed are traded is open and *"closing prices"* or *"closing bid prices"* shall be deemed to be: (i) for securities traded primarily on the New York Stock Exchange, the American Stock Exchange or Nasdaq, the last reported trade price or sale price, as the case may be, at 4:00 p.m., New York time, on that day and (ii) for securities listed or traded on other exchanges, markets and systems, the market price as of the end of the regular hours trading period that is generally accepted as such for such exchange, market or system. If, after the date hereof, the benchmark times generally accepted in the securities industry for determining the market price of a stock as of a given trading day shall change from those set forth above, the fair market value shall be determined as of such other generally accepted benchmark times.

3.    Liquidation Rights.

(a)    Series A Preferred Stock Liquidation Preference.  In the event of any Liquidation Event, the holders of the Series A Preferred Stock shall be entitled to receive, in preference and priority to any Distribution of any of the assets of the Corporation to the holders of the Common Stock or any other Junior Stock by reason of their ownership of such stock, an amount per share equal to the greater of: (i) the Liquidation Preference; or (ii) such amount per share as would have been payable had each such share been converted into Common Stock pursuant to Section 4 immediately prior to such Liquidation Event.  If, upon the occurrence of a Liquidation Event, the assets of the Corporation legally available for distribution to the holders of the Series A Preferred Stock are insufficient to permit the payment to such holders of the full amounts specified in this Section 3(a), then the entire assets of the Corporation legally available for distribution shall be distributed ratably among the holders of Series A Preferred Stock in proportion to the full Liquidation Preference that each such holder is otherwise entitled to receive pursuant to this Section 3(a).

(b)    Remaining Assets.  After the payment to the holders of Series A Preferred Stock of the full Liquidation Preference specified in Section 3(a) above, the entire remaining assets of the Corporation legally available for distribution by the Corporation shall be distributed with equal priority and *pro rata* among the holders of the Series A Preferred Stock and Common Stock in proportion to the number of shares of Common Stock held by them, with the shares of Series A Preferred Stock being treated for this purpose as if they had been converted to shares of Common Stock at the then applicable Conversion Rate.

-6-

(c)    Valuation of Non-Cash Consideration.    If any assets of the Corporation distributed to stockholders in connection with any Liquidation Event are other than cash, then the value of such assets shall be determined in accordance with the same procedures as set forth in Section 2(c) above.

4.    Conversion.  The holders of the Series A Preferred Stock shall have conversion rights as follows (the "*Conversion Rights*"):

(a)    Right to Convert.  Each share of Series A Preferred Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share at the office of the Corporation or any transfer agent for the Series A Preferred Stock, into that number of fully paid, nonassessable shares of Common Stock determined by dividing the Original Issue Price for the relevant series by the Conversion Price for such series.  Dividends on the shares of Series A Preferred Stock being converted in the Accrued Dividend Amount shall be paid to the holders of such shares of Series A Preferred Stock upon conversion.  The number of shares of Common Stock into which each share of Series A Preferred Stock may be converted is hereinafter referred to as the "*Conversion Rate*."  Upon any decrease or increase in the Conversion Price for any series of Preferred Stock, as described in this Section 4, the Conversion Rate for such series shall be appropriately increased or decreased.

(b)    Automatic Conversion.    Each share of Series A Preferred Stock shall automatically be converted into fully paid, non-assessable shares of Common Stock at the then effective Conversion Rate for such share either (i) immediately prior to the closing of a firm commitment underwritten initial public offering pursuant to an effective registration statement filed under the Securities Act of 1933, as amended (the "*Securities Act*"), covering the offer and sale of the Corporation's Common Stock, *provided* that the net proceeds to the Corporation are not less than $25,000,000 and the Corporation has a market capitalization, after giving effect to the public offering, equal to or in excess of $75,000,000, or (ii) upon the receipt by the Corporation of a written request for such conversion from the holders of at least fifty-five percent (55%) of the then-outstanding shares of Series A Preferred Stock, (each of the events referred to in (i) and (ii) are referred to herein as an "*Automatic Conversion Event*").

(c)    Mechanics of Conversion.    No fractional shares of Common Stock shall be issued upon conversion of Series A Preferred Stock.  In lieu of any fractional shares to which the holder would otherwise be entitled, the Corporation shall pay cash equal to such fraction multiplied by the then fair market value of a share of Common Stock as determined by the Board of Directors. For such purpose, all shares of Series A Preferred Stock held by each holder of Series A Preferred Stock shall be aggregated, and any resulting fractional share of Common Stock shall be paid in cash. Before any holder of Series A Preferred Stock be entitled to convert the same into full shares of Common Stock, and to receive certificates therefore, it, he or she shall either: (A) surrender the certificate or certificates therefore, duly endorsed, at the office of the Corporation or of any transfer agent for the Series A Preferred Stock; or (B) notify the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and execute an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates, and shall give written notice to the Corporation at such office that he elects to convert the same; *provided, however,* that on the date of an Automatic Conversion Event, the outstanding

-7-

shares of Series A Preferred Stock shall be converted automatically without any further action by the holders of such shares and whether or not the certificates representing such shares are surrendered to the Corporation or its transfer agent; *provided further, however,* that the Corporation shall not be obligated to issue certificates evidencing the shares of Common Stock issuable upon such Automatic Conversion Event unless either the certificates evidencing such shares of Series A Preferred Stock are delivered to the Corporation or its transfer agent as provided above, or the holder notifies the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and executes an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates. On the date of the occurrence of an Automatic Conversion Event, each holder of record of shares of Series A Preferred Stock shall be deemed to be the holder of record of the Common Stock issuable upon such conversion, notwithstanding that the certificates representing such shares of Series A Preferred Stock shall not have been surrendered at the office of the Corporation, that notice from the Corporation shall not have been received by any holder of record of shares of Series A Preferred Stock, or that the certificates evidencing such shares of Common Stock shall not then be actually delivered to such holder.

The Corporation shall, as soon as practicable after such delivery, or after such agreement and indemnification, issue and deliver at such office to such holder of Series A Preferred Stock, a certificate or certificates for the number of shares of Common Stock to which he shall be entitled as aforesaid, a check payable to the holder in the amount of any cash amounts payable as the result of a conversion into fractional shares of Common Stock, plus unpaid dividends in the Accrued Dividend Amount on the converted Series A Preferred Stock. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Series A Preferred Stock to be converted, and the person or persons entitled to receive the shares of Series A Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date; *provided, however,* that if the conversion is in connection with an underwritten offer of securities registered pursuant to the Securities Act or a merger, sale, financing, or liquidation of the Corporation or other event, the conversion may, at the option of any holder tendering Series A Preferred Stock for conversion, be conditioned upon the closing of such transaction or upon the occurrence of such event, in which case the person(s) entitled to receive the Common Stock issuable upon such conversion of the Series A Preferred Stock shall not be deemed to have converted such Series A Preferred Stock until immediately prior to the closing of such transaction or the occurrence of such event.

(d)    Adjustments to Conversion Price for Diluting Issues.

(i)    Special Definition. For purposes of this Section 4(d), "*Additional Shares of Common*" shall mean all shares of Common Stock issued (or, pursuant to Section 4(d)(iii), deemed to be issued) by the Corporation after the Filing Date, other than issuances or deemed issuances of:

(1)    shares of Common Stock issued or issuable upon conversion of the Series A Preferred Stock;

(2)    shares of Common Stock issued or issuable to officers, directors and employees of, or consultants to, the Corporation pursuant to stock grants, option plans,

-8-

PALIB2_2048840_11.DOC

purchase plans or other employee stock incentive programs or arrangements existing as of the Filing Date, or shares of Common Stock issued or issuable to such parties pursuant to any new plan or arrangement, *provided* that each such issuance or grant is approved by the Board and any increase after the Filing Date to the number of shares reserved for issuance under such plans, programs or arrangements is approved by the holders of at least fifty-five percent (55%) of the then-outstanding shares of Series A Preferred Stock;

(3)    shares of Common Stock issued upon the exercise or conversion of Options or Convertible Securities outstanding as of the Filing Date;

(4)    shares of Common Stock issued or issuable as a dividend or distribution on Series A Preferred Stock or pursuant to any event for which adjustment is made pursuant to <u>Section 4(e)</u>, <u>Section 4(f)</u> or <u>Section 4(g)</u> hereof;

(5)    shares of Common Stock issued in a registered public offering under the Securities Act pursuant to which all outstanding shares of Series A Preferred Stock are automatically converted into Common Stock pursuant to an Automatic Conversion Event;

(6)    shares of Common Stock issued or issuable pursuant to the acquisition of another corporation by the Corporation by merger, purchase of substantially all of the assets or other reorganization, *provided*, that such issuances are approved by the Board and by the holders of at least fifty-five percent (55%) of the then-outstanding shares of Series A Preferred Stock;

(7)    shares of Common Stock issued upon a stock split, stock dividend, or any subdivision of shares of Common Stock; or

(8)    shares that are otherwise excluded by vote or written consent, prior to or after such issuance, of holders of at least fifty-five percent (55%) of the then-outstanding shares of Series A Preferred Stock.

(ii)    <u>No Adjustment of Conversion Price</u>. No adjustment in the Conversion Price of the Series A Preferred Stock shall be made in respect of the issuance of Additional Shares of Common unless the consideration per share (as determined pursuant to Section 4(d)(v)) for an Additional Share of Common issued or deemed to be issued by the Corporation is less than the Conversion Price in effect on the date of, and immediately prior to such issue, for the Series A Preferred Stock.

(iii)    <u>Deemed Issue of Additional Shares of Common</u>. In the event the Corporation at any time or from time to time after the Filing Date shall issue any Options or Convertible Securities or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of shares (as set forth in the instrument relating thereto without regard to any provisions contained therein for a subsequent adjustment of such number) of Common Stock issuable upon the exercise of such Options or, in the case of Convertible Securities, the conversion or exchange of such Convertible Securities or, in the case of Options for Convertible Securities, the exercise of such

-9-

Options and the conversion or exchange of the underlying securities, shall be deemed to have been issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date, *provided* that in any such case in which shares are deemed to be issued:

(1)     no further adjustment in the Conversion Price of the Series A Preferred Stock shall be made upon the subsequent issue of Convertible Securities or shares of Common Stock in connection with the exercise of such Options or conversion or exchange of such Convertible Securities;

(2)     if such Options or Convertible Securities by their terms provide, with the passage of time or otherwise, for any change in the consideration payable to the Corporation or in the number of shares of Common Stock issuable upon the exercise, conversion or exchange thereof (other than a change pursuant to the anti-dilution provisions of such Options or Convertible Securities such as this Section 4(d) or pursuant to Recapitalization provisions of such Options or Convertible Securities such as Section 4(e), Section 4(f) and Section 4(g) hereof), the Conversion Price of the Series A Preferred Stock and any subsequent adjustments based thereon shall be recomputed to reflect such change as if such change had been in effect as of the original issue thereof (or upon the occurrence of the record date with respect thereto);

(3)     no readjustment pursuant to clause (2) above shall have the effect of increasing the Conversion Price of the Series A Preferred Stock to an amount above the Conversion Price that would have resulted from any other issuances of Additional Shares of Common and any other adjustments provided for herein between the original adjustment date and such readjustment date;

(4)     upon the expiration of any such Options or any rights of conversion or exchange under such Convertible Securities which shall not have been exercised, the Conversion Price of the Series A Preferred Stock computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto) and any subsequent adjustments based thereon shall, upon such expiration, be recomputed as if:

(a)     in the case of Convertible Securities or Options for Common Stock, the only Additional Shares of Common issued were the shares of Common Stock, if any, actually issued upon the exercise of such Options or the conversion or exchange of such Convertible Securities and the consideration received therefor was the consideration actually received by the Corporation for the issue of such exercised Options plus the consideration actually received by the Corporation upon such exercise or for the issue of all such Convertible Securities which were actually converted or exchanged, plus the additional consideration, if any, actually received by the Corporation upon such conversion or exchange, and

(b)     in the case of Options for Convertible Securities, only the Convertible Securities, if any, actually issued upon the exercise thereof were issued at the time of issue of such Options, and the consideration received by the Corporation for the Additional Shares of Common deemed to have been then issued was the consideration actually received by the Corporation for the issue of such exercised Options, plus the consideration deemed to have been

-10-

received by the Corporation (determined pursuant to Section 4(d)(v)) upon the issue of the Convertible Securities with respect to which such Options were actually exercised; and

(5)    if such record date shall have been fixed and such Options or Convertible Securities are not issued on the date fixed therefor, the adjustment previously made in the Conversion Price of the Series A Preferred Stock which became effective on such record date shall be canceled as of the close of business on such record date, and thereafter the Conversion Price of the Series A Preferred Stock shall be adjusted pursuant to this Section 4(d)(iii) as of the actual date of their issuance.

(iv)    Adjustment of Conversion Price Upon Issuance of Additional Shares of Common. In the event this Corporation shall issue Additional Shares of Common (including Additional Shares of Common deemed to be issued pursuant to Section 4(d)(iii)) without consideration or for a consideration per share less than the applicable Conversion Price of the Series A Preferred Stock in effect on the date of and immediately prior to such issue, then, the Conversion Price of the Series A Preferred Stock shall be reduced, concurrently with such issue, to a price (calculated to the nearest cent) determined by multiplying such Conversion Price by a fraction, the numerator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue plus the number of shares which the aggregate consideration received by the Corporation for the total number of Additional Shares of Common so issued would purchase at such Conversion Price, and the denominator of which shall be the number of shares of Common Stock immediately prior to such issue plus the number of such Additional Shares of Common so issued. Notwithstanding the foregoing, the Conversion Price shall not be reduced at such time if the amount of such reduction would be less than $0.01, but any such amount shall be carried forward, and a reduction will be made with respect to such amount at the time of, and together with, any subsequent reduction which, together with such amount and any other amounts so carried forward, equal $0.01 or more in the aggregate. For the purposes of this Section 4(d)(iv), all shares of Common Stock issuable upon conversion of all outstanding shares of Series A Preferred Stock and the exercise or conversion of any other outstanding Convertible Securities and all outstanding Options shall be deemed to be outstanding.

(v)    Determination of Consideration. For purposes of this Section 4(d), the consideration received by the Corporation for the issue (or deemed issue) of any Additional Shares of Common shall be computed as follows:

(1)    Cash and Property. Such consideration shall:

(a)    insofar as it consists of cash, be computed at the aggregate amount of cash received by the Corporation before deducting any reasonable discounts, commissions or other expenses allowed, paid or incurred by the Corporation for any underwriting or otherwise in connection with such issuance;

(b)    insofar as it consists of property other than cash, be computed at the fair market value thereof at the time of such issue, as determined in good faith by the Board and approved by either the BEV Director or the Walnut Director; and

(c)     in the event Additional Shares of Common are issued together with other shares or securities or other assets of the Corporation for consideration which covers both, be the proportion of such consideration so received, computed as provided in clauses (a) and (b) above, as reasonably determined in good faith by the Board and approved by either the BFV Director or the Walnut Director.

(2)     *Options and Convertible Securities.* The consideration per share received by the Corporation for Additional Shares of Common deemed to have been issued pursuant to Section 4(d)(iii) shall be determined by dividing:

(x)     the total amount, if any, received or receivable by the Corporation as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Corporation upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities by

(y)     the maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities.

(e)     Adjustments for Subdivisions or Combinations of Common Stock. In the event the outstanding shares of Common Stock shall be subdivided (by stock split, by payment of a stock dividend or otherwise), into a greater number of shares of Common Stock, the Conversion Price of Series A Preferred Stock in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased. In the event the outstanding shares of Common Stock shall be combined (by reclassification or otherwise) into a lesser number of shares of Common Stock, the Conversion Price for the Series A Preferred Stock in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased.

(f)     Adjustments for Subdivisions or Combinations of Series A Preferred Stock. In the event the outstanding shares of Series A Preferred Stock shall be subdivided (by stock split, by payment of a stock dividend or otherwise), into a greater number of shares of Series A Preferred Stock, the Dividend Rate, Original Issue Price and Liquidation Preference of the Series A Preferred Stock in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased. In the event the outstanding shares of Series A Preferred Stock shall be combined (by reclassification or otherwise) into a lesser number of shares of Series A Preferred Stock, the Dividend Rate, Original Issue Price and Liquidation Preference of the Series A Preferred Stock in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased.

(g)     Adjustments for Reclassification, Exchange and Substitution. Subject to Section 3 above ("*Liquidation Rights*"), if the Common Stock issuable upon conversion of the

-12-

Series A Preferred Stock is ever changed into the same or a different number of shares of any other class or classes of stock, whether by capital reorganization, reclassification or otherwise (other than a subdivision or combination of shares provided for above), then, in any such event, in lieu of the number of shares of Common Stock which the holders would otherwise have been entitled to receive each holder of such Series A Preferred Stock shall have the right thereafter to convert such shares of Series A Preferred Stock into a number of shares of such other class or classes of stock which a holder of the number of shares of Common Stock deliverable upon conversion of such series of Series A Preferred Stock immediately before that change would have been entitled to receive in such reorganization or reclassification, all subject to further adjustment as provided herein with respect to such other shares.

(h)    Certificate as to Adjustments.  Upon the occurrence of each adjustment or readjustment of the Conversion Price pursuant to this Section 4, the Corporation at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Series A Preferred Stock a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based.   The Corporation shall, upon the written request at any time of any holder of Series A Preferred Stock, furnish or cause to be furnished to such holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect and (iii) the number of shares of Common Stock and the amount, if any, of other property which at the time would be received upon the conversion of Series A Preferred Stock.

(i)    No Impairment.  The Corporation shall not, by amendment or restatement of its Amended and Restated Certificate of Incorporation or through any reorganization, transfer of assets, merger, consolidation, conversion transaction, mandatory share exchange, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Corporation, but shall at all times when any of the shares of Series A Preferred Stock remain outstanding in good faith assist in the carrying out of all the provisions of this Section 4 and in the taking of all such actions as may be necessary or appropriate in order to protect the rights of the holders of the Series A Preferred Stock against impairment.  Notwithstanding the foregoing, nothing in this Section 4(i) shall prohibit the Corporation from amending its Amended and Restated Certificate of Incorporation with the requisite consent of its stockholders and the board of directors.

(j)    Waiver of Adjustment of Conversion Price.  Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of the Series A Preferred Stock may be waived by the prior consent or vote of fifty-five percent (55%) of the then-outstanding shares of the Series A Preferred Stock.

(k)    Notices of Record Date.  In the event that this Corporation proposes at any time:

(i)    to declare any Distribution upon its Common Stock, whether in cash, property, stock or other securities, whether or not a regular cash dividend and whether or not out of earnings or earned surplus;

(ii)     to effect any reclassification or recapitalization of its Common Stock outstanding involving a change in the Common Stock; or

(iii)     to approve any Liquidation Event;

then, in connection with each such event, this Corporation shall send to the holders of the Series A Preferred Stock at least 10 days' prior written notice of the date on which a record shall be taken for such Distribution (and specifying the date on which the holders of Common Stock shall be entitled thereto and, if applicable, the amount and character of such Distribution) or for determining rights to vote in respect of the matters referred to in (ii) and (iii) above.

Such written notice shall be given by first class mail (or express courier), postage prepaid, addressed to the holders of Series A Preferred Stock at the address for each such holder as shown on the books of the Corporation and shall be deemed given on the date such notice is mailed.

The notice provisions set forth in this section may be shortened or waived prospectively or retrospectively by the vote or written consent of the holders of at least fifty-five percent (55%) of the then-outstanding shares of Series A Preferred Stock.

(l)     Reservation of Stock Issuable Upon Conversion. The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of effecting the conversion of the shares of the Series A Preferred Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all then outstanding shares of the Series A Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Series A Preferred Stock, the Corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

5.     Voting.

(a)     Restricted Class Voting. Except as otherwise expressly provided in this Section 5 or as required by law, the holders of Series A Preferred Stock and the holders of Common Stock shall vote together and not as separate classes.

(b)     No Series or Class Voting. Other than as provided in this Section 5 or required by law, there shall be no series or class voting.

(c)     Series A Preferred Stock. The holder of each share of Series A Preferred Stock shall have the right to one vote for each share of Common Stock into which such share of Series A Preferred Stock could then be converted as of the record date. The holders of shares of the Series A Preferred Stock shall be entitled to vote on all matters on which the Common Stock shall be entitled to vote. Holders of Series A Preferred Stock shall be entitled to notice of any stockholders' meeting in accordance with the Bylaws of this Corporation. Fractional votes shall not, however, be permitted and any fractional voting rights resulting from the above formula (after aggregating all

-14-

FROM CORPORATION TRUST WI LM. TEAM #2          (MON) 3. 7'05 12:22/ST. 12:19/NO. 4863796908 P 16

shares into which shares of Series A Preferred Stock held by each holder could be converted), shall be disregarded.

(d)    Authorized Number of Directors; Voting for the Election of Directors.

(i)    Authorized Number of Directors.  The authorized number of members of the Board of Directors shall be fixed at five (5).

(ii)    Voting for the Election of Directors.  As long as Brand Equity Ventures II, L.P. and/or any of its affiliates ("*BEV*") collectively own at least twenty-five percent (25%) of the shares of Series A Preferred Stock acquired by them pursuant to the Series A Preferred Stock Purchase Agreement dated as of March 3, 2005 (the "*Series A Purchase Agreement*") (subject to adjustment for Recapitalizations affecting such shares), BEV shall be entitled to designate one (1) member of the Board.  As long as Walnut Investment Partners, L.P., Walnut Private Equity Fund, L.P. and/or any of its affiliates ("*Walnut*") own at least twenty-five percent (25%) of the shares of Series A Preferred Stock acquired by them pursuant to the Series A Purchase Agreement (subject to adjustment for Recapitalizations affecting such shares), Walnut shall be entitled to designate one (1) member of the Board.  As long as Millevere Holdings Limited and/or any of its affiliates ("*Millevere*") collectively own at least twenty-five percent (25%) of the shares of Series A Preferred Stock acquired by them pursuant to the Series A Purchase Agreement (subject to adjustment for Recapitalizations affecting such shares), Millevere shall be entitled to designate one (1) member of the Board.  If any one (1) or more of BEV, Walnut or Millevere fail to meet the minimum ownership requirements set forth above, it or they shall lose their Board designation rights and the director formerly designated by BEV, Walnut or Millevere (as the case may be) shall be elected by the holders of the Series A Preferred Stock, voting as a separate class.  The holders of the Common Stock, voting as a separate class, shall be entitled to elect two (2) members of the Board (the "*Common Directors*").

(iii)    Quorum; Required Vote.

(1)    Quorum.  At any meeting held for the purpose of electing directors, the presence in person or by proxy of the holders of a majority of the shares of the Series A Preferred Stock or Common Stock, then outstanding, respectively, shall constitute a quorum for the election of directors to be designated by BEV, Walnut or Millevere or elected solely by the holders of the Series A Preferred Stock or Common Stock, respectively, in each case as provided in Section 5(d)(ii) above.

(2)    Required Vote.  With respect to the election of any director or directors by the holders of the outstanding shares of a specified series, class or classes of stock given the right to elect or designate such director or directors pursuant to Section 5(d)(ii) above (the "*Specified Stock*") or by specified holders of such shares ("*Specified Holders*"), that candidate or those candidates (as applicable) shall be elected who either:  (i) in the case of any such vote conducted at a meeting of the holders of such Specified Stock, receive the highest number of affirmative votes (on an as-converted basis) of the outstanding shares of such Specified Stock, up to the number of directors to be elected by such Specified Stock or receive the vote of the Specified Holder(s), as the case may be; or (ii) in the case of any such vote taken by written consent without a

meeting, are elected by the written consent of the holders of a majority of the outstanding shares of such Specified Stock or by the written consent of the Specified Holder(s), as the case may be.

(iv)    Vacancy.    If there shall be any vacancy in the office of a director elected or to be elected by the holders of any Specified Stock or by any Specified Holder, then a director to hold office for the unexpired term of such directorship may be elected by either: (i) a majority of the remaining director or directors (if any) in office that were so elected by the holders of such Specified Stock, by the affirmative vote of a majority of such directors (or by the sole remaining director elected by the holders of such Specified Stock if there be but one), or (ii) the required vote of holders of the shares of such Specified Stock specified in Section 5(d)(iii) above that are entitled to elect such director or by the Specified Holders, as the case may be.

(v)    Removal.    Subject to Section 141(k) of the General Corporation Law, any director who shall have been elected to the Board by the holders of any Specified Stock, or by any director or directors elected by holders of any Specified Stock as provided in Section 5(d)(iv) above or by designation of a Specified Holder, may be removed during his or her term of office, without cause, by, and only by, the affirmative vote of shares representing a majority of the voting power, on an as-converted basis, of all the outstanding shares of such Specified Stock entitled to vote, given either at a meeting of such stockholders duly called for that purpose or pursuant to a written consent of stockholders without a meeting or by the Specified Holders, as the case may be, and any vacancy created by such removal may be filled only in the manner provided in Section 5(d)(iv) above.

(vi)    Procedures.    Any meeting of the holders of any Specified Stock, and any action taken by the holders of any Specified Stock by written consent without a meeting, in order to elect or remove a director under this Section 5(d), shall be held in accordance with the procedures and provisions of the Corporation's Bylaws, the General Corporation Law and applicable law regarding stockholder meetings and stockholder actions by written consent, as such are then in effect (including but not limited to procedures and provisions for determining the record date for shares entitled to vote).

(e)    Common Stock.    Each holder of shares of Common Stock shall be entitled to one vote for each share thereof held.

(f)    Protective Provisions.    As long as at least a majority of the total number of shares (subject to adjustment from time to time for Recapitalizations occurring and as otherwise set forth elsewhere herein) of Series A Preferred Stock issued by the Corporation shall be issued and outstanding, the Corporation shall not, without first obtaining the approval (by vote or written consent as provided by law) of the holders of at least fifty-five percent (55%) of the then-outstanding shares of Series A Preferred Stock:

(i)    increase or decrease the authorized number of shares of Series A Preferred Stock;

-16-

(ii)    authorize or create (by reclassification or otherwise) any new class or series of shares having rights, preferences or privileges senior to or on a parity with the Series A Preferred Stock;

(iii)    materially change the nature of the Corporation's business (which shall not include any expansion of the Corporation or its acquisition of related or strategic businesses);

(iv)    amend, alter or repeal any provision of the Amended and Restated Certificate of Incorporation or Bylaws of the Corporation (whether directly or by means of a merger, consolidation, conversion transaction or mandatory share exchange) in a manner that adversely affects the rights of the holders of the Series A Preferred Stock;

(v)    consummate a Liquidation Event, unless pursuant thereto, the holders of Series A Preferred Stock receive a return for each shares of Series A Preferred Stock equal to at least four times (4x) the Original Issue Price;

(vi)    issue or incur any indebtedness of the Corporation in excess of $3,000,000;

(vii)    enter into, amend, alter or repeal any agreement, directly or indirectly, with officers, employees, stockholders or directors of the Company, other than employment agreements, compensation arrangements, stock options, or other service related transactions that are approved by the Board of Directors (including either the BEV Director or the Walnut Director);

(viii)    enter into any agreements, directly or indirectly, with any person to issue any capital stock of the Corporation in return for goods and services provided by such person;

(ix)    initiate the voluntary dissolution or winding-up or reorganization of the Corporation; or

(x)    amend this Section 5(f).

6.    Redemption.

(a)    At any time after March 3, 2011, and at the election of the holders of at least 30% of the then outstanding shares of Series A Preferred Stock (including all affiliated holders), this Corporation shall redeem, out of funds legally available therefore, all (but not less than all) outstanding shares of Series A Preferred Stock which have not been converted into Common Stock pursuant to Section 4 hereof, on a date not more than sixty (60) days after the Corporation's receipt of notice of the election by such holders (the "*Redemption Date*"). The Corporation shall redeem the shares of Preferred Stock by paying in cash an amount per share equal the greater of (i) the Original Issue Price for such Series A Preferred Stock plus any unpaid portion of the Accrued Dividend Amount and any other declared but unpaid dividends with respect to such share of Preferred Stock, or (ii) the fair market value of the Series A Preferred Stock (determined by an independent appraisal by an investment bank or other financial services firm reasonably acceptable to the Corporation and the holders of the Series A Preferred Stock electing redemption and

-17-

calculated without regard to any minority or lack of marketability discounts) (the greater of (i) or (ii), the "*Redemption Price*"). If the funds legally available for redemption of the Series A Preferred Stock shall be insufficient to permit the payment to such holders of the full respective Redemption Prices, the Corporation shall effect such redemption *pro rata* among the holders of the Series A Preferred Stock so that each holder of Series A Preferred Stock shall receive a redemption payment equal to a fraction of the aggregate amount legally available for redemption, the numerator of which is the number of shares of Series A Preferred Stock held by such holder with each number multiplied by the Redemption Price of each share of Series A Preferred Stock held by such holder, and the denominator of which is the number of shares of Series A Preferred Stock outstanding multiplied by the Redemption Price of each such outstanding share of Series A Preferred Stock. Notwithstanding the foregoing, the Corporation shall not be required to redeem any shares of Series A Preferred Stock if the Board of Directors determines in good faith that such redemption would (i) cause the Corporation to be insolvent or (ii) cause the Corporation to be in default of any outstanding indebtedness.

(b)      Any redemption effected pursuant to <u>Section 6(a)</u> shall be made on a *pro rata* basis among the holders of the Series A Preferred Stock in proportion to the shares of Series A Preferred Stock then held by them.

(c)      At least 15 days, but no more than 30 days, prior to the Redemption Date, written notice shall be mailed, first class postage prepaid, to each holder of record (at the close of business on the business day next preceding the day on which notice is given) of the Series A Preferred Stock to be redeemed, at the address last shown on the records of the Corporation for such holder, notifying such holder of the redemption to be effected, specifying the number of shares to be redeemed from such holder, the Redemption Date, the Redemption Price, the place at which payment may be obtained and calling upon such holder to surrender to the Corporation, in the manner and at the place designated, the holder's certificate or certificates representing the shares to be redeemed (the "*Redemption Notice*"). Except as provided herein, on or after the Redemption Date each holder of Series A Preferred Stock to be redeemed shall surrender to this Corporation the certificate or certificates representing such shares, in the manner and at the place designated in the Redemption Notice, and thereupon the Redemption Price of such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof and each surrendered certificate shall be cancelled. In the event less than all the shares represented by any such certificate are redeemed, a new certificate shall be issued representing the unredeemed shares.

(d)      From and after the Redemption Date, unless there shall have been a default in payment of the Redemption Price, all rights of the holders of shares of Series A Preferred Stock designated for redemption in the Redemption Notice as holders of Series A Preferred Stock (except the right to receive the Redemption Price without interest upon surrender of their certificate or certificates) shall cease with respect to the shares designated for redemption on such date, and such shares shall not thereafter be transferred on the books of the Corporation or be deemed to be outstanding for any purpose whatsoever. If the funds of the Corporation legally available for redemption of shares of Series A Preferred Stock on the Redemption Date are insufficient to redeem the total number of shares of Series A Preferred Stock to be redeemed on such date, those funds which are legally available may be used to redeem the maximum possible number of such shares ratably among the holders of such shares to be redeemed based upon their holdings of Series A

Preferred Stock. The shares of Series A Preferred Stock not redeemed shall remain outstanding and entitled to all the rights and preferences provided herein. At any time thereafter when additional funds of the Corporation are legally available for the redemption of shares of Series A Preferred Stock such funds shall be used to redeem the balance of the shares which the Corporation has become obliged to redeem on any Redemption Date, but which it has not redeemed.

(e)     On or prior to the Redemption Date, the Corporation may deposit the Redemption Price of all shares of Series A Preferred Stock designated for redemption in the Redemption Notice and not yet redeemed with a bank or trust corporation having aggregate capital and surplus in excess of $1,000,000,000, as a trust fund for the benefit of the respective holders of the shares designated for redemption and not yet redeemed, with irrevocable instructions and authority to the bank or trust corporation to pay the Redemption Price for such shares to their respective holders on or after the Redemption Date upon receipt of notification from the Corporation that such holder has surrendered a share certificate to the Corporation pursuant to Section 6(c) above. As of the Redemption Date, the deposit shall constitute full payment of the shares to their holders, and from and after the Redemption Date the shares so called for redemption shall be redeemed and shall be deemed to be no longer outstanding, and the holders thereof shall cease to be stockholders with respect to such shares and shall have no rights with respect thereto except the right to receive from the bank or trust corporation payment of the Redemption Price of the shares, without interest, upon surrender of their certificates therefore. Such instructions shall also provide that any moneys deposited by the Corporation pursuant to this Section 6(e) for the redemption of shares thereafter converted into shares of the Corporation's Common Stock pursuant to Section 4 hereof prior to the Redemption Date shall be returned to the Corporation forthwith upon such conversion. The balance of any moneys deposited by the Corporation pursuant to this Section 6(e) remaining unclaimed at the expiration of two (2) years following the Redemption Date shall thereafter be returned to the Corporation upon its request expressed in a resolution of the Board of Directors.

7.     Reissuance of Series A Preferred Stock.  In the event that any shares of Series A Preferred Stock shall be converted pursuant to Section 4, redeemed pursuant to Section 6 or otherwise repurchased by the Corporation, the shares so converted, redeemed or repurchased shall be cancelled and may not be re-issued by this Corporation.

8.     Notices.  Any notice required by the provisions of this Article V to be given to the holders of Series A Preferred Stock shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to each holder of record at such holder's address appearing on the books of the Corporation.

## ARTICLE VI

The Corporation is to have perpetual existence.

## ARTICLE VII

Elections of directors need not be by written ballot unless a stockholder demands election by written ballot at the meeting and before voting begins or unless the Bylaws of the Corporation shall so provide.

-19-

## ARTICLE VIII

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors of the Corporation is expressly authorized to make, alter, amend or repeal the Bylaws of the Corporation.

## ARTICLE IX

To the fullest extent permitted by the Delaware General Corporation Law, or any other applicable law, as the same exists or may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for any action taken, or any failure to take any action, as a director.

The Corporation shall indemnify and hold harmless, to the fullest extent permitted by the Delaware General Corporation Law, or any other applicable law, as the same exists or may hereafter be amended, any director of the Corporation who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "*Proceeding*") by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director, officer, employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, manager, officer, employee or agent of another corporation or of a partnership, joint venture, trust, limited liability company, enterprise or non-profit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses reasonably incurred by such person in connection with any such Proceeding. The Corporation shall be required to indemnify a person in connection with a Proceeding initiated by such person only if the Proceeding was authorized by the Board of Directors. The Corporation shall also advance expenses to the officers and directors of the Corporation to the fullest extent permitted by the Delaware General Corporation Law.

The Corporation shall have the power (but not the obligation) to indemnify and hold harmless, to the extent permitted by the Delaware General Corporation Law, or any other applicable law, as the same exists or may hereafter be amended, any officer, employee or agent of the Corporation who was or is made or is threatened to be made a party or is otherwise involved in any Proceeding by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was an officer, employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, manager, officer, employee or agent of another corporation or of a partnership, joint venture, trust, limited liability company, enterprise or non-profit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses reasonably incurred by such person in connection with any such Proceeding.

Neither any amendment nor repeal of this Article IX, nor the adoption of any provision of this Amended and Restated Certificate of Incorporation inconsistent with this Article IX, shall eliminate or reduce the effect of this Article in respect of any matter occurring, or any cause of action, suit or claim accruing or arising or that, but for this Article IX, would accrue or arise, prior to such amendment, repeal or adoption of an inconsistent provision.

PALIB2_2940840_11.DOC

-20-

## ARTICLE X

Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws may provide. The books of the Corporation may be kept (subject to any provision contained in the statutes) outside of the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

## ARTICLE XI

This Amended and Restated Certificate of Incorporation may only be amended by the affirmative vote or consent of a majority of the shares of the then-outstanding Common Stock and Series A Preferred Stock, voting together as a single class. Notwithstanding the foregoing, Article IV and Article V and this Article XI of this Amended and Restated Certificate of Incorporation may not be amended or restated (whether directly or by means of a merger, consolidation, conversion transaction or mandatory share exchange) or any term thereof waived without the prior affirmative vote or consent of fifty-five percent (55%) of the then-outstanding shares of Series A Preferred Stock, voting separately as a class; *provided, however* that such vote or consent shall be binding upon all holders of Series A Preferred Stock.

* * * * *

PALIB2_2940840_11.DOC

# EXHIBIT B

# Delaware

PAGE   1

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "THE LOVESAC CORPORATION", FILED IN THIS OFFICE ON THE TENTH DAY OF DECEMBER, A.D. 2004, AT 2:14 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

3894418   8100

040894285

AUTHENTICATION: 3538796

DATE: 12-10-04

CM CORPORATION TRUST WILM. TEAM #2        (FRI)12.10'04 14:20/ST. 14:19/NO. 4863796961 P  2

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 02:20 PM 12/10/2004*
*FILED 02:14 PM 12/10/2004*
*SRV 040894285 – 3894418 FILE*

# CERTIFICATE OF INCORPORATION OF

# THE LOVESAC CORPORATION

## ARTICLE I

The name of the corporation is The LoveSac Corporation (the "*Corporation*").

## ARTICLE II

The address of the Corporation's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of its registered agent at such address is The Corporation Trust Company.

## ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware as the same exists or may hereafter be amended.

## ARTICLE IV

This Corporation is authorized to issue one class of shares to be designated Common Stock. The total number of shares of Common Stock the Corporation has authority to issue is 15,000,000 with par value of $0.0001 per share.

## ARTICLE V

The name and mailing address of the incorporator are as follows:

Jason K. Robertson
Wilson Sonsini Goodrich & Rosati
2795 East Cottonwood Parkway, Suite 300
Salt Lake City, UT 84121

## ARTICLE VI

In furtherance and not in limitation of the powers conferred by statute, the board of directors of the Corporation is expressly authorized to make, alter, amend or repeal the bylaws of the Corporation.

## ARTICLE VII

Elections of directors need not be by written ballot unless otherwise provided in the bylaws of the Corporation.

PALIB2 2939372_1.DOC

## ARTICLE VIII

To the fullest extent permitted by the Delaware General Corporation Law, or any other applicable law, as the same exists or may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for any action taken, or any failure to take any action, as a director.

The corporation shall indemnify and hold harmless, to the fullest extent permitted by the Delaware General Corporation Law, or any other applicable law, as the same exists or may hereafter be amended, any director of the Corporation who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "*Proceeding*") by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director, officer, employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses reasonably incurred by such person in connection with any such Proceeding. The Corporation shall be required to indemnify a person in connection with a Proceeding initiated by such person only if the Proceeding was authorized by the Board.

The Corporation shall have the power to indemnify and hold harmless, to the extent permitted by the Delaware General Corporation Law, or any other applicable law, as the same exists or may hereafter be amended, any officer, employee or agent of the Corporation who was or is made or is threatened to be made a party or is otherwise involved in any Proceeding by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was an officer, employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses reasonably incurred by such person in connection with any such Proceeding.

Neither any amendment nor repeal of this Article, nor the adoption of any provision of this Certificate of Incorporation inconsistent with this Article, shall eliminate or reduce the effect of this Article in respect of any matter occurring, or any cause of action, suit or claim accruing or arising or that, but for this Article, would accrue or arise, prior to such amendment, repeal or adoption of an inconsistent provision.

## ARTICLE IX

Except as provided in **Article VIII** above, the Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

RCM CORPORATION TRUST WILM. TEAM #2          (FRI)12. 10' 04 14:21/ST. 14:19/NO. 4863796961 P   4

I, the undersigned, as the sole incorporator of the Corporation, have signed this Certificate of Incorporation on December 10, 2004.

/s/ Jason K. Robertson
Jason K. Robertson, Incorporator

# EXHIBIT C

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Kimberley S. Smith (513) 579-6953

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

    Kimberley S. Smith
    Keating, Muething & Klekamp PLL
    One East Fourth Street Suite 1400
    Cincinnati, Ohio 45202

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 11:00 AM 09/19/2005
INITIAL FILING NUM: 5235725 7
AMENDMENT NUMBER: 0000000
SRV: 050767076

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| The Lovesac Corporation | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 155 North West, Suite 520 | Salt Lake City | UT | 84103 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | corporation | Delaware | 3894418 ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Walnut Investment Partners, L.P. | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 312 Walnut Street Suite 1151 | Cincinnati | OH | 45202 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

Debtor and Secured Party have entered into three (3) 15% Secured Promissory Bridge Notes dated as of September 15, 2005 for a total principal sum of $630,000.  To secure the obligations of the Debtor to the Secured Party under the Notes, the Debtor hereby grants a second priority security interest to Secured Party in the collateral more particularly described on Exhibit A attached hereto and incorporated herein.

| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum (if applicable) | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 | |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

DEUCC1F04T - 12/17/2002 C T System Online

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| | |
|---|---|
| **9a. ORGANIZATION'S NAME** The Lovesac Corporation | |
| OR **9b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** / **MIDDLE NAME, SUFFIX** |

**10. MISCELLANEOUS:**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one name (11a or 11b) - do not abbreviate or combine names

| | | | |
|---|---|---|---|
| **11a. ORGANIZATION'S NAME** | | | |
| OR **11b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
| **11c. MAILING ADDRESS** | **CITY** | **STATE** / **POSTAL CODE** | **COUNTRY** |
| **11d. SEE INSTRUCTIONS** | **ADD'L INFO RE ORGANIZATION DEBTOR** | **11e. TYPE OF ORGANIZATION** | **11f. JURISDICTION OF ORGANIZATION** | **11g. ORGANIZATIONAL ID #, if any** ☐ NONE |

**12.** ☑ **ADDITIONAL SECURED PARTY'S** or ☐ **ASSIGNOR S/P'S NAME** - insert only one name (12a or 12b)

| | | | |
|---|---|---|---|
| **12a. ORGANIZATION'S NAME** Walnut Private Equity Fund, L.P. | | | |
| OR **12b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
| **12c. MAILING ADDRESS** 312 Walnut Street Suite 1151 | **CITY** Cincinnati | **STATE** OH / **POSTAL CODE** 45202 | **COUNTRY** USA |

**13. This FINANCING STATEMENT covers** ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

**14. Description of real estate.**

**16. Additional collateral description:**

**15. Name and address of a RECORD OWNER of above-described real estate** (if Debtor does not have a record interest)

**17. Check only if applicable and check only one box.**
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18. Check only if applicable and check only one box.**
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years
☐ Filed in connection with a Public-Finance Transaction — effective 30 years

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/22/02)

DEUCC1AD - 10/07/02 C T System Online

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| | 9a. ORGANIZATION'S NAME | | |
|---|---|---|---|
| OR | The Lovesac Corporation | | |
| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |

**10. MISCELLANEOUS:**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11b) - do not abbreviate or combine names**

| | 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 11c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | NONE |

**12.** ☑ **ADDITIONAL SECURED PARTY'S** or ☐ **ASSIGNOR S/P'S  NAME - insert only one name (12a or 12b)**

| | 12a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | Brand Equity Ventures II, L.P. | | | |
| | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 12c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| One Stamford Plaza 263 Tresser Blvd. 16th Floor | | Stamford | CT | 06901 | USA |

**13.** This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

**14.** Description of real estate:

**16.** Additional collateral description:

**15.** Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

**17.** Check *only* if applicable and check *only* one box.

Debtor is a ☐ Trust  or ☐ Trustee acting with respect to property held in trust  or ☐ Decedent's Estate

**18.** Check *only* if applicable and check *only* one box.

☐ Debtor is a TRANSMITTING UTILITY

☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years

☐ Filed in connection with a Public-Finance Transaction — effective 30 years

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/22/02)

DEUCC1AD - 10/07/02 C T System Online

## EXHIBIT A

(A)    *Inventory.*  All of Debtor's inventory of every description which is held by the Debtor for sale or is furnished by Debtor under any contract of service or is held by Debtor as raw materials, work in process or materials used or consumed in a business, whether now owned or hereafter acquired, wherever located, and as the same may now and hereafter from time to time be constituted, together with all cash and non-cash proceeds and products thereof (the "Inventory").

(B)    *Accounts.*  All of Debtor's accounts (including, without limitation, all notes, notes receivable, drafts, acceptances and similar instruments and documents) whether now owned or hereafter acquired, together with: (i) all cash and non-cash proceeds and products thereof; and (ii) all returned, rejected, or repossessed goods, the sale of which shall have given or shall give rise to an account; and (iii) all cash and non-cash proceeds and products of all such goods (the "Accounts").

(C)    *General Intangibles; Including Commercial Tort Claims.*  All of Debtor's general intangibles (including, without limitation, any proceeds from insurance policies), patents and applications therefor, unpatented inventions, trade secrets, copyrights, contract rights, goodwill, rights under licenses, choses-in-action, claims, information contained in computer media (such as data bases, source and object codes and information therein), trademarks and applications therefor, trade names, including the right to make, use, and vend goods utilizing any of the foregoing, permits, licenses, certifications, authorizations and approvals, the rights of Debtor thereunder, issued by any governmental, regulatory, or private authority, agency, or entity and other general intangibles (including commercial tort claims), whether now owned or hereafter acquired, together with all cash and non-cash proceeds and products thereof.

(D)    *Cash, Investment Property and Chattel Paper.*  All of Debtor's cash, cash equivalents, investment property and chattel paper, whether now owned or hereafter existing, acquired, or created, together with: (i) all moneys due and to become due thereafter; (ii) all cash and non-cash proceeds thereof; and (iii) all returned, rejected, or repossessed goods, the sale or lease of which shall have given or shall give rise to chattel paper; and (iv) all cash and non-cash proceeds and products of all such assets or goods (the "Chattel Paper").

(E)    *All Equipment and Fixtures.*  All of Debtor's equipment (including all motor vehicles) and fixtures, whether now owned or hereafter acquired, together with: (i) all additions, parts, fittings, accessories, special tools, attachments, and accessions now and hereafter affixed thereto and/or used in connection therewith; (ii) all replacements thereof and substitutions therefor; and (iii) all cash and non-cash proceeds and products thereof (the "Equipment").

1503472.1