# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| G & G LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 07-440-SLR |
| | ) |
| VERDI WHITE, III, DOYLE JUDD, | ) |
| CRAIG COX, TIM WEILAND, BRAND | ) |
| EQUITY VENTURES II LP, WALNUT | ) |
| INVESTMENT PARTNERS LP, | ) |
| WALNUT PRIVATE EQUITY FUND LP, | ) |
| WALNUT GROUP, MILLEVERE | ) |
| HOLDINGS LIMITED, DANIEL | ) |
| YARNELL, JAMES GOULD, SIMON | ) |
| WRIGHT, WALT SPOKOWSKI, | ) |
| WILSON SONSINI GOODRICH & | ) |
| ROSATI PC, and LILY C. WONG | ) |
| LANGEN, | ) |
| | ) |
| Defendants. | ) |

Virginia Whitehill Guldi and Thomas G. Macauley of Zuckerman Spaeder, L.L.P,
Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Marc E. Albert and Janet M.
Nesse of Stinson Morrison Hecker, L.L.P., Washington, D.C.

Michael A. Weidinger of Morris James, L.L.P., Wilmington, Delaware. Joseph S. Naylor
of Balick & Balick, L.L.C., Wilmington, Delaware. Counsel for Defendants Brand Equity
Ventures II, L.P., Walnut Investment Partners, L.P., Walnut Private Equity Fund, L.P.,
The Walnut Group, Millevere Holdings Limited, David Yarnell, James Gould, Simon
Wright and Walt Spokowski. Of Counsel: Michael L. Scheier and Joseph L. Bruemmer
of Keating, Muething & Klekamp, P.L.L., Cincinnati, Ohio.

## MEMORANDUM OPINION

Dated: January 25, 2008
Wilmington, Delaware

Robinson, District Judge.

## I. INTRODUCTION

On July 13, 2007, plaintiff Gourley & Gourley, LLC ("G & G") filed this suit against numerous defendants (collectively, "defendants") alleging various claims relating to 2.8 million dollars it had loaned to a Utah corporation, the LoveSac Corporation ("LoveSac Utah").[1] (D.I. 19 at ¶ 1) More specifically, G & G asserts that LoveSac Utah and a Delaware corporation, the LoveSac Corporation ("LoveSac Delaware"), merged and fraudulently concealed from G & G the merger and accompanying transfer of assets, thereby preventing G & G from perfecting its security interest. (Id.) On September 21, 2007, several defendants moved for dismissal based on lack of personal jurisdiction.[2] (D.I. 26) That same day, assorted defendants, including the moving defendants, moved to dismiss pursuant to the first-to-file rule or, alternatively, to stay the action. (D.I. 28) For the reasons that follow, both motions to dismiss (D.I. 26, 28) are denied without prejudice and with leave to renew.

## II. BACKGROUND[3]

### A. The Parties

G & G is a Virginia limited liability company, with its principal place of business in

---

[1]G & G subsequently amended this complaint on August 30, 2007. (D.I. 19)

[2]These defendants are: David Yarnell ("Yarnell"), James Gould ("Gould"), Simon Wright ("Wright"), Walt Spokowski ("Spokowski") and Millevere Holdings Limited ("Millevere") (collectively, the "moving defendants"). (D.I. 26)

[3]For purposes of these motions only, the facts alleged in the amended complaint are taken as true. See Christ v. Cormick, Civ. No. 06-275, 2007 WL 2022053, at *1 (D. Del. July 10, 2007).

McLean, Virginia.[4]  (D.I. 19 at ¶ 11)  With the exception of Millevere, the moving

defendants are all directors or officers of LoveSac Delaware who reside outside of

Delaware.[5]  (Id. at ¶¶ 3-4, 15, 23-25)  Yarnell also is the managing general partner of

another defendant in the case at bar, Brand Equity Ventures, II, LP ("Brand Equity").[6]

(Id. at ¶ 23)  Gould is the managing general partner of the Walnut Group, also a

defendant in the present suit.[7]  (Id. at ¶ 24)  Millevere, a foreign corporation organized

under the laws of the British Virgin Islands, owns 27.2% of LoveSac Delaware's stock,

which comprised Millevere's "only holding at the times material to this action."  (Id. at ¶¶

22, 45; D.I. 27, ex. E at ¶¶ 2-3)

### B. The Loan

In September 2003, LoveSac Utah approached G & G for a loan to finance its

day-to-day operations.  (D.I. 19 at ¶ 28)  On October 30, 2003, G & G issued a

revolving line of credit ("loan") to LoveSac Utah, evidenced by a revolving credit line

---

[4]Trent Gourley, not a party to this suit, is a principal of G & G.  (D.I. 19 at ¶ 11)

[5]Spokowski is the Interim Chief Executive Officer of LoveSac Delaware and resides in either Massachusetts or Utah.  (D.I. 19 at ¶¶ 15, 25)  Wright, Gould and Yarnell are directors of LoveSac Delaware who reside in California, Ohio, and Connecticut, respectively.  (Id. at ¶¶ 15, 23-25)

[6]Brand Equity is a Connecticut limited partnership with its principal place of business in Greenwich, Connecticut.  (D.I. 19 at ¶ 18)  Brand Equity is the owner of 27.2% of LoveSac Delaware's stock.  (Id.)

[7]The Walnut Group is an Ohio corporation, with its principal place of business in Cincinnati, Ohio, that controls two other defendants in this case, Walnut Investment Partners, L.P. ("Walnut Investment") and Walnut Private Equity Fund ("Walnut Private Equity").  (D.I. 19 at ¶ 21)  Walnut Investment and Walnut Private Equity are Delaware limited liability partnerships with their principal places of business in Cincinnati, Ohio, owning 18.48% and 9.24% of LoveSac Delaware's stock, respectively.  (Id. at ¶¶ 19-20)

deed of trust note ("note"). (Id.) Under the note terms, G & G agreed to lend up to 2.8 million dollars to LoveSac Utah.[8] (Id. at ¶¶ 29-30) The note was secured by a revolving credit line deed of trust, fixture filing and security agreement, and an assignment of leases and rents ("deed of trust documents").[9] (Id. at ¶ 29) In addition, the note terms, in part, secured real property located in Weber County, Utah. (Id. at ¶ 30) G & G perfected its security interest upon filing financing statements in Utah.[10] (Id.) A loan disbursement agreement, entered into by G & G and LoveSac Utah, governed advances under the note. (Id. at ¶ 35) Ultimately, relying on the representations of LoveSac Utah and its agents, G & G lent the full amount to LoveSac Utah. (Id. at ¶ 36)

In 2004, LoveSac Utah attempted to secure further financing. (Id. at ¶ 37) In particular, the Walnut Group organized a group of investors comprised of Walnut Private Equity, Walnut Investment, Brand Equity and Millevere (collectively, the "Investor defendants"). (Id.) In November 2004, a representative of the Walnut Group, acting on behalf of the Investor defendants, telephoned Trent Gourley and apprised him

---

[8]The original maturity date of the loan was November 1, 2005. (D.I. 19 at ¶ 59)

[9]In connection with the note and deed of trust documents, LoveSac Utah also executed a security agreement ("security agreement") granting G & G a first position, blanket lien on LoveSac Utah's personal property ("collateral"). (D.I. 19 at ¶ 31)

[10]Additionally, James Hyde ("Hyde") of LoveSac (Utah and Delaware), defendant Verdi White ("White") of LoveSac (Utah and Delaware), Shawn Nelson ("Nelson"), and Scott McDonough ("McDonough") (collectively, the "guarantors") executed an unconditional guaranty agreement pursuant to which they each, jointly, severally, unconditionally, and personally, guaranteed repayment of the loan. (D.I. 19 at ¶¶ 12, 13, 32) The guarantors also entered into a stock pledge, assignment and security agreement ("stock pledge agreement") pursuant to which 80% of the outstanding shares of LoveSac Utah were pledged to G & G. (Id. at ¶ 33) The pledged shares of stock were endorsed in blank, and transferred to G & G where they have been held in G & G attorneys' safe since delivery. (Id. at ¶ 34)

3

of the Investor defendants' intention to invest between eight and eleven million dollars in LoveSac Utah. (Id. at ¶ 38) The representative inquired whether G & G would release its stock and subordinate its security interest in the inventory. (Id.) G & G, reluctant to impair its lien position, did not agree to the representative's proposal and so informed the representative. (Id.)

## C. The Merger

Subsequent to this conversation and based on G & G's refusal, the Investor defendants insisted that LoveSac Delaware merge with LoveSac Utah. (Id. at ¶¶ 39, 48) On December 7, 2004, LoveSac Utah's Board of Directors adopted resolutions to effect a merger with LoveSac Delaware. (Id.) From the inception of the relationship with LoveSac Utah through 2006, when LoveSac Delaware filed for bankruptcy, the Investor defendants controlled LoveSac Utah, LoveSac Delaware, and their officers and directors. (Id.)

In January 2005, Doyle Judd ("Judd")[11] sent two emails to G & G. (Id. at ¶¶ 40-41) The emails advised G & G that LoveSac Utah was in the midst of obtaining equity financing and promised to repay G & G when the financing was acquired. (Id.) On February 4, 2005, a conference call occurred between a representative of G & G, Judd and John Bernloehr ("Bernloehr") of the Walnut Group. (Id. at ¶ 49) Judd and Bernloehr sought to extend G & G's loan for a year or year and a half with a reduction in interest rate because LoveSac Utah expected to be able to repay the loan after acquiring a significantly capitalized borrower. (Id.) LoveSac Utah never repaid G & G's

---

[11]Judd, also a defendant, was the Treasurer and Chief Financial Officer of LoveSac Utah and LoveSac Delaware from 2003 until April 19, 2006. (D.I. 19 at ¶ 14)

4

loan. (Id. at ¶ 41)

At some point, after January 28, 2005, the Investor defendants invested between eight and eleven million dollars in either LoveSac Utah or LoveSac Delaware.[12] (Id. at ¶ 42) On February 25, 2005, LoveSac Utah merged with and into LoveSac Delaware (the "Merger"), with LoveSac Delaware as the surviving entity. (Id. at ¶ 50) The note required LoveSac Utah to provide notice of the Merger to G & G, which LoveSac Utah failed to do. (Id.) In addition, LoveSac Utah failed to notify G & G of the transfer of control to the Investor defendants or the transfer of assets from LoveSac Utah to LoveSac Delaware. (Id.) G & G first became aware of the Merger in March 2006, after LoveSac Delaware filed for bankruptcy. (Id.) G & G contends that all defendants acted in unison, without dissent, to conceal the Merger. (Id. at ¶ 51)

### D. After the Merger

Following the Merger, the Investor defendants received approximately eighty-three percent of LoveSac Delaware's outstanding shares[13] and controlled seventy-five percent of the voting power of LoveSac Delaware's Board of Directors ("Board") in consideration of their contributions to LoveSac Delaware. (Id. at ¶¶ 42-48) In particular, Yarnell, Gould, and Wright, representing the Investor defendants, joined LoveSac Delaware's Board because of the investments made by their respective entities. (Id. at ¶ 46) Each joined the Board after the Merger. (Id.) As with the Merger,

---

[12]It is unclear from the amended complaint exactly when the investments occurred. (See D.I. 19 at ¶¶ 41-50)

[13]Brand Equity, Walnut Investment, Walnut Private Equity and Millevere received 27.72%, 18.48%, 9.24% and 27.72%, respectively. (D.I. 19 at ¶¶ 43-45)

G & G was not informed of the change of composition of the Board and only learned of the changes after the filing of the bankruptcy petition. (Id. at ¶ 47)

Subsequent to the Merger, LoveSac Delaware continued to operate and transact business as LoveSac Utah. (Id. at ¶ 52) Specifically, "LoveSac Utah" entered into three leases and a lease termination agreement after the Merger. (Id. at ¶¶ 53-54) Further, G & G received two communications asking for advances on the existing credit facility from LoveSac Utah in July 2005.[14] (Id. at ¶ 56) The communications used the same company letterhead as prior to the Merger and neither request mentioned the Merger or the transfer of assets. (Id.)

On September 12, 2005, the Investor defendants recorded financing statements with the Delaware Secretary of State that granted them a lien on all of LoveSac Delaware's inventory, accounts, general intangibles including commercial tort claims, cash, investment property and chattel paper and all equipment and fixtures. (Id. at ¶ 57) On September 19, 2005, the Investor defendants recorded additional financing statements in Delaware, securing three fifteen percent promissory bridge notes with all of LoveSac Delaware's inventory, accounts, and general intangibles. (Id. at ¶ 58)

After February 25, 2005 and prior to November 1, 2005, LoveSac Delaware, representing itself as LoveSac Utah, approached G & G about extending the maturity date of the loan.[15] (Id. at ¶ 59) During the loan extension discussions, Bernloehr, in

---

[14]These communications came from Judd and McDonough. (D.I. 19 at ¶ 56)

[15]Judd and Bernloehr were the primary contacts regarding the loan extension. (D.I. 19 at ¶¶ 60-65) Moreover, Judd sent an email to G & G representing that he and Bernloehr would be working together regarding the loan extension's terms. (Id. at ¶ 62)

6

October 2005, sent an email to G & G indicating that he was attaching bank statements that demonstrated the investment made by Walnut Investment, Brand Equity and Millevere. (Id. at ¶ 64) In another email, sent a month after the Investor defendants recorded their financing statements in Delaware, Bernloehr stated: "[G & G's] collateral position is well secured with the first lien on LoveSac's assets and the pledge of the Salt Lake real estate, coupled with the significant capital investment by Walnut, [Brand Equity], and Millevere." (Id. at ¶¶ 64-65) This email, in addition to other emails sent by Judd and Bernloehr discussing the loan extension, failed to mention the Merger and transfer of assets. (Id. at ¶¶ 60-65)

From October 25, 2005 through November 9, 2005, Lily C. Wong Langen ("Langen"),[16] an attorney working for LoveSac, communicated with G & G regarding the loan extension's terms. (Id. at ¶¶ 66-75) During these negotiations, Langen stated that she would provide the requested financials and projects upon confirmation of G & G's and LoveSac's renewal agreement. (Id. at ¶ 67) On November 3, 2005, G & G's counsel sent to Langen its final offer to extend the loan term. (Id. at ¶ 69) The LoveSac Corporation[17] accepted the final offer for renewal on November 7, 2005. (Id. at ¶ 73) On November 9, 2005, Langen provided the requested documents,[18] none of

---

[16]Langen worked in the offices of Wilson Sonsini Goodrich & Rosati ("Wilson Sonsini"). (D.I. 19 at ¶¶ 26-27) Langen and Wilson Sonsini, originally defendants in this suit, were dismissed from the case pursuant to a stipulation by the parties. (D.I. 44)

[17]For this allegation, the amended complaint does not distinguish between LoveSac Utah and LoveSac Delaware, consequently, neither does the court. (See D.I. 19 at ¶ 73)

[18]Langen provided the following false documents: the LoveSac Equity Structure, the LoveSac FY2005-06 Operating Plan, the LoveSac Business Plan, and the financial

which revealed the Merger or the transfer of assets to LoveSac Delaware. (Id. at ¶ 75) Also, during these negotiations, Bernloehr sent a facsimile with "The Walnut Group" letterhead to Trent Gourley at G & G, which similarly did not disclose anything about the Merger. (Id. at ¶ 72)

Langen also provided to G & G a document entitled "Common Stock Ledger." (Id. at ¶ 77) The common stock ledger refers to "The LoveSac Corporation" and provides that G & G continues to hold its stock interests as previously represented prior to LoveSac's acceptance of the Investor defendants' equity. (Id.) On November 15, 2005, the First Omnibus Amendment to Loan Documents ("loan amendment") was executed. (Id. at ¶ 78) The loan amendment, prepared by G & G's counsel, refers to LoveSac as a Utah corporation. (Id.) The loan amendment was reviewed and edited by Wilson Sonsini; however, no revision was made to reflect that LoveSac Utah had become LoveSac Delaware. (Id. at ¶¶ 78, 79) Wilson Sonsini also drafted a corporate resolution that authorized the loan amendment and refers to the "LoveSac Corporation" as a Delaware corporation. (Id. at ¶ 78) Also, on November 15, 2005, G & G received an affirmation from Langen representing that G & G's ownership of stock remained valid. (Id. at ¶¶ 80-81) Langen's email, copied to Bernloehr, stated that "the stock certificates [G & G] currently hold[s] . . . remain issued and outstanding and LoveSac's records [note that] these certificates are pledged to G & G." (Id. at ¶ 81)

On January 25, 2006, LoveSac Delaware filed a Second Amended and Restated Certificate of Incorporation ("Amended Certificate") with the Delaware Secretary of

_____

statements for Period 8 of the current fiscal year (the most recent published operating statement and balance sheet). (D.I. 19 at ¶¶ 74, 76)

8

State. (Id. at ¶ 82)  On January 30, 2006, LoveSac Delaware filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. (Id. at ¶ 83)  In the bankruptcy proceeding, LoveSac Delaware and its creditors succeeded in subordinating G & G's position on the ground that G & G's lien was not re-perfected in Delaware following the Merger. (Id. at ¶ 84)

From the time LoveSac Utah approached G & G about a lending relationship through the time of the Merger, LoveSac Utah was insolvent. (Id. at ¶ 85)  From the Merger through the bankruptcy filing, LoveSac Delaware was insolvent. (Id. at ¶ 86) Judd, describing the events of the last quarter in 2005 for LoveSac Delaware, stated: "[C]ome 2006, we simply did not have enough cash or enough prospect of receiving cash to meet all of the obligations that we had." (Id. at ¶ 91)  The bankruptcy proceeding was dismissed for lack of subject matter jurisdiction.

### E. Delaware Contacts

Yarnell, Gould, Wright and Spokowski (the "Director/Officer defendants") do not own any real or personal property, nor have any bank accounts or personal assets, in Delaware. (D.I. 27, exs. A, B, C, D at ¶¶ 3, 4)  In their capacities with LoveSac Delaware, none of the Director/Officer defendants solicited any business in the State of Delaware. (Id., exs. A, B, C, D at ¶ 5)  Similarly, none of the Director/Officer defendants participated in any business meetings in Delaware. (Id., exs. A, B, C, D at ¶ 7)  Neither LoveSac Delaware nor any of the Director/Officer defendants had offices within the State of Delaware. (Id., exs. A, B, C, D at ¶¶ 8-9)

### F. The Ohio Action

9

On May 15, 2007, several defendants from this suit filed an action against G & G and G & G's principal, Trent Gourley, in the United States District Court for the Southern District of Ohio (the "Ohio action"). (D.I. 29 at ¶ 4, ex. A2)  Walnut Investment, Walnut Equity, and Brand Equity, plaintiffs in the Ohio action (collectively, the "Ohio plaintiffs"), amended their complaint on August 3, 2007. (Id. at ¶ 5)  The Ohio action's claims arise out of the discussions regarding the loan extension. (Id., ex. A1 at ¶ 1)  Specifically, the Ohio plaintiffs claim that G & G orally agreed to extend the maturity date of the loan on the original terms for an indefinite period of time. (Id., ex. A1 at ¶ 16)  Based on these representations by G & G, the Ohio plaintiffs invested nine million dollars in LoveSac. (Id., ex. A1 at ¶¶ 17-18, 29)  G & G never extended the loan, which was crucial to the Ohio plaintiffs' decision to invest in LoveSac and, according to the Ohio plaintiffs, G & G never intended to honor the oral agreement. (Id., ex. A1 at ¶¶ 18-19)

## III. STANDARD OF REVIEW

Rule 12(b)(2) directs the court to dismiss a case when the court lacks personal jurisdiction over the defendant. Fed. R. Civ. P. 12(b)(2). When reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), a court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor. Traynor v. Liu, 495 F. Supp. 2d 444, 448 (D. Del. 2007). Once a jurisdictional defense has been raised, the plaintiff bears the burden of establishing with reasonable particularity that sufficient minimum contacts have occurred between the defendant and the forum to support jurisdiction. See Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987). To meet this burden, the plaintiff must

10

produce "sworn affidavits or other competent evidence," since a Rule 12(b)(2) motion "requires resolution of factual issues outside the pleadings." Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 67 n.9 (3d Cir. 1984).

To establish personal jurisdiction, the plaintiff must produce facts sufficient to satisfy two requirements by a preponderance of the evidence, one statutory and one constitutional. See Time Share Vacation Club, 735 F.2d at 66; Reach & Assoc. P.C. v. Dencer, 269 F. Supp. 2d 497, 502 (D. Del. 2003). With respect to the statutory requirement, the court must determine whether there is a statutory basis for jurisdiction under the forum state's long arm statute. See id. The constitutional basis requires the court to determine whether the exercise of jurisdiction comports with the defendant's right to due process. See id.; see also Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

Under the Due Process Clause, a foreign defendant is subject to the jurisdiction of the federal judiciary only when the defendant's conduct is such that it should "reasonably anticipate being haled into court there." See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). Personal jurisdiction over a nonresident defendant is proper when either specific or general jurisdiction exists. See Dollar Sav. Bank v. First Sec. Bank of Utah, N.A., 746 F.2d 208, 211 (3d Cir. 1984). "Specific personal jurisdiction exists when the defendant has 'purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or related to those activities.'" BP Chems. Ltd. v. Fibre Corp., 229 F.3d 254, 259 (3d Cir. 2000) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)). General jurisdiction exists when the defendant's contacts with the forum are

11

"continuous and systematic," whether or not the contacts relate to the litigation.  See id.

(quoting Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 416 (1984)).

## IV.  DISCUSSION

> Delaware's long arm statute, in relevant part, provides:

> As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:

> (1) Transacts any business or performs any character of work or service in the State; [or]

> \* \* \*

> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State; . . . .

10 Del. C. § 3104(c).  Subsection (c)(1) confers specific jurisdiction.  Intel Corp.

v. Broadcom Corp., 167 F. Supp. 2d 692, 700 (D. Del. 1992).  Specific

jurisdiction requires that the cause of action arise from the defendant's conduct

in the forum state.  See Provident Nat'l Bank, 819 F.2d at 437.  "Section

3104(c)(1) has been characterized as a 'single act statute' which allows the court

'to exercise jurisdiction over nonresidents on the basis of a single act done or

transaction engaged in by the nonresident within the state.'" Ace & Co., Inc. v.

Balfour Beatty PLC, 148 F. Supp. 2d 418, 422 (D. Del. 2001) (quoting Eudaily v.

Harmon, 420 A.2d 1175, 1180 n.4 (Del. 1980)).  In contrast, subsection (c)(4)

confers general jurisdiction, which requires that the defendant or its agents be

"generally present" in the forum state whether or not the tortious acts and injury

occurred inside Delaware. See Dencer, 269 F. Supp. 2d at 505.

## A. Millevere

### 1. Millevere's Delaware contacts

Millevere's Delaware contacts relating to the Merger are as follows.
Millevere is a foreign corporation and its only holding at the times material to this
action was its shares of LoveSac Delaware's stock, which Millevere received in
consideration of its equity investment in LoveSac Delaware. (D.I. 27, ex. E at ¶¶
2-3; D.I. 19 at ¶¶ 37, 42, 45) Millevere, exercising its control over the LoveSac
corporations, insisted that the Merger between LoveSac Utah and LoveSac
Delaware be effectuated in Delaware. (D.I. 19 at ¶ 39) Millevere is a party to
several agreements, between it and LoveSac Delaware, containing a choice of
law clause that elects Delaware law to govern disputes arising from the
agreements. (D.I. 37, ex. B at ¶ 7.3 of stock purchase agreement, ¶ 8(e) of
voting agreement, ¶ F of right of first refusal and co-sale agreement, ¶ 5.3 of the
investors' rights agreement)

### 2. Consent to jurisdiction

G & G argues that Millevere consented to jurisdiction in this court because
Millevere was a third party beneficiary of the merger agreement ("merger
agreement") between LoveSac Utah and LoveSac Delaware and, as such, is
bound by the "forum selection clause" contained in that agreement. (D.I. 36 at 7-
8) Significantly, the merger agreement does not contain a forum selection
clause; instead, it holds a choice of law provision. (D.I. 37, ex. A at 6)

13

Specifically, paragraph 4.7 of the merger agreement provides: "**Governing Law.**
This Agreement shall in all respects be construed, interpreted and enforced in
accordance with and governed by the laws of the State of Delaware and, so far
as applicable, the merger provisions of the URBCA [Utah Revised Business
Corporation Act]." (Id.) The absence of a forum selection clause precludes a
finding that Millevere consented to jurisdiction in Delaware.[19] See Greene v.
New Dana Perfumes Corp., 287 B.R. 328, 343 (D. Del. 2002) ("[T]he language in
question is a choice-of-law clause (not a forum-selection clause) which would not
equate to a consent of jurisdiction."); see also Hadley v. Shaffer, No. Civ. A. 99-
144, 2003 WL 21960406, at *3 (D. Del. Aug. 12, 2003) (citing Res. Ventures, Inc.
v. Res. Mgmt Int'l, Inc., 42 F. Supp. 2d 423, 431 (D. Del. 1999)) ("When a party
is bound by a forum selection clause, the party is considered to have expressly
consented to personal jurisdiction.").

### 3. Specific jurisdiction pursuant to § 3104(c)(1)

The amended complaint alleges that the Investor defendants insisted on the
Merger because G & G refused to relinquish its priority position on its lien and release

---

[19]Similarly, Millevere did not consent to jurisdiction in Delaware by virtue of its
status as a party to the stock purchase agreement, voting agreement, investors' rights
agreement and right of first refusal and co-sale agreement. These documents also
contain a choice of law provision, characterized as a "forum selection clause" by G & G,
that states: "**Governing Law.** This Agreement shall be governed in all respects by the
internal laws of the State of Delaware as applied to agreements entered into among
Delaware residents to be performed entirely within Delaware, without regard to
principles of conflicts of laws." (D.I. 37, ex. B at ¶ 7.3 of stock purchase agreement, ¶
8(e) of voting agreement, ¶ F of right of first refusal and co-sale agreement, ¶ 5.3 of the
investors' rights agreement) Given this, an analysis of Millevere's alleged third party
beneficiary status is unnecessary.

its stock with LoveSac Utah. (D.I. 19 at ¶ 39) The balance of G & G's claims is that it was injured as a result of defendants' conspiracy to conceal from G & G the Merger and accompanying transfer of assets.[20] (Id. at ¶ 51; D.I. 36 at 9) It follows that, for specific jurisdiction to exist, it must come from Millevere's acts in Delaware relating to its participation in the Merger and subsequent concealment of it. See Dencer, 269 F. Supp. 2d at 504; see also Intel Corp., 167 F. Supp. 2d at 700 (requiring a "nexus" between plaintiff's cause of action and defendant's conduct that is the basis for jurisdiction).

Taking as true all factual allegations in the amended complaint and granting all factual inferences in G & G's favor, the court concludes that specific jurisdiction exists over Millevere pursuant to 10 Del. C. § 3104(c)(1). See Cormick, 2007 WL 2022053, at *3. Specifically, Millevere's alleged insistence on and participation in the Merger confers this court with jurisdiction over it. See Crescent/Mach I Partners, L.P. v. Turner, 846 A.2d 963, 977-78 (Del. Ch. 2000) (finding personal jurisdiction under Section 3104(c)(1) because "the company was directly involved in the alleged wrongful conduct that resulted in the merger."); Kahn v. Lynch Communication Systems, Inc., No. Civ. A. 8748, 1989 WL 99800, at *4 (Del. Ch. Aug. 24, 1989) ("These facts and allegations are sufficient to establish that [defendant] directly, or through its subsidiary, transacted business in Delaware by negotiating and consummating the merger at issue.").

---

[20]The amended complaint contains counts for: (1) fraud; (2) constructive fraud; (3) fraudulent concealment; (4) conversion; (5) civil conspiracy; (6) Virginia statutory business conspiracy; and (7) negligence, among others. (D.I. 19) The negligence and fraud counts are brought against the Director/Officer defendants. (Id.) The constructive fraud, fraudulent concealment, conversion, civil conspiracy and Virginia statutory business conspiracy counts are brought against all defendants. (Id.)

Moreover, several of Millevere's other alleged Delaware contacts relate to the Merger, its concealment of it, and the resulting inability of G & G to perfect its security interests in its loan to LoveSac Utah with the same priority position it previously held. See NRG Barriers, Inc. v. Jelin, Civ. A. No. 15013, 1996 WL 377014, at *2 (Del. Ch. July 1, 1996). In particular, the stock purchase agreement, the filing of financial statements with the Delaware Secretary of State, and Millevere's stock ownership in LoveSac Delaware all combine with Millevere's alleged participation in the Merger to form the "mix of facts" that support this court's exercise of jurisdiction.[21] See id.

"Before a court may secure jurisdiction over a defendant, that defendant must have 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Id. at *4 (quoting International Shoe, 326 U.S. at 319) (alteration in original). "This district has held, however, that '[a] single act . . . in Delaware will suffice to confer personal jurisdiction over a nonresident defendant if such purposeful activity in Delaware is an integral component of the total transaction to which plaintiff's cause of action relates.'" Cormick, 2007 WL 2022053, at *5 (quoting Shamrock Holdings of California, Inc. v. Arenson, 421 F. Supp. 2d 800, 804 (D. Del. 2006)). Millevere's alleged contact with Delaware is directly related to the cause of action in the case at bar, if the court accepts as true (as it must) that the Merger and Millevere's participation in it was part of a conspiracy to defraud G & G. See id. The State of Delaware has a strong interest in

_____

[21]G & G's claims, in part, relate to the stock purchase agreement in that G & G's count VI charges all defendants with conversion for G & G's shares of LoveSac Utah. See NRG Barriers, 1996 WL 377014, at *2. Moreover, the stock purchase agreement is governed by Delaware law. (D.I. 37, ex. B at ¶ 7.3)

16

providing a forum for the resolution of disputes relating to the use of its corporate law.
See id. As G & G's allegations relate to the Merger of the LoveSac companies under
Delaware law, it is fair to characterize Millevere as having transacted business by
availing itself intentionally of a Delaware forum; therefore, the maintenance of this suit
will not offend traditional notions of fair play and substantial justice.[22] See id.; see also
Crescent/Mach I, 846 A.2d at 978. Because the court concludes that specific
jurisdiction exists over Millevere, it declines to address the parties' arguments with
respect to general jurisdiction.

### B. Director/Officer Defendants

#### 1. Consent to jurisdiction

G & G argues that Yarnell, Gould and Wright (collectively, the "Director
defendants") consented to jurisdiction in Delaware because each Director defendant is
a signatory to an Indemnification agreement between him and LoveSac Delaware.[23]

---

[22]Further, other alleged activities demonstrate that Millevere purposefully availed
itself of Delaware's laws such that Millevere could reasonably expect to be hailed into a
Delaware court to adjudicate its legal rights. See Cormick, 2007 WL 2022053, at *5;
NRG Barriers, 1996 WL 377014, at *4. Specifically, Millevere's signature on the stock
purchase agreement, which is governed by Delaware law, and Millevere's receipt of a
document, entitled "Significant Differences Between the Corporation Laws of Delaware
and Utah, suggest that Millevere intended to avail itself of Delaware's corporate law.
See NRG Barriers, 1996 WL 377014, at *4-5; (see also D.I. 37, ex. B at ¶ 7.3, ex. F).
Moreover, though defendants correctly state that ownership of stock in a Delaware
corporation **alone** is not enough to support personal jurisdiction, the court finds that G &
G has sufficiently alleged other Delaware contacts to support its exercise of jurisdiction.
See NRG Barriers, 1996 WL 377014, at *4.

[23] Similar to its argument regarding Millevere, G & G argues that Yarnell, Gould
and Wright consented to jurisdiction in Delaware because they are third-party
beneficiaries of the merger agreement and bound by the merger agreement's "forum
selection clause." (D.I. 36 at 13) For the reasons stated supra, this argument is without
merit.

(D.I. 36 at 13)  Paragraph 18 of the agreement contains the following clause:

> **Governing Law and Consent to Jurisdiction.**  This Agreement and the
> legal relations among the parties shall be governed by, and construed and
> enforced in accordance with, the laws of the State of Delaware, without
> regard to its conflict of laws rules.  The Company and Indemnitee hereby
> irrevocably and unconditionally (i) agree that any action or proceeding
> arising out of or in connection with this Agreement shall be brought only in
> the Chancery Court of the State of Delaware (the "Delaware Court"), and
> not in any other state or federal court in the United States of America or
> any court in any other country, (ii) consent to submit to the exclusive
> jurisdiction of the Delaware Court for purposes of any action or
> proceeding arising out of or in connection with this Agreement . . . .

(D.I. 37, ex. G)  "The well-settled rule is that the court should 'give effect to the terms of

private agreements to resolve disputes in a designated judicial forum out of respect for

the parties' contractual designation.'"  Troy Corp. v. Schoon, No. Civ. A. 1959, 2007 WL

949441, at *2 (Del. Ch. Mar. 26, 2007) (quoting Prestancia Mgmt. Group, Inc. v. Virginia

Heritage Found., II LLC, 2005 WL 1364616, at *7 (Del. Ch. May 27, 2005)).  Under the

plain language of the agreement, the Director defendants consented only to the

jurisdiction of the Chancery Court of the State of Delaware, not this court's jurisdiction.

Moreover, it is clear that the Indemnification agreement's forum-selection clause limits it

applicability to claims "arising out of or in connection" with that agreement.  G & G has

asserted no such claims and, therefore, the Director defendants have not consented to

jurisdiction in this court.

## 2. Conspiracy theory

G & G asserts that the Director/Officer defendants are subject to jurisdiction in

Delaware under the conspiracy theory of jurisdiction.  (D.I. 36 at 11)  The conspiracy

theory subjects a conspirator who is absent from the forum to the jurisdiction of the

court if five requirements are met.  See Amaysing Technologies Corp. v. Cyberair

18

Communications, Inc., No. Civ. A. 19890, 2005 WL 578972, at *6-7 (Del. Ch. Mar. 3,

2005)  Specifically, the plaintiff must make a factual showing that:

> (1) a conspiracy to defraud existed; (2) the defendant was a member of
> that conspiracy; (3) a substantial act or substantial effect in furtherance of
> the conspiracy occurred in the forum state; (4) the defendant knew or had
> reason to know of the act in the forum state or that acts outside the forum
> state would have an effect in the forum state; and (5) the act in, or effect
> on, the forum state was a direct and foreseeable result of the conduct in
> furtherance of the conspiracy.

See Istituto Bancario Italiano SpA v. Hunter Engineering Company, Inc., 449 A.2d 210,

225 (Del. 1982).  "The theory is rooted in policies that make conspirators liable for the

acts of their coconspirators in furtherance of a conspiracy."  Amaysing, 2005 WL

578972, at *7.  It is a "shorthand reference to an analytical framework where a

defendant's conduct that either occurred or had a substantial effect in Delaware is

attributed to a defendant who would not otherwise be amendable to jurisdiction in

Delaware," but is not an independent jurisdictional basis.  See Crescent/Mach I, 846

A.2d at 976.

"The specific factual allegations in a complaint that proposes to invoke the

'conspiracy theory' must be more than a 'facile way for [plaintiff] to circumvent the

minimum contacts requirement.'"  Id.  (quoting Computer People, Inc. v. Best

International Group, Inc., No. Civ. A. 16648, 1999 WL 288119, at *16 (Del. Ch. Apr. 27,

1999).  However, subjecting nonresident defendants to jurisdiction based on the

conspiracy theory comports with due process because, "when a defendant voluntarily

participates in a conspiracy with knowledge of its acts in or effects in the forum state, he

'can be said to have purposefully availed himself of the privilege of conducting activities

in the forum state, thereby fairly invoking the benefits and burdens of its laws.'"  See

19

Cormick, 2007 WL 2022053, at *6 (quoting Instituto Bancario, 449 A.2d at 225). This participation constitutes a substantial contact with the forum state, making it reasonable to require the defendant to defend the action there. See id.

In the case at bar, G & G alleges that the Director/Officer defendants were parties to a conspiracy that existed in the form of a plan to prevent G & G from perfecting its security interest in Delaware through the Merger. More specifically, G & G argues that each element of the five-part test is satisfied because: (1) counts IV and V allege the existence of a conspiracy to defraud G & G; (2) the moving defendants are among the conspirators named in these counts; (3) the Merger of LoveSac Utah and LoveSac Delaware was a substantial act in furtherance of the conspiracy; (4) counts VI and V allege that the Moving defendants knew of the Merger; and (5) G & G's failure to perfect its security interest in Delaware, with the resultant injury to G & G, was a direct and foreseeable result of the Merger. (D.I. 36 at 12) The court agrees that G & G's allegations meet the five-part test.[24]

The Director defendants became directors of LoveSac Delaware in exchange for their respective entities' contributions, which effectuated the Merger. Spokowski, Chief Financial Officer of LoveSac Delaware, played a role effectuating the Merger. The act of merger, itself, was a substantial act in furtherance of the plan and it occurred in Delaware. See Crescent/Mach I, 846 A.2d at 977. The Director/Officer defendants, having made arrangements for the equity financing, certainly knew that these

---

[24]The court also notes that, with respect to the first and second requirements, counts I, II, and III plead that the Director/Officer defendants engaged in a conspiracy to defraud G & G by misrepresenting LoveSac Utah as an existing entity after the Merger. (D.I. 19 at ¶¶ 93-121)

arrangements would have an effect on the Merger. See id. at 976-77. Further, the

Director/Officer defendants' participation directly affected the Merger in Delaware. See

id. In other words, G & G has sufficiently demonstrated a colorable claim that the

Director/Officer defendants acted in concert with the Merger players to agree to a

substantial act without which the Merger complained of would not have occurred.[25] See

id. at 977 ("In short, while [the acts of the Director/Officer defendants] would not subject

them to the jurisdiction of this [c]ourt, their actions are 'conduct that either occurred or

had a substantial effect in Delaware' and they are amenable to this [c]ourt's

jurisdiction."); see also In re Daimlerchrysler AG Securities Litigation, 197 F. Supp. 2d

86, 94-95 (D. Del. 2002) (finding allegations of a nonresident director defendant playing

an instrumental role in negotiating and structuring a merger consistent with due process

to permit exercising jurisdiction over the director). For the reasons stated above, the

court finds that it has jurisdiction over the Director/Officer defendants.[26]

## C. First-to-File Rule

_____

[25]A corporation cannot conspire with its own officers and directors. See Amaysing, 2005 WL 578972 at *7. In addition, the acts of an agent are generally the acts of the corporation. See id. Given these propositions, an unresolved issue, not briefed by the parties, remains as to whether, and to what extent, an officer or director can conspire with a corporation not his own.

[26]The moving defendants, relying on Computer People, argue that G & G failed to meet its burden of proof. In Computer People, the Delaware Court of Chancery stated: "[W]here a conspiracy is alleged and the defendants submit factual evidence controverting personal jurisdiction as to them, the plaintiff may not rely on conclusory allegations in his pleading that are unsupported by evidence." 1999 WL 288119, at *6. In the case at bar, G & G has asserted more than conclusory allegations and, therefore, Computer People is unavailing to the moving defendants. That said, where, as here, there has been no jurisdictional discovery, the court finds that further factual development is necessary to enable a conclusive determination on personal jurisdiction. See In re Daimlerchrysler, 197 F. Supp. 2d at 94, 96.

21

More than sixty years ago, the Third Circuit Court of Appeals adopted the "first-filed rule" where "in all cases of federal concurrent jurisdiction the court which first had possession of the subject must decide it." Crosley Corp. v. Hazeltine Corp., 122 F.2d 925, 929 (3d Cir. 1941) (quoting Smith v. McIver, 22 U.S. (9 Wheat.) 532 (1824)). Consequently, the second-filed action should be stayed or transferred to the court where the first-filed action is pending. See Peregrine Corp. v. Peregrine Indus. Inc., 769 F. Supp. 169, 171 (E.D. Pa. 1991); Dippold-Harmon Enters., Inc. v. Lowe's Cos., Inc., Civ. A. No. 01-532, 2001 WL 1414868, at *4 (D. Del. Nov. 13, 2001). The rule encourages sound judicial administration and promotes comity among federal courts of equal rank. E.E.O.C. v. University of Pennsylvania, 850 F.2d 969, 971 (3d Cir. 1988). The decision to transfer or stay the second action is within the discretion of the trial court. Id. at 972, 977.

The defendants moving for dismissal based on the first-to-file rule argue that dismissal is proper because this suit and the Ohio action share the same set of operative facts.[27]  (D.I. 29 at 2)  G & G disagrees with this characterization and points out that many of the defendants in the present case are not parties in the Ohio action. (D.I. 40 at 2)  Based on the parties' submissions, it is unclear to the court whether plaintiff can fully litigate all its claims against the parties in the Ohio action; therefore, the court is not prepared, at this juncture, to dismiss the case at bar in full.  For this reason, defendants' motion to dismiss (D.I. 28) is denied without prejudice and with leave to renew in the event this action and the Ohio litigation become duplicative.

_____

[27]In addition, they assert that G & G's claims in the present suit are compulsory counterclaims that G & G must bring in the Ohio action.  (D.I. 29 at 2)

22

## V. CONCLUSION

For the foregoing reasons, defendants' motions to dismiss (D.I. 26, 28) are denied without prejudice and with leave to renew.  An appropriate order shall issue.